## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    ex rel. CHRISTINE MARTINO-FLEMING,<br>                              Relator,<br>and | § § § § § | Civil Action No. 15-cv-13065 |
| STATE OF MASSACHUSETTS,<br>    ex rel. CHRISTINE MARTINO-FLEMING,<br>                              Relator, | § § § § | *JURY TRIAL DEMANDED*<br><br>**RELATOR'S SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL CORRECTED VERSION** |
| vs. | § § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |
| SOUTH BAY MENTAL HEALTH CENTER, INC.;   COMMUNITY   INTERVENTION SERVICES, INC.; H.I.G. GROWTH PARTNERS, LLC; H.I.G. CAPITAL, LLC.; PETER J. SCANLON; AND KEVIN P. SHEEHAN | § § § § § | **DO NOT ENTER INTO PACER** |
| Defendants. | § § | **DO NOT ENTER IN CM/ECF**<br><br>**DO NOT PLACE IN PRESS BOX** |

---

## I.    <u>INTRODUCTION</u>

1.    The allegations of this Complaint arise out of South Bay Mental Health Center, Inc.'s (hereinafter "South Bay") practices of billing mental health services of unlicensed, unqualified, and unsupervised employees. South Bay billed for these services through its 17 locations in clear violation of numerous express legal requirements of MassHealth, the Massachusetts Medicaid program, and requirements of persons who contracted with MassHealth to administer payment of mental health benefits for MassHealth beneficiaries: MBHP and various MCO's. South Bay had full knowledge of these violations, as did its purchasing entities, and facilitated them with false statements, billing MassHealth, MBHP, and the various MCO's

anyway, as though the services had been provided by qualified, licensed, and properly supervised mental health professionals in compliance with MassHealth regulations. The Relator learned of these false and fraudulent billing practices as part of her job duties at South Bay as Coordinator of Staff Development and Training from March 2012-September 2013 and also while working for Community Intervention Services (CIS), the parent company of South Bay, in 2013 to September 2014. She learned from co-workers that the fraudulent practices had been going on since at least 2009. The number of patients treated by these unqualified clinicians exceeds 30,000 per year. The patients were of all ages.

2.      Relator Christine Martino-Fleming brings this action on behalf of the United States and the Commonwealth of Massachusetts against Defendants South Bay; Community Intervention Services, Inc.; H.I.G. Growth Partners, LLC; H.I.G. Capital, LLC; Peter J. Scanlon, individually and in his capacity as President of South Bay and as a Board Member of South Bay and CIS; and Kevin P. Sheehan, individually and in his capacity as CEO and President of South Bay and CIS, and as Board Member of both these companies, (hereinafter collectively referred to as "Defendants"). The Plaintiffs seek treble damages and civil penalties arising from submission of claims for payment to the federal and state governments, or causing submission of false claims. The Defendants did so while fraudulently failing to disclose their violation of material, statutory, regulatory, or contractual requirements in violation of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and Massachusetts General Laws, Chapter 12, §§ 5A-50.

3.      The actions of the Defendants as described in greater detail herein, resulted in losses to both the federal government and the Commonwealth of Massachusetts in the amount of over $105 million.

## II.      JURISDICTION AND VENUE

4.     This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for Counts Four through Six arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that together they form part of the same case or controversy under Article III of the U.S. Constitution.

5.     At all times material to the time frames set forth in this Amended Complaint Defendants South Bay, CIS, HIG Growth, HIG Capital, Peter J. Scanlon, and Kevin P. Sheehan regularly conducted substantial business within the State of Massachusetts, maintained permanent employees and offices in Massachusetts, and made and are making significant revenue within Massachusetts. Defendants are thus subject to personal jurisdiction in Massachusetts.

6.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants conduct business throughout Massachusetts and have places of business in Massachusetts.

### III.     THE PARTIES

7.     Relator **Christine Martino-Fleming** is a citizen of the United States and a resident of the Commonwealth of Massachusetts. Ms. Martino-Fleming is a licensed mental health counselor. She was employed by South Bay from approximately June 2008 to September 2013, and by Defendant CIS from September 2013 to September 2014. Upon commencing her employment, she was a Job Coach who was tasked with assisting the staff therapists in completing their tasks efficiently, providing the correct documentation, and identifying how to track their billing so that South Bay's operations would be conducted with minimal interruption.

8.      In March 2012, she was promoted to the position of Coordinator of Staff Development and Training. Her responsibilities included clinical training for new clinicians and managerial leadership training for Supervisors, Directors, and Regional Directors. Her duties required her to examine the qualifications and education of new clinicians as well as the company Supervisors.

9.      In September 2013, because of the numerous complaints that the Relator made at South Bay related to its violations of MassHealth regulations, although her responsibilities and tasks remained the same, she was hired by Community Intervention Services (CIS), the parent company of South Bay. She remained in that role until her termination on September 4, 2014. The reason given for the termination was "position elimination."

10.     The Relator is an original source of the information underlying this Amended Complaint and that information has been provided to the United States and the Commonwealth of Massachusetts prior to the filing of this Amended Complaint.  She has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and to the State of Massachusetts, pursuant to Mass. Gen. Laws Ann. Chap 12 § 5C(3). To the Relator's knowledge, the information underlying the allegations and transactions in this Amended Complaint have not been publicly disclosed.

11.     **Defendant South Bay Mental Health Center, Inc. ("South Bay")** is a for profit corporation established under the laws of the Commonwealth of Massachusetts and does business here. South Bay has its corporate headquarters at 1115 West Chestnut Street, Brockton, Massachusetts. In April 2012, Defendants HIG Capital and HIG Growth purchased South Bay through CIS. Before the purchase, South Bay's Founder, President, Treasurer, and Director was

Peter J. Scanlon, PhD. In 2013, after the purchase of South Bay by HIG Capital and HIG

Growth, through CIS, the members on the Board of Directors for Defendant South Bay were:

Kevin P. Sheehan as President, Treasurer, and Director; Peter J. Scanlon, PhD as Secretary and

Chief Clinical Officer (CCO); Steven Loose as Director (who is also Managing Director of

Defendants HIG Growth and "Senior Member" of HIG Capital[1]), Nicholas Scola as Director

(who is also Principal of HIG Growth and HIG Capital[2]), and Eric Tencer as Director (who is

also a Principal of HIG Growth and HIG Capital[3]).

12.     As of 2014, Defendant South Bay had 17[4] mental health clinics in different

locations from which it provided mental health services to its clients. Defendant South Bay

offers clinical services both to children and adults. It employs a staff of over 500 counselors,

social workers, specialty therapists and developmental educators providing treatment services to

over 30,000 patients per year. South Bay is a Mental Health Center, as the term is defined in 130

CMR 429.402. South Bay Mental Health Centers are located at the following addresses:

      a.  Attleboro Clinic, 607 Pleasant Street, Suite 115, Attleboro, MA

      b.  Brockton Clinic, 1115 West Chestnut Street, Brockton, MA (headquarters)

      c.  Cape Cod Clinic, 470 Main Street, Mashpee, MA

      d.  Chelsea Outreach Program Center, 70 Everett Avenue, Suite 515, Chelsea, MA

      e.  Dorchester Clinic, 415 Neponset Avenue, 3rd Floor, Dorchester, MA

      f.  Fall River Clinic, 1563 North Main St., Suite 202, Fall River, MA

      g.  Lawrence Clinic, 360 Merrimack Street, Building 9, Door-H Lawrence, MA

---

[1] According to HIG Capital's own website.
[2] According to his LinkedIn page.
[3] According to his LinkedIn page and HIG Capital's website.
[4] According to its website, South Bay now operates 31 facilities offering Day Services; Early Childhood Services; Children's Behavioral Health Initiative Services; Mental Health and Substance Abuse Services; and Counseling Services.

h.  Leominster Clinic, 80 Erdman Way, Suite 208, Leominster, MA

i.  Lowell Clinic, 22 Old Canal Drive, Lowell, MA

j.  Lynn Clinic, 181 Union Street, Suite J, Lynn, MA

k.  Malden Clinic, 22 Pleasant Street, Malden, MA 02148

l.  Pittsfield Outreach Program Center, 100 North Street, Pittsfield, MA 01201

m.  Plymouth Clinic, 50 Aldrin Road, Plymouth, MA

n.  Salem Clinic, 35 Congress Street, Suite 214, Salem, MA

o.  Springfield Clinic, 140 High Street, Suite 230, Springfield, MA

p.  Weymouth Clinic, 541 Main Street, Suite 303, Weymouth, MA

q.  Worcester Clinic, 340 Main Street, Suite 818, Worcester, MA

13.  **Defendant Community Intervention Services, Inc.** ("CIS") is a corporation formed under the laws of the state of Delaware and registered in Massachusetts, and at all relevant times hereto was and is an affiliate of Defendant H.I.G. Capital LLC ("HIG Capital"). It is and has been, at all relevant times, doing business in Massachusetts. In April 2012, HIG Growth and HIG Capital, through CIS, purchased South Bay. From 2012 to the present, the members of the Board of Directors of CIS were: Kevin P. Sheehan as CEO and Director; Peter J. Scanlon, PhD as CCO (2012-2013); Nicholas Scola (Principal of HIG Growth and HIG Capital[5], and Director on the Board of South Bay) as Clerk and Director; Steven Loose (Managing Director of HIG Growth, "Senior Member of HIG Capital"[6], and Director on the Board of South Bay) as Director; and Eric Tencer (Principal of HIG Growth and HIG Capital[7], and Director on the Board of South Bay) as Director.

---

[5] According to his LinkedIn page.
[6] According to HIG Capital's own website.
[7] According to his LinkedIn page and HIG Capital's website.

14. **Defendant HIG Capital, LLC** ("HIG Capital") is a Delaware limited liability company. HIG Capital describes itself as a leading global private equity investment firm with $21 billion of equity capital under management. HIG Capital has offices in Boston, Miami, New York, Chicago, Dallas, Los Angeles, Atlanta and elsewhere.

15. Since 2012 to 2017, HIG Capital's website lists Mr. Scola, Mr. Loose, and Mr. Tencer as "Senior Members of H.I.G. Team." Also on its web site, HIG Capital lists Eric Tencer as a Principal in the Boston Office. Shortly after the purchase of South Bay in April 2012, Messrs. Scola, Loose, and Tencer were placed on the Board of Directors of South Bay, as well as the Board of Directors of CIS, to protect the interests of HIG Capital and HIG Growth, CIS, and South Bay. As of February 29, 2012, the only members of the CIS Board were Nicholas Scola, Steven Loose, Eric Tencer, Kevin Sheehan (CEO), and Peter J. Scanlon, Ph.D. (CCO). From April 2012 on, the Board Members of CIS were heavily involved in the operational decisions of South Bay, including approving contracts, strategic planning, budgeting, and earnings issues.

16. Board meetings of CIS and South Bay were held at which these Board members discussed a number of issues relating to South Bay, including the fact that South Bay was allowing unlicensed mental health clinicians to diagnose and treat patients without Supervision of licensed supervisors as required by Massachusetts regulations. In fact, in early 2014 as noted below, a special group of teams called the "Tiger Teams" were formed and tasked with investigating the cause of the rising employee turnover. The Tiger Teams gathered evidence and prepared a report which concluded that a key cause of the turnover was a lack of licensed Supervisors to oversee the mental health therapists. The Tiger Teams recommended that South Bay hire a substantial number of qualified Supervisors with LICSW licenses to oversee the clinicians. The Board members of CIS, including Messrs. Scola, Loose, and Tencer and

Defendant Kevin Sheehan, rejected these recommendations at the Board meetings. The fraud was allowed to continue.

17.     **Defendant HIG Growth Partners, LLC** ("HIG Growth") is a limited liability Corporation formed under the laws of the State of Delaware with offices in Boston, Miami, Atlanta, Chicago, Dallas, Los Angeles, New York, and elsewhere. It describes itself as a capital investment affiliate of HIG Capital, a private equity investment firm with over $8.5 billion of capital under management. It is a global private equity investment firm. At all relevant times, Defendant HIG Growth did business in Massachusetts.

18.     At relevant times, Steven Loose was and is a Managing Director of HIG Growth, was and is a "Senior Member" of HIG Capital[8], and was and is on the Board of CIS and the Board of South Bay.

19.     At relevant times, Nicholas Scola was and is a Principal of HIG Growth and HIG Capital[9], a Board Member of CIS, and a Board Member of South Bay. On behalf of HIG Growth and HIG Capital, he focuses on healthcare investments and has been responsible for sourcing, executing and monitoring transactions. Starting on or about early 2011, on behalf of HIG Growth and HIG Capital, Mr. Scola helped source, evaluate, structure and perfect HIG Growth's acquisition of South Bay Mental Health Inc., through CIS, culminating on or about April 17, 2012. To accomplish this, HIG Growth and HIG Capital set up a newly formed portfolio company, Community Intervention Service Inc. (CIS), an affiliate of HIG Capital, for which Mr. Scola also became a Board Member, and remained a Board Member to the present date.

---

[8] According to HIG Capital's website.
[9] According to his LinkedIn page.

20.     Also, at relevant times, Eric Tencer, was and is a Principal of HIG Growth and HIG Capital[10], on the Board of CIS, and on the Board of South Bay.

21.     The Relator recalls that shortly after HIG Growth acquired South Bay in April 2012, Defendant Kevin Sheehan introduced her to Nicholas Scola at the South Bay Brockton office. Defendant Sheehan later explained to the Relator that Mr. Scola was one of the investors with HIG Growth, the company that purchased South Bay and which was providing the revenue for expansion of South Bay and CIS.

22.     On May 24, 2013, Kevin P. Sheehan, then CEO of CIS, re-introduced the Relator to Nicholas Scola by e-mail, explaining that Mr. Scola wanted to discuss employee turnover rates at South Bay. The Relator specifically told Mr. Scola during an ensuing call that the high rate of employee turnover at South Bay was mainly due to the lack of qualifications and lack of required licensure of the Supervisors, which meant that there was no proper supervision of the staff therapists. At Defendant Kevin Sheehan's request, the Relator sent Mr. Scola South Bay's master employee list in May of 2013. Then, in October of 2013, she sent Mr. Scola two additional reports detailing the employee retention issues. *See* emails between the Relator and Mr. Scola, and reports, Exhibit 3.

23.     On or about December of 2013, Jeffrey Quade (CIS Director of HR), Edward Neuhaus (Chief Clinical Officer of CIS), and Defendant Kevin Sheehan (CEO of CIS), asked the Relator to travel to Texas as they were making a presentation to the CIS Board, to be held in Texas, concerning South Bay's high employee turnover rate. They needed the Relator's help to prepare the presentation and to create a coherent narrative with specific details about the turnover numbers in order to get CIS Board's approval to create and run "Tiger Teams[11]." The goal of

---

[10] According to his LinkedIn page and HIG Capital's website.
[11] A Tiger Team is a team of specialists in a particular field brought together to work on specific tasks.

these Tiger Teams was to pinpoint the causes of the turnover at South Bay. The Relator traveled to Texas in February of 2014. Once there, she worked with Mr. Quade, Dr. Neuhaus, and Defendant Sheehan to prepare the information they needed. For further facts about HIG Growth's and HIG Capital's involvement and fraudulent wrongdoing, see paragraphs 112-20 and 140-41 herein. Ultimately, the Tiger Teams concluded that the lack of qualified supervisors and unsupervised staff therapists was the main reason for the high turnover rate and it was recommended that a substantial number of qualified Supervisors be hired in accordance with the legal requirements of MassHealth and its administrative companies. Despite this, the CIS Board denied this request.

24.     **Defendant Peter J. Scanlon, PhD,** individually and in his capacity as President and Board Member of South Bay and also as Board Member of CIS, resides in the Commonwealth of Massachusetts. Defendant Scanlon founded South Bay Mental Health Center, Inc. ("South Bay") in 1986 and was the President and CEO of the company until April 2012, when South Bay was purchased by HIG through CIS. *See* South Bay company documents, Exhibit 12. On February 29, 2012, Defendant Scanlon became the Chief Clinical Officer of Community Intervention Services (CIS) and was also a member of the Board of Directors of CIS where he served through 2012. The only other members of the Board of Directors from February 2012 were Defendant Kevin Sheehan (CEO), Nicholas Scola, Steven Loose, and Eric Tencer. Defendant Scanlon remained on the South Bay Board of Directors through 2013.

25.     **Defendant Kevin P. Sheehan,** individually and in his capacity as President of South Bay and CIS, and as Board Member of both these companies, resides in Austin, Texas. From 2011-2016, he served as the Chief Executive Officer of Community Intervention Services (CIS). *See* CIS company documents, Exhibit 13. From 2016 to the present, Defendant Sheehan

has served as the Chairman of the Board of CIS. In his bio, Defendant Sheehan states that CIS was formed by partnering with private equity firm H.I.G. to build a multi-state community based healthcare service provider organization. He states the company has annual revenues of $120 million with 2,300 employees and operations in seven (7) states.

26.     From 1997-2011 Defendant Sheehan served as Chairman, President, and CEO of Youth & Family Centered Services (YFCS), a national healthcare services company operating in nine (9) states and consisting of 2,400 employees providing behavioral, educational, and medical services to a population of 4,400 patients.

27.     On April 19, 2012 the Defendant H.I.G. Growth Partners issued a press release which stated: "H.I.G. Growth Partners, the dedicated growth capital affiliate of H.I.G. Capital, a leading global private equity investment firm, is pleased to announce that its newly-formed portfolio company, Community Intervention Services, Inc., has completed the acquisition of South Bay Mental Health Center, Inc. CIS was established by H.I.G. in partnership with veteran behavioral healthcare executive Kevin Sheehan, to acquire, develop and operate a national network of specialized mental health and substance abuse facilities and community-based programs. South Bay marks the first acquisition and provides the Company with a strong platform for continued growth...."

## IV.   STATUTORY AND REGULATORY BACKGROUND

### A. The False Claims Act

28.     The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]...

> (G) knowingly makes, uses, or causes to be made or used,
> a false record     or statement material to an obligation
> to pay or transmit money or property to the
> Government, or knowingly conceals or knowingly and
> improperly avoids or decreases an obligation to pay or
> transmit money or property to the Government, is
> liable to the United States Government for a civil
> penalty of not less than $5,000 and not more than
> $10,000, . . . plus 3 times the amount of damages
> which the Government sustains because of the act of
> that person.

