**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF MASSACHUSETTS *ex rel.* CHRISTINE MARTINO-FLEMING,<br><br>      Relators-Plaintiffs,<br><br>v.<br><br>SOUTH BAY MENTAL HEALTH CENTER, INC., COMMUNITY INTERVENTION SERVICES, INC., H.I.G. GROWTH PARTNERS, LLC, H.I.G. CAPITAL, LLC, PETER J. SCANLON, and KEVIN P. SHEEHAN<br><br>      Defendants. | No. 15-CV-13065<br><br><br>**JURY DEMAND** |

**COMPLAINT IN INTERVENTION**
**OF THE COMMONWEALTH OF MASSACHUSETTS**

**PRELIMINARY STATEMENT**

1.      The Commonwealth of Massachusetts brings this action against Defendants South Bay Mental Health Center, Inc. ("South Bay"); Community Intervention Services, Inc. ("C.I.S.") and Community Intervention Services Holdings, Inc. ("C.I.S.H.") (collectively, "the C.I.S. Defendants"); H.I.G. Growth Partners, LLC and H.I.G. Capital, LLC (collectively, "H.I.G." or "the H.I.G. Defendants"); Peter J. Scanlon; and Kevin P. Sheehan, to recover payments made by the Massachusetts Medicaid program ("MassHealth") as a result of false claims that Defendants submitted and/or caused to be submitted to MassHealth from at least August 2009 to the present (the "relevant time period").

2.     Medicaid is a joint federal-state program that provides health care benefits for certain eligible individuals, including low-income children, seniors, and people with disabilities. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. §§ 1396a *et seq*. The federal portion of each state's Medicaid budget, known as the Federal Medical Assistance Percentage, is based on the state's per capita income compared to the national average. *Id.* § 1396d(b). The remainder of the Medicaid budget is funded by the state.

3.     MassHealth pays for mental health services provided to MassHealth members by qualified clinicians and counselors who are subject to certain licensure and/or supervision requirements. Mental health centers, including parent centers and satellite facilities,[1] that employ those rendering mental health services must comply with certain core staffing and supervision requirements set out in applicable regulations.

4.     At all times relevant to this action, Defendants employed unlicensed, unqualified, and unsupervised personnel, in violation of these regulations, at various mental health centers throughout the Commonwealth. Defendants also submitted or caused to be submitted claims for services in violation of these regulations to MassHealth, as well as to Massachusetts Behavioral Health Partnership ("MBHP") and various Managed Care Organizations ("MCOs"), entities under contract with MassHealth to administer the payment of mental health benefits for MassHealth beneficiaries. Defendants knew of these violations, yet billed MassHealth, MBHP,

---

[1] The term "mental health center" in 130 C.M.R. §§ 429.000 *et seq.* is used to refer to mental health centers, collectively, as well as parent centers. Section 429.000 *et seq.* refers to satellite clinics as "satellite facilities," however, each satellite facility is also a mental health center. These specific terms as they apply to each separate center are used throughout the Complaint as they are used in the regulations; collectively, the South Bay clinics are referred to as "centers." All mental health centers referred to herein are also "clinics" as that term is defined by 105 C.M.R. § 140.020.

and MCOs as if the services had been provided by qualified, properly supervised mental health professionals in full compliance with MassHealth regulations.

5.     The Commonwealth now files this action under the Massachusetts False Claims Act, Mass. Gen. Laws c. 12, §§ 5A *et seq.*; the Massachusetts Medicaid False Claims Act, Mass. Gen. Laws c. 118E, §§ 40 and 44; 130 C.M.R. §§ 450.237, 450.260(A), and 450.260(I); and the common law to recover damages and civil penalties from Defendants for losses suffered by the MassHealth program.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345, 1367(a), and under 31 U.S.C. § 3732(b), which provides this court with jurisdiction over state law claims arising from the same transactions or occurrences as an action brought under the Federal False Claims Act.

7.     The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants operate and/or have operated mental health centers throughout the Commonwealth and therefore transact business in the District of Massachusetts.

8.     Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) & (c) because Defendants regularly conduct and/or conducted business within the District of Massachusetts, maintained employees and offices in this District, and, as a result of the statutory violations alleged herein, submitted false claims and/or caused false claims to be submitted in this District.

## PARTIES

9.     The Plaintiff Commonwealth of Massachusetts is a sovereign state and body politic duly organized by law, and is represented by the Attorney General of the Commonwealth,

who brings this action in the public interest and on behalf of the Commonwealth and its citizens and taxpayers.

10.     Plaintiff-Relator Christine Martino-Fleming ("Relator") is a resident of the Commonwealth of Massachusetts. She is a licensed mental health counselor who was employed by Defendant South Bay from approximately June 2008 to September 2013, and by the C.I.S. Defendants from September 2013 to September 2014. In her role as a Job Coach at South Bay and later, in her role as Coordinator of Staff Development and Training at South Bay and the C.I.S. Defendants, Relator was responsible for training South Bay clinicians in documentation and billing, providing clinical training to new clinicians, supervisors, directors, and regional directors, and examining the qualifications of new South Bay clinicians and supervisors. South Bay terminated her employment on September 4, 2014 after she raised concerns regarding Defendants' regulatory violations.

11.     Defendant South Bay is a for-profit Massachusetts corporation that does business in Massachusetts and has a corporate headquarters at 1115 West Chestnut Street, Brockton, Massachusetts.

12.     Defendant C.I.S. is a for-profit Delaware corporation that does business in Massachusetts.

13.     Defendant C.I.S.H. is a for-profit Delaware corporation that does business in Massachusetts.

14.     Defendant H.I.G. Capital, LLC is a Delaware limited liability company and global private equity investment firm with an office in Boston, Massachusetts.

15.     Defendant H.I.G. Growth Partners, LLC is a Delaware limited liability company and a capital investment affiliate of H.I.G. Capital, LLC with an office in Boston, Massachusetts.

16.     Defendant Peter J. Scanlon is a resident of the Commonwealth of Massachusetts. Scanlon founded South Bay in 1986 and was the owner, President, and Chief Executive Officer of South Bay until South Bay's acquisition in April 2012. He remained a member of South Bay's Board of Directors through 2013 or 2014. From February 2012 through 2013 or 2014, Scanlon was also the Chief Clinical Officer and a member of the Board of Directors of the C.I.S. Defendants.

17.     Defendant Kevin P. Sheehan is a resident of Austin, Texas. In early 2012, Sheehan partnered with H.I.G. Growth Partners to form the C.I.S. Defendants. From April 2012 until 2016, Sheehan served as the Chief Executive Officer of the C.I.S. Defendants. Sheehan has served on the Board of Directors of the C.I.S. Defendants since 2011.

## SOUTH BAY OPERATIONS

18.     As described *infra*, Defendants own and/or operate a number of mental health centers, as defined by 130 C.M.R. § 429.402, throughout the Commonwealth of Massachusetts, including, for purposes of this action:

a.      Attleboro Mental Health Clinic, 607 Pleasant Street, Suite 115, Attleboro, MA 02703

b.      Brockton Mental Health Clinic, 103 Commercial Street, Brockton, MA 02302 (headquarters)

c.      Cape Cod Mental Health Clinic, 470 Main Street, Mashpee, MA 02649

d.      Chelsea Outreach Program Center, 70 Everett Avenue, Suite 515, Chelsea, MA 02150

e.      Dorchester Mental Health Clinic, 415 Neponset Avenue, 3rd Floor, Dorchester, MA 02122

f.      Fall River Mental Health Clinic, 1563 North Main Street, Suite 202, Fall River, MA[2]

g.      Lawrence Mental Health Clinic, 360 Merrimack Street, Building 9, Door-H, Lawrence, MA 01843

h.      Leominster Mental Health Clinic, 80 Erdman Way, Suite 208, Leominster, MA 01453

i.      Lowell Mental Health Clinic, 22 Old Canal Drive, Lowell, MA 01851

j.      Lynn Mental Health Clinic, 181 Union Street, Suite J, Lynn, MA 01901

k.      Malden Mental Health Clinic, 22 Pleasant Street, Malden, MA 02148

l.      Pittsfield Outreach Program Center, 100 North Street, Pittsfield, MA 01201

m.      Plymouth Mental Health Clinic, 50 Aldrin Road, Plymouth, MA 02360

n.      Salem Mental Health Clinic, 35 Congress Street, Suite 214, Salem, MA 01970

o.      Springfield Mental Health Clinic, 140 High Street, Suite 230, Springfield, MA 01105

p.      Swansea Mental Health Clinic, 463 Swansea Mall Drive, Swansea, MA 02777

q.      Weymouth Mental Health Clinic, 541 Main Street, Suite 303, Weymouth, MA 02190

r.      Worcester Mental Health Clinic, 340 Main Street, Suite 818, Worcester, MA 01608

---

[2] After South Bay opened the Swansea Clinic in September 2016, all operations at the Fall River Clinic were transferred to the Swansea Clinic.

Collectively, these entities are referred to as "South Bay." Individually, each entity will be referred to by "the [Location] Clinic"—*e.g.*, the Plymouth Clinic.

19.     At all relevant times, South Bay has been a MassHealth provider, and has operated and billed under MassHealth provider identification ("ID") numbers 110000049, 110000050 and 110104404. Each South Bay clinic is designated by a letter code in addition to one of the three South Bay provider IDs, as follows:

| Clinic Name | Provider ID + Location |
|---|---|
| Attleboro | 110000049L |
| Brockton[3] | 110000049E |
| Cape Cod | 110000049M |
| Chelsea | 110104404A |
| Dorchester | 110000049W |
| Lawrence | 110000050A |
| Leominster | 110000050I |
| Lowell | 110000049N |
| Lynn | 110000050H |
| Malden | 110000049V |
| Plymouth | 110000049F |
| Salem | 110000050F |
| Springfield | 110000049X |
| Swansea (formerly Fall River) | 110000049P |
| Weymouth | 110000049G |
| Worcester | 110000050B |

20.     During the relevant time period, all of the South Bay clinics were licensed by the Massachusetts Department of Public Health ("DPH"), which issues clinic licenses for mental health centers.[4] During the relevant time period, the Brockton Clinic was the main, or parent, center. All of the other South Bay centers in Massachusetts were considered satellite facilities of the Brockton Clinic.

---

[3] The Pittsfield Clinic does not have its own provider ID. Services rendered at the Pittsfield Clinic are billed using another clinic's provider ID (presumably that of its parent, the Brockton Clinic).
[4] The clinic licenses for the South Bay clinics are included as Exhibit 1.

## THE RELATIONSHIPS AMONG THE DEFENDANTS AND THEIR OWNERSHIP AND CONTROL OF SOUTH BAY

21.    South Bay was founded in 1986 by Scanlon.

22.    From 1986 through April 12, 2012, South Bay was owned by Scanlon, who served as its sole officer and director. Until April 12, 2012, Scanlon owned all of the outstanding capital stock on South Bay.

23.    In early 2012, the H.I.G. Defendants and Sheehan formed the C.I.S. Defendants to acquire South Bay from Scanlon.

24.    The C.I.S. Defendants were both incorporated on February 29, 2012 in Delaware as holding investment companies.

25.    On April 12, 2012, Scanlon entered into a stock purchase agreement to sell all rights, title, and interest in all capital stock of South Bay to the C.I.S. Defendants. In exchange, the C.I.S. Defendants issued Scanlon a cash payment, shares of common stock in C.I.S.H., and a promissory note, which, in sum, were worth $31,250,691.

26.    According to company organizational charts, C.I.S.H. indirectly owns C.I.S., which directly owns South Bay.

27.    The corporate filings for the C.I.S. Defendants with the Corporations Division of the Secretary of the Commonwealth of Massachusetts identify Sheehan as the Chief Executive Officer and Scanlon as the Chief Clinical Officer of both companies at the time of formation. The corporate filings also list Nicholas Scola, Steven Loose, Eric Tencer, Sheehan, and Scanlon as the members of the Boards of Directors of both companies at the time of formation.

28.    Scola, Loose, and Tencer are employees of H.I.G. Growth Partners, the majority shareholder of the C.I.S. Defendants. H.I.G. Growth Partners is the dedicated capital investment affiliate of H.I.G. Capital, LLC.

8

29.     According to company organization charts, H.I.G. Growth Partners owns 71.1% and Sheehan owns 5.4% of C.I.S.H.

30.     Loose is the Managing Director of H.I.G. Growth Partners. Scola and Tencer are Principals of H.I.G. Growth Partners.

31.     The ownership of South Bay post-acquisition is reflected in an organizational chart, which was provided to MassHealth, attached as Exhibit 2.

32.     Prior to partnering with the H.I.G. Defendants to create the C.I.S. Defendants and acquire South Bay, Sheehan had been working in behavioral health care for over 30 years.

33.     Since their formation, the C.I.S. Defendants have acquired two companies in addition to South Bay: Access Family Services, Inc. and Family Behavioral Resources, Inc. Since their formation, the C.I.S. Defendants have also engaged in two "tuck-in" acquisitions: Autism Education Research Institute (which was integrated into Family Behavioral Resources, Inc.) and Carolina Choice (which was integrated into Access Family Services, Inc.).

34.     At some point in 2013 or 2014, Scanlon left his position as Chief Clinical Officer and left the Board of Directors of the C.I.S. Defendants.

35.     At some point in 2016, Sheehan left his position as Chief Executive Officer but remained a member of the Board of Directors of the C.I.S. Defendants.

36.     At some point in 2016, Andrew Calkins joined C.I.S. as the Chief Executive Officer.

37.     The Board of Directors of the C.I.S. Defendants now consists of Calkins, Sheehan, and H.I.G. employees Scola, Loose, and Tencer.

## STATUTORY AND REGULATORY FRAMEWORK

## I.      MASSHEALTH REGULATIONS

38.     As MassHealth providers, the South Bay mental health centers must comply with MassHealth regulations. *See* 130 C.M.R. § 429.401 ("All Mental Health Centers participating in MassHealth must comply with the MassHealth regulations, including but not limited to MassHealth regulations set forth in 130 CMR 429.000 and 450.000."). South Bay's provider contract also requires South Bay to comply with all state and federal laws, regulations, and rules applicable to participation in MassHealth.

39.     The regulations governing mental health centers such as South Bay are set forth at 130 C.M.R. §§ 429.000 *et seq.*

40.     The regulations governing all providers who participate in MassHealth are set forth at 130 C.M.R. §§ 450.000 *et seq.*

### A.     MassHealth Mental Health Center Regulations

41.     A mental health center is defined in 130 C.M.R. § 429.402 as "an entity that delivers a comprehensive group of diagnostic and psychotherapeutic treatment services to mentally or emotionally disturbed persons and their families by an interdisciplinary team under the medical direction of a psychiatrist."

42.     Pertinent to this case, 130 C.M.R. §§ 429.422-24 set forth the requirements that must be met by each mental health center that is certified by MassHealth and bills for services to MassHealth members regarding who may administer, operate, and provide the mental health services billed to MassHealth.

43.     The regulations provide specific requirements for: (1) managerial staff composition for each center; and (2) licensure and supervision requirements of staff at each center.

44.     There are several types of mental health centers defined in 130 C.M.R. § 429.402, including, as relevant to this action, parent centers and satellite facilities.

45.     A parent center is the central location of the mental health center, at which most of the administrative, organizational, and clinical services are performed.[5] 130 C.M.R. § 429.402.

46.     A satellite facility is a mental health center program at a different location from the parent center that operates under the license of and falls under the fiscal, administrative, and personnel management of the parent center; and which is open to patients more than 20 hours a week and offers more than 40 person hours a week of services to patients. *Id.*

47.     Satellite facilities are further separated into autonomous satellite programs and dependent satellite programs. *Id.* An autonomous satellite program is a mental health center program operated by a satellite facility with sufficient staff and services to substantially assume its own clinical management independent of the parent center. *Id.* A dependent satellite program is a mental health center program in a satellite facility that is under the direct clinical management of the parent center. *Id.*

48.     Each mental health center must "have a balanced interdisciplinary staffing plan that includes three or more core professional staff members who meet the qualifications outlined in 130 CMR 429.424 for their respective professions. Of these, one must be a psychiatrist, and two must be from separate nonphysician core disciplines, including psychology, social work, or psychiatric nursing." *Id.* § 429.422(A).

