## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA ex rel.        )
CHRISTINE MARTINO-FLEMING, Relator      )
                                        )          Civil Action
                Plaintiffs,             )          No. 15-13065-PBS
                                        )
v.                                      )
                                        )
SOUTH BAY MENTAL HEALTH CENTER,         )
INC.; COMMUNITY INTERVENTION            )
SERVICES, INC.; H.I.G. GROWTH           )
PARTNERS, LLC; H.I.G. CAPITAL,          )
LLC; PETER J. SCANLON; AND              )
KEVIN P. SHEEHAN                        )
                                        )
                Defendants.             )
_____ __ )

### MEMORANDUM AND ORDER

September 21, 2018

Saris, C.J.

### INTRODUCTION

Relator Christine Martino-Fleming brings this action under
the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.,
against South Bay Mental Health Center, Inc. ("South Bay"), and
its owners and operators. She alleges that South Bay routinely
submitted bills for the mental-health services of unlicensed,
unqualified, and unsupervised employees to MassHealth, the
Massachusetts Medicaid program, and its contractors. The
Defendants are South Bay; H.I.G. Growth Partners, LLC ("H.I.G.
Growth"), and H.I.G. Capital, LLC ("H.I.G. Capital")

1

(collectively, "H.I.G. Defendants"); Community Intervention Services, Inc. ("C.I.S."); Peter J. Scanlon; and Kevin P. Sheehan.

Relator's Complaint asserts counts under both the FCA and its Massachusetts counterpart. The Commonwealth subsequently intervened and filed a 27-count Complaint-in-Intervention. The United States elected not to intervene. Defendants have filed motions to dismiss both complaints under Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

Because the Commonwealth has intervened, its Complaint-in-Intervention supersedes the Relator's Complaint with respect to the state-law claims. The motions to dismiss regarding those claims are discussed in a separate opinion, with which the Court assumes familiarity. This memorandum addresses the Relator's three federal-law counts that remain at issue: False Claims, 31 U.S.C. § 3729(a)(1)(A) (Count 1); False Statements Material to False Claims, 31 U.S.C. § 3729(a)(1)(B) (Count 2); and Reverse False Claims, 31 U.S.C. § 3729(a)(1)(G) (Count 3).

For the reasons stated below, the Court **DENIES** the motions to dismiss Counts 1 and 2, and **ALLOWS** the motions to dismiss Count 3.

## FACTUAL BACKGROUND

The facts below are taken from the Relator's 250-paragraph Second Amended Complaint ("SAC"). Many are disputed.

I.   **MassHealth**

The Massachusetts Medicaid program, known as MassHealth, covers mental-health services. It is jointly financed by the federal and state governments. The state has promulgated regulations governing mental-health services provided by the MassHealth program. See generally 130 Mass. Code Regs. §§ 401.401-650.035. Among other things, MassHealth regulations provide that unlicensed counselors must be under the "direct and continuous supervision" of a licensed psychiatrist, psychologist, independent clinical social worker, or psychiatric nurse to provide mental health services. Id. § 429.424.

Most MassHealth beneficiaries enroll in managed care plans such as a Managed Care Organization ("MCO") plan or a Primary Care Clinician ("PCC") plan. People not enrolled in these plans receive mental-health services on a fee-for-service basis. The MCOs contract with MassHealth, and MassHealth pays for the services. The MCOs manage the healthcare services and have their own authorization requirements. Id. § 508.004(B)(3). The Massachusetts Behavioral Health Program ("MBHP") administers and pays for mental-health services provided to MassHealth members enrolled in a PCC plan and has its own terms as well. See id. § 450.124(A). MassHealth pays MBHP and the MCOs a fixed monthly fee for each MassHealth member.

## II.  **South Bay**

South Bay is a mental-health center that offers services to patients throughout the Commonwealth in its 17 satellite clinics. It is a for-profit corporation established under the laws of Massachusetts. It was founded in 1986 by Defendant Dr. Peter Scanlon, who was its sole officer and director, and owned all outstanding capital stock until April 2012.

