**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| COMMONWEALTH OF MASSACHUSETTS ex ) | |
| rel. CHRISTINE MARTINO-FLEMING, ) | |
| Relator, ) | |
| ) | |
| ) | Civil Action |
| Plaintiff, ) | No. 15-13065-PBS |
| ) | |
| v. ) | |
| ) | |
| SOUTH BAY MENTAL HEALTH CENTER, ) | |
| INC.; COMMUNITY INTERVENTION ) | |
| SERVICES, INC.; COMMUNITY ) | |
| INTERVENTION SERVICES HOLDINGS, ) | |
| INC.; H.I.G. GROWTH PARTNERS, ) | |
| LLC; H.I.G. CAPITAL, LLC; PETER J. ) | |
| SCANLON; AND KEVIN P. SHEEHAN, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

September 21, 2018

Saris, C.J.

**INTRODUCTION**

The Commonwealth of Massachusetts brings this action against South Bay Mental Health Center, Inc. ("South Bay"), and others to recover payments made by the Massachusetts Medicaid program ("MassHealth") as a result of allegedly false claims submitted to MassHealth from August 2009 to the present. The other defendants are Community Intervention Services, Inc. ("C.I.S."), and Community Intervention Services Holdings, Inc. ("C.I.S.H."); H.I.G. Growth Partners, LLC, and H.I.G. Capital,

1

LLC (collectively, "H.I.G. Defendants"); Peter J. Scanlon; and Kevin P. Sheehan. The core allegation is that Defendants submitted claims for services of "unlicensed, unqualified, and unsupervised personnel" in violation of MassHealth regulations at 17 South Bay mental-health centers.

The Commonwealth's 27-count Complaint-in-Intervention ("the Complaint") contains 368 paragraphs and multiple exhibits alleging false claims in violation of state law, regulations, and common law. It asserts claims under the Massachusetts False Claims Act ("MFCA"), Mass. Gen. Laws ch. 12, §§ 5A et seq.; the Massachusetts Medicaid False Claims Act, Mass. Gen. Laws ch. 118E, §§ 40, 44; Recovery of Overpayment regulations, 130 Mass. Code Regs. §§ 450.237, 450.260(A), 450.260(I); Unjust Enrichment; and Breach of Contract. The Commonwealth asserts subject-matter jurisdiction over state-law claims arising from the same transactions or occurrences as an action brought under the federal False Claims Act ("FCA"). 31 U.S.C. § 3732(b).

In a separate complaint, Relator has brought claims under the FCA. The federal government has declined to intervene. Because the Relator's allegations, causes of action, and theories of recovery are different, her claims will be addressed in a separate opinion with which the Court assumes familiarity.

In February 2018, the Commonwealth reached an agreement to resolve its state-law claims against South Bay, C.I.S., and

C.I.S.H., and dismissed them as Defendants. Accordingly, this memorandum focuses on the remaining 14 state-law counts against the H.I.G. Defendants and the individual Defendants, Scanlon and Sheehan.

The remaining Defendants have moved to dismiss on multiple grounds. After a hearing, the Court **ALLOWS** the motions as to Counts 13, 14, and 15 against the H.I.G. Defendants; Counts 18 and 20 against Scanlon; and Counts 23, 24, and 26 against Sheehan. The motions are otherwise **DENIED**.

### FACTUAL BACKGROUND

The Complaint alleges the following facts, many of which are disputed. The Court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." <u>Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 44 (1st Cir. 2012).

## I.    **South Bay**

South Bay, a MassHealth provider, operates 17 mental-health centers in Massachusetts, which are licensed by the Department of Public Health. South Bay was founded by Defendant Scanlon in 1986, and from then until April 12, 2012, he owned all outstanding capital stock. South Bay's Brockton Clinic is the parent mental-health center, at which most of the administrative, organizational, and clinical services are performed. The satellite facilities are in different locations,

but operate under the license of the parent and fall under its fiscal, administrative, and personnel management.

South Bay submitted claims for mental-health counseling to MassHealth through the Massachusetts Behavioral Health Partnership ("MBHP"), which administers and pays mental health care plans for patients enrolled in the Primary Care Clinical Plan. Other patients are enrolled in Managed Care Organizations ("MCOs"), which contract with MassHealth to administer the payment of mental-health benefits. MassHealth also provides mental-health benefits on a fee-for-services basis. The MassHealth regulations governing the operations, staffing, licensing, and supervision requirements of mental-health centers are set out at 130 Mass. Code Regs. § 429.000, et seq.