31 U.S.C. § 3729(a) (2006), as amended by 31 U.S.C. § 3729(a)(1) (West 2010).[12]

    29.    For purposes of the False Claims Act,

        (1) the terms "knowing" and "knowingly"

        (A)    mean that a person, with respect to information – (1) has
actual knowledge of the information; (2) acts in deliberate
ignorance of the truth or falsity of the information; or (3)
acts in reckless disregard of the truth or falsity of the
information; and

        (B)    require no proof of specific intent to defraud.

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b) (West 2010).

### B. Reverse False Claims Act

    30.    Section 6402 of the Patient Protection and Affordable Care Act of 2010 was

amended by the Social Security Act by adding a new provision that addresses what constitutes an

overpayment under the FCA in the context of a federal health program. Under this section, an

overpayment is defined as any funds that a person receives or retains under Title XVIII or XIX

to which the person, after applicable reconciliation is not entitled." *See* 42 U.S.C. § 1320a-

---

[12] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the

Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47,099, 47,103 (1999), the
False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September
29, 1999.

7k(d)(4)(B). In addition, the provision states that overpayment must be reported and returned within 60 days after the date on which the overpayment was identified. Id. at § 1320a-7k(d)(2).

31.     Failure to return any overpayment such as each of the claims on which South Bay received an overpayment from Medicaid, constitutes a reverse false claim actionable under section 3729(a)(1)(G).

## C. The Massachusetts False Claims Act

32.     The Massachusetts Gen. Laws Chapter 12 § 5B provides liability for any person who:

> Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;
>
> Conspires to defraud The Commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;
>
> Is a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of:
>
> (i)     the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or
>
> (ii)    the date any corresponding cost report is due, if applicable,

These shall be liable to The Commonwealth or political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per violation[13], plus 3 times the amount of damages, including consequential damages, that The Commonwealth or a political subdivision thereof sustains because of such violation. A person violating sections 5B to 50, inclusive, shall also be

---

[13] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410 section 5, 104 Stat. 891, note following 28 U.S.C. section 2461.

liable to The Commonwealth or a political subdivision thereof for the expenses of the civil action brought to recover any such penalty or damages including, without limitation, reasonable attorneys' fees, reasonable expert fees and the costs of investigation. *See* M.G.L. Chapter 12, Section 5B.

33.     For purposes of the Massachusetts False Claims Act, the terms "knowing" and "knowingly" mean "possessing actual knowledge of relevant information, acting with deliberate ignorance of the truth or falsity of the information or acting in reckless disregard of the truth or falsity of the information; provided, however, that no proof of specific intent to defraud shall be required." *See* M.G.L. Chapter 12, Section 5A.

**D. The Medicaid Program**

34.     South Bay participates in the state Medicaid program known as MassHealth and bills and has billed MassHealth for services rendered to individuals insured by the program.

**D.1. MassHealth and Payment Systems for MassHealth Beneficiaries**

35.     The Medicaid Program is a means-tested government entitlement program, jointly financed by the federal and state governments, that provides health care to low-income individuals. Under Massachusetts General Laws Chapter 118E, the Executive Office of Health and Human Services administers the state's Medicaid program, known as MassHealth. For most MassHealth beneficiaries, MassHealth provides primary health insurance coverage. Some MassHealth beneficiaries, however, qualify for health insurance benefits under another health insurance plan, such as Medicare or a private insurance plan. For these beneficiaries, MassHealth is secondary insurance, providing coverage for services not covered under their primary plan, or for those who qualify, providing co-payor deductible payments that would otherwise be due under the beneficiaries' primary health plan coverage.

36.     Under MassHealth regulations, all beneficiaries who receive primary health insurance coverage from MassHealth must enroll in some type of managed care program, either in the Managed Care Organization ("MCO") Plan or MassHealth's Primary Care Clinician ("PCC") Plan. Both the MCO Plan and the PCC Plan provide mental health benefits to MassHealth beneficiaries.

37.     MassHealth beneficiaries enrolled in the MCO Plan must enroll in one of the MCOs approved by MassHealth. The MCO chosen by the MassHealth beneficiary is responsible for delivering and paying for the members' health care services. Once the beneficiary selects an MCO, the beneficiary must receive all healthcare from the providers within that MCO's network. Each MCO has contracts with the medical and behavioral health services providers within its network, and all claims for the services provided to the MCO's MassHealth beneficiaries are presented to, and paid by, the MCOs. The MCOs pay these claims with funds provided by MassHealth, pursuant to each MCO's contract with MassHealth. MassHealth, in turn, receives its funding from Medicaid program funds it receives from the United States and the Commonwealth of Massachusetts. Through MCO Plans, MassHealth pays for medical and behavioral health services on a capitated basis (a fixed monthly fee per beneficiary), and the MCOs ensure payment for beneficiaries' services.

38.     The PCC Plan administers non-behavioral health care on a fee-for-service basis. For behavioral healthcare services, however, the PCC Plan contracted with an MCO that specializes in the administration of mental health services, MBHP.

39.     Some MassHealth beneficiaries are not required to join a managed health program. *See* 130 CMR 508.002. These beneficiaries are frequently referred to as "fee-for-service" ("FFS") beneficiaries, and have their services paid for directly by the MassHealth on a

FFS basis. FFS beneficiaries include new MassHealth members who have not yet enrolled in a managed care plan, members who have Medicare (which covers 80% of health care costs), members with other primary health insurance coverage (e.g., employer-sponsored insurance), members who live in an institution, members who receive hospice care, and undocumented non-citizens, who are provided emergency medical services only. *Id.*

### D.2. Payment of Behavioral Health Services of MassHealth Beneficiaries Through Massachusetts Behavioral Health Partnership ("MBHP")

40.   Since 1992, the Commonwealth has operated MassHealth under a section 1115 Demonstration waiver. Section 1115 of the Social Security Act gives the Secretary of Health and Human Services authority to approve experimental, pilot, or demonstration projects that promote the objectives of the Medicaid program. The 1992 waiver authorized a behavioral health care carve-out program for MassHealth recipients.

41.   Under this arrangement, which has been in effect for more than twenty years, behavioral health care services for MassHealth members are administered by an MCO. For MassHealth beneficiaries enrolled in the PPC Plan, mental health care claims are paid for and administered by a private contractor who enters into a written agreement with MassHealth. Since 1996, MBHP, a subsidiary of ValueOptions Inc. has served as the behavioral health vendor for MassHealth's PPC members.[14] ValueOptions Inc. merged with Beacon Health Holdings in December 2014. Both entities are independently operated subsidiaries of Beacon Health Options ("Beacon").

---

[14] Most recently, in July 2017, the Executive Office of Health and Human Services and MBHP signed a new five-year contract to provide behavioral health service to MassHealth PCC members.

42.    MassHealth pays MBHP for each PCC member on a capitated basis from Medicaid program funds which MassHealth receives from the United States and the Commonwealth of Massachusetts.

43.    For MassHealth members enrolled in the MCO Plan, MassHealth has entered into a written contract with six MCOs for the provision of medical and mental health care services: Boston Medical Center HealthNet Plan, Neighborhood Health Plan, Tufts- Network Health, Fallon Community Health Plan, Health New England, and CeltiCare.[15]

44.    In practice, the vast majority of MassHealth beneficiaries who receive primary coverage from MassHealth have their behavioral health services paid for by MBHP or its affiliate, Beacon. Just as MassHealth has contracted with MBHP to provide and administer mental health care services for PCC Plan members, most of the MCOs have contracted with MBHP's affiliate, Beacon, on a capitated basis to provide behavioral health care services to MCO Plan members.

### D.3. MassHealth Regulations for Provision of Behavioral Health Services

45.    According to The Centers for Medicare & Medicaid Services ("CMS"), the federal agency that partners with the state governments to administer Medicaid to eligible beneficiaries, Medicaid strives to improve the quality of healthcare services delivered to program beneficiaries in a manner which prevents or minimizes harm to patients. CMS recognizes that communication and coordination between properly qualified healthcare providers is paramount to ensuring that quality health care is delivered safely to Medicaid beneficiaries.

---

[15] In addition to these six MCOs, during the relevant time period South Bay contracted and submitted behavioral health claims to five other MCOs (along with their affiliates) serving MassHealth members: Commonwealth Care Alliance, CCA One Care, Senior Whole Health, Tufts Health Plan, and Evercare (United Health Care). These plans serve discrete groups of beneficiaries, such as persons with disabilities, seniors, and individuals eligible for expanded Medicaid coverage under the Affordable Care Act.

46.     In accordance with this directive from CMS, the Massachusetts Medicaid program, MassHealth, promulgates regulations that govern a healthcare provider's interactions with the program. *See* generally, 130 CMR §401.401-130 CMR §650.035. *See* also 42 U.S.C. §§1396 - 1396v. The MassHealth regulations that apply to mental health centers are set forth in Chapter 429.000 of MassHealth's provider regulations. The regulations set forth in Chapter 429.000 establish "requirements for participation of mental health centers," *see*, § 429.401, regardless of whether such mental health services are paid directly by MassHealth or paid through a contractor, such as MBHP or one of the MCOs. Accordingly, these requirements apply equally to claims presented to MassHealth, MBHP or an MCO.

47.     To be eligible to submit bills to MassHealth, 130 CMR 429.401 provides that "[a]ll Mental Health Centers participating in MassHealth must comply with the MassHealth regulations, including but not limited to MassHealth regulations set forth in 130 CMR 429.000 and 450.000."

48.     It is axiomatic that a mental health center's ability to deliver safe, quality health care to patients depends upon the facility's mental health care professionals obtaining the proper qualifications for their particular profession and providing supervision to other health care providers who administer services to patients. Requiring practitioners who provide mental health services to MassHealth beneficiaries to have minimum qualification and supervision requirements is critical to ensuring that MassHealth members receive services of the requisite quality. Unless practitioners meet the minimum training, experience and supervision requirements, MassHealth does not receive the benefit of its bargain - it cannot be certain that its members are being treated by individuals with the requisite qualifications to provide services that

will actually assist its beneficiaries. MassHealth has a vital state interest in ensuring that its members are not treated by incompetent persons, and that government funds are not wasted.

49.    Pertinent to this case, 130 CMR 429.422 through 429.424 sets forth the requirements that must be met by each mental health center certified by MassHealth and billing for services to MassHealth members with regard to who may administer, operate, and provide the mental health services billed to MassHealth.

50.    The regulations provide specific requirements for the qualifications of the staff and the qualifications of permissible supervisors, which are set forth below. The supervisory qualifications requirements are two-fold: (1) there is a managerial staff composition requirement for each facility, and (2) each individual who does not have an independent license in one of the "core disciples" must be supervised by an independently licensed and/or board-certified core professional as set forth in the regulations. Each of these components is described more fully below.

### D.4. MassHealth Mental Health Center Regulations

51.    A mental health center is defined in 130 C.M.R. § 429.402 as "an entity that delivers a comprehensive group of diagnostic and psychotherapeutic treatment services to mentally or emotionally disturbed persons and their families by an interdisciplinary team under the medical direction of a psychiatrist."

52.    There are several types of mental health centers defined in 130 C.M.R. § 429.402, including two of which are relevant to this action, parent centers and satellite facilities.

53.    A parent center is the central location of the mental health center, at which most of the administrative, organizational, and clinical services are performed. *See* 130 C.M.R. § 429.402.

54.     A satellite facility is a mental health center program at a different location from the parent center that operates under the license of and falls under the fiscal, administrative, and personnel management of the parent center; and which is open to patients more than 20 hours a week and offers more than 40 person hours a week of services to patients. *Id.*

55.     Satellite facilities are further separated into "autonomous satellite programs" and "dependent satellite programs." *Id.* An autonomous satellite program is a mental health center program operated by a satellite facility with sufficient staff and services to substantially assume its own clinical management independent of the parent center. *Id.* A dependent satellite program is a mental health center program in a satellite facility that is under the direct clinical management of the parent center. *Id.* Services provided by a satellite program are reimbursable only if the program meets MassHealth's standards. 130 CMR 429.439. One of such standards, is a supervision requirement.

56.     According to MassHealth regulations, "in an autonomous satellite program, the supervisor must meet the qualifications required of a core staff member in his or her discipline, as set forth in 130 CMR 429.424." *See* 130 CMR 429.439(C)(2). MassHealth regulations define a *Core Team* as "a group of three or more mental-health professionals that must include a psychiatrist and one each of at least two of the following professionals: a licensed psychologist, independently licensed clinical social worker, psychiatric clinical nurse specialist, or psychiatric nurse." *Id.* 429.402. Further, MassHealth regulations define a core discipline as "one of the following disciplines: psychiatry, social work, psychology, or psychiatric nursing (including a psychiatric clinical nurse specialist), most or all of which are represented by the professionals qualified in these disciplines who comprise a mental health center's core team." *Id.*

57.     According to MassHealth regulations, "in a dependent satellite program, the supervisor must meet the basic qualifications required for his or her discipline, as set forth in 130 CMR 429.424, and receive regular supervision and consultation from qualified core staff at the parent center." *See* 130 CMR 429.439(C)(3).

58.     Each mental health center must "have a balanced interdisciplinary staffing plan that includes three or more core professional staff members who meet the qualifications outlined in 130 CMR 429.424 for their respective professions. Of these, one must be a psychiatrist, and two must be from separate non-physician core disciplines, including psychology, social work, or psychiatric nursing." Id. § 429.422(A).

59.     Further, each parent center and each autonomous satellite program "must employ the equivalent of at least three full-time professional staff members, two of whom must be core team members who meet qualifications outlined in 130 CMR 429.423 for their respective disciplines" and must meet the managerial staff composition requirements contained in 130 C.M.R. §§ 429.422-23. Id. § 429.422(C).

60.     "Dependent satellite programs must employ at least two full-time equivalent professional staff members from separate nonphysician core disciplines. The Director of Clinical Services at the parent center must ensure that supervision requirements of 130 CMR 429.438(E) are performed. If the satellite program's staff do not meet the qualifications for core disciplines as outlined in 130 CMR 429.424, they must receive supervision from qualified core staff professionals of the same discipline at the parent center." *Id.* § 429.422(D).

61.     Mental health centers must designate one person as the administrator responsible for the overall operation and management of the center and for ensuring compliance with MassHealth regulations. Id. § 429.423(A). The administrator must have previous training or

experience in personnel, fiscal, and data management, and may also serve as the clinical director. *Id.* § 429.423(A)(1).

62.     Each mental health center must also designate a professional staff member to be the clinical director. Id. § 429.423(B). The clinical director must be licensed, certified, or registered to practice as a board-certified psychiatrist, a licensed psychologist, a licensed independent clinical social worker (LICSW), or a registered psychiatric nurse, and must have had at least five years of full-time supervised clinical experience subsequent to obtaining a master's degree, two years of which must have been in an administrative capacity. Id. § 429.423(B)(1). The clinical director must be employed on a full-time basis. *Id.*

63.     Each mental health center must also designate a physician psychiatrist who meets the qualifications outlined in 130 C.M.R. § 429.424(A) as the medical director. The medical director must work at the center at least eight hours per week. Id. § 429.423(C). The roles and duties of administrator, clinical director, and medical director "may be assumed, all or in part, by a psychiatrist on the center's staff, provided that provision of services to members and performance of all relevant duties in 130 CMR 429.000 are carried out to meet professionally recognized standards of health care, as required by 130 CMR 450.000." Id. § 429.423(D).

64.     Summarized, each parent center or autonomous satellite must employ at least one qualified psychiatrist to oversee the staff as the medical director. The psychiatrist may also assume the role of clinical director so long as he/she can perform his/her dual role to the professional standards of health care required by MassHealth and its regulations. If the psychiatrist serves only as the medical director, then the center must also employ a clinical director who is either a board-certified psychiatrist, licensed psychologist, licensed independent social worker, or registered psychiatric nurse.

65.     The remainder of the staff must also be credentialed and qualified before they can

supervise others, or diagnose, treat, and bill for mental health services rendered to MassHealth

members. These requirements are set forth in 130 C.M.R. § 429.424.

66.     The Massachusetts Department of Health (DPH), is the agency responsible for the

clinical licensure regulation of mental health centers. It promulgates similar staffing and

personnel qualifications regulations at 105 C.M.R. Section 140.000 et seq.  These regulations

emphasize the importance of appropriate staff licensure and supervision. For example, 105

C.M.R. Sec. 140.530(E) provides that unlicensed staff members must be clinically supervised on

a regular basis by professional staff members defined in 105 C.M.R. Sec. 140.530(C).

67.     During the relevant time period, 130 C.M.R. § 429.424 was titled "Qualifications

of Staff by Core Discipline." On January 1, 2014, MassHealth changed the title of this section to

"Qualifications *of Professional Staff Authorized to Render Billable Mental Health Services* by

Core Discipline." Id. § 429.424 (emphasis added). (The provision was otherwise unchanged,

except for the addition of a subsection covering psychiatric clinical nurse specialists. *See* id. §

429.424(E).)

68.     To bill to MassHealth, the professionals diagnosing and treating MassHealth

members must either be independently licensed in a core discipline (psychiatrist, psychologist,

social worker, psychiatric nurse/psychiatric clinical nurse specialist), or otherwise qualify as a

professional staff member (counselor, occupational therapist) who is directly and continuously

supervised by a core team member. *See* id. § 429.424.

69.     Each of these respective professions has specific criteria regarding the

professional staff members' credentials that must be met so that they may provide services to

MassHealth members. *See id.* § 429.424(A)-(G). In sum, these requirements were as follows

during the relevant time period 2009-2015:

> (A) Psychiatrists: A psychiatrist must be certified by the American Board of Psychiatry and Neurology, or be eligible and applying for such certification. At least one staff psychiatrist must meet these qualifications at the mental health center. Id. § 429.424(A)(l). **Psychiatric resident physicians who are not certified by the American Board of Psychiatry and Neurology must be,** at minimum, licensed physicians in their second year of a psychiatric residency program accredited by the Council on Medical Education of the American Medical Association, and must be **under the direct supervision of a fully qualified psychiatrist to diagnose, treat, and bill for mental health services provided to MassHealth members.** Id. § 429.424(A)(2).