49.     Further, each parent center and each autonomous satellite program "must employ the equivalent of at least three full-time professional staff members, two of whom must be core

---

[5] As mentioned above, at all relevant times to this action, the Brockton Clinic was the parent center and the other centers were satellite facilities.

team members who meet qualifications outlined in 130 CMR 429.423 for their respective

disciplines" and must meet the managerial staff composition requirements contained in 130

C.M.R. §§ 429.422-23. *Id.* § 429.422(C).

50.     "Dependent satellite programs must employ at least two full-time equivalent

professional staff members from separate nonphysician core disciplines. The Director of Clinical

Services at the parent center must ensure that supervision requirements of 130 C.M.R. §

429.438(E) are performed. If the satellite program's staff do not meet the qualifications for core

disciplines as outlined in 130 C.M.R. § 429.424, they must receive supervision from qualified

core staff professionals of the same discipline at the parent center." *Id.* § 429.422(D).

51.     Each mental health center must also designate a professional staff member to be

the clinical director. *Id.* § 429.423(B). The clinical director must be licensed, certified, or

registered to practice as a board-certified psychiatrist, a licensed psychologist, a licensed

independent clinical social worker, or a registered psychiatric nurse, and must have had at least

five years of full-time supervised clinical experience subsequent to obtaining a master's degree,

two years of which must have been in an administrative capacity. *Id.* § 429.423(B)(1). The

clinical director must be employed on a full-time basis. *Id.*

52.     The remainder of the staff must also be credentialed and qualified before they can

supervise others, or diagnose, treat, and bill for mental health services rendered to MassHealth

members. These requirements are set forth in 130 C.M.R. § 429.424.

53.     During the relevant time period, 130 C.M.R. § 429.424 was titled "Qualifications

of Staff by Core Discipline." On January 1, 2014, MassHealth changed the title of this section to

"Qualifications of Professional Staff *Authorized to Render Billable Mental Health Services* by

Core Discipline." *Id.* § 429.424 (emphasis added). (The provision was otherwise unchanged,

except for the addition of a subsection covering psychiatric clinical nurse specialists. *Id.* §
429.424(E).)

54.     To bill MassHealth, the professionals diagnosing and treating MassHealth
members must hold a degree or license as a psychiatrist, psychologist, social worker, psychiatric
nurse, psychiatric clinical nurse specialist, counselor, or occupational therapist. *See id.* §
429.424.

55.     Each of these respective professions has specific criteria regarding the
professional staff members' credentials that must be met so that they may provide services to
MassHealth members. *See id.* § 429.424(A)-(G). For example, § 429.424(C) and (F) provide the
requisite criteria for social workers and counselors:

> Social Workers: At least one staff social worker must have a master's degree in social
> work from an accredited educational institution with at least two years of full-time
> supervised clinical experience subsequent to obtaining a master's degree, and must also
> be licensed or have applied for and have a license pending as an independent clinical
> social worker by the Massachusetts Board of Registration of Social Workers. *Id.* §
> 429.424(C)(l). Any additional social workers who are not licensed independent social
> workers must provide services under the direct and continuous supervision of an
> independent clinical social worker. These social workers must be licensed or applying for
> licensure as certified social workers by the Massachusetts Board of Registration of Social
> Workers and have received a master's degree in social work and completed two years of
> full-time supervised clinical work in an organized graduate internship program. *Id.* §
> 429.424(C)(2).

Counselors: All unlicensed counselors must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines of psychiatry, psychology, social work, and psychiatric nursing. 130 C.M.R. § 429.424(F)(1). All counselors must also hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and must have had two years of full-time supervised clinical experience in a multidisciplinary mental health setting subsequent to obtaining the master's degree. *Id.* § 429.424(F)(1).

56.     Essentially, to bill MassHealth for treating and diagnosing patients, an individual must be licensed by the appropriate Board or eligible to apply for licensure with the appropriate Board, or he or she must be directly and continuously supervised by one who is. The difference between the supervision requirements at dependent satellite programs versus autonomous satellite programs is that the direct and continuous supervision in an autonomous program must take place within that autonomous center, whereas the supervision in a dependent satellite program may come from the parent center.

57.     MassHealth payment for rendered services is conditioned on satellite facilities' compliance with the regulations regarding staff supervision and integration with parent centers at 130 C.M.R. §§ 429.422-24 & 429.438. *Id.* § 429.439.

58.     Section 601 of the Mental Health Center Manual in the MassHealth Manual Provider Series sets forth billing codes that correspond to particular mental health services. Section 601 contains descriptions of each mental health service, and providers use these codes to bill MassHealth for services. During the relevant time period, Section 601 of MassHealth's then-

operative Mental Health Center Manual required that services be performed "by [a] professional staff member as defined in 130 CMR 429.424."[6]

59.     These requirements are paramount to ensuring that MassHealth members—including some of the most vulnerable populations of impoverished and disabled citizens—receive necessary and appropriate treatment and services to which they are entitled under the law.

### B.     MassHealth All Provider Regulations

60.     In addition to the specific regulations governing mental health centers, all MassHealth providers are subject to the regulations at 130 C.M.R. §§ 450.000 *et seq.*

61.     These "All Provider" regulations state, in relevant part, that every provider under contract with MassHealth agrees to comply with all laws, rules, and regulations governing MassHealth. 130 C.M.R. § 450.223(C)(1).

62.     The regulations also state that every provider under contract with MassHealth certifies when submitting a claim for payment that "the information submitted in, with, or in support of the claim is true, accurate, and complete." *Id.* § 450.223(C)(2)(e).

63.     The MassHealth regulations governing overpayments state, "A provider must report in writing and return any overpayments to the MassHealth agency within 60 days of the provider identifying such overpayment or, for payments subject to reconciliation based on a cost report, by the date any corresponding cost report is due, whichever is later." *Id.* § 450.235(B).

64.     A provider is liable to the MassHealth agency for the full amount of any overpayments, or other monies owed under 130 C.M.R. §§ 450.000 *et seq.*, including but not

---

[6] In the current version of the manual, Section 601 continues to be clear that reimbursement is contingent on compliance with the MassHealth regulations discussed above: "MassHealth pays for services represented by the codes listed in Subchapter 6 in effect at the time of service, subject to all conditions and limitations in MassHealth regulations at 130 CMR 429.000 and 450.000."

limited to 130 C.M.R. § 450.235(B), or under any other applicable law or regulation. *Id.* § 450.260(A).

65.     MassHealth regulations define a "member" as "a person determined by the MassHealth agency to be eligible for MassHealth." *Id.* § 450.101. The regulations do not distinguish between those members receiving benefits through MassHealth fee-for-service, or through one of MassHealth's contracting entities, such as MBHP or its MCOs. Thus, claims submitted by providers with respect to services to members through any of these mechanisms must comply with Medicaid regulations.

## II.     ADDITIONAL REGULATIONS

66.     Numerous other agencies in the Commonwealth promulgate regulations that require facilities to have qualified clinicians and appropriate supervision in mental health centers. DPH, the agency responsible for the clinical licensure and regulation of mental health centers,[7] promulgates similar staffing and personnel qualification regulations at 105 C.M.R. §§ 140.000 *et seq*. These regulations mandate appropriate staff licensure and supervision. For example, section 140.530(E) provides that unlicensed staff members must be clinically supervised on a regular basis by professional staff members as defined in 105 C.M.R. § 140.530(C), and that documentation of supervision of such staff must be kept and available for review.

67.     The Massachusetts Division of Professional Licensure ("DPL") Board of Registration of Social Workers propounds regulations relating to the standards of professional practice and conduct in social work, which are set forth at 258 C.M.R. §§ 20 *et seq.* The regulations state that it is "unethical or unprofessional conduct" to authorize or permit "a person to perform functions or services which constitute the practice of social work . . . when one knows

---

[7] Under 130 C.M.R. § 140.101, "[e]very entity that falls within the definition of 'clinic' in Mass. Gen. Laws c. 111, § 52 is required by Mass. Gen. Laws c. 111, §§ 51 and 56 to obtain a clinic license from [DPH]."

or has reason to know that said person is not licensed by the Board and that a license is required"

to perform the services rendered. 258 C.M.R. § 20.01(5). Section 20.01(6) further states that it is

unethical to allow a licensed social worker to perform a particular service when one knows, or

has reason to know, that the performance of that service "exceeds the legally permissible scope

of practice for that level of licensure." The regulations further state that it is unethical to engage

in any course of conduct that is prohibited by any provisions of the Code of Ethics of the

National Association of Social Workers. 258 C.M.R. § 20.01(10). Section 20.03 forbids a social

worker from performing any service which "exceeds the legally permissible scope of practice for

his licensure."

**MASSHEALTH CLAIMS SUBMISSION AND BILLING**

**I.    MASSHEALTH REVENUE STREAMS**

68.    There are three streams of payment that are at issue in this action and that will be

relevant to determining total damage amounts. These are payments to South Bay through fee-for-

service ("FFS") providers, MBHP providers, and MCO providers.

69.    At all relevant times, all of the South Bay clinics that are the subject of this action

received payment through all three of these revenue streams.

70.    Section 1115 of the Social Security Act gives the Secretary of Health and Human

Services authority to approve experimental, pilot, or demonstration projects that promote the

objectives of the Medicaid program. Since 1992, the Commonwealth has operated under a

Section 1115 Demonstration waiver. The 1992 waiver authorized a behavioral health carve-out

program for MassHealth recipients. Under this arrangement, behavioral health care services for

some MassHealth members are administered by an MCO.

71.     MassHealth beneficiaries who receive primary health insurance coverage from MassHealth may enroll in either MassHealth's Primary Care Clinician ("PCC") plan or a Managed Care Organization ("MCO") plan. Both the PCC plan and the MCO plans provide mental health benefits to MassHealth beneficiaries. MassHealth administers health care, including mental health care, for beneficiaries not enrolled in the PCC plan or an MCO plan on a fee-for-service ("FFS") basis.[8] At all relevant times, the South Bay clinics mentioned herein were providers credentialed with MassHealth's FFS program, and were therefore required to comply with all applicable state and federal regulations, including those set forth in the Statutory and Regulatory Framework section of this Complaint.

72.     MassHealth's PCC plan administers health care on fee-for-service ("FFS") basis. As stated above, for MassHealth members enrolled in the PCC plan, mental health care claims are paid for and administered by a private contractor who enters into a written agreement with MassHealth. Since 1996, MBHP, a subsidiary of ValueOptions Inc., has served as the behavioral health vendor for MassHealth's PCC enrollees.[9] MassHealth's PCC Plan contracts with MBHP to provide, on a managed care basis, mental health care services to MassHealth members.

73.     MassHealth pays MBHP for each MassHealth member on a capitated (a fixed monthly fee per beneficiary) basis from Medicaid Program funds MassHealth receives from the United States and the Commonwealth of Massachusetts.

74.     At all relevant times, the South Bay clinics that are the subject of this action were credentialed with MBHP.

---

[8] Certain MassHealth beneficiaries are not required to enroll in PCC or an MCO. These exempt individuals include MassHealth members who are 65 or older, members who have Medicare or other primary health insurance, members receiving services from DCF or DYS, and members enrolled in a home- or community based-services waiver. *See* 130 C.M.R. § 508.001 *et seq.*

[9] In December 2014, ValueOptions Inc. merged with Beacon Health Holdings. Both entities are subsidiaries of Beacon Health Options ("Beacon").

75.     MassHealth beneficiaries enrolled in the MCO plan must enroll in one of the

MCOs approved by MassHealth. The MCO is responsible for delivering and paying for the

members' health care services. MassHealth pays for the medical and behavioral health services

provided to MassHealth members enrolled in an MCO on a capitated basis from Medicaid

Program funds MassHealth receives from the United States and the Commonwealth of

Massachusetts. Each MCO contracts with medical and behavioral health care providers within its

network, and claims for services provided to MassHealth members enrolled in the MCO are paid

by the MCO with funds provided by MassHealth, pursuant to each MCO's contract with

MassHealth. The South Bay clinics that are the subject of this action were credentialed with the

following MCOs:

| |
|---|
| BMC HealthNet Plan |
| CeltiCare |
| Fallon Community Health Plan |
| Health New England (HNE) |
| Neighborhood Health Plan (NHP) |
| Tufts Network Health Plan |
| United Healthcare |

76.     Massachusetts regulations do not distinguish among MassHealth beneficiaries

who receive MassHealth benefits via FFS, MassHealth beneficiaries who receive MassHealth

benefits via MBHP, and MassHealth beneficiaries who receive benefits via MCOs. All of these

MassHealth beneficiaries are MassHealth members under 130 C.M.R. § 450.101, and their

benefits are paid for using funds that have been provided by the United States and the

Commonwealth through the Massachusetts Medicaid Program. Consequently, payment for these

services, whether the claims are submitted to MassHealth directly or through MBHP or one of

the MCOs, comes from the Massachusetts Medicaid program.

## II.     CLAIMS SUBMISSION

19

77.     Mental health care providers such as South Bay contract with MBHP and MCOs to provide mental health services to MassHealth members. MBHP and MCOs pay these mental health care providers with funds they have received from the United States and the Commonwealth through the Massachusetts Medicaid Program.

78.     All claims submitted by mental health care providers on behalf of any MassHealth beneficiary, regardless of whether that beneficiary receives mental health care on a FFS basis or through MBHP or an MCO, must comply with Massachusetts Medicaid regulations. Every provider that submits claims to MassHealth must comply with the MassHealth regulations, including those set forth in 130 C.M.R. §§ 429.000 *et seq.* and §§ 450.000 *et seq.*, and every provider that submits claims to MassHealth certifies when submitting a claim for payment that "the information submitted in, with, or in support of the claim is true, accurate, and complete." 130 C.M.R. § 450.223(C)(2)(e). Therefore, providers impliedly certify that they are complying with applicable regulations when submitting claims for payment.

79.     Similarly, pursuant to all provider agreements with MBHP and the various MCOs, providers must comply with all state and federal regulatory requirements. Neither MBHP nor an MCO can change MassHealth's conditions of payment for MassHealth providers. MBHP and MCO contracts do not alter the expectations of MassHealth regarding regulatory compliance.

80.     Under the Massachusetts False Claims Act, a "claim" is "made to a contractor, subcontractor, grantee or other person, if the money or property is to be spent or used on behalf of or to advance a program or interest of the commonwealth or political subdivision thereof and if the commonwealth or any political subdivision thereof: (i) provides or has provided any portion of the money or property which is requested or demanded; or (ii) will reimburse directly

20

or indirectly such contractor, subcontractor, grantee or other person for any portion of the money or property which is requested or demanded." Mass. Gen. Laws c. 12, § 5A.

81.     A request for payment made by a provider to MBHP or an MCO on behalf of a MassHealth member is a "claim" for the purposes of Mass. Gen. Laws c. 12, §§ 5B and 5C. Presenting a false or fraudulent request or demand for payment to MBHP or an MCO for services provided to a MassHealth member is a "false claim" for the purposes of Mass. Gen. Laws c. 12, §§ 5B and 5C.

82.     The Current Procedural Terminology ("CPT") coding system, developed by the American Medical Association, is designed to provide information about services provided for financial and administrative purposes. CPT codes identify for the payer the services for which the provider seeks reimbursement. MassHealth, along with MBHP and the MCOs, uses the CPT coding system for services performed by mental health clinicians or other qualified health care practitioners.

83.     The list of CPT codes, and descriptions thereof used by MassHealth, that correspond to billable mental health services under MassHealth are set forth at Section 601 of the Mental Health Center Manual.

84.     Claims submitted to MassHealth, MBHP, and MCOs are submitted in batches and either approved or denied based on applicable system edits. A system edit may automatically deny a claim if a required field is not filled out—for example, the name of the member who received the services, or a valid provider number. Additionally, claims or providers may be flagged for further review for high utilization of certain CPT codes or other anomalies. Usually, though, claims are batched for submission and are then approved or denied by a computer

algorithm that allows or denies such claims based on the system edits that have been
programmed into the system.

85.     In short, MassHealth providers bill largely on the honor system. Claims can be
denied automatically in the specific circumstances described *supra* if certain criteria are absent,
but beyond that, claims are usually paid if these criteria are met. If MassHealth, or the
Massachusetts Attorney General's Office, later learns that claims should not have been paid—
whether due to fraud or for any other reason—it must then use other tools to recoup these claims,
which have already been paid out.