South Bay employs therapists and other professionals who do not meet the MassHealth licensing requirements or the requirements of its contractors. Moreover, a vast majority of unlicensed staff therapists at South Bay clinics had no qualified supervisor, and many South Bay clinics did not have qualified clinic directors. Despite these alleged violations of state law and contractual requirements, South Bay was reimbursed for services provided by unlicensed and improperly supervised professionals. Claim submissions by these unlicensed and improperly supervised professionals were false and fraudulent, Relator alleges.

## III. **South Bay's Acquisition by Private Equity Investors**

In April 2012, after conducting due diligence, H.I.G. Capital and H.I.G. Growth purchased South Bay through C.I.S. H.I.G. Capital is a Delaware limited liability company described as a "leading global private equity investment firm with $21 billion of equity capital under management." H.I.G. Growth, also

a Delaware limited liability company, is a capital-investment affiliate of H.I.G. Capital and is also a multi-billion dollar private equity company. Sheehan, the Chief Executive Officer ("CEO") of C.I.S., had over 30 years of behavioral health experience.

After the acquisition, the officers and members of the Boards of Directors of South Bay and C.I.S. overlapped:

| Name | South Bay Position(s) | C.I.S. Position(s) | Other Position(s) |
|------|----------------------|--------------------|--------------------|
| *Sheehan* | President, Director | CEO, Director | |
| *Scanlon* | Treasurer, Director | Chief Clinical Officer, Director (until 2012) | |
| *Steven Loose* | Director | Director | Managing Director of H.I.G. Growth; Senior Member of H.I.G. Capital |
| *Nicolas Scola* | Director | Clerk, Director | Principal of H.I.G. Growth and H.I.G. Capital |
| *Eric Tencer* | Director | Director | Principal of H.I.G. Growth and H.I.G. Capital |

From April 2012 on, the Board members of C.I.S. were "heavily involved in the operational decisions of South Bay, including approving contracts, strategic planning, budgeting, and earnings issues."

## IV.  **The Whistleblower**

Relator Christine Martino-Fleming is a licensed mental-health counselor. She was employed by South Bay from June 2008 until September 2013. Thereafter, she worked for C.I.S. from September 2013 to September 2014. Initially a Job Coach at South Bay, she became the Coordinator of Staff Development and Training, and was responsible for keeping track of employee turnover. In this role, Martino-Fleming learned that all South Bay clinics were not compliant with the Massachusetts regulations for mental-health centers because they had staff therapists who were unqualified, unlicensed, and unsupervised. Between 2009 and 2015, over 60 percent of regional directors, over 80 percent of clinical directors, and over 75 percent of supervisors across all South Bay facilities were not properly licensed according to MassHealth regulations, and there was a "systemic failure to hire qualified individuals."

Beginning in 2012, Martino-Fleming informed Scanlon and Sheehan, as well as other C.I.S. officers, that a significant percentage of employees at South Bay "lacked the requisite qualifications to see, diagnose or treat patients on their own,"

and that supervisors were also unqualified in violation of MassHealth regulations and MBHP/MCO requirements. She brought these issues to the Boards of C.I.S. and South Bay.

## V.   Tiger Teams

In 2013, Scola (a principal of the H.I.G. Defendants and senior member of H.I.G. Capital) began to examine the employee retention issue at South Bay.[1] Relator told him that South Bay's clinicians lacked the licensure and educational background required by MassHealth regulations, and that they were not being appropriately supervised. Accordingly, Scola was told none of the billing for their services was appropriate.

As a result of these concerns, "Tiger Teams" were tasked with investigating the cause of employee turnover and deficiencies in the supervision of licensed clinicians at South Bay. According to Relator, a Tiger Team was a "team of specialists in a particular field brought together to work on specific tasks." These teams discovered that employees with only associate's degrees were diagnosing and treating patients without supervision. They also found that clinicians sent their notes to other sites to be signed by licensed supervisors, but did not receive the direct and continuous supervision as necessary. The investigation concluded that the "lack of

---

[1]   The employee retention issue is described in more detail in the Court's memorandum on the Commonwealth's Complaint.

appropriate qualifications and independent licensure of
Supervisors, a lack of supervision of staff therapists, and a
lack of properly credentialed clinicians" were all leading to
high employee turnover.