## II.   **The Private Equity Investors**

Defendants H.I.G. Growth, LLC, and its capital investment affiliate, H.I.G. Capital, LLC, are Delaware limited liability companies. The H.I.G. entities and Defendant Sheehan partnered to acquire South Bay. They established layers of corporations to accomplish this purchase. Scanlon sold his capital stock in South Bay to C.I.S., a Delaware corporation, and received a cash payment, common stock, and a promissory note, together worth over $31 million. C.I.S.H., a Delaware holding corporation, owns C.I.S., which owns South Bay. H.I.G. Growth owns 71.1 percent of C.I.S.H. Sheehan, who had over 30 years of behavioral health

care experience and conducted "substantial due diligence" before purchasing C.I.S., became the Chief Executive Officer ("CEO") of C.I.S. until 2016, and Scanlon served as the Chief Clinical Officer until either 2013 or 2014. Scanlon was a member of the Boards of Directors of South Bay and C.I.S.

H.I.G.'s managing director and principals form the majority of the C.I.S. board that owns and operates South Bay. Nicholas Scola, Steven Loose, Eric Tencer, Sheehan, and Scanlon served on the five-member Board of Directors of C.I.S. Scola, Loose, and Tencer are principals or directors of H.I.G. Growth.[1] The Board of Directors of C.I.S. "was aware of South Bay operating" and was "responsible for making strategic decisions" including "personnel changes," "financial matters," and evaluations of "specific long-term issues at South Bay" like "the struggle to recruit and retain clinicians."

## III. **The Whistleblower**

Christine Martino-Fleming, the Relator, is a licensed mental-health counselor. She was employed by South Bay from June 2008 until September 2013. Initially, she was a Job Coach at South Bay, helping with documentation, billing, and time management. In March 2012, she was elevated to the Coordinator of Staff Development and Training position for C.I.S. Her duties

---

[1]     According to Relator's complaint, Loose is the Managing Director of H.I.G., and Scola and Tencer are principals of H.I.G.

included analyzing the education and experience of South Bay employees. She also was responsible for the clinical training of new clinicians and the managerial leadership training for supervisors, directors, and regional directors.

In examining the qualifications of the employees, Martino-Fleming came across numerous supervision and credentialing deficiencies, which she communicated to the Defendants as early as 2012: (1) hundreds of South Bay employees were not licensed and were ineligible for licenses; (2) at least 28 clinic directors did not have one of the licenses required by the regulations, and 24 clinic directors did not have any type of license; (3) many clinicians could not obtain licenses because they had degrees from unaccredited schools, they had not taken the prerequisite licensing courses, some of their degrees were in programs such as art therapy and school counseling rather than one of the core disciplines, or they had not had the required internships; (4) even when employees did have the proper credentials, they did not have supervised training on a full-time basis once they obtained their master's degrees; (5) unqualified clinicians were not receiving the necessary supervision; and (6) in some facilities, none of the supervisors were independently licensed, and it was common to find unlicensed clinic and regional directors. Because every clinic needed to be managed by a core team of licensed individuals,

every South Bay clinic, including the parent center, was in violation of the regulations.

In 2014, Martino-Fleming informed the Chief Operating Officer and the Compliance Officer that "'32 directors/supervisors do NOT have their independent license,' 13 directors/supervisors are independently licensed but don't have 5 years' experience, 'only 8 directors/supervisors are independently licensed and have 5 years post MA experience' and only '4 out of 5 regional directors have their independent license.'" Sara Hart, identified as a Director of Clinical Services and Compliance Officer, drove this point home with the President and Chief Operating Officer, noting that even if MBHP regulations were more flexible, "[South Bay] still ha[d] to be compliant with ALL [MassHealth regulations]." Hart went on to note that licensure supervision, necessary for clinicians to be license-eligible, was insufficient to meet the regulatory requirements of "direct and continuous" supervision.

## IV.  **<u>Tiger Teams</u>**

In early to mid-2014, the Board of Directors employed "Tiger Teams," working groups tasked with investigating the cause of employee turnover. The Tiger Teams found multiple improper practices, particularly with respect to lack of licensure supervision, in violation of requirements set by MassHealth, MBHP, and the MCOs. The teams made recommendations

to the C.I.S. Board and others, including, but not limited to,
Defendants Sheehan and Scanlon, to remedy the improper
practices. The teams encountered supervisors who expressed
concern about signing off on documentation from clinicians they
had never met. Although H.I.G. and C.I.S. knew about the
licensing violations, South Bay did not adopt the
recommendations to rectify the noncompliance and continued
submitting false claims to MassHealth, MBHP, and MCOs. It did
not report the noncompliance to MassHealth. Over $120 million in
unlawful reimbursements were made to South Bay.

### **LEGAL FRAMEWORK**

The MFCA, Mass. Gen. Laws ch. 12, § 5A, <u>et</u> <u>seq.</u>, which is
modeled on the FCA, imposes significant penalties on those who
defraud the Commonwealth. In relevant part, § 5B of the MFCA
subjects to liability any person who:

> (1) knowingly presents, or causes to be presented, a
> false or fraudulent claim for payment or
> approval; . . .
>
> (3) conspires to commit a violation of this
> subsection; . . . or
>
> (10) is a beneficiary of an inadvertent submission of
> a false claim to the commonwealth or a political
> subdivision thereof, or is a beneficiary of an
> overpayment from the commonwealth or a political
> subdivision thereof, and who subsequently discovers
> the falsity of the claim or the receipt of overpayment
> and fails to disclose the false claim or receipt of
> overpayment.