> (B) Psychologists: At least one psychologist must be licensed by the Massachusetts Board of Registration of Psychologists with a specialization listed in clinical or counseling psychology or a closely related specialty. Id. § 429.424(B)(l). **Psychological associates not licensed by the Massachusetts Board of Registration of Psychologists must** hold a minimum of a master's degree or the equivalent graduate study in clinical or counseling psychology or a closely related specialty from an accredited educational institution; be currently enrolled in or have completed a doctoral program in clinical or counseling psychology or a closely related specialty; have had two years of full-time supervised clinical experience subsequent to obtaining a master's degree in a multidisciplinary mental health setting; **and be under the direct and continuing supervision of a psychologist who meets the requirements of 130 C.M.R. § 429.424(B)(l) to diagnose, treat, and bill for mental health services provided to MassHealth members. Id. § 429.424(B)(2).**

> (C) Social Workers: At least one staff social worker must have a master's degree in social work from an accredited educational institution with at least two years of full-time supervised clinical experience subsequent to obtaining a master's degree, and must also be licensed or have applied for and have a license pending as an independent clinical social worker by the Massachusetts Board of Registration of Social Workers. Id. § 429.424(C)(l). **Any additional social workers who are not a Licensed Independent Social Worker (LICSW) must provide services under the direct and continuous supervision of an independent clinical social worker.** These social workers must be licensed or applying for licensure as certified social workers by the Massachusetts Board of Registration of Social Workers and have received a master's degree in social work and completed two years of full-time supervised clinical work in an organized graduate internship program. Id. § 429.424(C)(2).

> (D) Psychiatric Nurses: Psychiatric Nurses must be currently registered with the Massachusetts Board of Registration in Nursing with a master's degree in nursing

from an accredited National League of Nursing graduate school with two years of full-time supervised clinical experience in a multidisciplinary mental health setting eligible for certification as a clinical specialist in psychiatric/mental health nursing by the American Nursing Association. At least one staff psychiatric nurse must meet these qualifications at the mental health center. Id. § 429.424(D)(l). Any other nurses must be registered by the Massachusetts Board of Registration in Nursing and must have a bachelor's degree from an educational institution accredited by the National League of Nursing and two years of fulltime supervised skilled experience in a multidisciplinary mental health setting subsequent to that degree, or a master's degree in psychiatric nursing. Id. § 429.424(D)(2).

(E) Psychiatric clinical nurse specialists must be licensed registered nurses who are authorized by the Board of Registration in Nursing as practicing in an expanded role and who meet the requirements of 244 C.M.R. § 4.05(4): *Psychiatric Clinical Nurse Specialist.*

(F) **All counselors and unlicensed staff included in the center must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines described in 130 CMR 429.424(A) through (D)**[16]. i.e. board-certified psychiatrist, licensed psychologist, LICSW, or registered psychiatric nurse. *Id.* § 429.424(F)(1). All counselors must hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and must have had two years of full-time supervised clinical experience in a multidisciplinary mental-health setting subsequent to obtaining the master's degree. (One year of supervised clinical work in an organized graduate internship program may be substituted for each year of full-time experience.) Id. § 429.424(F).

(G) Occupational therapists must be registered by the American Occupational Therapy Association and must have a master's degree in occupational therapy from an accredited program in occupational therapy or a bachelor's degree in occupational therapy from an accredited program in occupational therapy and a master's degree in a related field such as psychology, social work, or counseling, and must have at least two years of full-time supervised clinical experience subsequent to obtaining a master's degree. Id. § 429.424(G).

---

[16] In November 2015, 130 CMR 429424(F) was changed to state: "All unlicensed counselors included in the center must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines described in 130 CMR 429.424(A) through (D). *See* Transmittal Letter MHC-48. This means that starting in November of 2015, licensed mental health counselors (LMHCs) could treat patients on their own without the direct and continuous supervision of a professional staff member trained in one of the core disciplines described in 130 CMR 429.424(A) through (D). However, even after this regulation took effect, licensed mental health counselors (LMHCs) could **not** supervise other clinicians because counseling is not one of the four "core disciples" listed in 429.424(A) through (D).

70.    Critically, in order to bill MassHealth for treating and diagnosing patients, an individual must be licensed in a core discipline by the appropriate Board or eligible to apply for licensure with the appropriate Board, **or** he or she must be directly and continuously supervised by one who is. The difference between the supervision requirements at dependent satellite programs versus autonomous satellite programs is that the direct and continuous supervision in an autonomous program must take place within that autonomous center, whereas the supervision in a dependent satellite program may come from the parent center. 130 CMR 429.439(B) and (C).

71.    MassHealth payment for rendered services is conditioned on satellite facilities' compliance with the regulations regarding staff supervision and integration with parent centers at 130 C.M.R. §§ 429.422-24 & 429.438. Id. § 429.439.

72.    MassHealth conditions a mental health center's ability to receive reimbursement by stating that "[t]he MassHealth agency pays for diagnostic and treatment services only when a professional staff member, as defined by 130 CMR 429.424, personally provides these services to the member or the member's family. *See* 130 CMR 429.441(A). Similarly, the title of §429.424 makes it clear that professional staff who fail to meet the qualifications requirements set forth therein are not "authorized to render billable mental health center services."[17]

73.    Thus, MassHealth through its formal regulations has made it plain that compliance with the qualifications requirements established by § 429.424 is material to its payment decision-the regulations forbid reimbursement for services provided by personnel who fail to meet these requirements. Further, because these requirements are mandatory for

---

[17] The title of Section 429.424 was amended in 2014 to include the language that professional staff must meet the qualification requirement to be authorized "to render billable mental health center services." This amendment merely codified the administrative requirement that was already known and in effect in the definitions of the service codes for individual, family and group therapy.

participation in MassHealth, such requirements are also material to the payment decision of any person with whom MassHealth has contracted to administer claims presented by mental health centers, including MBHP and the MCOs.

### D.4.1 MassHealth Scope of Mental Health Services and Procedures

74.     All mental health services must be clinically determined to be medically necessary and appropriate, and must be delivered by qualified staff in accordance with 130 CMR 429.424, and as part of the treatment plan in accordance with 130 CMR 429.432. *See* 130 CMR 429.421(A).

75.     A professional staff member authorized to render billable mental health center services as described in 130 CMR 429.424, must conduct a comprehensive evaluation of each MassHealth member prior to the initiation of therapy. *See* 130 CMR 429.431(A).

76.     A multidisciplinary team composed of mental health professionals, in accordance with 105 CMR 140.530[18], must conduct treatment planning, assessments, and case review for each MassHealth member. *See* 130 CMR 429.432. The multidisciplinary team must also conduct a case review according to 105 CMR 140.540; must prepare a treatment plan that complies with 105 CMR 140.520(C); and must also establish criteria for determining when termination of treatment is appropriate. *Id.* 429.432(A). The multidisciplinary team must review each case at termination of treatment and prepare a termination summary that describes the course of treatment and the aftercare program or resources in which the member is expected to participate. *Id.* 429.432(C).

---

[18] A multi-disciplinary staff must be comprised of mental health professionals who meet the requirements set forth under 105 CMR 140.530(C). This includes a board-certified physician physiatrist and at least two of the following: licensed physiologist, psychiatric social worker, psychiatric nurse, psychiatric nurse mental health clinical specialist, licensed mental health counselor, licensed alcohol and drug counselor, or other licensed mental health and substance abuse practitioners.

### D.5. MassHealth Revenue Streams

77.    There are streams of payment that are at issue in this action which are relevant to determining damages amounts. These are payments to the Defendant South Bay through fee-for-service (FFS) providers, through the Massachusetts Behavioral Health Partnership (MBHP) providers, and the Managed Care Organization (MCO) providers.

78.    At all relevant times, all of the facilities that are the subject of this action received payment through these three revenue streams. MassHealth, which administers the state Medicaid program, authorized the MBHP, the state's managed care behavioral health.

79.    Some mental health benefits are provided through the MassHealth FFS program. At all relevant times, South Bay Mental Health Centers mentioned herein were providers credentialed with the FFS program and were therefore required to comply with all applicable state and federal regulations, including those set forth above.

80.    Some mental health benefits provided by MassHealth are through the Massachusetts Behavioral Health Partnership ("MBHP"), an entity that has contracted with MassHealth to provide, on a managed care basis, mental health services to MassHealth members. MBHP offers mental health coverage to all of MassHealth's Primary Care Clinician ("PCC") Plan members. At all relevant times, the South Bay Mental Health Centers that are the subject of this action were credentialed by MBHP.

81.    Although MassHealth establishes qualifications, licensing and supervision requirements for professional staff at mental health centers, such as the South Bay facilities, it does not conduct individual reviews of each and every staff member to ensure they have met the requirements of 130 CMR 429.424. MassHealth places the responsibility on the mental health centers to ensure that their staff members who provide billable services meet the requirements,

and in particular, the regulations place this responsibility on the mental health center's Director of Clinical Services, *see 130* C.M.R. §429.423(B)(2).

82.     MBHP and the MCOs take a more pro-active approach in ensuring that all practitioners who provide billable mental health services to MassHealth members are qualified, licensed, and properly supervised. They require the mental health centers to actively investigate whether their staff has the minimum qualifications for providing mental health services and to make explicit certifications for each and every practitioner that the relevant qualification requirements have been met. Only if the mental health facility makes the appropriate certifications - which must be reaffirmed every three years - will MBHP and the MCOs accept claims based for services provided by the practitioner. If, in fact, MBHP and the MCOs pays claims for services provided by a practitioner who does not meet the requirements of §429.424 (or the other licensure, qualification or supervision requirements) it is only because the mental health clinic has either made a deliberate false statement or because it has provided certifications in reckless disregard of the truth or falsity of statements.

83.     Similar to MassHealth, MBHP will not pay claims presented by a provider who is not qualified to participate in the MassHealth program. Many mental health service claims, however, are submitted by mental health centers, which are usually corporate entities. In these cases, the named provider does not actually perform the service - the reimbursable service is performed by a mental healthcare professional who is an employee or a contractor. MBHP has a formal credentialing process to make sure that the individuals who actually perform the billable work are qualified to provide such services. In the case of South Bay, there were no procedures implemented to assure proper credentialing. As a result, uncredentialled, unqualified individuals

provided services and these services were not, therefore, billable to MBHP. As early as 2012, the Defendants knew this and intentionally or with reckless disregard, allowed the fraud to continue.

84.     The MBHP Provider Manual requires that all credentialed providers comply with all applicable state and federal laws and regulations, licensing and accreditation requirements, and federal and state affirmative action requirements; and that they conform to all applicable licensing certification, and other professional standards as set forth in applicable state and federal laws and regulations. *See* MBHP Appendix A-8, Credentialing Criteria, Exhibit 1.

85.     According to MBHP credentialing criteria outlined in the MBHP manuals referenced herein as Exhibit 1 and 2, during 2009-2014[19], all Master's level mental health counselors required supervision by "a Licensed Independent Clinical Social Worker (LICSW), a licensed psychologist, a Master's-Level Advanced-Practice Registered Nurse, Board-Certified in either Adult or Child and Adolescent Psychiatric Nursing (APRNBC), or a licensed psychiatrist meeting MBHP's credentialing criteria" *See* MBHP 2009 Manual, Appendix A, Exhibit 2.[20]

86.     Other MassHealth beneficiaries receive services from MCOs that provide Medicaid managed care plans for MassHealth members, such as Beacon Health Strategies, Neighborhood Health Plan, Network Health Tufts MCO, or BMC HealthNet Plan. These plans may contract with a third party, or MBHP or its affiliates, to provide and manage mental health benefits. MCOs also have a credentialing process for all mental health care practitioners.

---

[19] On November 4, 2014, MBHP changed its supervision requirements for Master's level mental health counselors to state: "Supervised in the provision of services by a Licensed Mental Health Counselor (LMHC), Licensed Independent Clinical Social Worker (LICSW), a licensed psychologist, a Master's-Level Advanced-Practice Registered Nurse, Board-Certified in either Adult or Child and Adolescent Psychiatric Nursing (APRNBC), or a licensed psychiatrist meeting MBHP's credentialing criteria." Prior to this change, LMHCs could not supervise other clinicians. Retrieved from
https://www.masspartnership.com/pdf/Appendix%20A%20Credentialing%20Criteria%2008-11-2014.pdf page 8.
[20] Retrieved from https://www.masspartnership.com/HNE/pdf/Chapter%205%20-%20Network%20Management%20and%20Credentialing.pdf pages 26-27.

87.    In order to be credentialed by Beacon Health Strategies, facilities must be licensed or certified by the state in which they operate, and the license must be in force and in good standing at the time of credentialing or re-credentialing. The credentialed facility is responsible for credentialing and overseeing its clinical staff as Beacon does not individually credential facility-based staff.

88.    According to Beacon Health Strategies credentialing criteria, a Master's-level mental health counselor working in a credentialed facility must be supervised "in the provision of services by a licensed independent clinical social worker (LICSW), a licensed psychologist, a licensed master's-level clinical nurse specialist, or licensed psychiatrist meeting the contractor's credentialing requirements." *See* Beacon Health Strategies, LLC Behavioral Health Policy and Procedure Manual for Providers, Organizational Credentialing, p. 9-11.

89.    Neighborhood Health Plan (NHP)[21], Fallon Community Health Plan[22], and Boston Medical Center HealthNet Plan[23] have the same supervision requirements as Beacon Health Strategies for Master's level mental health counselors working in a credentialed facility. Under the stated MCOs' regulations, licensed mental health counselors (LMHCs) cannot supervise Master's level mental health counselors.

90.    At all relevant times, FFS reimbursement was provided to providers directly from MassHealth. Mental health care providers such as South Bay also contract with MBHP and various MCO's and they are compensated by those entities for the mental health services they provide to MassHealth members. MBHP and MCO's are paid by MassHealth on a capitation

---

[21] *See* Behavioral Health Provider Manual, Guidelines for working with Beacon and NHP, Effective July 1, 2015, Organizational Credentialing, 2-6.
[22] See Fallon Community Health Plan, Behavioral Health Policy & Procedure Manual For Providers, Chapter 2, Organizational Credentialing, 2-9.
[23] See Behavioral Health Policy and Procedure Manual for Providers/Boston Medical Center HealthNet Plan, 2.9. Provider Credentialing and Recredentialing.

basis for their members, who are all qualifying MassHealth recipients and are considered MassHealth members under 130 C.M.R. Sec. 450.101, by MassHealth with funds that have been provided by the United States and the Commonwealth through the Massachusetts Medicaid Program. As such, payments for these services, whether the claims are submitted through MassHealth directly or through MBHP or one of its MCOs, comes from the Massachusetts Medicaid program. Also, causing a false claim to be submitted to MBHP or an MCO causes a false claim to be submitted to MassHealth and is in violation of federal and state False Claims Acts.

91.     Pursuant to all Provider Agreements between MBHP and the MCO's, providers must comply with all state and federal regulatory requirements.

### D.6. MassHealth Claims Submission

92.     Every provider that submits claims to MassHealth must comply with the MassHealth regulations, including those set forth in 130 C.M.R. § 429.000 *et seq.* and § 450.000 *et seq.*; and every provider that submits claims to MassHealth certifies when submitting a claim for payment that "the information submitted in, with, or in support of the claim is true, accurate, and complete." 130 C.M.R. § 450.223(C)(2)(e). Therefore, providers impliedly certify that they are complying with applicable regulations when submitting claims for payment.

93.     Claims submitted to MassHealth are submitted in batches and either approved or denied based on applicable system edits. A system edit may automatically deny a claim if a required field is not filled out—for example, the name of the member who received the services, or a valid provider number. Additionally, claims or providers may be flagged for further review for high utilization of certain CPT codes, or other anomalies. Usually claims are batched for

submission and are then approved or denied by a computer algorithm that allows or denies such claims based on the system edits that have been programmed into the system.

94.     In short, MassHealth providers bill on the honor system. Claims can be denied automatically in the specific circumstances described herein if certain criteria are absent, but beyond that, claims are usually paid if these criteria are met.

95.     Payment by the MassHealth agency for a mental health service includes payment for administrative operations and for all aspects of service delivery not explicitly included in 130 CMR 429.000, such as, but not limited to:

> (1) patient registration;
> (2) telephone contacts with members or other parties;
> (3) supervision or consultation with another staff member;
> (4) information and referral; and
> (5) recordkeeping.

*See* 130 CMR 429.408(c)(3).

### D.7. MassHealth All Provider Regulations

96.     In addition to the specific regulations governing mental health centers, all MassHealth providers are subject to the regulations at 130 C.M.R. § 450.000 et seq.

97.     These "All Provider" regulations state, in relevant part, that every provider under contract with MassHealth agrees to comply with all laws, rules, and regulations governing MassHealth. 130 C.M.R. § 450.223(C)(1).

98.     The regulations also state that every provider under contract with MassHealth certifies when submitting a claim for payment that "the information submitted in, with, or in support of the claim is true, accurate, and complete." Id. § 450.223(C)(2)(e).

99.     The MassHealth regulations governing overpayments state, "A provider must report in writing and return any overpayments to the MassHealth agency within 60 days of the

provider identifying such overpayment or, for payments subject to reconciliation based on a cost report, by the date any corresponding cost report is due, whichever is later." Id. § 450.235(B).

100.    A provider is liable to the MassHealth agency for the full amount of any overpayments, or other monies owed under 130 C.M.R. § 450.000 et seq., including but not limited to 130 C.M.R. § 450.235(B), or under any other applicable law or regulation. Id. § 450.260(A).

101.    MassHealth regulations define a "member" as "a person determined by the MassHealth agency to be eligible for MassHealth." Id. § 450.101. The regulations do not distinguish between those members receiving benefits through MassHealth fee-for-service, or through one of MassHealth's contracting entities, such as the Massachusetts Behavioral Health Partnership ("MBHP") or its Managed Care Organizations ("MCOs"). Thus, claims submitted by providers with respect to services to members through any of these mechanisms must comply with Medicaid regulations.

## V.    COMPANY PROTOCOLS

102.    As part of her job duties at South Bay, the Relator would regularly visit each facility of the organization to conduct trainings. She observed that at each South Bay facility, South Bay employs staff therapists who are required by company mandate to diagnose patients on the patient's first session and to complete treatment plans and comprehensive assessments by the third session[24]. Then they are supposed to treat clients on a weekly or bi-monthly basis. The

---

[24] The Relator had heard Ms. Gearheart state that all staff therapists have to render a diagnosis on the first session and submit a comprehensive evaluation of the client by the third session. In an email to Ed Neuhaus (Chief Clinical Officer at CIS) dated 08/29/2013, the Relator wrote: "Clinicians decide multi-axial diagnoses on their own. They need to have a diagnosis submitted on the very first session. No –they do not confer with supervisors before giving a diagnosis…There are no team consultations. A clinician may confer with his/her supervisor before the 3rd client session (when CA is due)." See emails, Exhibit 3. Also see paragraph 153 herein.

staff therapists report to the facility Supervisors[25], who are responsible for providing weekly supervision, overseeing client cases, conducting performance reviews, and conducting administrative tasks. In reality, a vast majority of clinicians had no qualified supervision.