86.     For mental health centers, claims are submitted with information about the
MassHealth member's ID number, the CPT code for the service rendered, and the servicing
provider's ID. The servicing provider ID is the provider number for the center, as well as a
location code—for example, South Bay's Brockton Clinic is 110000049E.

87.     The Massachusetts Attorney General's Office has access to claims data submitted
by mental health centers such as the South Bay clinics through the Medicaid Management
Information System ("MMIS"). This database, which allows investigators to review and export
reports of claims information based on the provider ID, does not allow investigators to run
reports on or export information about the treating provider ID—that is, the name of the clinician
who actually provided the services to the MassHealth member. This information should be kept
in patient files or other records kept by the facility that would indicate which MassHealth
members were treated by which clinicians or counselors.

## III.    SOUTH BAY CLAIMS

88.     The following counseling services were billed by South Bay during the relevant time period:[10]

**90791:** Psychiatric diagnostic evaluation

**90806:** Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 45 to 50 minutes face-to-face with the patient (by professional staff member as defined in 130 C.M.R. § 492.424)[11]

**90832:** Psychotherapy, 30 minutes with patient and/or family member

**90834:** Psychotherapy, 45 minutes with patient and/or family member

**90847:** Family psychotherapy (conjoint psychotherapy) (with patient present) (by professional staff member as defined in 130 C.M.R. § 429.424)

**90853:** Group psychotherapy (other than of a multiple-family group) (by professional staff member as defined in 130 C.M.R. § 429.424)

**90882:** Environmental intervention for medical management purposes on a psychiatric patient's behalf with agencies, employers or institutions

**90887:** Interpretation or explanation of results of psychiatric, other medical examinations and procedures, or other accumulated data to family or other responsible persons, or advising them how to assist patient (per one-half hour)

89.     From August 11, 2009 through December 1, 2017, South Bay has received payment from MassHealth FFS, MBHP, and MCOs based on counseling and medication management procedure codes in the amounts of $29,827,096.23, $40,206,432.27, and $53,076,320.63, respectively, for a total of $123,109,849.13. A list of counseling services and medication management codes for these claims billed to MassHealth, MBHP, and several of the MCOs is included in the summary claims data set forth at Exhibit 3.

## MBHP AND MCO CREDENTIALING REQUIREMENTS

---

[10] This list is not exhaustive, but representative of the types of services and codes for which counseling was billed to MassHealth. A full list of counseling and medication management codes billed by each center and used in the calculation of claims data can be found in the claims summary chart included as Exhibit 3.
[11] A number of the CPT codes for psychotherapy were revised on January 1, 2013. CPT code 90806 is not in the current list of CPT codes, but was in use until January 1, 2013.

90.     As set forth above, all mental health centers providing services to and submitting claims for services provided to MassHealth members must comply with Massachusetts Medicaid regulations, regardless of whether a particular member receives mental health care on a FFS basis or through MBHP or an MCO.

91.     Under MassHealth regulations, it is the responsibility of the Director of Clinical Services at the mental health center to ensure that the center's staff members meet the requirements of 130 C.M.R. § 429.424. *See* 130 C.M.R. § 429.423(B)(2).

92.     MBHP and the MCOs require mental health centers to actively investigate whether their staff has the minimum qualifications for providing mental health services and to make explicit certifications for every practitioner that the relevant qualification requirements have been met. Only if the mental health facility makes the appropriate certifications—which must be affirmed every three years—will MBHP and the MCOs accept claims for services provided by the practitioner. Thus, if MBHP or an MCO pays a claim for services provided by a practitioner who does not meet the requirements of § 429.424 (or other licensure, qualification, or supervision requirements), it is only because the mental health clinic has made a deliberate false statement or provided certifications in reckless disregard of the truth or falsity of its statements.

93.     According to MBHP's credentialing criteria, outlined in the MBHP Provider Manual, all master's-level counselors must be supervised by a Licensed Independent Clinical Social Worker ("LICSW"), a licensed psychologist, an Advanced Practice Registered Nurse ("APRN") board-certified in psychiatric nursing, or a licensed psychiatrist meeting MBHP's credentialing criteria. The MBHP Provider Manual further requires that all credentialed providers comply with all applicable state and federal laws and regulations, licensing and

accreditation requirements, and federal and state affirmative action requirements, and that they conform to all applicable licensing, certification, and other professional standards as set forth in applicable state and federal laws and regulations.

94.     As part of the credentialing process, South Bay and other mental health centers certify to MBHP that the individuals performing the billable services are qualified and able to perform the essential functions of their positions, and that they are in compliance with all licensing and supervision requirements.

95.     MBHP requires providers, such as South Bay, to update MBHP within 10 days if there are "material" changes in credentialing or re-credentialing applications. MBHP will terminate network participation if a provider fails to comply with its credentialing update requirements.

96.     MBHP may credential unlicensed master's-level mental health counselors so they may provide services to MassHealth beneficiaries, but only if the unlicensed master's-level counselor has a master's degree from an accredited college or university, is supervised by a licensed clinician meeting MBHP's credentialing criteria, and is in the process of completing their 24-month post-master's training required to attain licensure. A master's-level mental health counselor who is unwilling to take the professional licensing exam, or is unable to pass the licensing exam within 24 months, cannot bill MBHP for services.

97.     In its contracts with MBHP and the MCOs, South Bay has agreed that MBHP and the MCOs may impose sanctions (including suspension and termination of network participation) for credentialing/re-credentialing failures, professional competency and/or conduct issues, quality of care concerns/issues, and violations of state or federal laws, rules, or regulations.

98.     The credentialing requirements described above apply to claims made on behalf of PCC plan members whose mental health benefits are managed by MBHP.

99.     Virtually the same credentialing criteria apply to MassHealth beneficiaries in MCO plans. MBHP and Beacon are subsidiaries of Beacon Health Holdings and have nearly identical credentialing criteria. With the exception of Tufts-Network Health and CeltiCare, all of the MCOs contract out the management of their behavioral healthcare services to Beacon. Although Tufts Network Health and CeltiCare do not utilize Beacon as a contractor for their behavioral healthcare services, their credentialing criteria are nearly identical to Beacon's criteria. The credentialing model is widely adopted within the industry.

100.    The credentialing process established by MBHP and the MCOs ensures that providers are meeting government regulations and standards of behavioral health service. It also establishes that compliance with MassHealth's qualifications, licensure, and supervision requirements is material to MBHP's and the MCOs' payment decisions. MBHP and the MCOs would not have established and enforced these elaborate credentialing requirements if they did not intend to enforce the requirement that MassHealth funds will only be used to pay for services performed by qualified and properly supervised practitioners. If the provider performs the credentialing process in good faith, mental health practitioners who do not meet MassHealth's qualifications will be identified and neither MBHP nor the MCOs will knowingly pay claims for those practitioners' services.

## FACTUAL ALLEGATIONS

101.    At all relevant times, South Bay was required to comply with the statutory and regulatory requirements enumerated in this Complaint, but was in violation of those requirements. The South Bay clinics were not in compliance with the regulatory scheme set forth

above, and this non-compliance resulted in the knowing submission of false claims to

MassHealth, MBHP, and the MCOs.

## I.      SOUTH BAY'S NONCOMPLIANCE WITH LICENSURE AND SUPERVISION REQUIREMENTS

102.    South Bay employs staff therapists to provide mental health treatment to patients,

including MassHealth beneficiaries. Many of these therapists have master's degrees, but are not

licensed as social workers or mental health counselors. MassHealth regulations expressly state

that only unlicensed social workers who "provide services under the direct and continuous

supervision of an independent clinical social worker" are qualified to provide mental health

services to MassHealth members. 130 C.M.R. § 429.424(C)(2). Similarly, "all unlicensed

counselors . . . must be under the direct and continuous supervision of a fully qualified

professional staff member" to provide services to MassHealth members. 130 C.M.R. §

429.424(F)(1). As set forth in detail below, a vast majority of unlicensed staff therapists at South

Bay clinics had no qualified supervisor during the applicable time period.

103.    Each clinic is also required to have a clinic director who is "licensed, certified or

registered to practice in one of the core disciplines listed in 130 CMR 429.424, and must have

had at least five years of full-time, supervised clinical experience subsequent to obtaining a

master's degree, two years of which must have been in an administrative capacity." 130 C.M.R.

§ 429.423(B). As set forth below, many of the South Bay clinics did not have qualified clinic

directors during the applicable time period. In fact, many clinic directors were themselves

unlicensed.

104.    Clinic directors at South Bay report to regional directors. Regional directors

report to the Director of Clinical Services at the parent center. Prior to 2014, South Bay's

Director of Clinical Services at the parent center (Brockton) was Jennifer Gearhart. In

November 2014, Gearhart was terminated and Sara Hart became South Bay's Director of

Clinical Operations.

105.     Gearhart testified in a deposition pursuant to Civil Investigative Demand on June

6, 2017[12] that, after Scanlon created South Bay in Brockton in 1986 and began to open

additional clinics, she helped create the infrastructure at South Bay whereby clinic directors

oversaw all supervisors within their clinics, and a regional director oversaw the clinic directors

at two or three clinics.

106.     Kathy Bangerter, South Bay's Director of Utilization Management and

Compliance Officer from 2000 until 2012, testified on October 1, 2017 that, during that time

period, Scanlon and Gearhart were most responsible for ensuring that South Bay was complying

with MassHealth regulations. According to Bangerter, although South Bay had a "Compliance

Committee" during her tenure, it was a committee "theoretically" and "in name only." Bangerter

testified that, throughout her tenure as South Bay's Compliance Officer, Scanlon never once

asked her to ensure South Bay was compliant with supervision regulations.

107.     Gearhart testified that, as President and CEO of South Bay, Scanlon was

responsible for ensuring South Bay was in compliance with state and federal regulations.

Gearhart stated that she was not trained in how to interpret regulations or ensure compliance with

regulations, so she could not have been the "go to" person at South Bay for guidance on what

South Bay needed to do to comply with regulations.   When asked who was responsible for

ensuring that South Bay was satisfying payers' performance specifications, Gearhart responded:

"I would say Peter [Scanlon] was. I mean, as the head of the company and the one who was

---

[12] Several depositions, including those referenced herein, were taken pursuant to Civil Investigative Demands issued
by the Commonwealth and/or the United States Attorney's Office while the case was under seal.

really in charge of the regulations. I mean, he would always say, 'I'm the one that reads the regulations. I know what the regulations are. . .'"

108.    Scanlon confirmed in deposition testimony on September 29, 2017 that he personally reviewed regulations promulgated by MassHealth during his tenure as President of South Bay.

109.    South Bay was not in compliance with the staffing and supervision regulations set forth above. Relator Martino-Fleming raised these staffing and supervision issues with the Defendants beginning in 2012, although South Bay's systemic regulatory noncompliance had been ongoing for years and had been a source of concern for South Bay's billing department.

110.    Martino-Fleming was hired as a "job coach" at South Bay in 2008. In that role, she assisted South Bay's staff therapists with documentation, billing, and time management.

111.    In March 2012, Martino-Fleming was promoted to Coordinator of Staff Development and Training. One of her duties in this role was to analyze South Bay employees' educational background and experience. Martino-Fleming learned that South Bay was hiring unlicensed and unqualified individuals, placing them in roles for which they were not qualified, and not providing them with the required oversight.

112.    Martino-Fleming examined the educational backgrounds of hundreds of employees by reviewing their resumes and prepared a summary showing that, not only were the majority unlicensed, many were not even license-eligible because: (1) they had degrees in areas such as expressive therapy, art therapy, creative arts therapy, school counseling, somatic counseling, and agency counseling; (2) they had degrees from unaccredited schools; or (3) they were missing the core clinical courses, did not meet the 60-credit minimum, or did not have the needed internships. *See* Exhibit 4.

113.     Pursuant to MassHealth regulations, each clinic needs to be managed by a core team of individuals qualified pursuant to 130 C.M.R. § 429.422 and 130 C.M.R. § 429.423. During the applicable time period, because of these deficiencies, every South Bay clinic, including the parent clinic (Brockton), was in violation of § 429.422 and § 429.423.

114.     MassHealth regulations specifically provide that services provided by a satellite clinic are "reimbursable only if" the clinic director is licensed in one of the core disciplines (licensed psychiatrist, licensed psychologist, independently licensed clinical social worker (LICSW), psychiatric nurse specialist, or psychiatric nurse) and has at least five years' experience after obtaining a master's degree, 130 C.M.R. § 429.423(B)(1), yet several South Bay clinics were operating with unlicensed clinic directors. In some cases, even the regional directors were unlicensed.

115.     Based on Martino-Fleming's knowledge from her time at South Bay, she prepared a table that reflects that, during the relevant time period, at least 28 individuals who held the position of clinic director at one of the South Bay clinics did not have one of the licenses required by § 429.423(B)(1), and 24 clinic directors had no license at all. *See* Exhibit 5.

116.     South Bay's own analysis confirms that at least the Attleboro Clinic, Cape Cod Clinic, Chelsea Clinic, Dorchester Clinic, Fall River Clinic, Pittsfield Clinic, Plymouth Clinic, Salem Clinic, and Springfield Clinic were all operating with unqualified clinic directors in violation of MassHealth regulations. *See* Exhibit 6. All claims submitted by a clinic that did not have an appropriately licensed and qualified clinic director are false and fraudulent.

117.     All unlicensed counselors must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines (psychiatry, psychology, social work, and psychiatric nursing). 130 C.M.R. § 429.424(F)(1). All counselors

must also hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and must have had two years of full-time supervised clinical experience in a multidisciplinary mental health setting subsequent to obtaining the master's degree. *Id.* § 429.424(F)(1). As set forth above, many counselors at South Bay did not hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and/or did not have two years of full-time supervised clinical experience in a multidisciplinary mental health setting subsequent to obtaining a master's degree. *See* Exhibit 4. All claims submitted for therapy rendered by an unlicensed clinician who did not meet these qualifications are false and fraudulent.

118.   Moreover, the majority of these unlicensed South Bay clinicians had no qualified supervisor, therefore could not have been receiving the "direct and continuous supervision" required by 130 C.M.R. § 429.424. *See* Exhibit 5. All claims submitted for therapy rendered by an unlicensed clinician who was not receiving "direct and continuous supervision" from an appropriately licensed supervisor are false and fraudulent.

119.   Even in clinics where there were supervisors with the appropriate licenses, many unlicensed, master's-level clinicians were not actually receiving required clinical supervision. As evidenced by an email exchange between South Bay employees in July 2012, it was a company policy at South Bay that master's-level clinicians received no clinical supervision whatsoever in the first 90 days of their employment. *See* Exhibit 7. As demonstrated by the new hire evaluation form for a Mashpee employee in February 2016, South Bay's practice of not providing clinical supervision to employees in the first 90 days of their employment continued until at least 2016. *See* Exhibit 8.

120.     These were South Bay's most inexperienced clinicians—the clinicians who needed supervision the most—yet South Bay provided them with no clinical supervision whatsoever. Therefore, all claims submitted for treatment rendered to MassHealth beneficiaries by master's-level clinicians in their first 90 days of employment are false.

121.     South Bay was relying on a "waterfall effect" for supervision—as long as someone up the chain on the company's organizational chart was licensed (even if the only licensed person up the chain was Gearhart, the Director of Clinical Services for all of South Bay), South Bay took no action to ensure the clinician's actual supervisor or clinic director (or in some cases, regional director) was appropriately licensed, or to ensure that the clinician was actually being supervised.

122.     Gearhart testified that the supervision issues got worse after Sheehan, the C.I.S. Defendants, and the H.I.G. Defendants took over South Bay because "the pressure to grow was astronomical compared to what it had been" prior to South Bay's sale. Gearhart testified that she repeatedly voiced her concerns to Scanlon, Sheehan, Ed Neuhaus, C.I.S. Chief Clinical Officer, Jeff Quade, C.I.S. Vice President of Human Resources, and Michael Pelletier, the President and Chief Operating Officer of South Bay as of March 2014. She testified that the infrastructure she had created at South Bay was deteriorating—South Bay was hiring "more staff than the licensed supervisors could handle" and not replacing licensed supervisors who left the company.