The Tiger Teams recommended to the C.I.S. Board that South
Bay hire a "substantial" number of qualified supervisors "in
accordance with the legal requirements of MassHealth and its
administrative companies" to oversee the clinicians. The C.I.S.
Board rejected the recommendation of the Tiger Teams. Sheehan
and the C.I.S. Board thought the Tiger Teams were an "enormous
waste of time."

**LEGAL FRAMEWORK**

"In alleging fraud or mistake, a party must state with
particularity the circumstances constituting fraud or mistake."
Fed. R. Civ. P. 9(b). Allegations that a defendant violated the
federal False Claims Act ("FCA") must meet this "particularity"
requirement. See D'Agostino v. ev3, Inc., 845 F.3d 1, 10 (1st
Cir. 2016).

"Rule 9(b) requires a relator to allege with particularity
the who, what, when, where, and how of the fraud." D'Agostino,
845 F.3d at 10 (citing United States ex rel. Ge v. Takeda Pharm.
Co., 737 F.3d 116, 123 (1st Cir. 2013)). There is no "'checklist
of mandatory requirements' that each allegation in a complaint
must meet to satisfy Rule 9(b)," but

> details concerning the dates of the claims, the
> content of the forms or bills submitted, their
> identification numbers, the amount of money charged to
> the government, the particular goods or services for
> which the government was billed, the individuals
> involved in the billing, and the length of time
> between the alleged fraudulent practices and the
> submission of claims based on those practices are the
> types of information that may help a relator to state
> his or her claims with particularity.

Lawton ex rel. United States v. Takeda Pharm. Co., 842 F.3d 125,

131 (1st Cir. 2016) (quoting United States ex rel. Karvelas v.

Melrose-Wakefield Hosp., 360 F.3d 220, 233 (1st Cir. 2004)).

"[A]llegations limited to describing the defendant's scheme and

intent are insufficient." D'Agostino, 845 F.3d at 10. "Although

some questions [may] remain unanswered, the complaint as a whole

[must be] sufficiently particular to pass muster under the FCA."

United States ex rel. Gagne v. City of Worcester, 565 F.3d 40,

45 (1st Cir. 2009) (quoting United States ex rel. Rost v.

Pfizer, Inc., 507 F.3d 720, 732 (1st Cir. 2007)).

The First Circuit has applied a "more flexible" Rule 9(b)

standard in certain cases where a defendant is alleged to have

induced third parties to file false claims. See United States ex

rel. Allen v. Alere Home Monitoring, Inc., Civ. No. 16-11372-

PBS, 2018 WL 4119667, at *6 (D. Mass. Aug. 29, 2018) (and cases

cited). This line of cases holds that Rule 9(b) may be satisfied

where reliable indicia, such as factual or statistical evidence,

"strengthen the inference of fraud beyond possibility" even without details as to each false claim. Id.

In any event, "[b]ecause FCA liability attaches only to false *claims* merely alleging facts related to a defendant's alleged *misconduct* is not enough." Takeda Pharm. Co., 737 F.3d at 124 (emphasis in original) (internal citation omitted). "Thus, the allegations must also establish that the fraudulent conduct actually caused the submission of false claims to the government for payment." D'Agostino, 845 F.3d at 10 (citing Takeda Pharm. Co., 737 F.3d at 124).

## DISCUSSION

### I.   False Claims and False Statements (Counts 1 and 2)

In Count 1, Relator alleges that all Defendants knowingly, or in deliberate ignorance or reckless disregard for the truth, caused false claims to be presented to the United States for payment from MassHealth, MBHP, and MCOs in violation of 31 U.S.C. § 3729(a)(1)(A). The claims were allegedly false in material ways because Defendants misrepresented compliance with the MassHealth regulations concerning the supervision and qualifications of clinicians. In Count 2, Relator alleges that Defendants knowingly made false statements about the qualifications of individual practitioners in violation of 31 U.S.C. § 3729(a)(1)(B). The Relator does not assert an alter ego

or veil piercing theory; rather, her argument hinges on direct liability.