<u>Id.</u> § 5B(a).

Section 5A defines a "claim," in relevant part, as:

> a request or demand, whether pursuant to a contract or
> otherwise, for money or property, whether or not the
> commonwealth or a political subdivision thereof has
> title to the money or property, that: (1) is presented
> to an officer, employee, agent or other representative
> of the commonwealth or a political subdivision
> thereof; or (2) is made to a contractor,
> subcontractor, grantee or other person, if the money
> or property is to be spent or used on behalf of or to
> advance a program or interest of the commonwealth or
> political subdivision thereof and if the commonwealth
> or any political subdivision thereof: (i) provides or
> has provided any portion of the money or property
> which is requested or demanded; or (ii) will reimburse
> directly or indirectly such contractor, subcontractor,
> grantee or other person for any portion of the money
> or property which is requested or demanded.

Id. § 5A.

Other definitions in § 5A are applicable. The MFCA's
scienter requirement defines "knowing" and "knowingly" as
"possessing actual knowledge of relevant information, acting
with deliberate ignorance of the truth or falsity of the
information or acting in reckless disregard of the truth or
falsity of the information; provided, however, that no proof of
specific intent to defraud shall be required." Id. The MFCA
defines "material" as "having a natural tendency to influence,
or be capable of influencing, the payment or receipt of money or
property." Id. "Overpayment" is defined as "any funds that a
person receives or retains . . . to which the person, after
applicable reconciliation, is not entitled." Id.

## DISCUSSION

I.  **H.I.G.'s Motion to Dismiss**

    A.  **MFCA Conspiracy[2] (Count 13)**

The Commonwealth asserts that the H.I.G. Defendants[3] are liable for an MFCA conspiracy in violation of Mass. Gen. Laws ch. 12, § 5B(a)(3), which subjects to liability any person who conspires to violate § 5B(a)(1) or § 5B(a)(10). Unlike Relator, the Commonwealth does not assert that H.I.G. itself caused the submission of false claims. Rather, the Complaint alleges that the H.I.G. Defendants, "through their role overseeing and managing Defendant South Bay," agreed with South Bay to continue submitting false claims for services, in violation of Mass. Gen. Laws ch. 12, § 5B(a)(1), and to continue failing to declare to the Commonwealth the false claims and receipt of overpayments, in violation of Mass. Gen. Laws ch. 12, § 5B(a)(10). The H.I.G.

---

[2]  Relator does not assert an MFCA conspiracy theory. Neither she nor the Commonwealth rely on a veil-piercing or alter-ego theory of liability.

[3]  The complaint alleges that both H.I.G. Defendants are limited liability companies under Delaware law.

> [A]n LLC may be generally defined as an unincorporated entity that is formed or organized through a filing with the state under a state limited liability company statute, the members and managers of which do not have vicarious liability for the obligations of the entity, and the relationship of the members, managers and the entity is largely governed by an agreement among them or, where the parties have not agreed to the contrary, by the default rules of the state statute.

1 Ribstein and Keatinge on Limited Liability Companies § 1:3 (2018).

Defendants move to dismiss this count under the intracorporate conspiracy doctrine, which generally holds that parent and subsidiary corporations cannot, as a matter of law, conspire together.

To survive a motion to dismiss on an FCA conspiracy claim, the complaint must plausibly allege that "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy." United States v. President and Fellows of Harvard Coll. ("Harvard"), 323 F. Supp. 2d 151, 196 (D. Mass. 2004) (quoting United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 639 n.33 (S.D. Tex. 2001)). Conspiracy claims under the FCA require fraud to be alleged with particularity pursuant to Fed. R. Civ. P. 9(b). United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009). The same standards apply to an MFCA conspiracy claim. See Scannell v. Att'y Gen., 872 N.E.2d 1136, 1138 n.4 (Mass. App. Ct. 2007) (interpreting the MFCA with guidance from cases and treatises on the FCA because the former was "modeled on" the latter, "[t]here is little decisional law interpreting the MFCA, and its legislative history is scant").

Generally speaking, the intracorporate conspiracy doctrine forecloses the existence of a conspiracy between a parent and a

subsidiary because "[c]onspiracy requires an agreement -- and in particular an agreement to do an unlawful act -- between or among two or more separate persons." Ziglar v. Abbasi, 137 S. Ct. 1843, 1867 (2017). But, in the antitrust context at least, "the very notion of an 'agreement' . . . between a parent and a wholly owned subsidiary lacks meaning. . . . They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984).