103.     Each South Bay facility also has a Clinic Director who is responsible for hiring/firing staff, maintaining staffing schedule, leading staff and management meetings, establishing job descriptions, assigning staff to cases, and ensuring appropriate patient care. The Clinic Directors report to the Regional Directors who oversee the operations in multiple facilities within Massachusetts and ensure adherence to standards. They focus on retention, productivity, management training, program evaluation, and quality management. These individuals report to Jennifer Gearhart, South Bay's Director of Clinical Mental Health Services[26]. South Bay also employs one Medical Director for all its facilities. The Medical Director[27] is responsible for establishing all the medical policies and protocols and supervising all medical services provided by staff. The Medical Director and Ms. Gearhart reported to Defendant Peter Scanlon, President of South Bay Mental Health Centers[28] until 2012. As of April 2012, Defendant Scanlon reported to Defendant Kevin Sheehan, the CEO of Community Intervention Services (CIS). Many of the Directors and Supervisors with whom the Relator interacted over the years at South Bay and CIS were unlicensed, in violation of law. *See* Exhibit 5.

## VI.    **FACTUAL BACKGROUND**

---

[25] Dependent satellite facilities may have a supervisor on staff. According to 130 CMR 429.439(B) and (C), the supervision in a dependent satellite program may come from the parent center. The Director of Clinical Services at the parent center, Jennifer Gearhart, "must ensure that supervision requirements of 130 CMR 429.438(E) are performed. If the satellite program's staff do not meet the qualifications for core disciplines as outlined in 130 CMR 429.424, they must receive supervision from qualified core staff professionals of the same discipline at the parent center." *Id.* § 429.422(D).

[26] Ms. Gearhart was replaced by Sara Hart, LMHC, in 2014. Ms. Hart held the title of Director of Clinical Operations.

[27] As of 12/31/2013, Mary Barkalow, board-certified psychiatrist, was the Medical Director for all of South Bay.

[28] Once Defendant Scanlon left his employment, the Medical Director and Ms. Hart reported to Michel Pelletier, COO. Mr. Pelletier reports to Defendant Kevin Sheehan.

104.    At all relevant times, the South Bay Mental Health Centers were not in compliance with the regulatory scheme set out above, and this non-compliance resulted in the knowing submission of false claims to MassHealth, MBHP, and MCOs, as further set forth herein. The wrongdoing pre-dated the Relator's position as Coordinator of Staff Development and Training beginning in 2012. She knows this because she was told by various employees of South Bay, including Sara Hart (Farley), Compliance Officer, on numerous occasions that South Bay had employed unlicensed clinicians and unqualified, unlicensed Supervisors since she had been working with the company. Ms. Hart started her employment at South Bay in 2009.

105.    Relator was first hired as a "job coach" to assist the staff therapists in completing their tasks efficiently, providing the correct documentation, and identifying how to track their billing so that South Bay's operations may be conducted with minimal interruption.

106.    In March 2012, the Relator was promoted to be Coordinator of Staff Development and Training. For a significant time, South Bay suffered from high employee turnover and, in mid-2012, the Relator was charged with keeping track of the turnover. In trying to determine the cause of the turnover, the Relator analyzed whether the employees' educational background was the root cause. In this process, the Relator learned of South Bay's systemic failure to hire qualified individuals. One such person was Donna Scott, hired as a Master's level staff therapist. The Relator had previously worked with Donna Scott at another organization and knew that Ms. Scott lacked the qualifications necessary to treat and diagnose patients. Upon review of other employees, the Relator soon realized that a significant percentage of the employees at South Bay lacked the requisite qualifications to see, diagnose or treat patients on their own. In addition, she learned that Supervisors were not qualified as required by regulations.

107.    On May 14, 2012, Relator sent an email to Jennifer Gearhart (South Bay's Director of Clinical Services), Defendant Peter Scanlon (Executive Director at South Bay Mental Health Center) and Defendant Kevin Sheehan (Chief Executive Officer of CIS), voicing her concerns over Ms. Scott's lack of qualifications. In response, Defendant Sheehan said: "If all this is true, then this needs to be discussed and vetted immediately." The Relator said that recruiting had checked Ms. Scott's credentials and determined that she was unqualified for a clinician role. Defendant Sheehan said: "It sounds to me like everyone is running for cover and looking to put the big red circle on recruiting. I'm not buying it. This is a major blunder by everyone involved including me for going along with the exception." *See* emails, Exhibit 3.

108.    In a follow-up email dated May 16, 2012, Lucy Andrade (HR Director) stated: "We do have a few current staff who probably won't meet the 40 credit min or license eligible criteria and exceptions were made in the past…in regards to her clinical abilities, I cannot attest to this." *See* emails, Exhibit 3.

109.    On July 2, 2012, the Relator sent an email to Defendant Kevin Sheehan again voicing her concerns on the same issue. She wrote: "I have continued to bring to [Peter Scanlon's] attention the ethical issues that arise from hiring unqualified people who are not being supervised adequately by a licensed person and have offered suggestions on how to remedy this situation. I get no verbal response." *See* emails, Exhibit 3.

110.    On July 19, 2012, the Relator sent another email to Defendant Peter Scanlon regarding her recent complaints. She wrote: "I feel you have negatively reacted against me since I raised the concern about hiring a specific clinician, Donna Scott. She did not have the appropriate qualifications to be in a master's level position and efforts were made to have her

bypass the NHTP. She is not supervised by a licensed clinician and I was concerned that she was unable to provide adequate client care." *See* emails, Exhibit 3.

111.    The Relator made numerous complaints once she uncovered that these violations were wide-spread and not unique to Ms. Scott. Despite her efforts, the fraud continued.

## A. Additional Facts Relating to Defendant HIG Growth Partners and Defendant HIG Capital

112.    As mentioned above, at the request of Defendant Sheehan and her Supervisors, the Relator traveled to Texas to assist in the preparation of a presentation to the CIS Board about South Bay's employee retention issues. The CIS Board, including members Nicholas Scola, Steve Loose, and Eric Tencer of HIG Growth and HIG Capital, as well as Defendant Kevin Sheehan, authorized South Bay to create Tiger Teams in order to determine the causes of the poor employee retention at South Bay and to make specific recommendations to the Board on how to rectify the issue. The Board approved the Tiger Team investigation.

113.    The Tiger Teams began their work in March of 2014. Their meetings were held in the various offices of the South Bay clinics in different locations of the state. The Relator and Jeff Quade (CIS Director of HR) ran five Tiger Teams, one for each of the five divisions of the company: Mental Health, CBHI, Early Intervention, Support Staff, and Day Services. Each team was tasked with identifying the core issues that they believed were driving turnover. The Mental Health Tiger Team was comprised of directors, supervisors, mentors, and staff therapists.

114.    Even at the earliest stage of the Tiger Teams' investigations, significant causes for the high employee turnover rate surfaced immediately. The Tiger Teams observed that the lack of qualified Supervisors was the main cause of the turnover. The Tiger Team meetings focused on brainstorming potential reasons for turnover, assigning impact to each of these reasons, prioritizing the reasons, looking at turnover data and employee exit interview feedback, coming

up with potential solutions, and creating a report of their findings. The Mental Health Tiger Team wanted all Supervisors to be independently licensed.[29] *See* Exhibit 4.

115.    The Day/Partial Tiger Team (which included: Melissa Jodat, Shana Truel, Nicole Lopes, Lindsay Cotter, Jaime Rockwood, Carolyn Russo) reported that staff employees with only an Associate's degree were diagnosing and treating patients unsupervised by anyone. They also reported that staff were being required to enroll clients into different insurances which paid more so that South Bay would earn more per patient. They also reported that some patients were unable to obtain medications during the time of the insurance transition. Six different and separate Day/Partial hospital staff from six different sites all complained of these same issues.

116.    Day Tiger Team Notes from 3/25/14 with employees from six separate clinics who attended, stated:

> "All members of the group raised what they believe to be ethical/legal concerns. Members reported having raised their concerns multiple times BA-level, and at times associate's level, staff diagnose clients...Chief amongst those concerns voiced include:
>
> *BA-level and at times associate's level, staff diagnose clients. They report this happens the majority of the time. Their diagnosis and assessments form the basis of insurance approval for the Partial Hospital, IOP, and Day Programs. Members report that some of the staff who diagnose have a degree in non-psychology related subjects only.
>
> *No licensed person sees or assesses the clients prior to diagnosis. BA and AA-level staff know which diagnoses are most likely to get insurance approval. They are also 'pressured to beef up' certain behaviors that substantiate the need for Partial Hospital Approval.

---

[29] At South Bay, clinicians received **no** licensure supervision during their first 90 days of employment. In an email dated 07/12/2012 to Ms. Gearhart, the Relator wrote: "I have been getting a lot of questions lately from new clinicians about eligibility for licensure supervision. It is my understanding that we don't provide licensure supervision during the intro period because they aren't FT [full-time] employees yet. After this time, they are only eligible to receive licensure supervision if they have met the MA state requirements for licensure." Ms. Gearhart responded on the same day: "Yes – they need to be eligible to get their license otherwise the hours mean nothing. And – you are correct in they have to make it up to full time status to receive the benefit." *See* 07/12/2012 emails, Exhibit 3.

> *Licensed staff do not oversee cases. Notes are shipped to other sites to be signed by licensed supervisors. One member, who has her LMHC, states she is not comfortable having to sign documentation from clinicians she has never met and clients she has never seen."

*See* Day/Partial Hospital Tiger Team Notes of 3/25/14, Exhibit 4. The Relator recalls Mr. Quade explicitly telling her not to send these meeting minutes to the Day Tiger Team members.

117.    Once they completed their initial meetings, the Tiger Teams then wrote reports highlighting the top two-three issues raised. These were very specific. The Mental Health Tiger Team's report included statements that the reason for the high employee turnover rate was due to a lack of appropriate qualifications and independent licensure of Supervisors, a lack of supervision of the staff therapists, and a lack of properly credentialed clinicians. The reports also included recommended plans to remedy the problems raised in the interviews. The Mental Health Tiger Team's report detailed a plan to implement supervision for new hires. Edward (Ed) Neuhaus (Chief Clinical Officer of CIS) and Jeff Quade (CIS Director of HR) told the Relator that the Tiger Teams findings and reports were presented to the CIS Board of Directors in 2014.

118.    Mr. Quade and the Relator facilitated each of these Tiger Teams and were present for the presentations made at the "Town Hall Meetings" which were held on May 29, 2014 in the Brockton clinic.

119.    During the presentations, each Tiger Team presented their findings to the "Sponsors." The Sponsors were Michael Pelletier (South Bay's Chief Operating Officer), Defendant Peter Scanlon (South Bay's Secretary at the time), Ed Neuhaus, and Defendant Kevin Sheehan (then President of South Bay and CEO of CIS). The Division Director was also present for their respective Tiger Team Presentation. Jennifer Gearhart was present for the Mental Health Tiger Team, whose presentation focused on the issue of operating unethically and in non-

compliance with the Code of Massachusetts Regulations by having unlicensed staff supervised by unlicensed clinicians.

120.    Messrs. Scola, Loose, and Tencer, as well as Defendants Scanlon and Sheehan, knew that South Bay was in violation of the Code of Massachusetts Regulations and MassHealth's, MBHP's, and MCOs' requirements regarding licensure and supervision of mental health clinicians. Despite specific knowledge of ongoing Medicaid fraud, none of the Defendants took any actions to stop the fraudulent practices. The Relator was informed by Messrs. Neuhaus and Quade that the CIS Board rejected the recommendations of the Tiger Teams. Sara Hart (Farley), Compliance Officer, told the Relator that Defendant Kevin P. Sheehan and the rest of the CIS Board (Messrs. Scola, Loose, and Tencer) thought the Tiger Teams were an enormous waste of time and resources. As such, the regulatory violations and fraudulent invoicing were allowed to continue unabated after South Bay's acquisition in 2012 to at least 2016. Messrs. Scola, Loose, and Tencer while on the South Bay Board of Directors and the CIS Board of Directors were aware of the legal violations concerning the non-compliant Supervisor credentials and the unlicensed, educationally unqualified clinicians, and were then acting as Principals and Managing Director of HIG Growth, respectively, and as "Senior Members" of HIG Capital[30]. As such, they acted on behalf of HIG Growth and HIG Capital during relevant times post purchase of South Bay. Messrs. Scola, Loose, and Tencer exerted control over South Bay while acting on behalf of Defendants HIG Growth and HIG Capital, and as such, both HIG Growth and HIG Capital knew of the violations of regulations set forth in this Complaint and were complicit in the violations causing submission of fraudulent invoices to the federal government and the Commonwealth of Massachusetts. Through the actions of Messrs. Scola, Loose, and Tencer, the

---

[30] Mr. Scola, Mr. Tencer, and Mr. Loose are all listed as "Senior Members of H.I.G. Team" on the HIG Capital's own website. Per their respective LinkedIn pages, Mr. Scola and Mr. Tencer are Principals of HIG Capital.

Defendants HIG Growth and HIG Capital were complicit in the wrongdoing described herein while controlling South Bay and CIS.

### B. Facts relating to the wrongdoing of Peter J. Scanlon, Kevin P. Sheehan, and South Bay including their specific knowledge of the ongoing fraud

121.    As mentioned above, Defendant Peter J. Scanlon is the founder and was the President and Chief Executive Officer of South Bay from 1986 until its purchase by HIG Growth and HIG Capital, through CIS, in 2012. During his tenure as the CEO and President of the company, it was his duty and ultimate legal responsibility to make sure that the company complied with all federal and state laws and regulations relating to the provision of community mental health services. As the company Founder and executive leader, he helped to formulate company practices and procedures and oversaw their implementation. Defendant Scanlon intentionally allowed the decades-long fraud to ensue unabated.

122.    Also, at all relevant times, Defendant Peter Scanlon was a psychologist bound by the APA Code of Ethics and the Massachusetts General Laws for the Registration of Psychologists. The APA Code of Ethics for Psychologists states that psychologists who delegate work to employees, supervisees, research or teaching assistants, or others, authorize only those responsibilities that such persons can be expected to perform competently on the basis of their education, training or experience and to see that such persons perform these services competently. In addition, Defendant Scanlon was required to comply with 251 CMR 3.05 for Supervision Requirements, which states that Supervisors shall be a formal relationship between a qualified supervisor as provided in 251 CMR 3.05(3) and (4). As is shown herein, Defendant Scanlon was specifically aware and on direct notice that the individuals employed by South Bay as "Supervisors" were not qualified as Supervisors pursuant to 130 CMR 429.424 and 429.438.

123.    As set forth herein, CMS directs the Massachusetts Medicaid program, MassHealth, to make regulations that govern a healthcare provider's interactions with the program. *See* 130 CMR Sections 401.401 - 650.035. The MassHealth regulations that apply to mental health centers are found in Sections 429.000 *et. seq.* of the MassHealth provider regulations. These regulations set forth in Section 429.000 establish "requirements for participation of mental health centers," *see*, Sec. 429.401, regardless of whether such mental health services are paid directly by MassHealth or paid through a contractor, such as MBHP or one of the MCO's. Section 429.424 sets forth the professional qualification and supervision requirements for psychiatrists, psychologists, social workers and psychiatric nurses working in a mental health center. The regulations state that "all services provided by such additional staff (psychologists) must be under the direct and continuing supervision of a psychologist meeting the requirements set forth in 130 CMR 429.424(B)(1)." Further, all counselors and unlicensed staff [31] "must be under the direct and continuous supervision of a fully qualified professional staff member." Id. at Section 429.424(F)(1). All counselors must hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and must have had two years of full time supervised clinical experience in a multidisciplinary, mental health setting subsequent to obtaining the master's degree. Id. at Section 429.424(F)(2).

124.    Defendant Peter Scanlon was not only aware of these requirements, he was aware that the company was not in compliance with them.

---

[31] The regulations prior to November 2015 state this. In November 2015, 130 CMR 429424(F) was changed to state: "All unlicensed counselors included in the center must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines described in 130 CMR 429.424(A) through (D). See footnote 16 herein.

125.     In March 2012, when the Relator was promoted to the newly created position of Coordinator of Staff Development and Training, she became aware of the systemic and company-wide inadequacies of staff qualifications at South Bay. Her new responsibilities included clinical training for new clinicians and managerial leadership training for Supervisors, Directors, and Regional Directors. These responsibilities required her to examine the qualifications of the Supervisors and the newly hired clinicians.

126.     As previously noted, shortly after starting in this new position, the Relator learned that an individual named Donna Scott was hired as a clinician. The Relator had worked with Ms. Scott previously at another company and, as a result, knew that she did not have adequate training to be a clinician. She raised the issue with Defendant Peter J. Scanlon and Jennifer Gearhart (Division Director of Outpatient Mental Health), both orally and by email, explaining to them specifically that Ms. Scott was not qualified for the position. Instead of rectifying the issue, Defendant Scanlon allowed Ms. Scott to continue working and made special allowances for her to bypass the five-week "New Hire Training Program," which the Relator had designed and facilitated. Despite repeated efforts by the Relator in which she expressed her concern over the retention of Ms. Scott, nothing was done. Because of this, the Relator raised the issue with Defendant Kevin J. Sheehan, the new President of South Bay and CEO of CIS after South Bay's purchase. This resulted in conflict between Defendant Scanlon and Defendant Sheehan.

127.     As a result of the deficient qualification issues concerning Ms. Scott, the Relator began to closely examine the qualifications of other new clinician hires, as well as the company Supervisors. She learned that the clinicians were not licensed and many did not possess the appropriate educational background. In addition, they were not being supervised by qualified licensed Supervisors as the regulations required. This meant that unqualified, unlicensed

individuals lacking the appropriate education, were diagnosing and treating thousands of South Bay's mental health patients on their own without any supervision. The Relator determined that Donna Scott was not the exception, but the rule at South Bay.

128. The Relator observed, among other things, that a significant portion of the new hires did not have a degree which could even lead to licensure. While some had Master's Degrees, a substantial number of the clinicians, while employed at South Bay, did not have a clinical degree which met the minimum educational requirements needed to practice mental health counseling.

129. The relator examined the educational backgrounds of hundreds of employees by reviewing their resumes and saw that they had degrees in areas such as: expressive therapy, creative arts therapy, school counseling, sports psychology, art therapy, somatic counseling, agency counseling, and more. In addition, she also observed that a few of the counselors had degrees from unaccredited schools. These degrees, which did not meet the regulatory requirements, were missing the required core clinical courses, did not meet the 60-credit minimum, and did not have the needed internships. *See* Exhibit 14 for a partial listing of employees without proper clinical degrees who were working at South Bay.