123.     Gearhart testified that she did not think a licensed supervisor could properly supervise more than seven or eight clinicians, yet by 2014, some licensed supervisors were assigned twice that many supervisees.

124.     Rose Lunney, Business Manager, also confirmed in an interview with investigators from the Department of Health and Human Services, Office of Inspector General,

and Attorney General's Office on April 27, 2017 that South Bay's billing staff did not check to

see if a clinician was licensed or supervised by a licensed clinician before billing MassHealth.

Lunney had been responsible for processing billing at South Bay since 1986, when Scanlon

founded South Bay.

125.     Staffing and supervision deficiencies existed at all 17 South Bay clinics (as

detailed below) throughout the entire relevant time period. For examples of the patients who

received treatment from therapists who lacked appropriate licenses and/or were not properly

supervised, see Tables 1 and 2 in The Relator's Second Amended Complaint and Demand for

Jury Trial, 15-cv-13065, ECF No. 49 (Oct. 19, 2017).

**Plymouth Clinic**

126.     The Plymouth Clinic is a satellite of the Brockton Clinic and is located at 50

Aldrin Road, Plymouth, Massachusetts. Katie McMakin joined South Bay in June 2008 as a staff

therapist at the Plymouth Clinic. She had just finished her master's degree and had no license.

Six months later, South Bay promoted McMakin to supervisor at the Plymouth Clinic. At the

time South Bay promoted McMakin to supervisor, McMakin had only had her master's degree

for six months and was still unlicensed. McMakin testified on June 28, 2017 that, despite the fact

that she was unlicensed, she was the only supervisor at the Plymouth Clinic at that time.

Although pursuant to the regulations, McMakin was unqualified to provide mental health

services herself without "direct and continuous supervision" by an independently licensed

clinician, South Bay charged her with supervising other master's-level therapists at the Plymouth

Clinic. According to her testimony, not only was McMakin unlicensed, but her clinic director,

Jen (last name unknown), and her regional director, Amanda Pitts, were both unlicensed as well.

None of them were qualified to provide supervision as required by § 429.424.

127.    Martino-Fleming is aware of 80 individuals who worked at the Plymouth Clinic, only a handful of whom were independently licensed. There was only one independently licensed supervisor, as reflected in the rosters for each clinic, attached as Exhibit 9. The majority of staff therapists at the Plymouth Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

128.    The clinic directors and regional directors at the Plymouth Clinic were unlicensed as were the majority of "supervisors" at the clinic. Therefore, the Plymouth Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised. The Clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Plymouth Clinic were false and fraudulent.[13] For a breakdown of the claims submitted by the Plymouth Clinic in the applicable time period, see Exhibit 3.

**Cape Cod Clinic**

129.    The Cape Cod Clinic is a satellite of the Brockton Clinic and is located at 470 Main Street, Mashpee, Massachusetts. In the spring or summer of 2009, South Bay again promoted McMakin (who still only had a master's degree and no license), this time to the role of clinic director at the Cape Cod Clinic. South Bay assigned McMakin to be clinic director of the Cape Cod Clinic when she was unlicensed and had only held a master's degree for one year. Although pursuant to the regulations, McMakin was unqualified to provide mental health services herself without "direct and continuous supervision" by an independently licensed

---

[13] Because MassHealth regulations apply to all providers treating MassHealth beneficiaries regardless of whether those beneficiaries are enrolled in the PCC plan, MBHP, or an MCO, all claims submitted by the clinic while not in compliance were false regardless of whether the specific claim was submitted to MassHealth FFS, MBHP, or an MCO.

clinician, South Bay charged her with supervising the supervisors of the Cape Cod Clinic's master's-level therapists. McMakin held the role of clinic director at the Cape Cod Clinic for at least a year and a half before she obtained her LMHC in 2011 or 2012. An LMHC is not even qualified to serve as a clinic director under § 429.423 and was not qualified to provide supervision to unlicensed clinicians under § 429.424 until 2014.

130.    After McMakin left her role as clinic director at the Cape Cod Clinic, South Bay promoted Courtney Matto to the role of clinic director. Matto was also unlicensed. Matto testified on June 22, 2017 that she held the position of clinic director at the Cape Cod Clinic from February 2012 until June 2014. Although, pursuant to the regulations, Matto was unqualified to provide mental health services herself without "direct and continuous supervision" by an independently licensed clinician, South Bay charged her with supervising the supervisors of the Cape Cod Clinic's master's-level therapists. Matto did not receive her LMFT (which was not even sufficient to satisfy the regulatory requirements regarding the qualifications of a clinic director) until August 2013, a year and a half after South Bay promoted her to the role of clinic director.

131.    South Bay's practice of hiring unlicensed clinic directors continued after Sheehan, the C.I.S. Defendants, and the H.I.G. Defendants took over South Bay. After Matto left her role as clinic director, an email exchange between Gearhart and Pelletier in May 2014 shows that South Bay promoted yet another unqualified, unlicensed individual, Kristyn Riganese, to the role of clinic director at the Cape Cod Clinic. *See* Exhibit 10.

132.    Martino-Fleming is aware of at least 50 individuals who worked at the Cape Cod Clinic, only a handful of whom were independently licensed. There was not a single independently licensed supervisor. *See* Exhibit 9. The majority of staff therapists at the Cape Cod

Clinic were unlicensed and could not have been adequately supervised as required by 130
C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

133.    The Cape Cod clinic directors and regional directors were unlicensed as were the
"supervisors" at the clinic. Therefore, the Cape Cod Clinic was billing for claims for services
rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately
supervised. The clinic was in violation of the staffing and supervision regulations set forth
herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the
Cape Cod Clinic were false and fraudulent. For a breakdown of the claims submitted by the Cape
Cod Clinic in the applicable time period, see Exhibit 3.

**Fall River Clinic/Swansea Clinic**

134.    The Fall River Clinic was a satellite of the Brockton Clinic and was located at
1563 North Main Street, Suite 202, Fall River, Massachusetts. Operations were gradually moved
from the Fall River Clinic to the Swansea Clinic, after which time the Fall River Clinic was
closed in September 2016. The Swansea Clinic is a satellite of the Brockton clinic and is located
at 463 Swansea Mall Drive, Swansea, Massachusetts.

135.    Amanda Lee, the clinic director at the Fall River Clinic as of 2012, was
unlicensed.

136.    In July 2014, Sara Hart, South Bay's Director of Clinical Operations, reviewed
staff rosters for the Fall River Clinic, which showed that 6 out of 22 (27 percent) of South Bay's
unlicensed clinicians were assigned unlicensed supervisors, and an additional 3 (41 percent)
were assigned LCSW supervisors (an insufficient license to act as a supervisor under the
regulations). Her email to Gearhart and Pelletier summarizing these findings is included as
Exhibit 11.

137.    In March 2016, almost two years later, the Fall River Clinic was still assigning unlicensed "clinical supervisors" to unlicensed staff, as reflected in the Clinical Supervision Note at Exhibit 12.

138.    Martino-Fleming is aware of at least 100 individuals who worked at the Fall River Clinic, only two of whom were independently licensed supervisors. *See* Exhibit 9. The majority of staff therapists at the Fall River/Swansea Clinics were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

139.    The clinic directors at the Fall River/Swansea Clinics were unlicensed, the regional directors lacked the appropriate licenses, and the majority of the "supervisors" were unqualified to perform supervision under the regulations. Therefore, the Fall River/Swansea Clinics were billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised. The clinics were in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Fall River Clinic and Swansea Clinic were false and fraudulent. For a breakdown of the claims submitted by the Fall River and Swansea Clinics in the applicable time period, see Exhibit 3.

**Attleboro Clinic**

140.    The Attleboro Clinic is a satellite of the Brockton Clinic and is located at 607 Pleasant Street, Suite 115, Attleboro, Massachusetts. During the relevant time period, the Attleboro Clinic was operating with an unlicensed clinic director and an unlicensed regional director in violation of § 429.423 and § 429.424.

141.     Martino-Fleming is aware of at least 125 individuals who worked at the Attleboro Clinic, only a handful of whom were independently licensed. There were only two independently licensed supervisors, and the two licensed supervisors were only licensed during a part of their tenure at the clinic. *See* Exhibit 9. The majority of staff therapists at the Attleboro Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

142.     Even at clinics where there was an independently licensed supervisor on staff, in many cases, that person was not actually providing supervision to the unlicensed therapists. The Attleboro Clinic is one site where such supervision failures were identified. In February 2011, Lunney emailed Gearhart and informed her that if the Attleboro Clinic "lists Jen Sawdy as the lic supervisor then Jen needs to be supervising that therapist and reviewing the cases . . . documentation of that needs to be in the chart or in the supervision file." Exhibit 13.

143.     The Attleboro Clinic clinic directors and regional directors were unlicensed as were the majority of "supervisors" at the clinic. Therefore, the Attleboro Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Attleboro Clinic were false and fraudulent. For a breakdown of the claims submitted by the Attleboro Clinic in the applicable time period, see Exhibit 3.

**Lawrence Clinic**

144.     The Lawrence Clinic is a satellite of the Brockton Clinic and is located at 360 Merrimack Street, Building 9, Door-H, Lawrence, Massachusetts. Sara Hart was initially hired by South Bay as a staff therapist in 2008, shortly after receiving her master's degree in

counseling psychology. She testified on May 19, 2017 that, shortly after starting at South Bay, she was promoted to the role of supervisor at the Lawrence Clinic. In 2009, about one year after receiving her master's degree (and while she was still unlicensed), South Bay promoted Hart to clinic director at the Lawrence Clinic.

145.    Although pursuant to the regulations, Hart herself was unqualified to provide mental health services without "direct and continuous supervision" by an independently licensed clinician, South Bay charged her with overseeing the entire Lawrence Clinic. Hart acted as clinic director at the Lawrence Clinic until 2011. She received her LMHC in 2010 (which is still an insufficient license for a clinic director under the regulations), but acted as an unlicensed clinic director until that time.

146.    Martino-Fleming is aware of at least 100 individuals who worked at the Lawrence Clinic, only a handful of whom were independently licensed. To Martino-Fleming's knowledge, there was only one independently licensed supervisor who held a license for her entire tenure at the Lawrence Clinic. *See* Exhibit 9. The majority of staff therapists at the Lawrence Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

147.    The Lawrence Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unlicensed clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Lawrence Clinic were false and fraudulent. For a breakdown of the claims submitted by the Lawrence Clinic in the applicable time period, see Exhibit 3.

### Chelsea Clinic

148.    The Chelsea Clinic is a satellite of the Brockton Clinic and is located at 70 Everett

Avenue, Suite 515, Chelsea, Massachusetts. It opened in 2014. During the relevant time period,

neither the clinic director nor the regional director of the Chelsea Clinic was licensed as required

for these positions pursuant to § 429.423 and § 429.424. The staff therapists at the Chelsea Clinic

were unlicensed and could not have been adequately supervised as required by 130 C.M.R. §

429.424 given the lack of qualified supervisors at the clinic.

149.    The Chelsea Clinic was billing for claims for services rendered to MassHealth

beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the

clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing

and supervision regulations set forth herein, so all claims submitted to MassHealth (whether

through FFS, MBHP, or an MCO) by the Chelsea Clinic were false and fraudulent. For a

breakdown of the claims submitted by the Chelsea Clinic in the applicable time period, see

Exhibit 3.

### Dorchester Clinic

150.    The Dorchester Clinic is a satellite of the Brockton Clinic and is located at 415

Neponset Avenue, 3rd Floor, Dorchester, Massachusetts. Martino-Fleming is aware of at least 30

individuals who worked at the Dorchester Clinic, only a handful of whom were independently

licensed. The regional director of the Dorchester Clinic was not licensed as required by 130

C.M.R. §§ 429.423 and 429.424 throughout her tenure at South Bay. The clinic director was not

independently licensed until 2014. To Martino-Fleming's knowledge, there were no

independently licensed supervisors at the Dorchester Clinic who held their licenses for their

entire tenure. *See* Exhibit 9. The majority of staff therapists at the Dorchester Clinic were

unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

151.    The Dorchester Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unlicensed clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Dorchester Clinic were false and fraudulent. For a breakdown of the claims submitted by the Dorchester Clinic in the applicable time period, see Exhibit 3.

**Leominster Clinic**

152.    The Leominster Clinic is a satellite of the Brockton Clinic and is located at 80 Erdman Way, Suite 208, Leominster, Massachusetts. Martino-Fleming is aware of at least 25 individuals who worked at the Leominster Clinic. To Martino-Fleming's knowledge, while the regional director, clinic director, and supervisor at the Leominster Clinic were licensed as required by the regulations (at least during part of their tenure), there were staff therapists at the Leominster Clinic who failed to meet the requirements of 130 C.M.R. § 429.424. *See* Exhibit 9.

153.    The Leominster Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed and unqualified clinicians in violation of MassHealth regulations, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Lawrence Clinic for treatment rendered by those unqualified individuals were false and fraudulent. For a breakdown of the claims submitted by the Leominster Clinic in the applicable time period, see Exhibit 3.

**Lowell Clinic**

154.    The Lowell Clinic is a satellite of the Brockton Clinic and is located at 22 Old

Canal Drive, Lowell, Massachusetts. Martino-Fleming is aware of at least 150 individuals who

worked at the Lowell Clinic. The regional director of the Lowell Clinic was not properly licensed

as required for this position pursuant to 130 C.M.R. §§ 429.423 and 429.424. Only a handful of

individuals at the Lowell Clinic were independently licensed. To Martino-Fleming's knowledge,

the independently licensed supervisors at the Lowell Clinic did not provide much, if any, actual

supervision to the unlicensed clinicians at the clinic. *See* Exhibit 9. The majority of staff

therapists at the Lowell Clinic were unlicensed and could not have been adequately supervised as

required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

155.    The Lowell Clinic was billing for claims for services rendered to MassHealth

beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the

clinic was operating with an unqualified clinic director and regional director. The clinic was in

violation of the staffing and supervision regulations set forth herein, so all claims submitted to

MassHealth (whether through FFS, MBHP, or an MCO) by the Lowell Clinic were false and

fraudulent. For a breakdown of the claims submitted by the Lowell Clinic in the applicable time

period, see Exhibit 3.

**Lynn Clinic**

156.    The Lynn Clinic is a satellite of the Brockton Clinic and is located at 181 Union

Street, Suite J, Lynn, Massachusetts. Martino-Fleming is aware of at least 30 individuals who

worked at the Lynn Clinic. Neither the regional director nor the clinic director at the Lynn

Clinic were licensed as required for their positions pursuant to 130 C.M.R. §§ 429.423 and

429.424 throughout their tenure at South Bay. To Martino-Fleming's knowledge, none of the

supervisors at the Lynn Clinic were independently licensed. *See* Exhibit 9. The majority of staff

therapists at the Lynn Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

157.   The Lynn Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Lynn Clinic were false and fraudulent. For a breakdown of the claims submitted by the Lynn Clinic in the applicable time period, see Exhibit 3.

### Malden Clinic

158.   The Malden Clinic is a satellite of the Brockton Clinic and is located at 22 Pleasant Street, Malden, Massachusetts. Neither the regional director nor the clinic director were licensed as required for their positions pursuant to 130 C.M.R. §§ 429.423 and 429.424 throughout their tenure at South Bay. To Martino-Fleming's knowledge, only one of the supervisors at the Malden Clinic was independently licensed, and that supervisor only obtained her LICSW in late 2012. *See* Exhibit 9. The majority of staff therapists at the Malden Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

159.   The Malden Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Malden Clinic were false and fraudulent. For a

breakdown of the claims submitted by the Malden Clinic in the applicable time period, see

Exhibit 3.

### Pittsfield Clinic

160.    The Pittsfield Clinic is a dependent satellite clinic located at 100 North Street,

Pittsfield, Massachusetts. It opened in 2014, and during Martino-Fleming's tenure, had only

three employees. Upon information and belief, the regional director for the Pittsfield Clinic was

appropriately licensed but did not provide "direct and continuous" supervision to staff therapists

at the Pittsfield Clinic. The clinic director was not appropriately licensed pursuant to 130 C.M.R.

§§ 429.423 and 429.424. *See* Exhibit 9. The staff therapists at the Pittsfield Clinic were

unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424

given the lack of qualified supervisors at the clinic.