**A.    Causation**

Defendants argue that Relator does not articulate how any of them *directly* caused South Bay to submit false claims. Their primary argument is that the alleged failure to stop South Bay's policy and practice of submitting false claims for services by unqualified and unsupervised clinicians is insufficient to impose FCA liability on H.I.G. and C.I.S. They argue that the FCA requires "affirmative" steps to "cause" the submission of claims in order to impose liability.

The FCA, in relevant part, creates liability for anyone who

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or who]

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1). No intent to defraud is required by the statute. Id. § 3729(b)(1) ("[T]he terms 'knowing' and 'knowingly' . . . require no proof of specific intent to defraud."); Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 1999 n.2 (2016).

The purpose of the FCA is "to reach any person who knowingly assisted in causing the government to pay claims which

were grounded in fraud, without regard to whether that person had direct contractual relations with the government." <u>United States ex rel. Marcus v. Hess</u>, 317 U.S. 537, 544-45 (1943), <u>superseded by statute on other grounds as recognized in</u> <u>Schindler Elevator Corp. v. United States ex rel. Kirk</u>, 563 U.S. 401, 412 (2011).

"Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish 'causation' under the FCA." <u>United States v. President and Fellows of Harvard Coll.</u>, 323 F. Supp. 2d 151, 186 (D. Mass. 2004). "To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required." <u>Id.</u> at 186-87. However, the FCA does not always require an "affirmative act" to impose liability. For example, "a defendant may be liable if it operates under a policy that causes others to present false claims." <u>Id.</u> at 187. Moreover,

> [w]here the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes "a course of conduct that allowed fraudulent claims to be presented to the federal government."

<u>Id.</u> (quoting <u>United States ex rel. Long v. SCS Bus. & Tech.</u> <u>Inst.</u>, 999 F.Supp. 78, 91 (D.D.C. 1998)). A defendant may be liable where the submission of false claims by another entity

was the foreseeable result of a business practice. See, e.g.,
United States ex rel. Franklin v. Parke-Davis, 147 F. Supp. 2d
39, 52 (D. Mass. 2001).

Here, the Relator alleges that she and the Tiger Teams
expressly informed the CEO and Boards of C.I.S. and South Bay
that the supervision of clinical workers violated state
regulations and recommended that a substantial number of
licensed supervisors be hired to fix the problem, and that the
recommendation was rejected. The allegation that C.I.S. and
Sheehan, the CEO, knowingly ratified the prior policy of
submitting false claims by rejecting recommendations to bring
South Bay into regulatory compliance constitutes sufficient
participation in the claims process to trigger FCA liability.

Because it is alleged that H.I.G. members and principals
formed a majority of the C.I.S. and South Bay Boards, and were
directly involved in the operations of South Bay, the motion to
dismiss the H.I.G. entities is also denied. A parent may be
liable for the submission of false claims by a subsidiary where
the parent had direct involvement in the claims process. See,
e.g., United States ex rel. Hockett v. Columbia/HCA Healthcare
Corp., 498 F. Supp. 2d 25, 62-63 (D.D.C. 2007) (pointing out the
"frequency and level of detail" of communication between
subsidiary and corporate officials as well as the parent's
involvement in fraudulent activity); cf. United States v.

Bestfoods, 524 U.S. 51, 68 (1998) (holding, under different statute, that parent company may be liable when it operates a facility, as evidenced by parent's participation in the activities of the facility).

Finally, because of Scanlon's role at South Bay as the sole owner and person primarily responsible for ensuring compliance with MassHealth regulations, Relator plausibly alleges Scanlon had sufficient participation in submission of the false claims to be liable under the FCA.

### B.   Materiality

Next, Defendants argue that the Complaint fails to allege that the violations of the state regulations were material or that they knew about the materiality. This argument is unpersuasive. For the reasons stated in the Court's memorandum regarding the Commonwealth's Complaint-in-Intervention, the Court concludes that the Relator adequately alleges that the violations of the MassHealth regulations are indeed material, and that each defendant knew about, or was deliberately ignorant of, those violations.