In Copperweld, the Supreme Court emphasized that "substance, not form, should determine whether a separately incorporated entity is capable of conspiracy." Id. at 773 n.21. "[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense." Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 195 (2010). Rather, "[t]he question is whether the [allegedly conspiratorial] agreement joins together 'independent centers of decisionmaking.'" Id. at 196 (quoting Copperweld, 467 U.S. at 769). Id.

Centers of decisionmaking are not "independent" if one sufficiently controls the other. See In re Aluminum Warehousing Antitrust Litig., 95 F. Supp. 3d 419, 445 (S.D.N.Y. 2015).

12

"Taken together, Copperweld and American Needle establish that a non-wholly owned affiliate cannot conspire with its parent . . . if they are jointly controlled. The same principles apply to agents. To the extent agents are merely carrying out the decisions of principals, they are not separate entities." Id.

Several federal district courts, including courts in this district, have applied the intracorporate conspiracy doctrine to FCA conspiracy claims.[4] For example, one court observed that, because a corporation can only act through its agents and employees, it "does not make sense to permit a conspiracy claim under the FCA to proceed on the theory that [a] defendant [corporation] has conspired with its officers and employees." United States ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d 240, 269 (D. Mass. 2015) (collecting cases), aff'd sub nom. Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26

---

[4]     Outside of the antitrust context, the scope of the intracorporate conspiracy doctrine is far from settled. Several circuits, including the First Circuit, have recognized an exception to the doctrine in the context of criminal fraud under 18 U.S.C. § 371. See United States v. Peters, 732 F.2d 1004, 1008 (1st Cir. 1984) ("The actions of two or more agents of a corporation, conspiring together on behalf of the corporation, may lead to conspiracy convictions of the agents (because the corporate veil does not shield them from criminal liability) and of the corporation (because its agents conspired on its behalf)."). Separately, the Supreme Court recently declined to decide whether, or to what extent, the intracorporate conspiracy doctrine from antitrust cases should apply to a conspiracy to violate civil rights. See Ziglar, 137 S. Ct. at 1868. Given the dearth of guidance from either Massachusetts or federal appellate courts, the Court follows the majority of the federal district court cases, which apply the doctrine to FCA conspiracies (and, by extension, to MFCA conspiracies).

(1st Cir. 2016). Stated differently, because a conspiracy requires a meeting between at least two minds, a "corporation cannot conspire with itself anymore than a private individual can." United States ex rel. Ruhe v. Masimo Corp., 929 F. Supp. 2d 1033, 1038 (C.D. Cal. 2012) (citation and quotation marks omitted). But see, e.g., United States ex rel. Harris v. Lockheed Martin Corp., 905 F. Supp. 2d 1343, 1354–55 (N.D. Ga. 2012) (holding that the doctrine is inapplicable because of an exception for intracorporate criminal conspiracies to defraud the United States).

Here, the Complaint does not adequately allege a conspiracy among independent centers of decisionmaking. The Commonwealth alleges that H.I.G. Growth owns 71.1 percent of C.I.S.H., and that H.I.G. placed its managing director and two of its principals/employees on C.I.S.'s five-member Board, thereby controlling both C.I.S. and South Bay. It alleges that the H.I.G. Defendants -- private equity investors in South Bay, not competitors -- oversaw and managed C.I.S. and South Bay. As alleged, H.I.G. and C.I.S. are not independent centers of decisionmaking, and the formalistic legal distinctions among the multiple corporate entities are not dispositive. Even when all reasonable inferences are drawn in the Commonwealth's favor, the allegations in the Complaint do not support the contention that

C.I.S., H.I.G., and South Bay are independent actors. The conspiracy claim against the H.I.G. Defendants is dismissed.[5]

## B.   Reverse MFCA (Count 14)

The Commonwealth has asserted a "reverse false claims" count against the H.I.G. Defendants. With respect to this theory, the MFCA imposes liability on "any person" who is

> a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth . . .

Mass. Gen. Laws ch. 12, § 5B(a)(10).

The Commonwealth alleges that from April 2012 to the present, the H.I.G. entities, through their ownership of C.I.S., benefitted from payments based on false claims. Specifically, the Commonwealth alleges: "[T]he H.I.G. Defendants, as majority owners of the C.I.S. Defendants, received money to which they were not entitled, and which they have retained." Moreover, the Commonwealth alleges that H.I.G. knew about the failure to meet regulatory requirements governing supervision and licensing

---

[5]    Of course, discovery may reveal additional facts with respect to the relationship between the corporate Defendants. Therefore, this dismissal is without prejudice to the Commonwealth's ability to revive the conspiracy count should the facts support it.

through communications by the whistleblower and the Tiger Teams to its agents on the Board of Directors.

The H.I.G. Defendants have moved to dismiss on the ground that the Commonwealth has failed to show that they actually received or retained any payments. They point out that South Bay, not H.I.G., received and retained the alleged overpayments.