130. In addition to notifying Defendants Scanlon and Sheehan, the Relator also spoke with Mr. Nicholas Scola, Sara Hart (Compliance Officer), Kim Arrouca (Director of Program Initiatives), Lucy Andrade (HR Director), and Sharon Collins Beals (Comptroller) of the utter lack of qualified Supervisors and the wide-spread lack of proper educational qualifications of the treating counselors as required by law. She explained to them that none of the billing for treatments provided by unsupervised, unlicensed clinicians could be appropriate because the clinicians could not address medical necessity of patients. They did not have the education,

experience or supervision to do so. The Relator became increasingly concerned for the safety and well-being of the patients who were being treated by individuals who did not have proper education, licensure, and supervision, as well as for the thousands of patients who had been treated by South Bay in the past.

131.    The Relator repeatedly spoke to Defendant Peter Scanlon about her concerns. As a result, instead of remedying the fraud, Defendant Scanlon began treating the Relator poorly by purposely and repeatedly embarrassing her in front of her co-workers and withholding resources which the Relator needed to do her job. In addition, Defendant Scanlon began giving the Relator poor performance evaluations.

132.    Because Defendant Scanlon refused to listen to the Relator's concerns, she again spoke to Defendant Kevin Sheehan about the company's violations of regulations. Defendant Sheehan expressed his concern over what the Relator had revealed, but he recommended that the Relator "hang in there" until Defendant Scanlon left the company. Despite his recognition of the problems, no changes were made regarding the lack of supervision.

133.    On one occasion, when the Relator mentioned to Defendant Scanlon the fact that the company was improperly billing Medicaid and expressed her concern for the safety and well-being of the patients being treated, Defendant Scanlon responded that "fraud is not fraud until it is proven in court." He also told the Relator that, if South Bay were ever found to be in violation of a regulation, nothing more would come of it than a "slap on the wrist and a fine."

134.    Sara Hart (Farley), Compliance Officer for Defendant South Bay, was also concerned about these problems and she told the Relator that she felt that the company was in direct violation of the regulations and was wrongfully billing Medicaid. When the Relator worked at South Bay, her office was near Ms. Hart's office and the two spoke and met

frequently. On a few occasions when the Relator was in Ms. Hart's office, she noted that Ms. Hart had emailed Defendant Sheehan and Michael Pelletier about the Supervisors and clinician qualifications. Also, Ms. Hart told the Relator that she was speaking to management and emailing them to try to get things changed. Ms. Hart also told the Relator that Mr. Pelletier asked her not to email him anymore as he did not want an "email trail."

135.    After the sale of South Bay in April of 2012, and during the time of the discussions between the Relator and Ms. Hart, the Relator saw that Ms. Hart met with Nicholas Scola whenever he visited South Bay. Although the Relator was not present at any meetings between Ms. Hart and Mr. Scola, she assumed that their meetings concerned regulatory and compliance issues because Ms. Hart was the company's Compliance Officer.

136.    The Relator also expressed her concerns about unlicensed clinicians being supervised by unlicensed staff to Lucy Andrade (HR Director), Kim Arrouca (Director of Program Initiatives), and Sharon Collins Beals (Comptroller). The Relator also mentioned the fact that she had detailed these violations to Defendant Peter Scanlon and that he had started retaliating against her for pressing on the issue.

137.    Around the period of May 2012 through approximately September 2013, the Relator continued to speak with Defendant Kevin Sheehan about these matters and sent him emails pressing her concerns. *See* emails, Exhibit 3.

138.    In September of 2013, Defendant Sheehan offered the Relator a new position with CIS under the same title and job duties. She accepted this position. Her two new supervisors were Ed Neuhaus (Chief Clinical Officer of CIS) and Jeff Quade (CIS Director of HR). The Relator attempted to discuss the staffing issues with them and sought their help in these matters, but they would not assist her in pursuing the problems.

139.    Michael Pelletier became the COO of South Bay in 2014. The Relator met with him two weeks after he started his work at South Bay and she conveyed the significant issues concerning the lack of licensed and qualified Supervisors as well as the inadequate academic qualifications of the mental health counselors. During one of those meetings, the Relator showed Mr. Pelletier the 12-week reports and told him that unlicensed clinicians were not receiving proper supervision. The Relator said that this was a regulatory compliance violation. Mr. Pelletier said he would look into the matter. However, nothing was ever done. *See* 12-week Reports, Exhibit 10.

## C. Relator's Communications with Nicholas Scola/HIG

140.    In 2012 and 2013, Relator had contact by phone and email with Nicholas Scola with particular regard to the staff productivity. The Relator informed Mr. Scola on several occasions that a major cause of the increased staff turnover was the lack of qualified, licensed Supervisors at South Bay.

141.    At all relevant times, despite the specific knowledge of Defendants Scanlon, Sheehan, and HIG through Messrs. Scola, Loose, and Tencer, the fraudulent practices and wrongful invoicing to MassHealth, MBHP, and the various MCOs was allowed to continue as it had for years before South Bay's acquisition in 2012. The Relator determined that over a majority of the individuals employed by South Bay failed to meet the requirements set forth in 130 CMR 429.423 and 429.424 because 1.) most clinical directors were not licensed, certified, or registered to practice in one of the core disciplines, as required by 130 CMR 429.423(B); and 2.) a substantial number of South Bay's staff therapists were neither independently licensed by the appropriate Board or eligible to apply for licensure with the appropriate Board, nor directly and continuously supervised by a clinician licensed, certified, or registered in one of the core

disciplines listed in 130 CMR 429.424(A) through (D). Indeed, very few of the clinics'
"Supervisors" were qualified to supervise at all pursuant to 130 CMR 429.424(A)-(D) and
424.439(C). *See* license charts, Exhibit 5 herein.

## VII. SOUTH BAY'S VIOLATIONS

### A. Defendants' Violations of MassHealth's Staff Composition Requirements

142.    Pursuant to the regulations each mental health clinic needs to be managed by a
core team of individuals qualified pursuant to 130 CMR 429.422 and 429.423. However, neither
the headquarters of South Bay nor any of its satellite offices complied with this requirement at
least between 2009 and 2015, and in some instances, continue to be in violation of 429.423 and
429.424 at this writing.

143.    Although each facility had a clinical director, only a handful of these clinical
directors held an independent license in one of the four core disciplines: a licensed psychiatrist, a
licensed psychologist, an independently licensed clinical social worker, a psychiatric nurse
specialist, or a psychiatric nurse. Of the handful who were independently licensed in one of the
four core disciplines, all were licensed independent clinical social workers (LICSWs). None
were a psychiatrist, psychologist, or psychiatric nurse. Simultaneously, none of the facilities
were managed by a core team of individuals qualified as required by 130 CMR 429.423. *See*
Clinic Directors license status, Exhibit 5.

144.    A mental health center "**must** have a balanced interdisciplinary staffing plan that
includes three or more core professional staff members who meet the qualifications outlined in
130 CMR 429.424 for their respective professions. Of these, one must be a psychiatrist, and two
must be from separate nonphysician core disciplines, including psychology, social work, or
psychiatric nursing." [emphasis added] 130 CMR 429.422(A). The regulations go on to specify

the minimum years of experience and credentials that the individuals administering, directing, and generally overseeing the services provided by South Bay need.

145.    South Bay's independent satellite facilities "must employ the equivalent of at least three full-time professional staff members, two of whom must be core team members who meet qualifications outlined in 130 CMR 429.423 for their respective disciplines." *See* 429.42(C) and (F).

146.    This means that the headquarters of South Bay and each of its independent facilities must maintain a team composed of an administrator, a clinical director, and a medical director. The only exception to this rule is if the individual holding the title as the clinic director, administrator and medical director was a board-certified psychiatrist, and was able to carry out all of her duties to a permissible standard. *Id.* 429.423. None of the Clinic Directors were board certified psychiatrists.

147.    Between 2009 and 2015, the Relator observed that a high percentage of the Clinic Directors and Regional Directors were not licensed, certified, or registered to practice in one of the core disciplines during their employment with South Bay. A majority of the individuals who held the title of Clinical Director and Regional Director at South Bay either lacked a license, registration or certification completely; or lacked the correct type of license, registration or certification in one of the core disciples, as required by 130 CMR 429.422 and 429.423. No Regional Directors were properly licensed in one of the core disciplines *throughout* their tenure at South Bay. Out of eight (8) Regional Directors known to the Relator in the relevant time period, two (2)[32] were licensed in one of the core disciplines only during *part* of their tenure at South Bay. Out of 44 Clinic Directors known to the Relator during the relevant time period, two

---

[32] Rebecka Humphrey and Katherine Morrill

(2)[33] were licensed in one of the core disciplines *throughout* their tenure as Clinic Directors at

South Bay. In addition, five (5)[34] other Clinic Directors were licensed in one of the core

disciplines only *during part* of their tenure at South Bay. *See* Regional and Clinic Directors

License status, Exhibit 5.

### B. Defendants Knowingly Submitted or Caused to be Submitted False Claims to MassHealth for Services Rendered by Unlicensed and/or Unsupervised Clinicians and Counselors

148.    The Massachusetts regulations that govern mental health care services *offered in*

*the state* differ with those regulations which govern mental health services offered to MassHealth

members. Generally, Massachusetts provides licensure for various professions including board

certified psychiatrists, psychiatric nurses, and psychologists, in addition to licensed independent

clinical social workers, clinical social workers, licensed mental health counselors, licensed

alcohol and drug counselors, licensed physical therapists, among many. However, the

Massachusetts legislature has determined that for purposes of treating MassHealth members, a

mental health center must employ therapists that are qualified as specifically described by 130

CMR 429.424.

149.    To bill MassHealth for mental health services, the professionals diagnosing and

treating MassHealth members must hold a degree or license as a psychiatrist, psychologist, social

worker, psychiatric nurse, psychiatric clinical nurse specialist, counselor, or occupational

therapist. Id. 429.424(A) through (G). Each of these respective professions has specific criteria

regarding the professional staff members' credentials that must be met so that they may provide

services to MassHealth members. Id. *See* paragraph 69 herein.

---

[33] Megan Callahan and Kathryn Wells
[34] Shannon Richardson, Colleen Feeney, Kristina Garland, Juleah Berliner, Katherine Morill

150.   MassHealth permits unlicensed individuals, who meet the qualifications in accordance with their discipline, to diagnose and treat patients and bill MassHealth for mental health services so long as the unlicensed staff therapist billing MassHealth is directly and continuously supervised by a supervisor who meets "the qualifications required of a core staff member," i.e. a board-certified psychiatrist[35], a licensed psychologist[36], a licensed independent clinical social worker[37], or a registered psychiatric nurse[38]. *See* 130 CMR 429.439. Counseling is not one of the four "Core Disciplines[39]." Accordingly, as it relates to MassHealth, a Licensed Mental Health Counselor (LMHC) cannot supervise other clinicians. From 2009-2014 MBHP had similar regulations regarding LMHCs, according to its manuals[40]. During that time, a LMHC was not allowed to supervise a clinician, as this required a licensed independent clinical social worker (LICSW). In November 2014, MBHP changed its rules to allow LMHCs to supervise other clinicians. The Defendants violated the MBHP regulations prior to this change.

151.   Only a handful of the people employed by South Bay were independently licensed pursuant to 130 C.M.R. § 429.424 to diagnose and treat these patients on their own, during their employment at South Bay. In fact, a substantial number of the staff therapists were neither independently licensed or eligible to apply for licensure with the appropriate Board, nor were they directly and continuously supervised by a qualified supervisor as described in 130 CMR 429.424(A) through (D). This is because a great majority of the Supervisors between 2009 and 2015 were not independently licensed/certified/registered in one of the core disciplines and thus

---

[35] 130 CMR 429.424(A)(1)
[36] 130 CMR 429.424(B)(1)
[37] 130 CMR 429.424(C)(1)
[38] 130 CMR 429.424(D)(1)
[39] Include psychiatry, social work, psychology, or psychiatric nursing (including a psychiatric clinical nurse specialist). *See* 130 CMR 429.402.
[40] *See* MBHP manuals, Exhibits 1 and 2.

not qualified to supervise other clinicians during their employment at South Bay.[41] *See* Supervisors License status, Exhibit 5. As such, a vast majority of the staff therapists across the South Bay facilities were supervised by individuals who were unlicensed or inadequately licensed to be able to supervise and comply with regulations. All claims for services submitted to MassHealth by the unlicensed and unsupervised staff therapists at the relevant time period are false and fraudulent, spanning over the entire time of the treatment of the patients, in many cases for years. Unsupervised, unlicensed staff therapists cannot diagnose or treat patients.

152. Because a significant percentage of the non-licensed clinicians and certain licensed clinicians[42] did not receive the required supervision under MassHealth regulations, mental health services provided to approximately 35,000 patients[43] per year by South Bay were fraudulently invoiced to MassHealth, MBHP, and MCOs. In fact, scores of individuals who were called Supervisors and who were acting as Supervisors, were not in fact qualified as Supervisors pursuant to 130 CMR 429.424(A) through (D) as required. Unlicensed, inexperienced, and unsupervised clinicians were evaluating, diagnosing, and treating thousands of patients per year, ranging in age from 5 to 95 years old, who were suffering from some of the worst known recognized mental illness including: paranoid schizophrenia, severe psychoses, severe depression, suicidality, and more. *See* list of South Bay diagnosis codes, Exhibit 6. This is exactly what the regulations were designed to prevent.

---

[41] Of the 78 Supervisors known to the Relator between 2009-2015, only two (2) Supervisor, Kelley Wallace and Tracee Sprong (Licensure Supervisor), were licensed in one of the core disciplines (LISCW), as required for the position, *throughout* their tenure at South Bay. Nineteen (19) other Supervisors were licensed in one of the core disciplines *only during part* of their tenure at South Bay. At least during some part of their tenure, these 19 Supervisors supervised clinicians while not properly licensed as required for this position by MassHealth regulations. Twenty-eight (28) Supervisors were licensed as either a LMHC, LCSW, or LMFT, but not able to supervise others as these are not one of the core disciplines according to MassHealth regulations. Twenty-four (24) Supervisors were not licensed at all. Five (5) Supervisors received their license after their employment with South Bay or after the alleged six-year period of wrongdoing (2009-2015).

[42] For example, licensed clinical social workers (LCSWs)

[43] By 2013, the number of patient treated yearly by South Bay had increased.

153.    Because a majority of the staff therapists were unlicensed and unsupervised, services rendered by these individuals were not medically necessary and/or appropriate, in violation of regulations stated above. According to 130 CMR 429.431(A), prior to the initiation of therapy, a professional staff member authorized to render billable mental health center services must conduct a comprehensive evaluation of each client. Except in the case in which a staff therapist was independently licensed in a core discipline or an unlicensed staff therapist was directly and continuously supervised by a qualified supervisor, comprehensive evaluations were not completed by a qualified mental health provider. A comprehensive evaluation of each client/patient requires a diagnosis from the qualified mental health provider or one supervised continuously and directly by a qualified Supervisor as set forth herein. In each case where such comprehensive evaluation of each MassHealth member prior to the initiation of therapy was not provided by a qualified provider, the entire course of therapy was tainted and non-billable as the therapy was rendered by individuals who were lacking proper licensure and qualified supervision. This means that every invoice for every service of all patients who were not properly evaluated prior to the initiation of therapy was fraudulently submitted. In many cases, therapies lasted several years.

154.    Further, the Relator observed that the South Bay facilities did not have a multidisciplinary team to properly develop a diagnosing evaluation and treatment plan for the patient, as required by the regulations. Instead, the Relator observed that unlicensed and unsupervised staff therapists solely evaluated the clients, carried out the day to day treatments, determined if and when the client could see a psychiatrist, and determined when to terminate treatment without any communication, input, or discussion with qualified staff members. This is in direct violation of 130 CMR 429.432 which states that a multidisciplinary team composed of

at least three members, one of whom is board-certified physician psychiatrist[44], must conduct
treatment planning, assessments, and case review for each member.

<u>Patient Examples</u>

155.    Table 1 below shows 26 Medicare and/or Medicaid patients[45] from the Brockton
facility. Ever one of these patients was treated by staff therapists who were either unlicensed or
not licensed to treat patients independently, and who did not receive the required supervision by
a board-certified psychiatrist, a licensed psychologist, a licensed independent clinical social
worker, or a registered psychiatric nurse, as required by the regulations. *See* Exhibits 7 and 8 for
Medicare/Medicaid patient records[46]. Table 1 shows the patients' names (redacted); insurance
providers; dates of service; staff therapist and his/her license status; and provider's Supervisor
and his/her license status.

156.    Table 2 shows nine (9) South Bay patients treated by staff therapists who were
either unlicensed or not licensed to treat patients independently, and who did not receive the
required supervision by a board-certified psychiatrist, a licensed psychologist, a licensed
independent clinical social worker, or a registered psychiatric nurse, as required by the
regulations. These patients were treated at the Weymouth facility. These patients are included as
an indicator that South Bay engaged in the fraudulent practices described herein across all its
facilities. *See* Exhibit 9 for Weymouth facility patient records.

---

[44] Plus at least two of following: licensed psychologist, licensed social worker, a registered psychiatric nurse, a
psychiatric nurse mental health clinical specialist, a licensed mental health counselor, licensed alcohol and drug
counselor, or other licensed mental health and substance abuse practitioner.
[45] At South Bay, a "Medicare waiver" was rendered to the clients to bill Medicaid. Each patient 1-19 has two rows
detailing treatment by two different providers. The "initial session date" and the "date of last session" are known for
the first row. The patient was assigned a new provider at some point during the treatment, as indicated by the second
row. As such, only the date the patient was assigned a new provider is known for the second row. The patient's
"date of last treatment" with the new provider is not indicated in the documents.
[46] Patients' identifying information has been redacted.