161.    The Pittsfield Clinic was billing for claims for services rendered to MassHealth

beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the

clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing

and supervision regulations set forth herein, so all claims submitted to MassHealth (whether

through FFS, MBHP, or an MCO) by the Pittsfield Clinic were false and fraudulent.

### Salem Clinic

162.    The Salem Clinic is a satellite of the Brockton Clinic and is located at 35

Congress Street, Suite 214, Salem, Massachusetts. Martino-Fleming is aware of at least 80

individuals who worked at the Salem Clinic, only a handful of whom were independently

licensed. Neither the regional director nor the clinic director at the Salem Clinic were licensed as

required for their positions pursuant to 130 C.M.R. §§ 429.423 and 429.424 throughout their

tenure at South Bay. To Martino-Fleming's knowledge, none of the supervisors at the Salem

Clinic were independently licensed. There was one licensure supervisor who had her LICSW, but she was not providing "direct and continuous supervision" to unlicensed clinicians at the clinic. *See* Exhibit 9. The majority of staff therapists at the Salem Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

163.    The Salem Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Salem Clinic were false and fraudulent. For a breakdown of the claims submitted by the Salem Clinic in the applicable time period, see Exhibit 3.

### Springfield Clinic

164.    The Springfield Clinic is a satellite of the Brockton Clinic and is located at 140 High Street, Suite 230, Springfield, Massachusetts. Martino-Fleming is aware of at least 40 individuals who worked at the Springfield Clinic, only a handful of whom were independently licensed. The clinic director at the Springfield Clinic was not licensed as required for her position pursuant to 130 C.M.R. §§ 429.423 and 429.424 throughout her tenure at South Bay. To Martino-Fleming's knowledge, there were no independently licensed supervisors at the Springfield clinic. *See* Exhibit 9. The majority of staff therapists at the Springfield Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

165.     The Springfield Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Springfield Clinic were false and fraudulent. For a breakdown of the claims submitted by the Springfield Clinic in the applicable time period, see Exhibit 3.

## Weymouth Clinic

166.     The Weymouth Clinic is a satellite of the Brockton Clinic and is located at 541 Main Street, Suite 303, Weymouth, Massachusetts. Martino-Fleming is aware of at least 100 individuals who worked at the Weymouth Clinic. Neither the regional director nor the clinic director at the Weymouth Clinic were licensed as required for their respective positions pursuant to 130 C.M.R. §§ 429.423 and 429.424 throughout their tenure at South Bay. To Martino-Fleming's knowledge, there were only four independently licensed supervisors at the Weymouth Clinic. *See* Exhibit 9. The majority of staff therapists at the Weymouth Clinic were unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424 given the lack of qualified supervisors at the clinic.

167.     The Weymouth Clinic was billing for claims for services rendered to MassHealth beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing and supervision regulations set forth herein, so all claims submitted to MassHealth (whether through FFS, MBHP, or an MCO) by the Weymouth Clinic were false and fraudulent. For a

breakdown of the claims submitted by the Weymouth Clinic in the applicable time period, see

Exhibit 3.

### Worcester Clinic

168.    The Worcester Clinic is a satellite of the Brockton Clinic and is located at 340

Main Street, Suite 818, Worcester, Massachusetts. Martino-Fleming is aware of at least 120

individuals who worked at the Worcester Clinic. The clinic director at the Worcester Clinic was

not licensed as required by 130 C.M.R. §§ 429.423 and 429.424 throughout their tenure at South

Bay. To Martino-Fleming's knowledge, there were no independently licensed supervisors at the

Worcester Clinic. *See* Exhibit 9. The majority of staff therapists at the Worcester Clinic were

unlicensed and could not have been adequately supervised as required by 130 C.M.R. § 429.424

given the lack of qualified supervisors at the clinic.

169.    The Worcester Clinic was billing for claims for services rendered to MassHealth

beneficiaries by unlicensed clinicians who were not being appropriately supervised and while the

clinic was operating with an unqualified clinic director. The clinic was in violation of the staffing

and supervision regulations set forth herein, so all claims submitted to MassHealth (whether

through FFS, MBHP, or an MCO) by the Worcester Clinic were false and fraudulent. For a

breakdown of the claims submitted by the Worcester Clinic in the applicable time period, see

Exhibit 3.

### Brockton Clinic

170.    South Bay's headquarters is located at 1115 West Chestnut Street in Brockton,

Massachusetts. South Bay provides day services and mental health clinic services in Brockton at

its Commercial Street location.[14] To Martino-Fleming's knowledge, there were six independently

---

[14] This action only pertains to claims for mental health services, not day services.

licensed supervisors at the Brockton Clinic who held a license for at least part of their tenure. *See*

Exhibit 9. However, the majority of staff therapists at the Brockton Clinic were unlicensed and

could not have been adequately supervised as required by 130 C.M.R. § 429.424 by only six

qualified supervisors at the clinic.

171.    The Brockton Clinic was billing for claims for services rendered to MassHealth

beneficiaries by unlicensed clinicians who were not being appropriately supervised. The clinic

was in violation of the staffing and supervision regulations set forth herein, so all claims

submitted to MassHealth (whether through FFS, MBHP, or an MCO) by unlicensed clinicians

who were not appropriately supervised at the Brockton Clinic were false and fraudulent. For a

breakdown of the claims submitted by the Brockton Clinic in the applicable time period, see

Exhibit 3.

## II.    FALSE AND FRAUDULENT INFORMATION IN SUPERVISION FOLDERS

172.    As noted above, even before early 2012, when Martino-Fleming raised these

supervision issues with Defendants, by February 2011, South Bay's billing department had

recognized and informed Gearhart via email that, in the event of a chart review, they would not

be able to provide documentation to "support the supervision of these cases." Exhibit 14.

173.    In December 2013, Martino-Fleming informed South Bay and the C.I.S.

Defendants that new hires who had no licensed supervisor were being instructed to write in the

name of a supervisor they had never met in their supervision folders "in case they were ever

audited." Exhibit 15.

174.    Lunney responded that she was aware that MCOs Beacon and UBH required non-

licensed staff to have the licensed supervisor's name on each session note and that "[t]his would

not be an issue if all supervisors were independently licensed but they are not." Exhibit 15.

48

Christine Oldham, Assistant Business Manager, noted in the same email chain that "putting a supervisor on it that they have never met and really does not 'supervise' them . . . is going to bite us in the butt." Exhibit 16. Lunney stated in her interview that Gearhart had instructed licensed clinic directors to sign session notes even if they had not actually met with or supervised the clinician.

175.     McMakin testified that this practice was occurring during her tenure as well.

III.     SALE OF SOUTH BAY TO C.I.S., C.I.S.H., H.I.G., AND KEVIN SHEEHAN

176.     At some point in 2011, Scanlon discussed the possibility of selling South Bay to H.I.G. with, among other individuals, Nicholas Scola of H.I.G. Scola then approached Sheehan through a mutual connection about partnering with H.I.G. on the sale. Scanlon then met, on various occasions, with Scola, Steven Loose, and Eric Tencer of H.I.G., and Sheehan to discuss the possibility of selling South Bay to H.I.G. and Sheehan. Scanlon also presented to the H.I.G. Board of Directors and Sheehan about this possible sale.

177.     Loose, who was the managing director of H.I.G. at the time, stated that he was "the more senior person" on the possible sale of South Bay to H.I.G. Loose testified on October 26, 2017 that he thought of South Bay as "an interesting business. . . I had seldom seen businesses with a supply-demand imbalance like this. . . there is way too much demand for the services and not enough supply, so if . . . we just crack that code, that's a great business with, at the time, good margins."

178.     Loose also testified that Sheehan's partnership made the deal more palatable to H.I.G., because "Kevin had experience in a similar business, YFS, Youth and Family Services." Loose was referring to the fact that Sheehan had served from 1997-2011 as the co-founder, Chairman, President, and Chief Executive Officer of Youth and Family Centered Services, Inc.

("YFCS"), which provided children and adolescents with room and board and intensive psychiatric/behavioral health services. Sheehan's co-founder in this venture was Raphael Luccasen.

179.     In April 2009, the United States Attorney's Office for the Eastern District of Pennsylvania announced that it had reached a settlement to resolve allegations that YFCS and its wholly owned subsidiary, Southwood Psychiatric Hospital, Inc., had violated the False Claims Act by subjecting residents to inadequate care resulting from: (1) insufficient levels and methods of staffing; (2) inadequate staff training; (3) deficient facilities; (4) deficient safety procedures; and (5) deficient medical/psychological treatment. The settlement agreement required YFCS to maintain proper staffing levels and specified the licensure requirements for the individuals that YFCS was mandated to hire and retain. The settlement agreement also required YFCS to report any overpayments stemming from any violations of health care regulations and repay the improperly obtained funds to the government. Sheehan signed this settlement agreement on behalf of YFCS and testified on October 23, 2017 that he was aware at the time that "inadequate staff training" was involved in the settlement.

180.     H.I.G. and Sheehan developed a proposal wherein they would jointly form a company, C.I.S., and a holding company, C.I.S.H., to purchase South Bay. H.I.G. subsequently issued a letter of intent to purchase South Bay.

181.     H.I.G. and Sheehan conducted substantial due diligence before purchasing South Bay. According to Loose, H.I.G. conducted financial due diligence itself and hired: (1) Luccasen to do clinical due diligence; (2) accountants to do a quality of earnings assessment; (3) another firm or individual to conduct benefits analysis; (4) another firm or individual to conduct

insurance diligence; and (5) McDermott Will & Emery to conduct legal due diligence. Sheehan

had recommended that Luccasen conduct clinical due diligence.

182.     During the diligence process, Sheehan recalled spending "two to three days a

week with [Scanlon] trying to kind of shadow and get the lay of the land and be introduced to

people."

183.     Through this due diligence process, H.I.G. and Sheehan learned that South Bay

employed mental health therapists that did not have adequate licensure and/or were not

adequately supervised. For example, Raphael Luccasen's due diligence report, attached as

Exhibit 17, stated that South Bay had "poor quality of supervision" and that "[d]ue to the issues

identified with . . . staff training and supervision . . . South Bay Mental Health would benefit

from a re-examination of these programs." Sheehan recalled discussing the issues with

supervision that Luccasen identified in his due diligence review with Scola and Eric Tencer of

H.I.G.

184.     Through Sheehan's and Luccasen's past experience at YFCS, including

settlement of a False Claims Act action, Luccasen's report concerning the inadequacy of

supervision at South Bay, and the legal due diligence conducted by McDermott Will & Emery,

H.I.G. and Sheehan knew or should have known that South Bay's failure to hire and/or retain

properly licensed mental health therapists and/or provide appropriate supervision to mental

health therapists violated MassHealth, MBHP, and MCO regulations and requirements and

necessitated repayment of any overpayments.

185.     H.I.G. and Sheehan formally incorporated C.I.S. and C.I.S.H. on February 29,

2012 as holding investment companies. On April 12, 2012, H.I.G. and Sheehan formally

purchased South Bay via a stock purchase agreement whereby Scanlon received shares of

common stock in C.I.S.H., a promissory note, and a cash payment. In total, Scanlon received over $31 million from the sale.

186.    As part of the stock purchase agreement, Scanlon represented that South Bay was not "in material violation of or being investigated for material violation of any Health Care Laws by which [South Bay] is bound or to which any business activity or professional services performed by such Person for [South Bay] (including services provided to other Persons but arranged by [South Bay]) is subject." Scanlon also represented that South Bay "is operating in material compliance with all Federal Health Care Program rules and regulations and all material provisions of each Federal Health Care Program Contract to which it is a party or by which it is bound."

187.    Scanlon testified that he "didn't do anything out of the normal process and procedures" to ensure that these statements were accurate before signing the stock purchase agreement. Sheehan testified that he relied on Scanlon's representations and did not seek further information concerning South Bay's compliance with health care regulations in advance of the sale, aside from what was revealed during H.I.G.'s and Sheehan's due diligence process. Loose testified that he, as Managing Director of H.I.G., relied on Scanlon's representations and did not seek further information concerning South Bay's compliance with health care regulations in advance of the sale, aside from what was revealed during the due diligence process.

## IV.    MANAGEMENT OF SOUTH BAY BY C.I.S., C.I.S.H., H.I.G., AND SHEEHAN

188.    Once C.I.S. and C.I.S.H. acquired South Bay, Sheehan became the Chief Executive Officer of C.I.S., a position he held until 2016. Scanlon joined C.I.S. in the role of Chief Clinical Officer until he left C.I.S. in 2013 or 2014. During this time, Scanlon and Sheehan served on the Board of Directors for C.I.S., which oversaw South Bay's operations. The other

three members of the Board of Directors for C.I.S. were Scola, Loose, and Tencer from H.I.G. After Scanlon assumed the role of Chief Clinical Officer at C.I.S., Michael Pelletier assumed responsibility for South Bay's day-to-day operations as President and Chief Operating Officer of South Bay.

189.   Scanlon testified that, in his role as Chief Clinical Officer and a member of the C.I.S. Board of Directors, he "provided some direction working with referral agencies . . . provided some individual supervision for [] three division directors . . . and went down [to Pennsylvania and North Carolina to other C.I.S.-owned facilities] to help them to develop their outpatient mental health services." Scanlon also testified that, in Sheehan's role as Chief Executive Officer of C.I.S. and a member of the C.I.S. Board of Directors, was "responsible for pretty much anything that happened." Loose testified that "[t]he responsibility [for ensuring compliance with regulations] would have -- does rest at the CEO." As the H.I.G. representatives on the Board of Directors of C.I.S., Loose asserted that he, Scola, and Tencer provided "strategic input to highlight areas that come to [our] attention that [we] want to give advice on, that [we] believe need analysis to question."

190.   The Board of Directors of C.I.S. met quarterly. According to Loose, the Board of Directors was responsible for making strategic decisions with respect to entities owned by C.I.S., including settlement of lawsuits, considering additional acquisitions, and adopting personnel changes, such as the hiring and firing of company leadership. The Board of Directors of C.I.S. also provided direction with respect to certain financial matters, deciding "whether or not to put additional finances into the company." To inform its decisions associated with South Bay's finances, the Board of Directors of C.I.S. received detailed reports concerning the status of South Bay's finances and conducted periodic discussions with South Bay employees concerning its

financial state. Loose added that the Board of Directors of C.I.S. would also evaluate specific long-term issues at South Bay, and did so with respect to the question of why South Bay was struggling to recruit and retain clinicians.

191.     During this time, C.I.S. acquired two companies in addition to South Bay: Access Family Services, Inc. and Family Behavioral Resources, Inc. As reflected in the due diligence presentation conducted in advance of the acquisition of Access Family Services, Inc. included at Exhibit 18, the Board of Directors of C.I.S. understood that its companies "will continue to be subject to various state laws and Medicaid regulations. This regulatory environment and charges for services can have a significant impact on the Company's future operations and profitability." With respect to at least Access Family Services, Inc., the Board of Directors of C.I.S. then conducted separate due diligence with respect to compliance with regulatory requirements.

192.     In serving in these roles, Sheehan and the representatives from H.I.G. knew or should have known what Scanlon already knew – that South Bay was not in compliance with MassHealth, MBHP, and MCO requirements governing licensure and supervision of clinicians and was obligated to return any overpayments it had received.

## V.     DEFENDANTS' KNOWLEDGE OF NONCOMPLIANCE

193.     South Bay could have complied with the statutory and regulatory requirements by ensuring that the staff at each center were properly credentialed when hired and by ensuring that those staff who were not properly qualified to provide services without supervision were supervised in accordance with applicable MassHealth regulations and MBHP and MCO payer specifications, as set forth *supra* in the Statutory and Regulatory Framework section of this Complaint.

194.     Instead, South Bay knowingly employed people who were not qualified to provide services or who were not properly supervised in their provision of services. Information about each individual's qualifications could have been obtained during the hiring process, and for those who were not qualified on their own, South Bay was obligated to ensure proper supervision of those clinicians and counselors to provide billable services to MassHealth members.