The Court addresses separately the claims submitted to the MCOs and MBHP. Defendants argue that Relator has not sufficiently pleaded that violations of the MassHealth regulations were material to payment decisions made by the MCOs and MBHP, which have their own supervision and credentialing

14

criteria. This argument is without merit because Plaintiffs have alleged that MBHP and the MCOs would deny payment had they known of South Bay's failure to comply with MassHealth regulations.

However, Defendants also argue that Relator fails to allege with particularity which requirements South Bay failed to meet under the different contracts of each MCO and MBHP. The Court agrees. Although these contractual criteria are mentioned in multiple places throughout the SAC, Relator does not appear to base Counts 1 or 2 on breaches of these separate requirements, nor does she allege that the violations of these contractual provisions are material to the extent they are different from the state regulations. Thus, the motion to dismiss is allowed insofar as it is based on the MCO or MBHP criteria.

## II.  __Reverse False Claims (Count 3)__

Relator alleges that Defendants knowingly concealed, avoided, or decreased an obligation to pay money to the United States. The theory is that South Bay's failure to return the overpayments once it was aware of the regulatory violations constitutes a reverse false claim, and that Scanlon, Sheehan, C.I.S., and H.I.G. are liable under the reverse false claims provision because they were "aware of the overpayments and responsible to report them, but failed to do so." Relator states that this is only an alternative theory of liability. Perhaps

for this reason, it is a poorly briefed and underdeveloped claim.

The reverse false claims provision of the FCA imposes liability in two scenarios. First, it applies when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Second, it applies when a person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." Id. Although the Complaint uses language from both scenarios, only the second is meaningfully advanced.

By statute, an "obligation" is "an established duty, whether fixed or not, arising from . . . the retention of any overpayment." 31 U.S.C. § 3729(b)(3). As relevant to this case, the term "overpayment" means "any funds that a person receives or retains under [Medicare or Medicaid] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B). Moreover, if a person -- which includes a "provider of services, supplier, [or] medicaid managed care organization" -- has received an overpayment, the person must "report and return the overpayment" to the government. 42 U.S.C. § 1320a-7k(d)(1)(A), (d)(4)(C)(i).

Relator's Complaint fails to adequately allege that any of the Defendants incurred an "obligation" within this statutory framework. As a general matter, "to retain -- to not return -- an overpayment constitutes a violation of the FCA." Kane ex rel. United States v. Healthfirst, Inc., 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015). But "there is no liability for obligations to pay that are merely potential or contingent." United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC, 878 F.3d 1224, 1231 (10th Cir. 2017), petition for cert. filed, No. 17-1509 (U.S. May 7, 2018). Indeed, the Senate specifically struck "contingent" duties from the proposed statutory language. 1 John T. Boese, Civil False Claims and Qui Tam Actions § 2.01[L], at 2-84 (4th ed. Supp. 2018). Nor can reverse-FCA liability be premised solely on the same conduct that gives rise to traditional presentment or false-statement claims. See Pencheng Si v. Laogai Research Found., 71 F. Supp. 3d 73, 97 (D.D.C. 2014); accord Boese, Civil False Claims and Qui Tam Actions § 2.01[L] at 2-83 ("[R]everse false claim liability cannot be premised solely on the conduct that creates the obligation.").

Under these principles, South Bay cannot be liable for a reverse false claim because Relator does not adequately allege that South Bay took any action independent of the main FCA theories already discussed. Because South Bay's conduct forms the foundation for the reverse-FCA theory against the other

Defendants, Relator's reverse-FCA claims against them fail as well. That is, Relator has not adequately explained how any of the other Defendants had an "established" -- as opposed to a potential or contingent – "obligation" to repay funds to the government. In this case, an "overpayment" only exists where the recipient, "after applicable reconciliation, is not entitled" to the disputed funds. 42 U.S.C. § 1320a-7k(d)(4)(B). Here, there is no allegation that any such "reconciliation" occurred, nor is it clear what that would look like given that the parties' entitlement vel non to Medicaid reimbursements is the subject of this very litigation.