The MFCA does not require that a defendant actually receive a Medicaid payment, but more broadly states that it applies to a "beneficiary of an overpayment," or a beneficiary of an "inadvertent submission of a false claim." The statute, though, does not define "beneficiary," and there is a paucity of caselaw construing the term in the context of the MFCA.[6]

This Court has once before rejected too expansive a definition of "beneficiary." See In re Pharm. Indus. Average Wholesale Price Litig., 478 F. Supp. 2d 164, 176 (D. Mass. 2007) (rejecting argument that drug manufacturers who fraudulently inflate drug prices are beneficiaries because they profit from

---

[6]    Cf. Cape Cod Bank & Tr. Co. v. Cape Cod Hosp., 327 N.E.2d 902, 904 (Mass. App. Ct. 1975) ("A 'beneficiary,' in the natural and ordinary sense of the term, is someone who actually 'receives something . . . .'" (quoting Wood v. Packard, 55 N.E. 315, 315 (Mass. 1899)). Typically, a beneficiary is "[s]omeone who is designated to receive the advantages from an action or change," especially someone who "receive[s] something as a result of a legal arrangement or instrument." Beneficiary, Black's Law Dictionary (10th ed. 2014). Under the broadest definition, "benefit" can mean "to be useful or helpful to (someone or something)." Benefit, Merriam-Webster Dictionary (online edition).

increased market share from drug sales to providers who get the higher reimbursements). Construing a similar provision under California law, one court has held that a "beneficiary" need not be the one who submitted the false claim, and that the legislative history of the section evidences an intent to impose liability on "third party beneficiaries of false claims." Armenta ex rel. City of Burbank v. Mueller Co., 47 Cal. Rptr. 3d 832, 840-41 (Ct. App. 2006) (holding, over a vigorous dissent and without discussion, that the parent, grandparent, and great-grandparent corporations of a subsidiary could be liable as beneficiaries of reverse false claims).

The Court declines to adopt the virtually limitless definition of "beneficiary" upon which the Commonwealth bases its reverse-MFCA claim. While the MFCA should be liberally read, if "beneficiary" is construed too broadly, any person who incidentally benefitted from South Bay's improved financial status resulting from its alleged submission of false claims could be a "beneficiary" -- say, an employee getting a higher salary or a shareholder whose stock increases in value. The Commonwealth cites no caselaw or legislative history to support such a broad reading, and the Court has found none.

Even under an expansive definition, however, the Commonwealth's reverse-MFCA claim fails. For one, the Commonwealth has not adequately alleged an "overpayment" within

the meaning of the MFCA. The statute defines "overpayment" as "any funds that a person receives or retains . . . to which the person, *after applicable reconciliation*, is not entitled." Mass. Gen. Laws ch. 12 § 5A (emphasis added). As discussed in the Court's memorandum on Relator's complaint, the Commonwealth has not adequately alleged that any such reconciliation occurred here. And, far from being established, the parties' entitlement to the disputed Medicaid payments is the subject of this very litigation.

Moreover, the Commonwealth has not alleged that the purported overpayments from MassHealth to South Bay were transferred to H.I.G., or that H.I.G. was a third-party beneficiary that benefitted directly from the alleged overpayments. Finally, the "beneficiary" provision does not impose liability on "a successor for wrongs committed previously." Armenta, 47 Cal. Rptr. 3d at 839 n.6. Accordingly, Count 14 is dismissed.

## C.   Recovery of Overpayment Claim (Count 15)

For similar reasons, the Court dismisses the Commonwealth's recovery-of-overpayment count against the H.I.G. Defendants. MassHealth defines an overpayment as "a payment made by the MassHealth agency to or for the use of a provider to which the provider was not entitled under applicable federal or state law or regulations." 130 Mass. Code. Regs. § 450.101. The Complaint

does not allege that the H.I.G. Defendants were "providers" or that they received overpayments.

### D.   Unjust Enrichment (Count 16)

The unjust enrichment claim may be pled against all defendants as an alternative theory of liability. See Fed. R. Civ. P. 8(d). The motion to dismiss is denied.

## II.   Scanlon's Motion to Dismiss

### A.   MFCA and Medicaid FCA (Counts 17, 18, 19)

#### 1.   Particularity

Scanlon argues that the Complaint must be dismissed under Fed. R. Civ. P. 9(b) because the Commonwealth fails to identify actual false claims. See United States ex rel. Ge v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 123 (1st Cir. 2013) (noting that plaintiffs must state "with particularity the who, what, when, where, and how of the alleged fraud" (internal citations and quotation marks omitted)). Typically, an allegation of an actual false claim is necessary to satisfy Rule 9(b). Id. at 123-24. But this is not an inexorable requirement, as the First Circuit has applied a "more flexible" Rule 9(b) standard under certain circumstances. See United States ex rel. Allen v. Alere Home Monitoring, Inc., Civ. No. 16-11372-PBS, 2018 WL 4119667, at *4, *6-7 (D. Mass. Aug. 29, 2018).