**Table 1**

| Client | Insurance | Initial Session Date | Date of Last Session | Current Provider | Current Provider License at date of last session | Current Provider qualified per 429.424 at date of last session | South Bay Facility | Provider's License (eventually) | Date Provider obtained License | Current Direct Supervisor | Current Direct Supervisor License at date of last session | Current Direct Supervisor qualified per 429.424 at date of last session | South Bay Facility | Supervisor's License (eventually) | Date Supervisor obtained License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 1[47] | M&M | 9/12/12 | 6/13/13 | Nicole Caraballo | None | No | Brockton Trauma | LMHC | 3/20/14 | Shannon Richardson | None | No | Brockton Adult | LCSW LISCW | 7/23/13; 4/16/14 |
|  |  |  | 6/19/13 | Amanda Hibbard |  |  | Brockton Adult | LMHC | 10/21/14 |  |  |  |  |  |  |
| Patient 2[48] | M&M | 12/14/12 | 3/19/13 | Sarah Lieber | None | No | Brockton Family | LMHC | 09/09/16 | Lauren Mazzola | None | No | Brockton Family | LMHC | 12/30/13 |
|  |  |  | 4/2/13 | Michael Corrado |  |  | Brockton Family | LMHC | 11/21/14 |  |  |  |  |  |  |
| Patient 3[49] | M&M | 8/10/11 | 12/5/12 | Yun Chu Chen | None | No | Brockton Family |  |  | Rachel Palmer | LCSW | No | Brockton Family | LCSW LICSW | 09/01/10; 1/25/13 |
|  |  |  | 12/11/12 | Inessa Althsuler |  |  | Brockton Family | LMHC | 11/09/15 |  |  |  |  |  |  |
| Patient 4[50] | M&M | 12/14/10 | 7/25/13 | Melissa LeBlanc | None | No | Brocton | LMHC | 7/30/14 | Marissa Bedrosian | None | No | Brockton Dual | LMHC | 4/16/14 |
|  |  |  | 7/29/13 | Meghan List |  |  | Brockton Forensic | LCSW LICSW | 10/25/12 ; 01/29/16 |  |  |  |  |  |  |
| Patient 5[51] | M&M | 5/30/13 | 7/17/2013 | Jessica Jones | None | No | Brockton Trauma | LMHC | 04/20/17 | Shannon Richardson | None | No | Brockton Adult | LCSW LISCW | 7/23/13; 4/16/14 |
|  |  |  | 7/18/13 | Rebecca Wassell |  |  | Brockton Forensic | LCSW LICSW | 6/10/13; 12/19/16 |  |  |  |  |  |  |

[47] Received treatment for diagnosis codes: 300.02 (Generalized Anxiety Disorder); 296.32 (Major depressive affective disorder, recurrent episode, moderate); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[48] Received treatment for diagnosis codes: 295.30 (Paranoid type schizophrenia, unspecified); V71.09 (Observation for other suspected mental condition).

[49] Received treatment for diagnosis codes: 296.32 (Major depressive affective disorder, recurrent episode, moderate); 300.21 (Agoraphobia with panic disorder); V71.09 (Observation for other suspected mental condition).

[50] Received treatment for diagnosis codes: 296.32 (Major depressive affective disorder, recurrent episode, moderate); 309.81 (Posttraumatic stress disorder); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[51] Received treatment for diagnosis codes: 296.62 9 {Bipolar I disorder, most recent episode (or current) mixed, moderate}.

| Patient | M&M | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 6[52] | M&M | 8/10/12 | on or before 02/05/13 | Nicole Burk | None | No | Brockton Trauma | | | Shannon Richardson | None | No | Brockton Adult | LCSW LISCW | 7/23/13; 4/16/14 |
| | | 2/5/13 | | Inessa Althsuler | | | Brockton Family | LMHC | 11/09/15 | | | | | | |
| Patient 7[53] | M&M | 2/3/12 | 12/3/12 | Molly Sloate Dowden | None | No | Brockton Family | | | Lauren Mazzola | None | No | Brockton Family | LMHC | 12/30/13 |
| | | 12/11/12 | | Inessa Althsuler | | | Brockton Family | LMHC | 11/09/15 | | | | | | |
| Patient 8[54] | M&M | 7/16/12 | 4/19/13 | Rachel Cuffe | LCSW | No | Brockton Trauma | LCSW LICSW | 12/27/11; 7/30/14 | Aditi Gohil | LMHC | No | Brockton | | 12/2/10 |
| | | 4/24/13 | | Danielle Minihane | | | Brockton Forensic | | | | | | | | |
| Patient 9[55] | M&M | 10/31/11 | 2/27/12 | Charis Stone Racer | None | No | Brockton Trauma | | | Danielle Dunn | LMHC | No | Brockton Region Director | | 4/4/08 |
| | | 6/5/12 | | Amanda Hibbard | | | Brockton Adult | LMHC | 10/21/14 | | | | | | |
| Patient 10[56] | M&M | 10/3/12 | 1/21/13 | Malachy Fallon | None | No | Brockton | LMHC | 12/09/15 | Aditi Gohil | LMHC | No | Brockton | | 12/2/10 |
| | | 2/25/13 | | Meagan Noah | | | Brockton Family | LMHC | 10/9/14 | | | | | | |
| Patient 11[57] | M&M | 2/22/13 | 3/12/2013 | Jessica Konior | LCSW | No | Brockton Trauma | LCSW LICSW | 03/08/13; 09/30/14 | Shannon Richardson | None | | Brockton Adult | LCSW LISCW | 7/23/13; 4/16/14 |
| | | 3/14/13 | | Lee-Ann Thoms | | | Brockton Adult | LCSW LISCW | 5/14/13; 9/16/13 | | | | | | |

[52] Received treatment for diagnosis codes: 309.81 (Posttraumatic stress disorder); 311 (Depressive disorder, not elsewhere classified); V71.09 (Observation for other suspected mental condition).

[53] Received treatment for diagnosis codes: 300.4 (Dysthymic disorder); 300.02 (Generalized anxiety disorder); V71.09 (Observation for other suspected mental condition).

[54] Received treatment for diagnosis codes: 300.23 (Social phobia); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[55] Received treatment for diagnosis codes: 309.81 (Posttraumatic stress disorder); 296.89 (Other bipolar disorders); 304.80 (Combinations of drug dependence excluding opioid type drug, unspecified); 799

[56] Received treatment for diagnosis codes: 295.30 (Paranoid type schizophrenia, unspecified); 850.9 (Concussion, unspecified); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[57] Received treatment for diagnosis codes: 300.22 (Agoraphobia without mention of panic attacks); 299.80 (Other specified pervasive developmental disorders, current or active state).

| Patient | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 12[58] | M&M | on or before 02/04/13 | on or before 02/04/13 | Rachel Cuffe | LCSW | No | Brockton Trauma | LCSW LICSW | 12/27/11; 7/30/14 | Aditi Gohil | LMHC | No | Brockton | | 12/2/10 |
| | | 2/4/13 | | Lee-Ann Thoms | | | Brockton Adult | LCSW LISCW | 5/14/13 9/16/13 | | | | | | |
| Patient 13[59] | M&M | 2/1/10 | 3/11/13 | Jessica Konior | LCSW | No | Brockton Trauma | LCSW LICSW | 03/08/13; 09/30/14 | Shannon Richardson | None | No | Brockton Adult | LCSW LISCW | 7/23/13; 4/16/14 |
| | | 3/19/13 | | Lee-Ann Thoms | | | Brockton Adult | LCSW LISCW | 5/14/13 9/16/13 | | | | | | |
| Patient 14[60] | M&M | 1/10/13 | 1/10/13 | Nicole Burk | None | No | Brockton Trauma | | | Shannon Richardson | None | No | Brockton Adult | LCSW LISCW | 7/23/13; 4/16/14 |
| | | 2/11/13 | | Amanda Hibbard | | | Brockton Adult | LMHC | 10/21/14 | | | | | | |
| Patient 15[61] | M&M | 9/12/2012 | 10/31/2012 | Marilyn Ramkissoon | LMHC | No | Brockton Family | | 6/25/97 | Lauren Mazzola | None | No | Brockton Family | LMHC | 12/30/13 |
| | | 2/13/2013 | | Inessa Althsuler | | | Brockton Family | | | | | | | | |
| Patient 16[62] | M&M | 7/17/2012 | on or before 01/02/2013 | Leslie Libertine | LMHC | No | Brockton Dual | | 3/23/04 | Marissa Bedrosian | None | No | Brockton Dual | LMHC | 4/16/14 |
| | | 1/3/2013[63] | | Michael Corrado | | | Brockton Family | LMHC | 11/21/14 | | | | | | |
| Patient 17[64] | M&M | 1/11/2008 | 2/27/2013 | Kathleen Smith | none | No | Brockton Family | | | Lauren Mazzola | None | No | Brockton Family | LMHC | 12/30/13 |
| | | 3/1/2013 | | Inessa Althsuler | | | Brockton Family | | | | | | | | |

---

[58] Received treatment for diagnosis codes: 296.33 (Major depressive affective disorder, recurrent episode, severe, without mention of psychotic behavior); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[59] Received treatment for diagnosis codes: 296.32 (Major depressive affective disorder, recurrent episode, moderate); V71.09 (Observation for other suspected mental condition).

[60] Received treatment for diagnosis codes: 311 (Depressive disorder, not elsewhere classified); V71.09 (Observation for other suspected mental condition).

[61] Received treatment for diagnosis codes: 304.51 (Bulimia nervosa); 269.33 (Major depressive affective disorder, recurrent episode, severe, without mention of psychotic behavior); 300.02 (Generalized anxiety disorder); V71.09 (Observation for other suspected mental condition).

[62] Received treatment for diagnosis codes: 300.02 (Generalized anxiety disorder); 303.90 (Other and unspecified alcohol dependence, unspecified); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[63] Leslie Libertine signed on 01/02/2013 that she was the patient's current provider. The patient was then transferred to Michael Corrado. Mr. Corrado signed the document as "01/03/12."

[64] Received treatment for diagnosis codes: 296.32 (Major depressive affective disorder, recurrent episode, moderate); 309.81 (Posttraumatic stress disorder).

| Patient | Insurance | Date of Service | | Provider | Provider's License at time of treatment | | South Bay facility | Provider's License (eventually) | Date Provider Obtained License | Provider's Supervisor | Supervisor's License at time of treatment | | South Bay facility | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 18[65] | M&M | 7/20/2012 | 11/27/12 | Jennifer Karno | LCSW | No | Brockton Forensic | LICSW | 2/18/2014 | Allison O'Connell[66] | None | No | Brockton Forensic | |
| | | | 11/28/12 | Meghan List | | | Brockton Forensic | LCSW LICSW | 10/25/12; 01/29/16 | | | | | |
| Patient 19[67] | M&M | 8/21/2012 | 11/19/2012 | Jennifer Karno | LCSW | No | Brockton Forensic | LICSW | 2/18/2014 | Allison O'Connell | None | No | Brockton Forensic | |
| | | | 12/3/2012 | Rebecca Wassell | | | Brockton Forensic | LCSW; LICSW | 6/10/13; 12/19/16 | | | | | |
| Patients 20-22 | M&M | On or about 04/02/10 | On or about 04/02/10 | Tyler Babineau[68] | None | No | Brockton Forensic | | | Dan Stewart | None | No | Brocton Forensic | |
| Patients 23-26 | Medicaid | On or about 04/02/10 | On or about 04/02/10 | Tyler Babineau | None | No | Brockton Forensic | | | Dan Stewart | None | No | Brocton Forensic | |

**Table 2**

| Client | Insurance | Date of Service[69] | | Provider | Provider's License at time of treatment | Provider qualified per 429.424 | South Bay facility | Provider's License (eventually) | Date Provider Obtained License | Provider's Supervisor | Supervisor's License at time of treatment | Supervisor qualified per 429.424 | South Bay facility | Supervisor's License (eventually) | Date Supervisor Obtained License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 53 | | 03/14/2011 | | Edward Flynn[70] | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 54 | | 03/15/2011 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 55 | | 03/11/2011 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 56 | | 03/02/2011 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |

[65] Received treatment for diagnosis codes: 309.81 (Posttraumatic stress disorder); 304.30 (Cannabis dependence, unspecified); 799.9 (Other unknown and unspecified cause of morbidity and mortality).

[66] The "Supervision Files Checklist" form for Allison O'Connell dated 04/05/2011 states that Ms. O'Connell had 89 IAPs [treatment plans] and CAs [comprehensive assessments] in her chart.

[67] Received treatment for diagnosis codes: 300.02 (Generalized anxiety disorder); 71.09 (Observation for other suspected mental condition).

[68] Tyler Babineau's "Coaching Plan" dated 04/02/2010 shows that Mr. Babineau's Supervisor was Dan Stewart. This "Coaching Plan" also shows that Mr. Babineau had 35 "Active Clients/Open Cases" and 23 (not including terminations) "Active Client Hrs Possible Weekly."

[69] Listed are only the specific dates of service known to the Relator.

[70] Edward Flynn's "Coaching Plan" dated 03/24/2011 shows that Mr. Flynn's Supervisor was Kristin Sweeney. This "Coaching Plan" also shows that Mr. Flynn had 26 "Active Clients/Open Cases" and 30 "Active Client Hrs Possible Weekly."

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 57 | | 03/10/11; 03/17/11 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 58 | | 03/08/201 1 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 59 | | 03/07/201 1 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 60 | | 03/05/11; 03/15/11; 03/17/11 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |
| Patient 61 | | 03/08/11; 03/15/11 | | Edward Flynn | None | No | Weymouth | LMHC | 02/11/16 | Kristin Sweeney | None | No | Weymouth | | |

157.     At all relevant times, the Relator observed that South Bay engaged in the practice

of having unlicensed and unsupervised staff therapists treat MassHealth patients **across all 17 of**

**its facilities**. As part of her duties as a Job Coach, and later as the Coordinator of Staff

Development and Training, the Relator was tasked with training new clinicians, Supervisors,

Directors, and Regional Directors. As a result, she had contact with many different staff

therapists, supervisors, and directors who worked at the different South Bay facilities. She

observed that a substantial number of the staff therapists were not licensed or properly licensed

to independently treat patients. She also observed that these therapists did not receive appropriate

supervision by a qualified supervisor because many of the supervisors and directors either lacked

a license, registration or certification completely; or lacked the correct type of license,

registration or certification in one of the core disciplines to be able to supervise other clinicians

as required by the regulations.

158.     At all relevant times, the Relator observed the same pattern of unlicensed and

unsupervised therapists treating patients at each of the 17 South Bay facilities. The fraudulent

activities observed by the Relator at the various facilities of South Bay are depicted below in

paragraphs 159-199 and supported by Exhibits 5 and 11[71].

### a.     Attleboro Branch

159.     This satellite facility is located at 607 Pleasant Street, Suite 115, Attleboro,

Massachusetts. At relevant times, Relator is aware of at least 125 individuals who worked for

South Bay from this location. Yet neither the Regional Director nor the Clinic Directors, known

to the Relator, were licensed as required for these positions pursuant to 130 CMR 429.423 and

---

[71] *See* supporting documents for all facilities noted in this section, Exhibit 11. These spreadsheets relate to the wrongdoing observed by the Relator between 2008-2014. Updated spreadsheets related to the wrongdoing observed by the Relator during the relevant time period are included as Exhibit 5.

429.424 during their tenure at South Bay. Also, only two of the Supervisors were licensed in one of the core disciplines, pursuant to 130 CMR 429.424 and 429.439, at least during part of their tenure at South Bay[72].

160.    One staff therapists, George Devlin (LICSW), maintained an independent clinical license during his entire tenure to be able to work as clinicians[73].

161.    A majority of the staff therapists at Attleboro were not licensed in one of the core disciplines to be able to treat patients independently and were supervised by unlicensed individual or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

###    b.    *Brockton Branch*

162.    The Brockton location is South Bay's headquarters. It is located at 1115 West Chestnut Street, Brockton, Massachusetts. At relevant times, Relator is aware of at least 300 individuals who worked for South Bay from this location. Because Brockton is a larger location, compared to the other locations, the number of licensed individuals is greater at Brockton. Brockton has both Day Services and Mental Health Clinic Services provided at the Commercial Street location. The issues raised by Relator herein are solely related to the Mental Health Clinic Services provided by South Bay.

---

[72] Cheryl Pratt and Juleah Berliner were LICSWs during *part* of their tenure as Supervisors at South Bay.
[73] Staff therapists' license status is based on the information known to the Relator at the time she worked at South Bay.

163.    Only one[74] of the Regional Directors and three[75] of the Clinic Directors, known to the Relator, were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424, at least during part of their tenure at South Bay. Also, only six[76] of the "Supervisors" were licensed as required for this position, at least during part of their tenure as Supervisors at South Bay.

164.    A substantial number of the staff therapists at Brockton were not licensed in one of the four core disciplines to be able to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

    *c.*   ***Cape Cod Branch***

165.    The Cape Cod Branch is located at 470 Main Street, Mashpee, Massachusetts.  At relevant times, Relator is aware of at least 50 individuals who worked for South Bay from this location. None of the individuals designated as the Regional Directors nor the Clinic Directors were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424

---

[74] Katherine Morrill, Regional Director, was a LICSW at least during part her tenure as Regional Director at South Bay.

[75] Kathryn Wells and Meagan Callahan were LICSWs throughout their tenure as Clinical Directors at South Bay. Shannon Richardson was a LICSW during part of her tenure as Clinic Director at South Bay.

[76] Megan Callahan was a LICSW only during part of her tenure as a Supervisor at South Bay; Andrea Nardini was a LICSW only during part of her tenure as a Supervisor at South Bay; Colleen Feeney was a LICSW only during part of her tenure at South Bay; Kristina Garland was a LICSW during part of her tenure at South Bay; Rachel Palmer was a LICSW only during part of her tenure at South Bay; Christina McElroy was a LICSW only during part of her tenure as a Supervisor at South Bay.

throughout their tenure at South Bay. Also, none[77] of the individuals named and acting as

Supervisors, known to the Relator, were licensed in one of the core disciplines pursuant to 130

CMR 429.424 and 429.439 throughout their tenure at South Bay.

166.    Relator is aware of three individuals who were independently licensed at this

location of the more than 50 employees: Carol Wood, Lynne Salter, and Sherry Thomson.

Notably, none of them were supervisors.

167.    There are additional individuals at Cape Cod who were independently licensed,

such as Mary-Lynn Swanson, Alicia Kupchik, and Paige Rawlins, but they had not yet achieved

independent licensure when they each were first employed by South Bay and yet they provided

services prior to licensure.  More important, they along with the other staff therapists at Cape

Cod, during their tenure at South Bay, diagnosed and treated MassHealth members in violation

of 130 CMR 429.424[78].