195.     A mental health center can easily determine if its billing therapists are properly qualified to provide services, and/or are receiving the necessary supervision before submitting claims on their behalf. Whether the mental health workers have the necessary licenses is a matter of public record and can be discerned by a simple web search. Whether the worker has received the necessary supervision can be discerned by checking the supervision records the organization is required to keep. Indeed, when asked whether Scanlon or Gearhart had ever sent her, as the Compliance Officer, "MassHealth regulations respecting the licensing of clinical practitioners," for proper implementation, Kathy Bangerter responded that "They could have, but they did not."

196.     South Bay's conduct goes beyond recklessness, however, as there is evidence that South Bay had actual knowledge of the staffing and supervision issues at its clinics. Gearhart testified that, at least as early as 2011, she had discussions with Scanlon, and later with Sheehan and Pelletier, regarding the need for South Bay to hire more independently licensed supervisors at South Bay clinics to have enough qualified supervisors to supervise unlicensed clinicians. She testified, "I remember discussions with [Scanlon]. I remember discussions with CIS that that was – yes, that we needed to do that, yes." Question: "What prompted those discussions?" Answer: "We didn't have enough. It was really volume and, you know, as you increase volume, you need to increase the number of supervisors that you're having that are licensed." At this point, Scanlon

and, through its officers, South Bay, knew that it was not in compliance with MassHealth,

MBHP, and MCO requirements and that South Bay was obligated to repay the overpayments it

had received.

197.   Scanlon also testified that he knew that MassHealth and MBHP, as well as certain

MCOs, required that unlicensed master's-level therapists be supervised by licensed clinicians.

198.   At least as early as May 2012, as evidenced by the email communication included

as Exhibit 19, Martino-Fleming spoke to Sheehan about the fact that South Bay had staff

therapists who were unlicensed and were not properly supervised by licensed clinicians. At this

point, Sheehan knew or should have known, based on his background at YFCS, the due diligence

process undertaken for acquiring South Bay, and South Bay's own internal compliance

procedures, that South Bay was not in compliance with MassHealth, MBHP, and MCO

requirements and that South Bay was obligated to repay the overpayments it had received.

199.   At least as early as May 2013, as evidenced by the email communication included

at Exhibit 20, Martino-Fleming informed Scola that South Bay had staff therapists who were

unlicensed and were not properly supervised by licensed clinicians. At this point, H.I.G. knew or

should have known, based on its experience with Access Family Services, Inc., the due diligence

process undertaken for acquiring South Bay, and South Bay's own internal compliance

procedures, that South Bay was not in compliance with MassHealth and MCO regulations and

that South Bay was obligated to repay the overpayments it had received.

200.   By June of 2014, South Bay knew without a doubt that it was not in compliance

with MassHealth regulations. At that time, Martino-Fleming informed Pelletier, President and

Chief Operating Officer, and Hart, Compliance Officer, that "32 directors/supervisors do NOT

have their independent license," 13 directors/supervisors are independently licensed but don't

have 5 years' experience, "only 8 directors/supervisors are independently licensed and have 5 years post MA experience" and only "4 out of 5 regional directors have their independent license." Exhibit 21. South Bay had received the regulations, an explanation of systemic noncompliance, and specific examples of noncompliance (Plymouth). Plus, it was alerted that any administrative supervision clinicians were receiving was insufficient for MassHealth purposes. *See id.*

201.    Hart understood the regulations and the significance of noncompliance, informing Pelletier in an email on June 17, 2014 that South Bay has "to be compliant with ALL regs. . . . even if MBHP regulations are not as strict, we still have to be compliant with MassHealth regulations." Exhibit 22.

202.    Hart then created a document that identified South Bay's noncompliance at every level of applicable regulations and payer requirements. *See* Exhibit 23. She noted that, in the first three months of employment, new hires did not receive any type of clinical supervision from an independent licensed professional. *See id.* She also noted that not all staff members receive regular, ongoing, and consistent supervision that conforms to the MassHealth regulations. *See id.*

203.    On June 18, 2014, Pelletier requested information from Human Resources that allowed him to see significant staffing and supervision issues in violation of the MassHealth regulations. *See* Exhibit 24.

204.    That same day, Pelletier forwarded this information to Sheehan. *See* Exhibit 25.

205.    Hart's emails make clear that South Bay was also aware that "licensure supervision" (supervision needed for a clinician to become license-eligible) was insufficient to meet the regulatory requirement of "direct and continuous supervision" in § 429.424. Hart informed Pelletier on June 7, 2014 that "[i]t is important to note that 'licensure supervision' is

different from what the regulations state as 'direct and continuous supervision'. So, even if these unlicensed clinicians are receiving supervision for their licensure hours – this is still not their **direct**, continuous supervisor." Exhibit 26 (emphasis in original). Scanlon confirmed this fact when he testified that he understood "direct and continuous" supervision to mean "an ongoing relationship, supervisor relationship. . . a person to person connection. We had indirect supervision for our multi disciplinary team. Direct was a person to person connection."

206.    By Sheehan's own admission, at least by mid-2014, he had learned that South Bay was "out of compliance with rules" through the "Tiger Teams" process undertaken at South Bay. The "Tiger Teams" were a series of working groups authorized by the Board of Directors and were tasked with, among other issues, addressing the issue of employee retention at South Bay.

207.    According to Martino-Fleming, during one "Tiger Team" presentation in mid-2014, the "Tiger Team" informed a number of individuals, including Scanlon, Sheehan, and Gearhart, that it had concluded that South Bay was out of compliance with regulations because of its policies concerning supervision. Martino-Fleming recalled that Sheehan turned to Gearhart and Scanlon, asked whether this statement was accurate, and remarked "I don't look good in pinstripes. I consider myself as notified now." Sheehan requested that Scanlon and Gearhart prepare a report explaining why they believed the company was compliant with existing regulations.

208.    The "Tiger Teams" reported in notes from one meeting on March 25, 2014 that a South Bay supervisor with her LMHC reported that she was not comfortable with the practice of signing documentation from clinicians she had never met regarding clients she had never seen. *See* Exhibit 27.

209.     The "Tiger Teams" also reported their findings and made recommendations

concerning supervision improvements to the C.I.S. Board of Directors, though Loose could not

recall if these recommendations included a discussion of South Bay's compliance with existing

regulations. Loose also could not recall if H.I.G. or C.I.S. requested that South Bay adopt any

recommendations.

210.     According to a manual of South Bay's Policies and Procedures, attached as

Exhibit 28, the Board of Directors was to "receive quarterly compliance reports from [South

Bay's] Compliance Officer and an annual report recommending any changes necessary to

improve the compliance program. Annually, the Board [would] review the Plan and compliance

efforts during the year and will act on any suggested revisions necessary to improve the

compliance program." The Compliance Plan referenced in this manual was to be "developed in

accordance with applicable law, with guidance from state and federal authorities . . . [and to]

focus[] on the prevention of fraud, abuse, and waste in federal, state, and private healthcare

plans."

211.     In reckless disregard of its obligations as a provider of mental health services, the

Board of Directors of C.I.S. failed to ensure that these obligations were fulfilled. Despite the fact

that Hart has testified that she delivered quarterly and annual compliance reports to be delivered

to the Board, Loose testified that he does not recall ever receiving any reports from a compliance

officer at South Bay or seeing an annual report recommending changes necessary to improve

South Bay's compliance program.

## VI.    DEFENDANTS KNOWINGLY RETAINED OVERPAYMENTS FOR SERVICES RENDERED BY UNQUALIFIED AND/OR UNSUPERVISED CLINICIANS AT THE SOUTH BAY CLINICS

212.    To date, South Bay has not repaid any overpayments to MassHealth, MBHP, or MCOs stemming from the fact that it had not been in compliance with regulations concerning licensure and supervision of clinicians for years.

213.    Notwithstanding their general obligation to understand and abide by all staffing and supervision requirements at all relevant times, by 2014 at the latest, all Defendants knew or should have known that claims had been submitted to and paid by MassHealth for services provided by unlicensed and/or unsupervised clinicians and counselors.

214.    MassHealth regulations explicitly refer to who is authorized to render "billable mental health center services." The title of 130 C.M.R. § 429.424 is "Qualifications of Professional Staff Authorized to Render Billable Mental Health Center Services by Core Discipline."

215.    In February 2013, MBHP sent an email to providers that explicitly tied "the expectation that unlicensed clinicians will be clinically supervised on a regular basis by licensed clinicians" to the "ability to be reimbursed." Exhibit 29.

216.    In September 2013, MCO Beacon was equally explicit in a provider bulletin: "Services can be billed only if performed under the supervision of licensed independent clinicians." Exhibit 30.

217.    An undated South Bay compliance presentation circulated by Sara Hart in May 2013 identifies "billing for services provided by unqualified or unlicensed staff" as a "specific risk area for noncompliance." Exhibit 31.

218.    Emails as early as March 2011 between Lunney, Oldham, and Gearhart show that the South Bay billing department understood the connection between compliance with MassHealth's supervision requirement and billing long before 2014. *See* Exhibit 32.

219.    Gearhart testified that she also knew, throughout her tenure at South Bay (which began in 1986), that billing for services provided by unqualified or unsupervised staff was noncompliant with the regulations, and that it was inappropriate to bill for such services.

220.    Further, she testified that if an unlicensed clinician was not being properly supervised by an independently licensed clinician, "you shouldn't have billed for those services. You should pay the money back for sure."

221.    Gearhart testified that, in late 2013, she told Sheehan, Pelletier, and Quade that if South Bay was not providing appropriate supervision to unlicensed clinicians, and they were billing for those services, they would have to pay the money back if they were ever audited.

222.    South Bay had an obligation to determine the existence and amount of the overpayment that had been made by MassHealth for these services. Pursuant to 130 C.M.R. § 450.260(A), MassHealth providers must repay the full amount of overpayments promptly; and providers must disclose and return the amount of such overpayments within 60 days, pursuant to 130 C.M.R § 450.235(B). Defendants knowingly retained and did not disclose these overpayments to MassHealth—and continued to submit and receive payment at the South Bay clinics in knowing violation of the regulations set forth herein.

223.    As a result of this pervasive culture of noncompliance, the Defendants, through the South Bay clinics, deliberately submitted false claims to MassHealth for reimbursement, or at least recklessly disregarded the truth or falsity of the claims being submitted.

224.    Compliance with the regulations regarding staffing and supervision at mental health centers was an express precondition of payment by MassHealth; every submission of a claim implicitly represents compliance with relevant regulations, and undisclosed violations of these regulations render these claims false or fraudulent.

225.     The licensing and supervision requirements at issue are central to the MassHealth regulatory program and go to the very essence of the bargain of MassHealth's contractual relationships with various health care providers that participate in the Medicaid program. MassHealth has made it clear in its regulations that it expects that individuals in the business of providing mental health services in the Commonwealth have adequate training, professional credentials, and supervision.

226.     Instead of preventing or correcting the deficiencies outlined in this Complaint, the Defendants prioritized money and profits over compliance with the regulations intended to ensure that MassHealth members received the proper, vital services to which they were entitled.

227.     MassHealth will not pay claims for services rendered by those not in compliance with the regulatory staffing, qualification, and supervision requirements set forth at 130 C.M.R. §§ 429.000 *et seq.* The regulatory scheme is paramount to ensuring that the services provided by employees at mental health centers are appropriate and proper. Had MassHealth known of the regulatory violations detailed herein, it would not have paid the claims submitted for services rendered by staff who were not qualified according to the regulations.

228.     Once MassHealth became aware of the fact that South Bay was not in compliance with MassHealth regulations and had been submitting false and fraudulent claims to MassHealth for years, it immediately imposed a payment suspension on South Bay's fee-for-service claims bearing psychotherapy and psychiatric medication management procedure codes.

## LIABILITY OF DEFENDANTS

### I.     SOUTH BAY

229.     South Bay is ultimately responsible for the submission of all false claims to MassHealth, MBHP, and the MCOs from August 2009 to the present. South Bay signed provider

agreements with MassHealth wherein it agreed that it would comply with all state and federal statutes, rules, and regulations applicable to South Bay's participation in MassHealth.

230.    By 2012 at the latest, South Bay knew that it was not in compliance with licensure and supervision requirements for staff under MassHealth, MBHP, and MCO requirements, and knew or should have known about the materiality of such noncompliance to payment of claims through communications between and among Peter Scanlon, Rose Lunney, Christine Oldham, Jennifer Gearhart, Sara Hart, and Christine Martino-Fleming.

231.    By 2012 at the latest, South Bay was a beneficiary of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. South Bay failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

**II.    C.I.S. DEFENDANTS**

232.    As of April 2012, through the due diligence process undertaken in acquiring South Bay, the C.I.S. Defendants knew or should have known that South Bay was not in compliance with licensure and supervision requirements for staff under MassHealth, MBHP, and MCO regulations and requirements. Because of this due diligence process, the C.I.S. Defendants knew or should have known that South Bay's noncompliance with licensure and supervision requirements was material to payment of claims by MassHealth, MBHP, and MCOs.

233.    The C.I.S. Defendants knew or should have known about South Bay's noncompliance and its materiality to payment of claims even after the due diligence process was concluded through: (1) their ongoing management of South Bay through the C.I.S. Board of Directors, which was required to receive quarterly reports from South Bay's Compliance Officer; (2) communications with Christine Martino-Fleming as early as May 2012, who informed C.I.S.

CEO Sheehan that South Bay had therapists who were not properly licensed and/or supervised; and (3) the reports of South Bay's "Tiger Teams" as early as March 2014, which determined that South Bay was noncompliant with MassHealth, MBHP, and MCO requirements governing licensure and supervision and reported their findings to Sheehan and the C.I.S. Board of Directors.

234.     The C.I.S. Defendants, which owned South Bay, are ultimately responsible for the submission of false claims to MassHealth, MBHP, and MCOs from April 2012 through the present.

235.     The C.I.S. Defendants, which owned South Bay, are also beneficiaries of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. The C.I.S. Defendants have failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

## III.     H.I.G. DEFENDANTS

236.     As of April 2012, through the due diligence process undertaken in acquiring South Bay, the H.I.G. Defendants knew or should have known that South Bay was not in compliance with licensure and supervision requirements for staff under MassHealth, MBHP, and MCO regulations and requirements. Because of this due diligence process, the H.I.G. Defendants knew or should have known that South Bay's noncompliance with licensure and supervision requirements was material to payment of claims by MassHealth, MBHP, and MCOs.

237.     The H.I.G. Defendants knew or should have known about South Bay's noncompliance and its materiality to payment of claims even after the due diligence process was concluded through: (1) their ongoing management of South Bay through the C.I.S. Board of Directors, which was required to receive quarterly reports from South Bay's Compliance Officer;

(2) communications with Christine Martino-Fleming as early as May 2013, who informed H.I.G.'s Scola that South Bay had therapists who were not properly licensed and/or supervised; and (3) the reports of South Bay's "Tiger Teams" as early as March 2014, which determined that South Bay was noncompliant with MassHealth, MBHP, and MCO requirements governing licensure and supervision and reported their findings to the C.I.S. Board of Directors.

238.     The H.I.G. Defendants took no steps to cause South Bay to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff, and thereby knowingly agreed that South Bay should continue submitting or causing to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1). This conspiracy violates Mass. Gen. Laws c. 12, § 5B(a)(3).

239.     The H.I.G. Defendants, through their ownership interest in the C.I.S. Defendants and thereby South Bay, are also beneficiaries of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. The H.I.G. Defendants have failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

## IV.     **PETER SCANLON**

240.     Scanlon was the founder, sole owner, President, and CEO of South Bay until April 2012. He is ultimately responsible for the submission of all false claims to MassHealth, MBHP, and the MCOs by South Bay between August 2009 and April 2012. Scanlon signed the South Bay provider agreements with MassHealth wherein he agreed that South Bay would comply with all state and federal statutes, rules, and regulations applicable to South Bay's participation in MassHealth. He was responsible for ensuring that South Bay was in compliance with MassHealth regulations and all MBHP and MCO payer specifications.

241.     Scanlon knew or should have known that South Bay was not in compliance with licensure and supervision requirements for staff under MassHealth, MBHP, and MCO regulations, and knew or should have known about the materiality of such noncompliance to payment of claims through his management of South Bay and his communications with Rose Lunney, Christine Oldham, Jennifer Gearhart, Sara Hart and Christine Martino-Fleming.

242.     As part of his stock purchase agreement, Scanlon represented that South Bay was not in material violation of any health care laws. However, he knew or should have known that was not the case.