With respect to Scanlon and Sheehan, Relator also has not plausibly alleged that they "knowingly" or "improperly" concealed or avoided any overpayments. See Boese, Civil False Claims and Qui Tam Actions § 2.01[L] at 2-83 (noting that "improperly" denotes "either improper motive or inherently improper means").31 U.S.C. § 3729(a)(1)(G). Finally, with respect to C.I.S. and the H.I.G. Defendants, it is not alleged that these Defendants are "persons" as defined by statute because they are not a "provider of services, supplier, or managed care organization." Accordingly, the reverse-FCA count is dismissed as to all Defendants.

## III. **Remaining Arguments (All Counts)**

### A.    **Particularity Under Rule 9(b)**

Defendants also argue that the SAC is not pleaded with sufficient particularity as required by Fed. R. Civ. P. 9(b). This argument is rejected for the same reasons stated in the memorandum addressing the Commonwealth's Complaint-in-Intervention.

### B    **Supervision of Clinicians**

Defendants argue the claims alleged are not false as a matter of law because "an unlicensed clinician need not receive clinical supervision from his or her administrative supervisor." Distinguishing between "administration supervision" and "licensure supervision," they contend that South Bay's unlicensed clinicians received adequate licensure supervision (as opposed to administrative supervision), which in their view, is sufficient under the regulations.

Relator cites two MassHealth regulations applicable to supervision. First, all staff members must receive supervision appropriate to the person's skills and level of professional development. See 130 Mass. Code Regs. § 429.438(E)(1) ("Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration."). Second, 130 Mass. Code Regs. § 429.424 sets forth the "Qualifications of Professional Staff Members

19

Authorized to Render Billable Mental Health Center Services by Core Discipline." It provides that "[a]ll unlicensed counselors . . . must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines" of psychiatry, social work, psychology, and psychiatric nursing. Id. §§ 429.424(A)-(D), (F)(1).

Relator alleges that South Bay failed to provide both types of supervision. She further alleges that files were effectively rubber-stamped by so-called "licensed signatories," who would sign off on documents without meeting patients or counselors. Moreover, she alleges that unlicensed, unqualified clinicians did not receive any supervision whatsoever for the first 90 days. These allegations are sufficient to state a claim.

Defendants also argue that the SAC must be dismissed because the regulations allow clinic directors to be "licensed, certified, or registered to practice in one of the core disciplines listed," 130 Mass. Code Regs. § 429.423, and although Relator alleges that they were unlicensed, she did not specify whether they were also unregistered or uncertified. It is true that the focus of Relator's SAC is that the treating professionals are unlicensed. However, she also alleges that therapists "lacked the correct type of license, registration or certification in one of the core disciplines" as required by the regulations. Therefore, this argument is without merit.

### C.    Capitated Payments

Finally, Defendants argue that the claims involving MCOs and MBHP fail because these government contractors are paid on a capitated basis at a fixed rate per patient regardless of the service offered. A "claim" is defined by statute to include claims of payment of government funds made to government contractors. See 31 U.S.C. § 3729(b)(2). Here, Relator alleges that South Bay submitted false claims and made false statements to Medicaid contractors who paid the bills with Medicaid funds as a result. The fact that Medicaid did not suffer damages because it paid a capitated rate does not negate liability because liability attaches to the "claim for payment." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1173 (9th Cir. 2016) ("Proof of damage to the government is not required.").

### ORDER

The Court dismisses Count 3 (reverse false claims) as to all Defendants. Counts 1 and 2 remain viable. Accordingly, the motions to dismiss by South Bay (Dkt. No. 101), the H.I.G. and C.I.S. Defendants (Dkt. No. 103), Sheehan (Dkt. No. 106), and Scanlon (Dkt. No. 109) are **ALLOWED IN PART** and **DENIED IN PART**.

```
                        /s/ PATTI B. SARIS_____
                        Honorable Patti B. Saris
                        Chief U.S. District Judge
```

21