The Commonwealth argues that its Complaint is replete with allegations specifying clinic-by-clinic claims that were

systematically submitted to MassHealth for services provided in violation of the staffing and supervision regulations. For example, the Commonwealth alleges that in the Salem clinic, "only a handful" of the 80 individuals were independently licensed. Neither the regional director nor the clinical director were licensed. None of the supervisors were individually licensed. There was one licensed supervisor (a licensed independent clinical social worker), but she was not providing "direct and continuous supervision" to unlicensed clinicians. The majority of staff therapists were unlicensed and could not have been adequately licensed given the lack of qualified supervisors. According to the Commonwealth, because the clinic was in violation of the staffing and supervision regulations, all claims to MassHealth were false and fraudulent.

Scanlon argues that the Complaint does not meet Rule 9(b) requirements because MassHealth has information about services billed based on provider identification but does not have information about the specific clinicians who provided those services. Attached to the Complaint, though, is a claims summary chart, which includes information about the procedure codes and the amounts MassHealth and its reimbursement partners paid to South Bay for services totaling $123,109,849.13.

The Complaint also references a table in Relator's second amended complaint listing specific examples of South Bay's

claims for patients who received treatment from unlicensed and unsupervised clinicians. Scanlon complains that the "Information as of Last Date billed" field in this table does not identify the date of an allegedly false claim. The Court disagrees: these allegations of systemic regulatory violations, together with patient-specific bills, amply meet the particularity requirement of Rule 9(b).

2.   Causation

Next, Scanlon argues that he did not cause the government to make payments that it would not have otherwise made. Under both the FCA and the MFCA, a defendant who did not himself submit false claims is liable if he "causes to be presented" a false or fraudulent claim for payment or approval. See Mass. Gen. Laws ch. 12 § 5B(a)(1); United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 732 n.9 (1st Cir. 2007) (interpreting the FCA).

Under the FCA, the purpose of the "causes to be presented" provision is "to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943), superseded by statute on other grounds as recognized in Schindler Elevator Corp. v. United States ex rel. Kirk, 563 U.S. 401, 412 (2011).

If a person knowingly participates in a scheme that, if successful, would ultimately result in the submission of a false claim to the government, he has caused those claims to be submitted. United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243-44 (3d Cir. 2004). Even when claims are submitted by innocent parties, unlawful acts by nonsubmitting persons or entities may give rise to a false or fraudulent claim. See United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 389-90 (1st Cir. 2011).

To be liable, a person must have "some degree of participation" in the claims process. Harvard, 323 F. Supp. 2d at 186-87. A defendant may be liable if "it operates under a policy that causes others to present false claims." Id. at 187.

> Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the federal government.

Id. (internal quotation marks and citations omitted); see also United States ex rel. Franklin v. Parke-Davis, 147 F. Supp. 2d 39, 52-53 (D. Mass. 2001) (holding defendant could be liable when the submission of false claims was foreseeable).

The Commonwealth alleges that Scanlon as the founder, sole owner, president, and CEO of South Bay until April 2012 was

ultimately responsible for the submission of all false claims to
MassHealth. It argues that "Scanlon created and enforced South
Bay's policies and procedures, oversaw the billing department,
registered South Bay as a MassHealth provider, and signed the
contracts with MassHealth wherein he represented that South Bay
would comply with all laws, rules and regulations." The
Commonwealth has sufficiently alleged that, as the leader,
Scanlon participated in the alleged fraudulent scheme to submit
claims for reimbursement for unlicensed and unsupervised
clinicians and thereby "caused" the submission of false claims.

### 3.   Violation of MassHealth Regulations

Scanlon argues that no violations of the MassHealth
regulations have been asserted. He criticizes the Commonwealth
for confusing "administrative supervision" and "licensure
supervision." This argument is also addressed in the Court's
memorandum on Relator's case.

The Commonwealth alleges numerous violations of MassHealth
licensing and supervision regulations. For example, one
MassHealth regulation specifies that "[a]ll unlicensed
counselors included in the center must be under the direct and
continuous supervision of a fully qualified professional staff
member." 130 Mass. Code Regs. § 429.424(F)(1). Because the
majority of unlicensed South Bay clinicians had no qualified
supervisor, the Commonwealth contends they were not receiving

the "direct and continuous supervision" required by 130 Mass. Code Regs. § 429.424. The Commonwealth further asserts that South Bay's newly hired clinicians who had no licensed supervisors were "instructed to write in the name of a supervisor they had never met . . . 'in case they were ever audited.'" The Court finds that the Commonwealth has sufficiently alleged violations of the MassHealth regulations.

The Court does not address the separate contractual requirements of the MCOs and MBHP because any alleged violations of separate contractual requirements are not stated with particularity or briefed adequately. Accordingly, any allegations regarding false claims submitted to the government contractors will only be considered to the extent they violate MassHealth regulations.