168.    A majority of the staff therapists at Cape Cod were not licensed in one of the core

disciplines to be able to treat independently and were supervised by unlicensed individuals or

persons inadequately licensed to supervise. These staff therapists were not properly supervised as

required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by

them are false and fraudulent. In addition, the certification required to be signed with each

invoice submission stating that "the information submitted in, with, or in support of the claim is

true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true,

accurate or complete.

    d.    **Chelsea Branch**

---

[77] Stephen L. Smith was a LCSW as of 03/04/2011. The Relator recalls that he was terminated from South Bay due to allegations of misconduct. Stephen L. Smith's license is marked as "probation" and "suspension."
[78] Staff therapists' license status is based on the information known to the Relator at the time she worked at South Bay.

169.     The Chelsea Branch is located at 70 Everett Avenue, Suite 515, Chelsea, Massachusetts. This is a fairly new location and opened in 2014. It started out very small and employed five individuals who worked directly from Chelsea. Nevertheless, neither the Regional Director not the Clinic Director were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout their tenure at South Bay.

170.     The staff therapists at Chelsea were not licensed in one of the core disciplines to be able to treat patients independently during the relevant time period. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C) by the staff at the Chelsea facility[79].

### e.     Dorchester Branch

171.     The Dorchester Branch is located at 415 Neponset Avenue, 3rd Floor, Dorchester, Massachusetts. At relevant times, the Relator is aware of at least 30 individuals who worked for South Bay from this location. The Regional Director was not licensed as required for this position pursuant to 130 CMR 429.423 and 429.424 throughout her tenure at South Bay. The Clinic Director, Colleen Feeney, was a LICSW, but even she did not obtain her individual clinic license as a social worker until March 2014. Also, none of the individuals named and acting as Supervisors, known to the Relator, were licensed in one of the core disciplines pursuant to 130 CMR 429.424 and 429.439 throughout their tenure at South Bay. As such, a majority of the individuals who worked at Dorchester and diagnosed and treated MassHealth members did so in violation of 130 CMR 429.424.

---

[79] On information, the Relator states that the Chelsea facility is a dependent satellite facility. Dependent satellite facilities may have a supervisor on staff. According to 130 CMR 429.439(B) and (C), the supervision in a dependent satellite program may come from the parent center. The Director of Clinical Services at the parent center must ensure that supervision requirements of 130 CMR 429.438(E) are performed. If the satellite program's staff do not meet the qualifications for core disciplines as outlined in 130 CMR 429.424, they must receive supervision from qualified core staff professionals of the same discipline at the parent center." *See* 130 CMR 429.422(D).

172.    A majority of the staff therapists at Dorchester were not licensed in one of the core disciplines to be able to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

### f.    Fall River Branch

173.    The Fall River Branch is located at 1563 North Main St., Suite 202, Fall River, Massachusetts. At relevant times, the Relator is aware of at least 100 individuals who worked for South Bay from this location. None of the individuals designated as the Regional Directors nor the Clinic Directors, known to the Relator, were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout their tenure at South Bay. Only two of the Supervisors known to the Relator were licensed in one of the core disciplines pursuant to 130 CMR 429.424 and 429.439, at least during part of their tenure at South Bay[80].

174.    Relator is aware of three individuals who were independently licensed at this location of the more than 100 individuals. Four individuals held an independent license during their entire tenure at South Bay and an additional four individuals obtained their license some time after they had commenced their employment at South Bay. Additional individuals on the roster who were independently licensed include Margot Lynn (Conley), Karen Pirog, Kerry Duarte, Adriana Guerrero-Owens, Benjamin Mahoney, Cindy Medeiros, Jennifer Killenberg, and

---

[80] Michael Venezia did not obtain his individual clinic license as a social worker (LISCW) until September of 2015; Danni Bultemeier was a LICSW during part of his tenure at South Bay.

Rebecca Gessow, but these individuals were not licensed while they were employed at South Bay. They each received their independent licensure after their termination from South Bay. More important, during their tenure at South Bay, they diagnosed and treated MassHealth members in violation of 130 CMR 429.424[81].

175.    A significant number of the staff therapists at Fall River were not licensed in one of the core disciplines to be able to treat independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

g.    **Lawrence Branch**

176.    The Lawrence Clinic is located at 360 Merrimack Street, Building 9, Door-H Lawrence, Massachusetts. At relevant times, the Relator is aware of at least 100 individuals who worked for South Bay from this location.  None of the individuals designated as the Regional Directors nor the Clinic Directors were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout their tenure at South Bay. However, one[82] of the Clinic Directors was a Licensed Independent Clinical Social Worker (LICSW) during *part* of her tenure as Clinic Director at South Bay. In addition, only one[83] of the individuals named and acting as

---

[81] Staff therapists' license status is based on the information known to the Relator at the time she worked at South Bay.
[82] Kristina Garland was a LICSW during part of her tenure as Clinic Director at South Bay.
[83] Kelley Wallace was a LICSW throughout her tenure as Supervisor at South Bay.

Supervisors known to the Relator was licensed in one of the core disciplines pursuant to 130 CMR 429.424 and 429.439 throughout her tenure at South Bay.

177.    A majority of the staff therapists at Lawrence were not licensed in one of the core disciplines to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

### *h.*    *Leominster Branch*

178.    The Leominster Branch is located at 80 Erdman Way, Suite 208, Leominster, Massachusetts. At relevant times, the Relator is aware of at least 25 individuals who worked for South Bay from this location.  The Leominster Branch is the only location where the Regional Director[84], the Clinic Director[85] and the Supervisor[86] were licensed as required for these positions, at least during part of their tenure in the respective positions at South Bay.

179.    South Bay hired two staff therapists[87] for this location who failed to meet the minimal requirements of staff therapists under 130 CMR 429.424.  These two individuals bring to light of South Bay's additional failures. South Bay regularly hired individuals who lacked the minimal qualifications to diagnose and treat patients.

---

[84] Rebecka Humphrey (LISCW)
[85] Juleah Berliner (LISCW)
[86] Brooke Chamberland (LISCW)
[87] Robert Moore and Cassandra Durand

180.   On more than one occasion Relator expressed concern that the individuals in her New Hire Training Courses appeared to be unqualified to commence working. The first time this occurred, Relator had previously met the new hire while they were both previously employed elsewhere. Relator relayed her concerns that the new hire, Donna Scott, was not clinically qualified to diagnose and treat patients. Despite the Relator's objections, South Bay hired Donna Scott, even though she did not meet the minimal requirements to treat and diagnose patients. Although Donna Scott is not one of the two individuals who lacked qualifications at Leominster, it was a widespread practice at South Bay to hire unqualified therapists.

### i.   *Lowell Branch*

181.   The Lowell Branch is located at 22 Old Canal Drive, Lowell, Massachusetts. At relevant times, the Relator is aware of at least 150 individuals who worked for South Bay from this location. The Regional Director was not properly licensed as required for this position pursuant to 130 CMR 429.423 and 429.424. Although the Relator is aware of three individuals at this location in a supervisory role that were independently licensed, one of them, Katherine Morrill (LISCW), was one of the Clinic Directors and to the best of Relator's knowledge, she did not directly oversee any staff therapists. Another one, Olga Lisysyan only received her license (LISCW) in January of 2015, and yet had been employed by South Bay and provided services since 2010. The third one, Christopher Marobella (LISCW), was the part-time licensure supervisor, meaning that he too did not directly and continuously supervise anyone.[88] Consequently, a majority of the staff who worked at Lowell diagnosed and treated MassHealth members in violation of 130 CMR 429.424.

---

[88] He provided one-hour supervisions once a week to satisfy an individual's licensure board to obtain initial licensure. He did not perform performance reviews, hire/fire, assume responsibility for any patients, etc.

182. A majority of the staff therapists at Lowell were not licensed in one of the core disciplines to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

### j.   Lynn Branch

183. The Lynn Branch is located at 181 Union Street, Suite J, Lynn, Massachusetts. At relevant times, the Relator is aware of at least 30 individuals who worked for South Bay from this location. Neither the Regional Director nor the Clinic Director were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout their tenure at South Bay. Also, none of the individuals named and acting as Supervisors, known to the Relator, was licensed in one of the core disciplines pursuant to 130 CMR 429.424 and 429.439 throughout tenure at South Bay.

184. The Relator is aware of one individual who is independently licensed at this location, Carol Hull, and she only worked for South Bay for four weeks. Notably, she was not a supervisor. There are additional individuals on the roster who are currently independently licensed, such as Bianca Deeb and Lauren Ide, but they had not achieved independent licensure during their tenure at South Bay. As such, they along with the other staff therapists at Lynn,

during their tenure at South Bay, diagnosed and treated MassHealth members in violation of 130

CMR 429.424[89].

185.     A majority of the staff therapists at Lynn were not licensed in one of the core

disciplines to treat patients independently and were supervised by unlicensed individuals or

persons inadequately licensed to supervise. These staff therapists were not properly supervised as

required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by

them are false and fraudulent. In addition, the certification required to be signed with each

invoice submission stating that "the information submitted in, with, or in support of the claim is

true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true,

accurate or complete.

### k.     *Malden Branch*

186.     The Malden Branch is located at 22 Pleasant Street, Malden, Massachusetts.  The

Regional Director was not properly licensed as required for this position pursuant to 130 CMR

429.423 and 429.424. Even though this location has one independently licensed supervisor,

Kristen Rossino, and even though the Relator does not know which staff therapists Ms. Rossino

directly and continuously supervised, Ms. Rossino did not obtain her independent license

(LICSW) until late 2012, and the remaining staff who were not directly supervised by Ms.

Rossino would have been under the direct and continuous supervision of the Clinic Director,

Elizabeth Yoder, who was not licensed as required for this position pursuant to 130 CMR

429.423 and 429.424 throughout her tenure at South Bay.

### l.     *Pittsfield Branch*

---

[89] Staff therapists' license status is based on the information known to the Relator at the time she worked at South Bay.

187.    The Pittsfield Branch is located at 100 North Street, Pittsfield, Massachusetts. This is a fairly new location opened in 2014. It started out very small and employed three individuals who worked directly from Pittsfield. Even though the Regional Director, Rebecka Humphrey, is an independently licensed clinical social worker (LISCW), she does not directly and continuously supervise the staff at Pittsfield. Accordingly, neither the Clinic Director nor the two staff therapists working at Pittsfield were licensed in one of the core disciplines to be able to treat independently and were not directly and continuously supervised by licensed individuals pursuant to 130 CMR 429.424, by staff at the facility[90].

### m.    Plymouth Branch

188.    The Plymouth Branch is located at 50 Aldrin Road, Plymouth, Massachusetts. At relevant times, the Relator is aware of at least 80 individuals who worked for South Bay from this location. Neither the Regional Director nor the Clinic Directors were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout their tenure at South Bay. Also, only one[91] of the individuals named and acting as Supervisors, known to the Relator, was licensed in one of the core disciplines pursuant to 130 CMR 429.424 and 429.439, at least during part of her tenure at South Bay.

189.    Relator is aware of three other individuals who were independently licensed at this location: Mary Grosso, Rebecca Getterman, and Kathleen Dunn[92].

---

[90] On information, the Relator states that the Pittsfield facility is a dependent satellite facility. Dependent satellite facilities may have a supervisor on staff. According to 130 CMR 429.439(B) and (C), the supervision in a dependent satellite program may come from the parent center. The Director of Clinical Services at the parent center must ensure that supervision requirements of 130 CMR 429.438(E) are performed. If the satellite program's staff do not meet the qualifications for core disciplines as outlined in 130 CMR 429.424, they must receive supervision from qualified core staff professionals of the same discipline at the parent center." See 130 CMR 429.422(D).
[91] Dianna Barbosa was a LICSW during part of her tenure at South Bay. She left her employment in May of 2009 and the Relator is not sure whom Ms. Barbosa directly and continuously supervised.
[92] Staff therapists' license status is based on the information known to the Relator at the time she worked at South Bay.

190.    A majority of the staff therapists at Plymouth were not licensed in one of the core
disciplines to be able to treat patients independently and were supervised by unlicensed
individuals or persons inadequately licensed to supervise. These staff therapists were not
properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such,
claims submitted by them are false and fraudulent. In addition, the certification required to be
signed with each invoice submission stating that "the information submitted in, with, or in
support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e),
was not in fact true, accurate or complete.

### n.    *Salem Branch*

191.    The Salem Branch is located at 35 Congress Street, Suite 214, Salem,
Massachusetts. At relevant times, the Relator is aware of at least 80 individuals who worked for
South Bay from this location. Neither the Regional Director nor the Clinic Director were
licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout
their tenure at South Bay. Also, none of the individuals named and acting as clinic Supervisors,
known to the Relator, were licensed in one of the core disciplines pursuant to 130 CMR 429.424
and 429.439 throughout tenure at South Bay. There was, however, a Licensure Supervisor,
Tracee Sprong, who was properly licensed (LICSW) to supervise others, but as a licensure
supervisor, she was not in charge of directly and continuously overseeing anyone's work.

192.    Relator is aware of one individual who was independently licensed at this
location, Kathleen Zubick. Holly Barron, Jessica Bocca, Lee Fuoco, Marissa Demirel, Paul
Larrabee, and Phenice Zawatsky all earned their independent clinical licenses well after they

departed from South Bay's Salem location, but while each of them treated patients and billed MassHealth during their tenure at South Bay, they did so in violation of 130 CMR 429.424[93].

193.    A majority of the staff therapists at Salem were not licensed in one of the core disciplines to be able to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

### o.    *Springfield Branch*

194.    The Springfield Branch is located at 140 High Street, Suite 230, Springfield, Massachusetts. At relevant times, the Relator is aware of at least 40 individuals who worked for South Bay from this location. Even though the Regional Director in charge of Springfield, Rebecka Humphrey, is an independently licensed clinical social worker (LICSW), she does not directly and continuously supervise the staff at Springfield. Neither the Clinic Director nor the Supervisor, known to the Relator, were licensed in one of the core disciplines pursuant to 130 CMR 429.424 throughout their tenure at South Bay.

195.    A majority of the staff therapists at Springfield were not licensed in one of the core disciplines to be able to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such,

---

[93] Staff therapists' license status is based on the information known to the Relator at the time she worked at South Bay.

Page **74** of **92**

claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

### p.  *Weymouth Branch*

196.    The Weymouth branch is located at 541 Main Street, Suite 303, Weymouth, Massachusetts. At relevant times, the Relator is aware of over 100 individuals who worked for South Bay from this location.  Because Weymouth is one of the larger locations within South Bay's umbrella, the number of independently licensed individuals is greater at Weymouth. Nevertheless, neither the Regional Directors nor the Clinic Directors were licensed as required for these positions pursuant to 130 CMR 429.423 and 429.424 throughout their tenure at South Bay. Only four[94] of the Supervisors, known to the Relator, were licensed as required for this position pursuant to 130 CMR 429.423 and 424.439, at least during part of their tenure at South Bay.

197.    A majority of the staff therapists at Weymouth were not licensed in one of the core disciplines to be able to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in

---

[94] Megan Rohrwasser (LICSW), Laura Gaskins (LISCW), Catherane Faucher (LICSW) and Angela Smith (LICSW). Brian Chau earned his license as an Independent Clinical Social Worker (LICSW) after leaving his employment with South Bay.

support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

### q. *Worcester Branch*

198.   The Worcester branch is located at 340 Main Street, Suite 818, Worcester, Massachusetts. At relevant times, the Relator is aware of over 120 individuals who worked for South Bay from this location. Neither the Clinic Directors nor the Supervisors, known to the Relator, were licensed as required for these positions pursuant to 130 CMR 429.424.

199.   A majority of the staff therapists at Worcester were not licensed in one of the core disciplines to be able to treat patients independently and were supervised by unlicensed individuals or persons inadequately licensed to supervise. These staff therapists were not properly supervised as required by 130 C.M.R. 429.424; 429.438(E); and 424.439(C). As such, claims submitted by them are false and fraudulent. In addition, the certification required to be signed with each invoice submission stating that "the information submitted in, with, or in support of the claim is true, accurate, and complete," pursuant to 130 C.M.R. § 450.223(C)(2)(e), was not in fact true, accurate or complete.

200.   The average staff therapist working for South Bay was assigned between 40 and 60 patients. Sometimes, South Bay assigned up to 80 patients to new therapists, but the number of patients per therapist stabilized around 40-60 patients, and each therapist treated at least 20 patients a week, a majority of whom were MassHealth members. South Bay employed vast number of unqualified individuals who diagnosed and treated MassHealth members and billed for these claims in violation of the regulations.

### C. Defendants' violations of MCHB and MCO requirements, all material to payment of invoices submitted

201.    In addition to receiving Medicaid payments through the fee-for service directly through MassHealth, Defendant South Bay also received Medicaid funds through the Massachusetts Behavioral Health Partnership ("MBHP") and various managed care organizations ("MCOs"). MassHealth contracts with MBHP to help administer some of the state's Medicaid funds for mental health services.

202.    For the period of 2009 through 2015 South Bay allowed its unlicensed, inexperienced and unqualified counselors to treat patients with mental health issues without the supervision of qualified Supervisors, many of whom were also unlicensed. This violated the MassHealth regulations. In addition, between 2009 and 2014, in allowing unlicensed, inexperienced, unqualified counselors to treat patients with mental health issues, without supervision by a qualified Supervisor, South Bay also violated MBHP's and various MCOs' qualification requirements for Supervisors.

203.    Between 2009-2014, both, MBHP and various MCO's required that Master' level mental health counselors be supervised by a LICSW, a licensed psychologist, a licensed master's-level clinical nurse specialist, or a licensed psychiatrist meeting contractor's credentialing criteria. LMHCs could not supervise clinicians who were treating MBHP and MCO[95] patients. However, as observed by the Relator, at South Bay, staff therapists who were either unlicensed or not licensed to treat patients independently, and who did not receive the required supervision, treated MBHP and MCO patients during the relevant period of time. *See* Table 3 and paragraph 205 herein.

204.    The regulations of MassHealth, MBHP, and various MCOs were material to the payment of the submitted invoices.

---

[95] The various MCOs listed in paragraphs 86-89 herein.

205.    Table 3 shows MBHP and MCO patients were treated by unlicensed, unqualified clinicians, who were not supervised by qualified supervisors during the relevant time period. The table shows the patients (names deleted); insurance; dates of service; staff therapist and his/her license status; and provider's Supervisor and his/her license status.

a.    15 MBHP patients (Patients 27 to 41) who were treated by an unlicensed staff therapist, who was supervised by an unqualified supervisor per MBHP regulations, at the Brockton facility.

b.    11 MCO patients (Patients 42-44: Boston HealthNet; Patients 45-52: Neighborhood Health Plan) who were treated by an unlicensed staff therapist, who was supervised by an unqualified supervisor per the stated MCOs' regulations, at the Brockton facility. *See* Tyler Babineau's Patient List, Exhibit 8.