243.     Scanlon remained a member of South Bay's Board of Directors through 2013 or 2014. From February 2012 through 2013 or 2014, Scanlon was also the Chief Clinical Officer and a member of the Board of Directors of the C.I.S. Defendants. In that capacity, Scanlon knew of should have known that South Bay was continuing to operate in violation of MassHealth, MBHP, and MCO regulations and requirements, and was continuing to submit claims for services provided while South Bay was not in compliance with said regulations and requirements.

244.     Scanlon was a beneficiary of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. Scanlon failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

## V.     KEVIN SHEEHAN

245.     As of April 2012, through the due diligence process undertaken in acquiring South Bay, Sheehan knew or should have known that South Bay was not in compliance with licensure and supervision requirements for staff under MassHealth, MBHP, and MCO

regulations and requirements. Because of this due diligence process and his own past experience with the False Claims Act, Sheehan knew or should have known that South Bay's noncompliance with licensure and supervision requirements was material to payment of claims by MassHealth, MBHP, and MCOs.

246.    Sheehan knew or should have known about South Bay's noncompliance and its materiality to payment of claims even after the due diligence process was concluded through: (1) his ongoing management of South Bay through his roles as CEO of C.I.S. and a member of the C.I.S. Board of Directors, which was required to receive quarterly reports from South Bay's Compliance Officer; (2) communications with Christine Martino-Fleming as early as May 2012, who informed Sheehan that South Bay had therapists who were not properly licensed and/or supervised; and (3) the reports of South Bay's "Tiger Teams" as early as March 2014, which determined that South Bay was noncompliant with MassHealth, MBHP, and MCO requirements governing licensure and supervision and reported their findings to Sheehan and the C.I.S. Board of Directors.

247.    Sheehan, in his role as CEO at C.I.S., which owned South Bay, was ultimately responsible for the submission of false claims to MassHealth and MCOs from April 2012 through 2016.

248.    Sheehan took no steps until June 2014 to cause South Bay to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff, and thereby agreed that South Bay should continue submitting or causing to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1) from April 2012 through June 2014. This conspiracy violates Mass. Gen. Laws c. 12, § 5B(a)(3).

249.    Sheehan, through his role as Chief Executive Officer at C.I.S. and ownership interest in the C.I.S. Defendants and thereby South Bay, is also a beneficiary of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. Sheehan has failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

## CAUSES OF ACTION

### South Bay – Count One
**(False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(1))**

250.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-249 of this Complaint as if fully alleged herein.

251.    From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at least August 2009 to the present, Defendant South Bay, either with actual knowledge or deliberate ignorance of or reckless disregard for the truth, submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1).

252.    These claims were false inasmuch as they were for services not eligible for reimbursement because Defendant South Bay misrepresented compliance with applicable state laws and regulations that are conditions of payment. These misrepresentations were material as that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

253.    By virtue of the false or fraudulent claims that the Defendants knowingly

submitted and caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered

actual damages and is entitled to recover treble damages plus civil monetary penalties.

### South Bay – Count Two
### (False Claims Conspiracy in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(3))

254.    Plaintiff Commonwealth of Massachusetts incorporates by reference the

allegations contained in paragraphs 1-253 of this Complaint as if fully alleged herein.

255.    From at least August 2009 to the present, Defendant South Bay failed to comply

with applicable statutes and regulations regarding licensure and supervision requirements for

staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at

least August 2009 to the present, Defendant South Bay, either with actual knowledge or

deliberate ignorance of or reckless disregard for the truth, submitted or caused to be submitted

false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, §

5B(a)(1).

256.    By April 2012 at the latest, the H.I.G. Defendants and Defendant Sheehan knew

or should have known that South Bay had submitted or caused to be submitted false claims for

services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1). By April

2012 at the latest, the H.I.G. Defendants and Defendant Sheehan also knew or should have

known that Defendant South Bay had misrepresented compliance with applicable regulations and

that the H.I.G. Defendants and Defendant Sheehan, through Defendant South Bay, were in

receipt of money that should not have been paid. These sums of money therefore constituted

overpayments. The H.I.G. Defendants, Defendant Sheehan, and Defendant South Bay have not

repaid to MassHealth any overpayments they obtained by submitting claims and receiving

money to which they were not entitled.

257.    Despite this actual or constructive knowledge, the H.I.G. Defendants took no

steps at all and Defendant Sheehan took no steps until June 2014 to cause Defendant South Bay

to comply with applicable statutes and regulations regarding licensure and supervision

requirements for staff. The H.I.G. Defendants and Defendant Sheehan took no steps at all to

disclose to the Commonwealth the false claims and/or receipt of overpayments. The H.I.G.

Defendants and Defendant Sheehan, through their role overseeing and managing Defendant

South Bay, thereby agreed with Defendant South Bay to continue submitting or causing to be

submitted false claims for services to the MassHealth program, in violation of Mass. Gen. Laws

c. 12, § 5B(a)(1), and to continue failing to disclose to the Commonwealth the false claims

and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10). Through

these actions, the H.I.G. Defendants and Defendant Sheehan conspired with Defendant South

Bay to violate Mass. Gen. Laws c. 12, § 5B(a)(3).

258.    By virtue of the false or fraudulent claims that the Defendants conspired to submit

and cause to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual

damages and is entitled to recover treble damages plus civil monetary penalties.

### South Bay – Count Three
### (Reverse False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(10))

259.    Plaintiff Commonwealth of Massachusetts incorporates by reference the

allegations contained in paragraphs 1-258 of this Complaint as if fully alleged herein.

260.    From at least August 2009 to the present, Defendant South Bay failed to comply

with applicable statutes and regulations regarding licensure and supervision requirements for

staff. MassHealth was unaware of the noncompliance. As a result of South Bay's material misrepresentations of compliance, from at least August 2009 to the present, Defendant South Bay received money to which it was not entitled, and which it has retained.

261.    By 2012 at the latest, Defendant South Bay knew or should have known that it had misrepresented compliance with applicable regulations and was in receipt of money that should not have been paid. These sums of money therefore constituted overpayments. Defendant South Bay has not repaid to MassHealth any overpayments it obtained by submitting claims and receiving money to which it was not entitled.

262.    Defendant South Bay is therefore the beneficiary of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. Defendant South Bay has failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

263.    By virtue of the knowing and improper retention of overpayments, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

### South Bay – Count Four
### (False Claims in Violation of Massachusetts Medicaid False Claims Act, MASS. GEN. LAWS c. 118E, §§ 40, 44)

264.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-263 of this Complaint as if fully alleged herein.

265.    From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of this noncompliance, Defendant South Bay, either with actual knowledge or in willful blindness, knowingly and

willfully made or caused to be made false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 118E, § 40.

266.    These claims were false because they were for services that were not eligible for reimbursement because Defendant South Bay misrepresented compliance with applicable state laws and regulations that are conditions of payment. These misrepresentations were material as that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

267.    By virtue of the false or fraudulent claims that Defendant South Bay submitted or caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus the costs of investigation and litigation, in accordance with Mass. Gen. Laws c. 118E, § 44.

## South Bay – Count Five
## (Recovery of Overpayment, 130 C.M.R. §§ 450.237, 450.260(A), 450.260(I))

268.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-267 of this Complaint as if fully alleged herein.

269.    From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff, in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E). Defendant South Bay submitted claims for services while Defendant South Bay was not in compliance with the MassHealth regulations. MassHealth paid those claims.

270.    By virtue of Defendant South Bay's submission of claims to MassHealth while in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E), MassHealth made overpayments to Defendant South Bay.

271.    Defendant South Bay is liable to repay to the Commonwealth of Massachusetts the amount received from these overpayments in an amount to be determined at trial.

### South Bay – Count Six
### (Unjust Enrichment)

272.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-271 of this Complaint as if fully alleged herein.

273.    If Defendant South Bay had not impliedly misrepresented compliance with applicable state laws and regulations, MassHealth would not have paid for the claims submitted for services. By retaining monies received from its submissions of claims that were reimbursed by the Medicaid program, Defendant South Bay has retained money that is the property of the Commonwealth of Massachusetts and to which Defendant South Bay is not entitled.

274.    It is unfair and inequitable for Defendant South Bay to retain revenue from payments from MassHealth that Defendant South Bay obtained by violating state laws, MassHealth regulations, and provider contracts for each of the South Bay mental health centers.

275.    As a consequence of the acts set forth above, Defendant South Bay has been unjustly enriched and is liable to pay such amounts, which are to be determined at trial, to Plaintiff Commonwealth of Massachusetts.

### South Bay – Count Seven
### (Breach of Contract)

276.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-275 of this Complaint as if fully alleged herein.

277.    Defendant South Bay breached its MassHealth provider contract from at least August 2009 to the present by submitting illegitimate claims for payment to MassHealth for services provided that did not comply with licensure and supervision requirements for staff.

278.     From at least August 2009 to the present, Defendant South Bay breached its MassHealth provider contract by failing to comply with all state and federal laws, regulations, and rules applicable to participation in the MassHealth program and submitting claims for payment that were based on claims for services not in compliance with all state and federal laws, regulations, and rules applicable to MassHealth.

279.     Each illegitimate claim submitted by Defendant South Bay that was not in compliance with MassHealth rules and regulations constitutes a breach of Defendant South Bay's provider contract.

280.     By failing to comply with all applicable state and federal laws, regulations, and rules applicable to the MassHealth program, Defendant South Bay materially breached its MassHealth provider contract.

281.     As a result of Defendant South Bay's breach of its provider contract, the Commonwealth has been significantly damaged.

### C.I.S. Defendants – Count Eight
**(False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(1))**

282.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-281 of this Complaint as if fully alleged herein.

283.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at least April 2012 to the present, the C.I.S. Defendants, either with actual knowledge or deliberate ignorance of or reckless regard for the truth, submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1).

284.     These claims were false inasmuch as they were for services not eligible for

reimbursement because Defendant South Bay misrepresented compliance with applicable state

laws and regulations that are conditions of payment. These misrepresentations were material as

that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See,*

*e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United*

*States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

285.     By virtue of the false or fraudulent claims that the Defendants knowingly

submitted and caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered

actual damages and is entitled to recover treble damages plus civil monetary penalties.

### C.I.S. Defendants – Count Nine
### (Reverse False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(10))

286.     Plaintiff Commonwealth of Massachusetts incorporates by reference the

allegations contained in paragraphs 1-285 of this Complaint as if fully alleged herein.

287.     From at least August 2009 to the present, Defendant South Bay failed to comply

with applicable statutes and regulations regarding licensure and supervision requirements for

staff. MassHealth was unaware of the noncompliance. As a result of South Bay's material

misrepresentations of compliance, from at least April 2012 to the present, the C.I.S. Defendants

received money to which they were not entitled, and which they have retained.

288.     By April 2012 at the latest, the C.I.S. Defendants knew or should have known that

Defendant South Bay had misrepresented compliance with applicable regulations and that the

C.I.S. Defendants, through Defendant South Bay, were in receipt of money that should not have

been paid. These sums of money therefore constituted overpayments. The C.I.S. Defendants

have not repaid to MassHealth any overpayments they obtained by submitting claims and receiving money to which they were not entitled.

289.    The C.I.S. Defendants are therefore beneficiaries of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. The C.I.S. Defendants have failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

290.    By virtue of the knowing and improper retention of overpayments, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

## C.I.S. Defendants – Count Ten
## (False Claims in Violation of Massachusetts Medicaid False Claims Act, MASS. GEN. LAWS c. 118E, §§ 40, 44)

291.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-290 of this Complaint as if fully alleged herein.

292.    From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. From at least April 2012 to the present, as a result of this noncompliance, the C.I.S. Defendants, either with actual knowledge or in willful blindness, knowingly and willfully made or caused to be made false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 118E, § 40.

293.    These claims were false because they were for services that were not eligible for reimbursement because Defendant South Bay misrepresented compliance with applicable state laws and regulations that are conditions of payment. These misrepresentations were material as that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See,*

*e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

294.     By virtue of the false or fraudulent claims that the C.I.S. Defendants submitted or caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus the costs of investigation and litigation, in accordance with Mass. Gen. Laws c. 118E, § 44.

### C.I.S. Defendants – Count Eleven
### (Recovery of Overpayment, 130 C.M.R. §§ 450.237, 450.260(A), 450.260(I))

295.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-294 of this Complaint as if fully alleged herein.

296.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff, in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E). Defendant South Bay submitted claims for services while Defendant South Bay was not in compliance with the MassHealth regulations. MassHealth paid those claims.

297.     By virtue of Defendant South Bay's submission of claims to MassHealth while in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E), MassHealth made overpayments to Defendant South Bay, and thereby to the C.I.S. Defendants.

298.     The C.I.S. Defendants are liable to repay to the Commonwealth of Massachusetts the amount received from these overpayments in an amount to be determined at trial.

### C.I.S. Defendants – Count Twelve
### (Unjust Enrichment)

299.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-298 of this Complaint as if fully alleged herein.

300.     If Defendant South Bay had not impliedly misrepresented compliance with applicable state laws and regulations, MassHealth would not have paid for the claims submitted for services. By retaining monies received from its submissions of claims that were reimbursed by the Medicaid program, the C.I.S. Defendants have retained money that is the property of the Commonwealth of Massachusetts and to which the C.I.S. Defendants are not entitled.

301.     It is unfair and inequitable for the C.I.S. Defendants to retain revenue from payments from MassHealth that the C.I.S. Defendants obtained by violating state laws, MassHealth regulations, and provider contracts for each of the South Bay mental health centers.

302.     As a consequence of the acts set forth above, the C.I.S. Defendants have been unjustly enriched and are liable to pay such amounts, which are to be determined at trial, to Plaintiff Commonwealth of Massachusetts.

**H.I.G. Defendants – Count Thirteen**
**(False Claims Conspiracy in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(3))**

303.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-302 of this Complaint as if fully alleged herein.

304.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at least August 2009 to the present, Defendant South Bay, either with actual knowledge or deliberate ignorance of or reckless disregard for the truth, submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1).

305.     By April 2012 at the latest, the H.I.G. Defendants knew or should have known that South Bay had submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1). By April 2012 at the latest, the H.I.G. Defendants also knew or should have known that Defendant South Bay had misrepresented compliance with applicable regulations and that the H.I.G. Defendants, through Defendant South Bay, were in receipt of money that should not have been paid. These sums of money therefore constituted overpayments. The H.I.G. Defendants have not repaid to MassHealth any overpayments they obtained by submitting claims and receiving money to which they were not entitled.

306.     Despite this actual or constructive knowledge, the H.I.G. Defendants took no steps to cause Defendant South Bay to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff or disclose to the Commonwealth the false claims and/or receipt of overpayments. The H.I.G. Defendants, through their role overseeing and managing Defendant South Bay, thereby agreed with Defendant South Bay to continue submitting or causing to be submitted false claims for services to the MassHealth program, in violation of Mass. Gen. Laws c. 12, § 5B(a)(1), and to continue failing to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10). Through these actions, the H.I.G. Defendants conspired with Defendant South Bay to violate Mass. Gen. Laws c. 12, § 5B(a)(3).

307.     By virtue of the false or fraudulent claims that the Defendants conspired to submit and cause to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

### H.I.G. Defendants – Count Fourteen

**(Reverse False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(10))**

308.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-307 of this Complaint as if fully alleged herein.

309.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of South Bay's material misrepresentations of compliance, from at least April 2012 to the present, the H.I.G. Defendants, as majority owners of the C.I.S. Defendants, received money to which they were not entitled, and which they have retained.

310.     By April 2012 at the latest, the H.I.G. Defendants knew or should have known that Defendant South Bay had misrepresented compliance with applicable regulations and that the H.I.G. Defendants, through Defendant South Bay, were in receipt of money that should not have been paid. These sums of money therefore constituted overpayments. The H.I.G. Defendants have not repaid to MassHealth any overpayments they obtained by submitting claims and receiving money to which they were not entitled.

311.     The H.I.G. Defendants are therefore beneficiaries of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. The H.I.G. Defendants have failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

312.     By virtue of the knowing and improper retention of overpayments, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

## H.I.G. Defendants – Count Fifteen

**(Recovery of Overpayment, 130 C.M.R. §§ 450.237, 450.260(A), 450.260(I))**

313.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-312 of this Complaint as if fully alleged herein.