    4.   Materiality

Scanlon also argues that the Commonwealth has not sufficiently alleged that the violations were material to the payment decisions made by MassHealth, MBHP, or the MCOs. A false statement is "material" if it has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." Mass. Gen. Laws ch. 12, § 5A; see United States ex rel. Loughren v. Unum Grp., 613 F.3d 300, 307 (1st Cir. 2010) (construing similar provision in the FCA). In

Universal Health Servs., Inc. v. United States ex rel. Escobar,

136 S. Ct. 1989 (2016), the Supreme Court held:

> [P]roof of materiality can include, but is not
> necessarily limited to, evidence that the defendant
> knows that the Government consistently refuses to pay
> claims in the mine run of cases based on noncompliance
> with the particular statutory, regulatory, or
> contractual requirement. Conversely, if the Government
> pays a particular claim in full despite its actual
> knowledge that certain requirements were violated,
> that is very strong evidence that those requirements
> are not material. Or, if the Government regularly pays
> a particular type of claim in full despite actual
> knowledge that certain requirements were violated, and
> has signaled no change in position, that is strong
> evidence that the requirements are not material.

136 S. Ct. at 2003–04. It also provided factors that did not

necessarily prove materiality:

> A misrepresentation cannot be deemed material merely
> because the Government designates compliance with a
> particular statutory, regulatory, or contractual
> requirement as a condition of payment. Nor is it
> sufficient for a finding of materiality that the
> Government would have the option to decline to pay if
> it knew of the defendant's noncompliance. Materiality,
> in addition, cannot be found where noncompliance is
> minor or insubstantial.

Id. at 2003. Ultimately, "[m]ateriality is more likely to be

found where the information at issue goes to the very essence of

the bargain." United States ex rel. Escobar v. Universal Health

Servs., Inc., 842 F.3d 103, 110 (1st Cir. 2016) (internal

citations and quotation marks omitted).

Here, the Commonwealth alleges that MassHealth ceased

making payments on South Bay's fee-for-service claims when the

Complaint was unsealed. Moreover, as alleged, Scanlon knew or had reason to know that hiring unqualified mental health clinicians who are not properly supervised by qualified mental health professionals as required by MassHealth regulations goes to the heart of the bargain.[7] See Escobar, 842 F.3d at 110. Therefore, the allegations are sufficient to show the allegedly false statements were material to the payment decision.

5.   Causation Pertaining to Government Contractors Paid at Fixed "Capitation" Rates

Scanlon argues that the Commonwealth has failed to allege that South Bay's claims to MBHP and MCOs "caused" the government to make payments because the contractors are paid on a "capitated" basis -- that is, at a fixed rate per patient. He points out that the Commonwealth has not alleged with particularity that South Bay submitted any false claims or certifications to the contractors which increased the capitation rates. See, e.g., United States ex rel. Zemplenyi v. Group Health Coop., Civ. No. 09-603, 2011 WL 814261, at *2 (W.D. Wash. Mar. 3, 2011) (holding that alleged false claims for unnecessary medical procedures, under capitated system, did not violate FCA

---

[7]    As pointed out above, the Commonwealth also alleges that Defendants violated separate MBHP and MCO requirements. The Commonwealth does not allege that violations of these contractual requirements are material within the meaning of the MFCA. However, it is alleged that all providers must comply with MassHealth regulations regardless of whether they submit directly to MassHealth, MBHP, or the various MCOs.

because the government was not spending additional money when surgery was performed). This argument is also addressed in the memorandum on Relator's complaint.

Scanlon's argument fails because the MFCA imposes liability on any person who causes a false claim to be presented to a government contractor. Mass. Gen. Laws ch. 12, § 5B(a)(1). Although the contractors are paid a fixed rate by MassHealth, the claims for mental health care are paid with government money. Under the MFCA, a person who makes false claims to a government contractor is liable if the money is to be spent to "advance a program or interest of the commonwealth." Mass. Gen. Laws. ch. 12, § 5A. Like the FCA, the MFCA does not require the government to prove actual or specific damages. See United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 188 (5th Cir. 2009) (construing the FCA).

      6.   Reverse MFCA

Scanlon also argues that the reverse false claims count under Mass. Gen. Laws ch. 12 § 5B(a)(10) should be dismissed because it has not been alleged that he was a beneficiary of the funds. The Commonwealth argues that because Scanlon owned all outstanding capital stock in South Bay, the Complaint plausibly states he was a third-party "beneficiary" of the overpayments made to South Bay for that time period.

Assuming, without deciding, that Scanlon qualifies as a
"beneficiary" within the scope of § 5B(a)(10), this claim
suffers from most of the same defects as the reverse-FCA claim
against the H.I.G. Defendants, discussed above. The Commonwealth
again has failed to sufficiently explain or develop this claim
as to Scanlon. Accordingly, Count 18 is dismissed.