**Table 3**

| Client | Insurance | Initial Session Date | Date of Last Session | Current Provider | Current Provider License at date of last session | Current Provider qualified per 429.424 at date of last session | South Bay Facility | Provider's License (eventually) | Date Provider obtained License | Current Direct Supervisor | Current Direct Supervisor License at date of last session | Current Direct Supervisor qualified per 429.424 at date of last session | South Bay Facility | Supervisor's License (eventually) | Date Supervisor or obtained License |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patients 27-41 | MBHP | On or about 04/02/10 | On or about 04/02/10 | Tyler Babineau | None | No | Brockton Forensic | | | Dan Stewart | None | No | Brocton Forensic | | |
| Patients 42-44 | BHN | On or about 04/02/10 | On or about 04/02/10 | Tyler Babineau | None | No | Brockton Forensic | | | Dan Stewart | None | No | Brockton Forensic | | |
| Patients 45-52 | NHP | On or about 04/02/10 | On or about 04/02/10 | Tyler Babineau | None | No | Brockton Forensic | | | Dan Stewart | None | No | Brockton Forensic | | |

## D. Defendants' Billing Violations

206.    As mentioned, South Bay submitted some of its payments through managed care organizations operating in Massachusetts such as MBHP, HNE, Beacon Health Options (NHP, BMCHP, FH, THP-NH) and CeltiCare. In order to hide the fact that South Bay was hiring unlicensed staff who were being supervised by unlicensed individuals, South Bay employed "licensed signatories" whose function was to sign documents for billing purposes. These individuals were signing off on documents stating what services were rendered to patients, without having directly supervised the individuals who were ostensibly offering the "treatments." In fact, for the most part, the licensed signatories did not even meet the clinicians for whom they were certifying the treatment provided. They were given stacks of files to sign without review and without discussions with the counselors or the patients.

207.    In an email to Jennifer Gearhart dated 12/24/2014, the Relator wrote: "The majority of clinicians said they were told to write in a name of a supervisors other than their actual supervisor. For example, the Dorchester folks were told to write in Amanda Jablonski's [LMHC] name and have her sign the notes, even though they have never met Amanda. One clinician stated that they were being told they had to do this in case they were ever audited." Ed Neuhaus, Jeff Quade, and Rose Camps Lunney were copied on this email. *See* emails, Exhibit 3.

208.    In another email dated 12/24/13, Rose Camps Lunney stated that "UBH and Beacon require non licensed [sic] staff to have the licensed supervisor name on each session note…if staff do not have a direct licensed supervisor, then a licensed supervisor is assigned to them by the site Director, I believe to sign off on these plans and to be noted on their supervision notes…This would not be an issue if all supervisors were independently licensed but they are not." *See* emails, Exhibit 3.

209.    Ms. Gearhart replied to both, the Relator's and Ms. Lunney's emails on

12/23/2013 stating: "This is correct rose [sic] and Chris thank you." *See* 12/24/2013 emails,

Exhibit 3.

210.    Other email correspondence between the Relator and administrators at the

Brockton headquarters shows that the documents signed by the Licensure Supervisors were often

incomplete because they lacked the patients' diagnosis. In a 09/18/2013 email to Sara Farley,

Director of Utilization Management at the time[96], the Relator wrote: "All the new hires said they

were adding the diagnosis after the note was signed. They said they were being instructed by

their mentors, supervisors, and billing staff to do this. They reported that they are generally

unsure about any diagnosis in the first session, so they look it up after the session and just add it

in later on the note. One new clinician stated he thought this was fraudulent because the ps

already signed the document." The Relator was referring to "the Brockton crew, one Dorchester

clinician, and one Plymouth mentor."

211.    In an email response dated the same day, Ms. Farley wrote: "technically the note

should be completely filled out before the person signs it HOWEVER there are a few things that

if forgotten can be completed by the clinician after signature in order to be submitted to billing."

She then added in a follow-up email: "Oh, also – nothing can be considered 'fraudulent' until

proven by a court and proves intent – as Peter [Scanlon] would say…We call it the 'F word' in

our supervision." *See* 09/18/2013 emails, Exhibit 3.

212.    Internal email correspondence between the administrators at the Brockton

headquarters discuss the specific requirements that an unlicensed staff therapist must be overseen

by an independently licensed supervisor are set forth and discussed. In a 09/20/2013 email, Ms.

---

[96] Ms. Farley was promoted to Director of Clinical Operations in 2014.

Lunney stated: "We need to be clear on what they [Beacon Health Strategies] mean by supervised by independent licensed…If it means their direct supervisor of the case then we are not doing that I am guessing sometimes." In her response, the division director of Outpatient Mental Health Services, Jennifer Gearhart, erroneously stated: "if they get supervision of any kind by a licensed staff we are covered and that includes their licensed supervisor." *See* 09/20/2013 emails, Exhibit 3. A "licensure supervisor" is not the direct and continuous supervisor. *See* paragraph 206 herein. The regulations specifically state that the supervision must be direct and continuous, and in their own documents South Bay admits that the supervisors overseeing the staff therapists are not all licensed. South Bay's violated these regulations.

213.    A majority of the individuals who were designated as supervisors and directors at South Bay lacked any licensure whatsoever. In an email dated 06/06/2014 to Michael Pelletier, South Bay's President and Chief Operating Officer, the Relator wrote:

"As you can see:
- only 4 out of 5 regional directors have their independent license
- only 8 directors/supervisors are independently licensed with 5 years post MA experience
- only 13 directors/supervisors are independently licensed without 5 year experience
- 32 directors/supervisors do NOT have their independent license.

Consideration of Plymouth as an example:
- Unlicensed hew hire → reports to unlicensed supervisor (Marissa) → reports to unlicensed director (Renee) → reports to unlicensed regional director (Amanda) → reports to Jen (licensed)"
- When existing staff do receive "licensure supervision" in Plymouth, it would be by another clinician. While this would satisfy the requirements to get licensed, it doesn't satisfy the Massachusett's [sic] regulations for 'direct and continuous supervision.' I don't think the clinician who is taking on the role of licensure supervisor is ultimately responsible outside of the paid one hour a week. The direct supervisor is responsible for all cases and thus we are failing to provide direct and continuous supervision by an independently licensed clinician in most cases."

Please let me know what questions you may have. Again, I will give all of this to Sara [Farley, Director of Utilization Management] as well." *See* email, Exhibit 3.

214.    One of the ways in which Ms. Gearhart and Defendant Peter Scanlon promulgated the fraudulent supervision scheme is by creating an artificial distinction between a "direct supervisor" and a "licensure supervisor" for the purpose of misleading its clinical staff and MassHealth. A supervisor simply cannot provide clinical supervision without being independently licensed.

215.    South Bay knowingly submitted claims to MassHealth, MBHP, and the various MCOs, a majority of which were factually false because the signature of the individuals noted as supervisors of the staff therapists were not of those that actually directly and continuously supervised the staff therapists.  Moreover, as set forth above, South Bay violated the cardinal regulations which requires that Supervisors be independently licensed in one of the core disciplines pursuant to 130 CMR 429.424 and 429.439. These practices are in violation of 130 CMR. 450.423(C)(2)(e), which states that the submission of any claim by or on behalf of the provider constitutes a certification that "the information submitted in, with, or in support of the claim is true, accurate, and complete."

216.    These practices led to South Bay filing tens of thousands of false and fraudulent claims for health services to MassHealth, MBHP or the various MCOs for recovery of Medicaid funds, part of which were paid for with federal monies. For the month of July 2013 alone, South Bay billed at least $1.3 million in mental health services. *See* 12-Week Reports and Billing Reports, Exhibit 10.

217.    MassHealth, MBHP and the MCOs reimbursed South Bay for services because South Bay attested and certified in writing that their treating individuals and supervisors were

properly credentialed. If MassHealth, MBHP and the MCOs had known that the supervisors and mental health workers were not properly credentialed, they would not have authorized payment provided by these clinicians.

218.    The Defendants' fraudulent schemes are estimated to have caused the United States and the Commonwealth of Massachusetts over $105 million of losses in the relevant time period.

219.    As hereinbefore described, Defendants Scanlon, Sheehan, South Bay, CIS, H.I.G. Growth, and HIG Capital were all aware of the lack of qualifications of its Supervisors and clinicians and that this violated various regulations all material to the false claims made to Medicaid. The Defendants knowingly made or caused to be made false claims and certifications and failed to report and return the funds owed to Medicaid, which would not have been paid had Medicaid been aware of the fraudulent claims and certifications. Defendant Scanlon was aware of the violations at least by May of 2012 when specifically informed of them by the Relator, and probably earlier. Defendant Sheehan was also aware of the violations by 2012 when the Relator conveyed specific information to him about the violations which had been ongoing. So too, the HIG Defendants was aware of the regulatory violations through Messrs. Scola, Loose and Tencer, either through communications with the Relator or information concerning the Tiger Team reports. All of the Defendants intentionally and or recklessly failed to take the necessary steps to timely identify the claims affected by the regulatory violations or to timely reimburse the state and federal governments for those affected claims that resulted in overbilling to Medicaid.

**COUNT ONE**
31 U.S.C. § 3729(a)(1)(A)
False Claims

220.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

Page **84** of **92**

221.    As set forth above, at all relevant times, the Defendants knowingly or in deliberate ignorance or reckless disregard of the truth, presented or caused to be presented false claims to the United States for payment from MassHealth, MBHP, and MCOs in violations of 31 U.S.C. § 3729(a)(1)(A). The claims were false because they were for MassHealth services which were ineligible for reimbursement because the Defendants misrepresented compliance with MassHealth regulations which are conditions of payment. The misrepresentations were material as the term is defined in the False Claims Act and interpreted by the courts.

222.    These claims were false in violation of 31 U.S.C. § 3729(a)(1)(A) because MassHealth, MBHP, and the MCOs rules and policies concerning the supervision and qualifications of clinicians through regulation are by contract.

223.    As a result of Defendants' misconduct, the United States has incurred damages through payment of false claims by MassHealth, MBHP, and MCOs, including payment for mental health services by unsupervised, unlicensed employees.

224.    The Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $10,000 (adjusted for inflation) for each false claim they presented and caused to be presented for payment.

## COUNT TWO
31 U.S.C. § 3729(a)(1)(B)
False Statements Material to False Claims

225.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

226.    Either with actual knowledge or in deliberate ignorance or reckless disregard of the truth, Defendants made and used false statements that were material to false claims. In

MassHealth's, MBHP's and MCOs' credentialing and re-credentialing procedures, Defendants were required to make attestations about the qualifications of individual practitioners, yet falsely stated that many of its unqualified practitioners were qualified to provide psychiatric, psychological or counseling services.

227.     As a result of the Defendants' misconduct, the United States has incurred damages through payment of false claims by MassHealth, MBHP and MCOs, including payment for mental health services by unsupervised and unlicensed employees.

228.     The Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $10,000 (adjusted for inflation) for each false statement they made, used, or caused to be made or used that were material to a false or fraudulent claim.

**COUNT THREE**
31 U.S.C. § 3729(a)(1)(G)
Reverse False Claims Act

229.     Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

230.     By 2011 latest, Defendant Peter J. Scanlon knew or should have known that South Bay misrepresented compliance with material applicable regulations and, as a result, were paid money to which Defendant Scanlon and Defendant South Bay were not entitled. By 2012 latest, Defendants Sheehan, CIS, HIG Growth, and HIG Capital knew or should have known that South Bay misrepresented compliance with material applicable regulations and, as a result, was paid money to which Defendant South Bay was not entitled.

231.     Accordingly, Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or

knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

232.     Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(a)(1)(A). Failure to return any overpayment such as the claims on which Defendant South Bay received any overpayment from Medicaid constitute a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act. The other Defendants—Scanlon, Sheehan, CIS, HIG Growth, and HIG Capital—were aware of the overpayments and responsible to report them, but failed to do so in violation of 31 U.S.C. § 3729(a)(1)(G).

## COUNT FOUR
Massachusetts False Claims
M.G.L. c. 12 § 5(B)(1)

233.     Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

234.     Either with actual knowledge or in deliberate ignorance or reckless disregard of the truth, Defendants presented or caused to be presented false claims to the Commonwealth of Massachusetts for payment from MassHealth, MBHP, and MCOs, in violation of M.G.L. c. 12 § 5(B)(1). These claims were false claims because they were for mental health services which were ineligible for reimbursement because the Defendants misrepresented compliance with MassHealth regulations which are conditions of payment. These misrepresentations were material as that term is defined in the Massachusetts False Claims Act and interpreted by the courts.

235.     These claims were also false in violation of M.G. L. c. 12 § 5(8)(1) because MassHealth, MBHP, and MCOs must adhere to rules and policies concerning the supervision and qualification of clinicians, through regulation and by contract.

236.     As a result of the Defendants' misconduct, the Commonwealth has incurred damages through payment of false claims, including payment for mental health services by unsupervised and unlicensed employees.

237.     Pursuant to M.G.L. c. 12 § 58(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 (adjusted for inflation) for each and every false or fraudulent claim presented or caused to be presented by the Defendants.

## COUNT FIVE
M.G.L. c. 12 § 5(B)(2)
False Statements Material to False Claims

238.     Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

239.     Either with actual knowledge or in deliberate ignorance or reckless disregard of the truth, Defendants made and used false statements that were material to false claims. In MassHealth's, MBHP's, and MCO's credentialing and re-credentialing procedures, Defendants were required to make attestations about the qualifications of individual practitioners, yet falsely stated that many of its unqualified practitioners were qualified to provide psychiatric, psychological or counseling services.

240.     As a result of the Defendants' misconduct, the Commonwealth of Massachusetts has incurred damages through payment of false claims by MassHealth, MBHP, and MCOs, including payment for mental health services by unsupervised and unlicensed employees.

Page **88** of **92**

241.    The Defendants are jointly and severally liable to the Commonwealth of Massachusetts under the Massachusetts False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $10,000 (adjusted for inflation) for each false statement they made, used, or caused to be made or used that were material to a false or fraudulent claim.

### COUNT SIX
Massachusetts False Claims
M.G.L. c. 12 § 5B(a)(10)
Recovery of Overpayments

242.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

243.    From 2009 to at least 2016, Defendants failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. Defendants misrepresented or caused to be misrepresented compliance with applicable state laws and regulations that are conditions of payment. MassHealth was unaware of the noncompliance. As a result of the Defendants' material misrepresentations of compliance, Defendants received money to which they were not entitled, and which they have retained.

244.    By May of 2012 at the latest, Defendants knew or should have known that they had misrepresented compliance with applicable regulations and were in receipt of money that should not have been paid. These sums of money therefore constituted overpayments. The Defendants have not repaid to MassHealth any overpayments they obtained by submitting claims and receiving money to which they were not entitled.

245.    The Defendants are therefore beneficiaries of overpayments from the Commonwealth, despite having subsequently discovered the receipt of the overpayments. The

Defendants have failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of M.G.L. c. 12 § 5B(a)(10).

246.    By virtue of the knowing and improper retention of overpayments, the Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

247.    From 2009 to at least 2016, the Defendants failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff, in violation of 130 CMR §429.422, 429.424, and 494.238(E). The defendants submitted or caused to be submitted claims for services while not in compliance with the MassHealth regulations. MassHealth paid those claims.

248.    By virtue of the Defendants' submission or causing submission of claims to MassHealth while in violation of 130 CMR §429.422, 429.424, and 494.238(E), MassHealth made overpayments to the Defendants.

249.    The Defendants are liable to repay to the Commonwealth of Massachusetts the amount received from these overpayments in an amount to be determined at trail.

## CONCLUSION AND PRAYER FOR RELIEF

250.    WHEREFORE, the Relator, on behalf of the United States and the Commonwealth of Massachusetts hereby prays that after a trial, this Court:

1. Enter judgment holding the Defendants liable for a civil penalty of $11,000, adjusted for inflation, for each violation of the False Claims Act committed by the Defendants jointly and severally;

2. Enter a judgment against the Defendants for three times the amount of damages sustained by the United States of America because of the acts of the Defendants;

3. Enter judgment holding the Defendants liable for the maximum civil penalties permitted for each violation of the Massachusetts False Claims act as pled herein;

4. Enter judgment against the Defendants for the damages sustained by the Commonwealth of Massachusetts because of the acts of the Defendants described herein, multiplied, as permitted under the Massachusetts False Claims Act;

5. Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

6. Award the Relator a percentage of the proceeds of recoveries under the Massachusetts False Claims Act;

7. Award the Relator her costs and reasonable attorneys' fees for prosecuting this action; and

8. Enter such other relief which the Court finds just and equitable.

**<u>DEMAND FOR JURY TRIAL</u>**

Relator, on behalf of herself, the United States, and the Commonwealth of Massachusetts, demands a jury trial on all claims alleged herein.

Respectfully submitted,

Jeffrey A. Newman  10/31/17

Jeffrey A. Newman
Massachusetts BBO # 370450
**JEFFREY NEWMAN LAW**
One Story Terrace
Marblehead, MA 01945
(617) 823-3217 (Telephone)
(781) 639-8688 (Facsimile)
jeffrey.newman1@gmail.com

_Charles Siegel Esq_ 10/31/17

Charles Siegel, Esq.
Texas State Bar No. 18341875
Pennsylvania State Bar No. 310882
3141 Hood Street, Suite 700
Dallas, Texas 75219
214-357-6244
214-357-7252 (Facsimile)
**WATERS & KRAUS, LLP**
*Pro Hac Vice*


_Caitlyn Silhan Esq._ 10/31/17

Caitlyn E. Silhan, Esq.
Texas State Bar No. 24072879
California State Bar No. 303177
3141 Hood Street, Suite 700
Dallas, Texas 75219
214-357-6244 (Telephone)
214-357-7252 (Facsimile)
**WATERS & KRAUS, LLP**
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served an electronic copy of the foregoing document on Deana El-Mallawany, Assistant US Attorney, at deana.el-mallawany@usdoj.gov; Kriss Basil, Assistant US Attorney, at kriss.basil@usdoj.gov; Robyn Dollar, Assistant Attorney General, at Robyn.dollar@state.ma.us; Gregory Matthews, Assistant Attorney General, gregory.matthews@state.ma.us; and Kevin Lownds, Assistant Attorney General, at Kevin.Lownds@massmail.state.ma.us.

Jeffrey A. Newman        10/31/17