314.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff, in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E). Defendant South Bay submitted claims for services while Defendant South Bay was not in compliance with the MassHealth regulations. MassHealth paid those claims.

315.     By virtue of Defendant South Bay's submission of claims to MassHealth while in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E), MassHealth made overpayments to Defendant South Bay, and thereby to the H.I.G. Defendants as majority owners of the C.I.S. Defendants.

316.     The H.I.G. Defendants are liable to repay to the Commonwealth of Massachusetts the amount received from these overpayments in an amount to be determined at trial.

## H.I.G. Defendants – Count Sixteen
### (Unjust Enrichment)

317.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-316 of this Complaint as if fully alleged herein.

318.     If Defendant South Bay had not impliedly misrepresented compliance with applicable state laws and regulations, MassHealth would not have paid for the claims submitted for services. By retaining monies received from its submissions of claims that were reimbursed by the Medicaid program, the H.I.G. Defendants have retained money that is the property of the Commonwealth of Massachusetts and to which the H.I.G. Defendants are not entitled.

319.     It is unfair and inequitable for the H.I.G. Defendants to retain revenue from payments from MassHealth that the H.I.G. Defendants obtained by violating state laws, MassHealth regulations, and provider contracts for each of the South Bay mental health centers.

320.     As a consequence of the acts set forth above, the H.I.G. Defendants have been unjustly enriched and are liable to pay such amounts, which are to be determined at trial, to Plaintiff Commonwealth of Massachusetts.

## Peter Scanlon – Count Seventeen
### (False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(1))

321.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-320 of this Complaint as if fully alleged herein.

322.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at least August 2009 to April 2012, Defendant Scanlon, either with actual knowledge or deliberate ignorance of or reckless disregard for the truth, in his role as the President and CEO of South Bay, submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1).

323.     These claims were false inasmuch as they were for services not eligible for reimbursement because Defendant South Bay misrepresented compliance with applicable state laws and regulations that are conditions of payment. These misrepresentations were material as that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

324.     By virtue of the false or fraudulent claims that the Defendant knowingly submitted and caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

### Peter Scanlon – Count Eighteen
**(Reverse False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(10))**

325.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-324 of this Complaint as if fully alleged herein.

326.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of South Bay's material misrepresentations of compliance, from at least August 2009 to April 2012, Defendant Scanlon, in his role as President and CEO of South Bay, received money to which he was not entitled, and which he has retained.

327.     By 2012 at the latest, Defendant Scanlon knew or should have known that Defendant South Bay had misrepresented compliance with applicable regulations and that Defendant Scanlon, through Defendant South Bay, was in receipt of money that should not have been paid. These sums of money therefore constituted overpayments. Defendant Scanlon has not repaid to MassHealth any overpayments he obtained by submitting claims and receiving money to which he was not entitled.

328.     Defendant Scanlon is therefore a beneficiary of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. Defendant Scanlon has failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

329.     By virtue of the knowing and improper retention of overpayments, Plaintiff

Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble

damages plus civil monetary penalties.

### Peter Scanlon – Count Nineteen
### (False Claims in Violation of Massachusetts Medicaid False Claims Act, MASS. GEN. LAWS c. 118E, §§ 40, 44)

330.     Plaintiff Commonwealth of Massachusetts incorporates by reference the

allegations contained in paragraphs 1-329 of this Complaint as if fully alleged herein.

331.     From at least August 2009 to the present, Defendant South Bay failed to comply

with applicable statutes and regulations specifying licensure and supervision requirements for

staff. MassHealth was unaware of the noncompliance. As a result of this noncompliance, from at

least August 2009 to at least April 2012, Defendant Scanlon, in his role as President and CEO of

South Bay, either with actual knowledge or in willful blindness, knowingly and willfully made or

caused to be made false claims for services to the MassHealth program in violation of Mass.

Gen. Laws c. 118E, § 40.

332.     These claims were false because they were for services that were not eligible for

reimbursement because Defendant South Bay misrepresented compliance with applicable state

laws and regulations that are conditions of payment. These misrepresentations were material as

that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See,

e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United

States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

333.     By virtue of the false or fraudulent claims that Defendant Scanlon submitted or

caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages

and is entitled to recover treble damages plus the costs of investigation and litigation, in accordance with Mass. Gen. Laws c. 118E, § 44.

### Peter Scanlon – Count Twenty
### (Recovery of Overpayment, 130 C.M.R. §§ 450.237, 450.260(A), 450.260(I))

334.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-333 of this Complaint as if fully alleged herein.

335.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff, in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E). Defendant South Bay submitted claims for services while Defendant South Bay was not in compliance with the MassHealth regulations. MassHealth paid those claims.

336.     By virtue of Defendant South Bay's submission of claims to MassHealth while in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E), MassHealth made overpayments to Defendant South Bay, and thereby to Defendant Scanlon in his role as President and CEO of South Bay.

337.     Defendant Scanlon is liable to repay to the Commonwealth of Massachusetts the amount received from these overpayments in an amount to be determined at trial.

### Peter Scanlon – Count Twenty-one
### (Unjust Enrichment)

338.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-337 of this Complaint as if fully alleged herein.

339.     If Defendant South Bay had not impliedly misrepresented compliance with applicable state laws and regulations, MassHealth would not have paid for the claims submitted for services. By retaining monies received from its submissions of claims that were reimbursed

by the Medicaid program, Defendant Scanlon, in his role as President and CEO of South Bay, has retained money that is the property of the Commonwealth of Massachusetts and to which Defendant Scanlon is not entitled.

340.     It is unfair and inequitable for Defendant Scanlon to retain revenue from payments from MassHealth that Defendant Scanlon obtained by violating state laws, MassHealth regulations, and provider contracts for each of the South Bay mental health centers.

341.     As a consequence of the acts set forth above, Defendant Scanlon has been unjustly enriched and is liable to pay such amounts, which are to be determined at trial, to Plaintiff Commonwealth of Massachusetts.

## Kevin Sheehan – Count Twenty-two
### (False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(1))

342.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-341 of this Complaint as if fully alleged herein.

343.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at least April 2012 to the present, Defendant Sheehan, in his role as CEO of C.I.S., either with actual knowledge or deliberate ignorance of or reckless regard for the truth, submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1).

344.     These claims were false inasmuch as they were for services not eligible for reimbursement because Defendant South Bay misrepresented compliance with applicable state laws and regulations that are conditions of payment. These misrepresentations were material as

that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

345.     By virtue of the false or fraudulent claims that the Defendant knowingly submitted and caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

### Kevin Sheehan – Count Twenty-three
### (False Claims Conspiracy in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(3))

346.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-345 of this Complaint as if fully alleged herein.

347.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of the noncompliance, from at least August 2009 to the present, Defendant South Bay, either with actual knowledge or deliberate ignorance of or reckless disregard for the truth, submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1).

348.     By April 2012 at the latest, Defendant Sheehan knew or should have known that South Bay had submitted or caused to be submitted false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 12, § 5B(a)(1). By April 2012 at the latest, Defendant Sheehan also knew or should have known that Defendant South Bay had misrepresented compliance with applicable regulations and that Defendant Sheehan, through Defendant South Bay, was in receipt of money that should not have been paid. These sums of

money therefore constituted overpayments. Defendant Sheehan has not repaid to MassHealth any overpayments he obtained by submitting claims and receiving money to which he was not entitled.

349.    Despite this actual or constructive knowledge, Defendant Sheehan took no steps until June 2014 to cause Defendant South Bay to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff and took no steps at all to disclose to the Commonwealth the false claims and/or receipt of overpayments. Defendant Sheehan, through his role overseeing and managing Defendant South Bay, thereby agreed with Defendant South Bay to continue submitting or causing to be submitted false claims for services to the MassHealth program, in violation of Mass. Gen. Laws c. 12, § 5B(a)(1), and to continue failing to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10). Through these actions, Defendant Sheehan conspired with Defendant South Bay to violate Mass. Gen. Laws c. 12, § 5B(a)(3).

350.    By virtue of the false or fraudulent claims that the Defendants conspired to submit and cause to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

### Kevin Sheehan – Count Twenty-four
### (Reverse False Claims in Violation of Massachusetts False Claims Act, MASS. GEN. LAWS c. 12, § 5B(a)(10))

351.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-350 of this Complaint as if fully alleged herein.

352.    From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations regarding licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of South Bay's material

misrepresentations of compliance, from at least April 2012 to the present, Defendant Sheehan, in his role as CEO of C.I.S., received money to which he was not entitled, and which he has retained.

353.     By April 2012 at the latest, Defendant Sheehan knew or should have known that Defendant South Bay had misrepresented compliance with applicable regulations and that Defendant Sheehan, through Defendant South Bay, was in receipt of money that should not have been paid. These sums of money therefore constituted overpayments. Defendant Sheehan has not repaid to MassHealth any overpayments he obtained by submitting claims and receiving money to which he was not entitled.

354.     Defendant Sheehan is therefore a beneficiary of overpayments from the Commonwealth, having subsequently discovered the receipt of overpayments. Defendant Sheehan has failed to disclose to the Commonwealth the false claims and/or receipt of overpayments, in violation of Mass. Gen. Laws c. 12, § 5B(a)(10).

355.     By virtue of the knowing and improper retention of overpayments, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus civil monetary penalties.

**Kevin Sheehan – Count Twenty-five**
**(False Claims in Violation of Massachusetts Medicaid False Claims Act, MASS. GEN. LAWS c. 118E, §§ 40, 44)**

356.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-355 of this Complaint as if fully alleged herein.

357.     From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff. MassHealth was unaware of the noncompliance. As a result of this noncompliance,

Defendant Sheehan, in his role as CEO of C.I.S., either with actual knowledge or in willful blindness, knowingly and willfully made or caused to be made false claims for services to the MassHealth program in violation of Mass. Gen. Laws c. 118E, § 40.

358.    These claims were false because they were for services that were not eligible for reimbursement because Defendant South Bay misrepresented compliance with applicable state laws and regulations that are conditions of payment. These misrepresentations were material as that term is defined in the Massachusetts False Claims Act and interpreted by the courts. *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002-04 (2016); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016).

359.    By virtue of the false or fraudulent claims that Defendant Sheehan submitted or caused to be submitted, Plaintiff Commonwealth of Massachusetts has suffered actual damages and is entitled to recover treble damages plus the costs of investigation and litigation, in accordance with Mass. Gen. Laws c. 118E, § 44.

<u>**Kevin Sheehan – Count Twenty-six**</u>
**(Recovery of Overpayment, 130 C.M.R. §§ 450.237, 450.260(A), 450.260(I))**

360.    Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-359 of this Complaint as if fully alleged herein.

361.    From at least August 2009 to the present, Defendant South Bay failed to comply with applicable statutes and regulations specifying licensure and supervision requirements for staff, in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E). Defendant South Bay submitted claims for services while Defendant South Bay was not in compliance with the MassHealth regulations. MassHealth paid those claims.

362.     By virtue of Defendant South Bay's submission of claims to MassHealth while in violation of 130 C.M.R. §§ 429.422, 429.424, and 429.438(E), MassHealth made overpayments to Defendant South Bay, and thereby to Defendant Sheehan in his role as CEO of C.I.S.

363.     Defendant Sheehan is liable to repay to the Commonwealth of Massachusetts the amount received from these overpayments in an amount to be determined at trial.

**Kevin Sheehan – Count Twenty-seven**
**(Unjust Enrichment)**

364.     Plaintiff Commonwealth of Massachusetts incorporates by reference the allegations contained in paragraphs 1-363 of this Complaint as if fully alleged herein.

365.     If Defendant South Bay had not impliedly misrepresented compliance with applicable state laws and regulations, MassHealth would not have paid for the claims submitted for services. By retaining monies received from submissions of claims that were reimbursed by the Medicaid program, Defendant Sheehan, in his role as CEO of C.I.S., has retained money that is the property of the Commonwealth of Massachusetts and to which Defendant Sheehan is not entitled.

366.     It is unfair and inequitable for Defendant Sheehan to retain revenue from payments from MassHealth that Defendant Sheehan obtained by violating state laws, MassHealth regulations, and provider contracts for each of the South Bay mental health centers.

367.     As a consequence of the acts set forth above, Defendant Sheehan has been unjustly enriched and is liable to pay such amounts, which are to be determined at trial, to Plaintiff Commonwealth of Massachusetts.

**JURY DEMAND**

368.     The Commonwealth demands trial by jury in this action of all issues so triable.

**PRAYERS FOR RELIEF**

91

**WHEREFORE**, the Commonwealth demands and prays that after trial on the merits, judgment be entered in its favor as follows:

## South Bay

a.  <u>Counts One, Two, and Three</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, and civil penalties as required by Mass. Gen. Laws c. 12, § 5B, together with such other relief as may be just and proper;

b.  <u>Count Four</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, together with such other relief as may be just and proper;

c.  <u>Count Five</u> – for the amount of the Commonwealth's damages, as is proved at trial, and costs;

d.  <u>Count Six</u> – for the amount of the Commonwealth's damages, as is proved at trial, interest, and costs; and

e.  <u>Count Seven</u> – for the amount of the Commonwealth's damages, as is proved at trial, and interest at the statutory rate of 12% pursuant to Mass. Gen. Laws c. 231, § 6C, from the date of each breach of contract, together with such other relief as may be just and proper.

## C.I.S. Defendants

a.  <u>Counts Eight and Nine</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, and civil penalties as required by Mass. Gen. Laws c. 12, § 5B, together with such other relief as may be just and proper;

b.  <u>Count Ten</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, together with such other relief as may be just and proper;

c.  <u>Count Eleven</u> – for the amount of the Commonwealth's damages, as is proved at trial, and costs; and

d.  <u>Count Twelve</u> – for the amount of the Commonwealth's damages, as is proved at trial, interest, and costs.

## H.I.G. Defendants

a.  <u>Counts Thirteen and Fourteen</u> – for the amount of the Commonwealth's

damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, and civil penalties as required by Mass. Gen. Laws c. 12, § 5B, together with such other relief as may be just and proper;

b.   <u>Count Fifteen</u> – for the amount of the Commonwealth's damages, as is proved at trial, and costs; and

c.   <u>Count Sixteen</u> – for the amount of the Commonwealth's damages, as is proved at trial, interest, and costs.

**Peter Scanlon**

a.   <u>Counts Seventeen and Eighteen</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, and civil penalties as required by Mass. Gen. Laws c. 12, § 5B, together with such other relief as may be just and proper;

a.   <u>Count Nineteen</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, together with such other relief as may be just and proper;

b.   <u>Count Twenty</u> – for the amount of the Commonwealth's damages, as is proved at trial, and costs; and

c.   <u>Count Twenty-one</u> – for the amount of the Commonwealth's damages, as is proved at trial, interest, and costs.

**Kevin Sheehan**

a.   <u>Counts Twenty-two, Twenty-three, and Twenty-four</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, and civil penalties as required by Mass. Gen. Laws c. 12, § 5B, together with such other relief as may be just and proper;

b.   <u>Count Twenty-five</u> – for the amount of the Commonwealth's damages, trebled as required by law, plus the costs of investigation and litigation, including the costs of experts, together with such other relief as may be just and proper;

c.   <u>Count Twenty-six</u> – for the amount of the Commonwealth's damages, as is proved at trial, and costs; and

d.   <u>Count Twenty-seven</u> – for the amount of the Commonwealth's damages, as is proved at trial, interest, and costs.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,
MAURA HEALEY
Attorney General

Dated: January 5, 2018

By: */s/ Robyn Dollar*
Robyn Dollar, BBO #674480
Gregory H. Matthews, BBO #653316
Kevin Lownds, BBO #685274
Assistant Attorneys General
Medicaid Fraud Division
One Ashburton Place, 18th Floor
Boston, MA 02108
617-727-2200
robyn.dollar@state.ma.us
gregory.matthews@state.ma.us
kevin.lownds@state.ma.us

**<u>Certificate of Service</u>**

I hereby certify that this document with any attachments filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


Dated: January 5, 2018                          By: <u>*/s/ Robyn Dollar*</u>
                                                             Robyn Dollar