### B.    Recovery of Overpayment Regulations (Count 20)

The Commonwealth's claims pursuant to 130 Mass. Code Regs.
§ 450.260(A) fail. That regulation permits MassHealth to recover
"the full amount of any moneys" owed by a provider. A provider
is liable for the prompt payment to any MassHealth agency of the
full amount of any overpayments owed under applicable laws or
regulations. 130 Mass. Code Regs. § 450.260(A). A provider is
defined as "an individual, group, facility, agency, institution,
organization, or business that furnishes medical services and
participates in MassHealth under a provider contract with the
MassHealth agency." 130 Mass. Code Regs. § 450.101. There is no
allegation that Scanlon individually furnished "medical
services" -- defined as "medical care or related goods and
services, including behavioral health services and long-term
services and supports (LTSS) provided to members, paid or
payable by the MassHealth agency" -- under a provider contract.
Id. This claim is dismissed as to Scanlon.

### C.    Unjust Enrichment (Count 21)

As above, the unjust enrichment claim may be pled against all defendants as an alternative theory of liability. Fed. R. Civ. P. 8(d). The motion to dismiss is denied.

## III. **Sheehan's Motion to Dismiss**

### A.    Causation and Knowledge under the MFCA (Count 22)

Sheehan argues that the Complaint does not contain sufficient allegations that he caused the submission of false claims pursuant to Mass. Gen. Laws ch. 12, § 5B(a)(1). He argues that when he learned of the problems at South Bay, in June 2014, he took immediate steps to remedy them. Alternatively, in an argument of a different stripe, he contends the failure to take steps to stop the payment after he learned of the falsity from the Tiger Teams is insufficient to "cause" the presentment of false claims to the government under § 5B(a)(1).

As alleged by the Complaint, Sheehan was both the CEO and a Board member of C.I.S., the parent company of South Bay. The Complaint alleges that he knew about the regulatory issues based on the due diligence report, statements of Relator, and the Tiger Team investigation as early as May 2012. The Complaint also alleges that as the CEO of the company that owned South Bay, he knowingly rejected recommendations to have licensed supervision and to end the policy that caused others to submit

false claims for the services of unqualified and unlicensed individuals.

Sheehan, as CEO of C.I.S. and a member of the Boards of C.I.S. and South Bay, had the power, authority, and duty to stop the submission of false claims by the agents and employees of South Bay once he learned about material violations of MassHealth regulations. His alleged rejection of the recommendation left in place the policy which led to the submission of false claims. These allegations are sufficient to state a claim under § 5B(a)(1). The motion to dismiss is denied.

### B.    MFCA Conspiracy (Count 23)

The Commonwealth alleges that Defendant Sheehan "implicitly" conspired with South Bay in violation of Mass. Gen. Laws ch. 12 § 5B(a)(3). Even with reasonable inferences drawn in the Commonwealth's favor, the Complaint does not adequately allege that Sheehan, the CEO of C.I.S., which wholly owned and controlled South Bay, was an independent center of decisionmaking. Therefore, this claim is barred by the intracorporate conspiracy doctrine for the reasons discussed above.

### C.    Reverse False Claims (Count 24)

The Complaint alleges that Sheehan is liable for reverse false claims in violation of Mass. Gen. Laws ch. 12, § 5B(a)(10). It alleges that by April 2012, Sheehan, in his role

as CEO of C.I.S., "received money to which he was not entitled, and which he has retained." The Commonwealth argues that it has sufficiently stated a claim because it alleges Sheehan held a financial interest in South Bay.

As above, the Commonwealth has not adequately developed its reverse-FCA claim against Sheehan. In addition, Sheehan maintained only a 5.4 percent ownership stake in South Bay by way of his stake in C.I.S.H. This small of a stake makes it even less likely that Sheehan would qualify as a "beneficiary" under § 5B(a)(10). This count is dismissed.

### D.   Mass Medicaid FCA (Count 25) and Recovery of Overpayment Regulations (Count 26)

Sheehan's motion to dismiss does not separately challenge these counts apart from the arguments already discussed. Accordingly, Count 25 is not dismissed for the reasons stated in Part III.A. of this opinion. Count 26 is dismissed for the reasons given in Part III.C.

### F.   Unjust Enrichment (Count 27)

Once again, the unjust enrichment claim may be pled against all defendants as an alternative theory of liability. Fed. R. Civ. P. 8(d). The motion to dismiss is denied.

### ORDER

The motions to dismiss (Dkt. Nos. 103, 106, and 109) are **ALLOWED IN PART** and **DENIED IN PART**. The Court dismisses Counts

31

13, 14, and 15 against the H.I.G. Defendants; Counts 18 and 20

against Scanlon; and Counts 23, 24, and 26 against Sheehan. The

other counts remain viable.

　　　　　　　　　　　　　　　　/s/ PATTI B. SARIS　　　　　　　　
　　　　　　　　　　　　　　　　Patti B. Saris
　　　　　　　　　　　　　　　　Chief U.S. District Judge