# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. CHRISTINE MARTINO-FLEMING, Relator,<br><br>and<br><br>COMMONWEALTH OF MASSACHUSETTS ex rel. CHRISTINE MARTINO-FLEMING,<br><br>*Relator*,<br><br>v.<br><br>SOUTH BAY MENTAL HEALTH CENTER, INC.; COMMUNITY INTERVENTION SERVICES, INC.; COMMUNITY INTERVENTION SERVICES HOLDINGS, INC.; H.I.G. GROWTH PARTNERS, LLC; H.I.G. CAPITAL, LLC; PETER J. SCANLON; AND KEVIN P. SHEEHAN,<br><br>*Defendants*. | Civil Action No. 15-CV-13065-PBS |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SOUTH BAY MENTAL HEALTH CENTER, INC., COMMUNITY INTERVENTION SERVICES, INC., COMMUNITY INTERVENTION SERVICES HOLDINGS, INC., H.I.G. GROWTH PARTNERS, INC., AND H.I.G. CAPITAL, INC.**

Mark W. Pearlstein (BBO # 542064)
Laura McLane (BBO # 644573)
Shamis N. Beckley (BBO # 697425)
Mara Theophila (BBO # 704763)
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109
Telephone: 617.535.4000
Email:  mpearlstein@mwe.com
          lmclane@mwe.com
          sbeckley@mwe.com
          mtheophila@mwe.com

*Counsel for South Bay Mental Health Center, Inc., Community Intervention Services, Inc., Community Intervention Services Holdings, Inc., H.I.G. Growth Partners, LLC, H.I.G. Capital, LLC*

May 11, 2020

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     UNDISPUTED FACTUAL AND REGULATORY BACKGROUND ...........................6

        A.      South Bay...................................................................................... 6

        B.      Relator Christine Martino-Fleming.............................................. 6

        C.      The Formation of CIS and Its Purchase of South Bay ............................ 7

                1.      The Pre-Transaction Due Diligence.............................................7

                2.      Seller Representations in the Stock Purchase Agreement ...........8

                3.      H.I.G.'s Role Post-Closing .........................................................8

        D.      Employee Retention at South Bay ...................................................... 9

        E.      Supervision and Staffing Rules in Massachusetts ............................. 10

                1.      The MassHealth Regulations ....................................................10

                2.      MBHP and MCO Guidance ......................................................11

                3.      Department of Public Health Regulations ................................11

        F.      Successful Audits and Surveys of South Bay ..................................... 11

        G.      Payors Repeatedly Attempt to Clarify Their Requirements .................. 12

        H.      South Bay Provided Supervision and Properly Staffed Its Satellite
                Facilities ................................................................................... 13

ARGUMENT ...................................................................................................... 13

I.      THE SUMMARY JUDGMENT STANDARD................................................13

II.     H.I.G. IS ENTITLED TO SUMMARY JUDGMENT UNDER THE FCA & MFCA .....14

        A.      There Is No Evidence That H.I.G. Caused South Bay to Submit
                False Claims or Create False Records, Requiring Summary
                Judgment on Counts 1-4 ............................................................... 14

                1.      H.I.G. Did Not Cause South Bay to Submit False Claims ........14

                2.      H.I.G. Did Not Cause South Bay to Create False
                        Statements ................................................................................20

B.   Plaintiffs Cannot Demonstrate Scienter Against H.I.G. ....................................... 21

C.   Plaintiffs Cannot Demonstrate H.I.G.'s Knowledge of Materiality
     to Payment ................................................................................................... 22

III.  ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE
      FCA & MFCA BECAUSE PLAINTIFFS CANNOT ESTABLISH FALSITY ...............23

      A.   Plaintiffs Cannot Establish Falsity Based on the MassHealth
           Regulations ................................................................................................... 23

           1.   The Regulatory "Requirements" Advanced by Plaintiffs
                Concerning What Constitutes Supervision Do Not Exist ........................24

                a.   There Is No Regulatory Requirement That Every
                     Supervision Session Must Discuss Particular Clients...................25

                b.   There Is No Regulatory Requirement That Group
                     Supervision Include Particular Client Discussions ......................26

                c.   There Is No Regulatory Requirement That
                     Supervision Be Exclusively "Clinical" .........................................27

                d.   There Is No Regulatory Requirement That
                     Supervision Occur Within Two Weeks of a Service ....................30

                e.   MassHealth Imposes No Supervision
                     Documentation Requirement ........................................................31

                f.   South Bay Reasonably Interpreted Regulatory
                     Guidance and Provided Regular Supervision in
                     Accordance With the Regulations ..................................................32

           2.   South Bay Supervisors Were Properly Credentialed ................................33

           3.   Plaintiffs' Claims Regarding MassHealth's Clinic Staffing
                Requirements Are Inconsistent With the Regulations ..............................35

           4.   South Bay Clinicians Were Properly Credentialed...................................37

      B.   The MassHealth Regulations Are Inapplicable to the MBHP/MCO
           Claims ........................................................................................................... 38

      C.   Relator's False Statements Claims Fail ................................................................ 39

IV.   PLAINTIFFS CANNOT ESTABLISH SCIENTER AS TO ANY DEFENDANT..........39

V.    PLAINTIFFS CANNOT ESTABLISH MATERIALITY AS TO ANY DEFENDANT..41

A.      The Regulations at Issue Were Not Material to Payment ..................................... 41

B.      There is No Evidence That Defendants Knew the Regulations
        Were Material ......................................................................................................... 44

VI.    CIS DID NOT CAUSE SOUTH BAY TO SUBMIT FALSE CLAIMS .........................44

VII.   SUMMARY JUDGMENT SHOULD BE GRANTED TO H.I.G. ON THE
       COMMONWEALTH'S UNJUST ENRICHMENT CLAIM (COUNT 5) ......................45

VIII.  CONCLUSION..............................................................................................................45

Page(s)

**Cases**

*Chesbrough v. VPA, P.C.*,
  655 F.3d 461 (6th Cir. 2011) .............................................................................29, 30

*Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*,
  334 F. Supp. 3d 394 (D. Mass. 2018) ................................................................38, 45

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ..................................................................................22

*Luckey v. Baxter Healthcare Corp.*,
  183 F.3d 730 (7th Cir. 1999) ....................................................................................23

*Luckey v. Baxter Healthcare Corp.*,
  2 F. Supp. 2d 1034 (N.D. Ill. 1998) .........................................................................35

*Murray v. Kindred Nursing Ctrs. W. LLC*,
  789 F.3d 20 (1st Cir. 2015) .......................................................................................13

*Perez v. Volvo Car Corp.*,
  247 F.3d 303 (1st Cir. 2001) ...............................................................................18, 19

*Reed v. Zipcar, Inc.*,
  883 F. Supp. 2d 329 (D. Mass 2012) ........................................................................45

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ..............................................................................................13, 23

*Shaulis v. Nordstrom, Inc.*,
  865 F.3d 1 (1st Cir. 2017) .........................................................................................45

*Stratton v. Nat'l Union Fire Ins. Co.*,
  No. CIV.A.03-CV-12018-RGS, 2004 WL 1950337 (D. Mass. Sept. 3, 2004) .......24

*Theriault v. Genesis HealthCare, LLC*,
  890 F.3d 342 (1st Cir. 2018) .....................................................................................13

*United States ex rel. Bartlett v. Tyrone Hosp., Inc.*,
  234 F.R.D. 113 (W.D. Pa. 2006) ..............................................................................16

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
  297 F. Supp. 2d 272 (D.D.C. 2004) ..........................................................................29

iv

*United States ex rel. Coffman v. City of Leavenworth,*
    303 F. Supp. 3d 1101 (D. Kan. 2018) ................................................................42

*United States ex rel. Englund v. Los Angeles Cty.,*
    No. CIV.S-04-282 LKK/JFM, 2006 WL 3097941 (E.D. Cal. Oct. 31, 2006).........................24

*United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Grp.,*
    298 F. Supp. 2d 91 (D.D.C. 2004) ................................................................41

*United States ex rel. Escobar v. Universal Health Servs., Inc.,*
    No. 11-11170-DPW, 2014 WL 1271757 (D. Mass. Mar. 26, 2014) ......................................44

*United States ex rel. Farmer v. City of Houston,*
    523 F.3d 333 (5th Cir. 2008) ................................................................39

*United States ex rel. Greenfield v. Medco Health Sols, Inc.,*
    880 F.3d 89 (3d Cir. 2018) ................................................................36

*United States ex rel. Janssen v. Lawrence Mem'l Hosp.,*
    949 F.3d 533 (10th Cir. 2020) ................................................................41

*United States ex rel. Kelly v. Serco, Inc.,*
    846 F.3d 325 (9th Cir. 2017) ................................................................41

*United States ex rel. Lamers v. City of Green Bay,*
    168 F.3d 1013 (7th Cir. 1999) ................................................................32

*United States ex rel. Landis v. Tailwind Sports Corp.,*
    324 F. Supp. 3d 67 (D.D.C. 2018) ................................................................14

*United States ex rel. Lockyer v. Haw. Pac. Health Grp. Plan for Emps. of Haw.*
*Pac. Health,*
    343 F. App'x 279 (9th Cir. 2009) ................................................................23, 26, 32

*United States ex rel. Lockyer v. Hawaii Pac. Health,*
    490 F. Supp. 2d 1062 (D. Haw. 2007) ................................................................26

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.,*
    No. 15-13065-PBS, 2018 WL 4539684 (D. Mass. Sept. 21, 2018) ............................... *passim*

*United States ex rel. McGinnis v. OSF Healthcare Sys.,*
    No. 11–cv–1392, 2014 WL 2960344 (C.D. Ill. July 1, 2014) ................................................................33

*United States ex rel. Patton v. Shaw Servs., L.L.C.,*
    418 F. App'x 366 (5th Cir. 2011) ................................................................29

*United States ex rel. Petratos v. Genentech Inc.,*
    855 F.3d 481 (3d Cir. 2017) ................................................................16

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
    857 F.3d 1148 (11th Cir. 2017) .................................................................................40

*United States ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ..................................................................23, 39, 41

*United States ex rel. Reidel v. Boston Heart Diagnostics Corp.*,
    332 F. Supp. 3d 48 (D.D.C. 2018) ......................................................................14, 23

*United States ex rel. Ruscher v. Omnicare, Inc.*,
    663 F. App'x 368 (5th Cir. 2016) ...........................................................................20

*United States ex rel. Swafford v. Borgess Med. Ctr.*,
    98 F. Supp. 2d 822 (W.D. Mich. 2000) ..................................................................38

*United States ex rel. Williams v. Renal Care Grp., Inc.*,
    696 F.3d 518 (6th Cir. 2012) .................................................................................40

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) .................................................................................23

*United States ex rel. Winkelman et al. v. CVS Caremark Corp.*,
    827 F.3d 201 (1st Cir. 2016) .................................................................................42

*United States v. Care Alts.*,
    952 F.3d 89 (3d Cir. 2020) ....................................................................................23

*United States v. Medica-Rents Co.*,
    285 F. Supp. 2d 742 (N.D. Tex. 2003) ..................................................................40

*United States v. President and Fellows of Harvard Coll.*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ........................................................15, 16, 17

*United States v. Salus Rehab., LLC*,
    304 F. Supp. 3d 1258 (M.D. Fla. 2018) .................................................................22

*United States v. Sanford-Brown Ltd.*,
    840 F.3d 445 (7th Cir. 2016) .................................................................................41

*United States v. Universal Health Servs., Inc.*,
    No. 1:07CV00054, 2010 WL 4323082 (W.D. Va. Oct. 31, 2010) ..........................16

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ................................................................................. *passim*

*Watkins v. Omni Life Sci., Inc.*,
    692 F. Supp. 2d 170 (D. Mass. 2010) ...................................................................45

## Statutes, Regulations, & Rules

False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ...................................................................1

31 U.S.C. § 3729(a)(1) ......................................................................................................14

31 U.S.C. § 3729(b)(1)(A)(iii) ..........................................................................................21

Massachusetts False Claims Act, Mass. Gen. Laws. Ch. 12, §§ 5A *et seq.* .........1, 14, 21

105 CMR § 140.310 (2014) ...............................................................................................11

105 CMR § 140.311 (2014) ...............................................................................................11

105 CMR § 140.530 (2014) ....................................................................................11, 26, 32

130 CMR § 429.402 (2015) ...............................................................................................35

130 CMR § 429.408(C)(3) (2015) .....................................................................................27

130 CMR § 429.422(D) (2015) ....................................................................................11, 36

130 CMR § 429.423(B) (2015) ..........................................................................................36

130 CMR § 429.424 (2015) ....................................................................................... *passim*

130 CMR § 429.436 (2015) ...............................................................................................31

130 CMR § 429.438(E) (2015) .........................................................................10, 25, 30, 33

130 CMR § 429.439 (2015) .........................................................................................11, 36

130 CMR § 450.124(A) (2017) ..........................................................................................38

130 CMR § 450.200 (2017) ...............................................................................................39

130 CMR § 450.205(A) (2017) ..........................................................................................32

130 CMR § 450.260(F) (2017) ............................................................................................3

258 CMR §§ 9.01 *et seq.* (2017) .................................................................................31, 34

258 CMR § 12.02 (2017) ...................................................................................................34

262 CMR §§ 2.01, *et seq.* (2015) ..............................................................................30, 31, 37

Fed. R. Civ. P. 56. ..............................................................................................................13

Fed. R. Evid. 701 ...............................................................................................................18

Local Rule 56.1 ...................................................................................................................6

## I.    __INTRODUCTION__

Plaintiffs are not entitled to a trial of their claims.  After extensive discovery, the following is clear:  Plaintiffs attempt to recover billions of dollars for "fraud" based on allegations that South Bay Mental Health Center, Inc. ("South Bay") violated regulatory standards that are ambiguous and on which Plaintiffs have changed their position throughout this litigation.  Their attempt has failed.  There are no genuine disputes of material fact, and summary judgment should be granted.

This is an extraordinary case.  There is no dispute that the mental health services billed to MassHealth and its managed care payors by South Bay were medically necessary and provided to clients.  There is no evidence that any client received poor care.  Against this backdrop, Relator, Christine Martino-Fleming ("Relator"), and the Commonwealth of Massachusetts seek nearly $200 million in treble damages and between $5.6 and $11.2 billion in penalties based on ever-evolving theories of how South Bay supposedly violated MassHealth regulations concerning staffing and supervision.  Because the regulations do not contain the standards on which Plaintiffs base their case and are, at their very best, ambiguous—so much so that MassHealth elected to issue a clarifying bulletin concerning the very regulations at issue as recently as March 2019—Plaintiffs have pivoted to reliance on their experts' opaque references to purported "industry understandings" in the mental health field.  From these "understandings," Plaintiffs graft detailed "requirements" onto the regulations that appear nowhere in their text, many of which first made their debut in Plaintiffs' December 2019 expert reports.  As a matter of law, such "understandings" are not a basis for fraud liability under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), and the Massachusetts False Claims Act, Mass. Gen. Laws. Ch. 12, §§ 5A *et seq.* ("MFCA").

### H.I.G. Is Entitled to Summary Judgment

However, prior to wading into the regulatory jungle, the Court can address the very straightforward question of whether Plaintiffs can continue to pursue claims against H.I.G. Growth

1

Partners, LLC and H.I.G. Capital, LLC (collectively, "H.I.G."). They cannot. Plaintiffs' theory against H.I.G. is that it "caused" South Bay to submit false claims to MassHealth and various managed care payors. H.I.G. is the majority owner of CIS,[1] which purchased South Bay in 2012 and owned five other subsidiaries during the relevant time period. H.I.G. certainly cannot be liable for causing South Bay to submit false claims prior to the 2012 transaction, and it cannot be liable for doing so afterwards. It is undisputed that H.I.G. does not provide health care services, and does not submit claims to MassHealth. There is no evidence that H.I.G. played any role, whether directly or indirectly, in South Bay's claiming process, or that it was involved in decisions about who should staff South Bay's clinics or how supervision of unlicensed clinicians should occur (the Commonwealth expressly allows unlicensed clinicians to provide care under supervision).

Nobody raised concerns about violations of MassHealth regulations, or any other regulations, to H.I.G.; which, in any event, would not be enough to establish causation, an element of proof distinct from scienter under the FCA and MFCA. Plaintiffs' entire case against H.I.G. rests on innuendo; in particular, on what Relator "assumed" H.I.G. knew about alleged violations of MassHealth regulations, despite her admission under oath (debunking her suggestion in the complaint, *see, e.g.*, Amended Consolidated Complaint ("ACC") ¶¶ 211, 249, ECF No. 201) that she never actually reported her supposed concerns about regulatory or billing violations to anyone at H.I.G.

Plaintiffs also cannot prove the separate element of scienter against H.I.G. Plaintiffs' scienter theory appears to mimic their theory on causation. But where it is uncontroverted that H.I.G. received a report before the transaction from an expert validating that South Bay was operating in compliance with payor requirements, received representations and warranties from

---

[1] "CIS" refers to Community Intervention Services, Inc. and Community Intervention Services Holdings, Inc.

the seller that corroborated the expert's conclusion, and nobody reported alleged concerns about violations of MassHealth or any other regulations to H.I.G. at any time, Plaintiffs cannot establish that H.I.G. recklessly disregarded anything.  H.I.G. properly relied on management to ensure compliance with regulatory requirements, and to raise regulatory compliance issues to the CIS Board if they arose.  This never happened (and, as discussed below, there were no such issues).

In addition, Plaintiffs cannot establish that compliance with the regulations was material to payment, or that H.I.G. *knew* that such compliance was material.  *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002–04 (2016).  There is simply no evidence that H.I.G. had knowledge that the regulations in question were material to payment (they were not), and Plaintiffs cannot meet the *Escobar* standard.

### All Defendants Are Entitled To Summary Judgment

Of course, even if Plaintiffs could establish, as they must, causation, scienter and materiality as to H.I.G., their claims fail as against H.I.G. *and every other defendant* because they cannot raise a genuine dispute of fact as to whether the claims South Bay submitted were, in fact, false.  Plaintiffs' flagship claim is that South Bay's supervision failed to meet MassHealth's regulatory requirements.  South Bay provided supervision to its clinicians, and produced voluminous supervision records demonstrating that fact.  Numerous witnesses testified that supervision was provided at South Bay.  Plaintiffs complain that such supervision was not good enough, even though there is no claim (or evidence) that South Bay's clinicians provided sub-par care to clients.  Rather than exercising the avenues available to address perceived regulatory violations under its own administrate framework, *e.g.* 130 CMR § 450.260(F) (2017)

(Recoupment),[2] the Commonwealth pursues fraud claims, thereby seeking recovery of treble damages and draconian penalties. But neither it nor Relator can succeed on those claims.

To try to meet their falsity burden, Plaintiffs retained an unlicensed social worker, Frederic Reamer, who has never treated patients and who has never supervised unlicensed post-masters' clinicians (the therapists at issue here). He reviewed a sample of supervision records, and determined that a portion of them purportedly failed to comply with the MassHealth regulations. However, Reamer repeatedly conceded that the regulations do not, in fact, set forth the standards he applied, such as the "requirement" that every single supervision session must include a discussion of a particular client's case. For example:

> **Q. Is there a single regulation promulgated by any agency of the Commonwealth of Massachusetts that says that clinical supervision records must contain discussion of client cases?**
>
> **A. Not that I'm aware.**

SOF ¶ 106. Yet Reamer nonetheless found claims to be "false" on this basis, or because they fell short of other standards that are found nowhere in the MassHealth regulations (or any other regulations). In the end, Reamer invoked his view of supposed industry "understandings" to conclude that claims were false, while admitting that the regulations include "aberration[s]" and "anomal[ies]." SOF ¶ 105. Plaintiffs' counseling expert, Miriam Williams, similarly testified that the regulations are "awkward," "unclear," "always changing," and "inconsistent." *Id.*

It is undisputed that there was confusion in the provider community with respect to how to interpret the regulatory morass. The record is replete with communications between South Bay and its payors seeking clarification about staffing and supervision requirements, and with communications and bulletins from payors attempting to provide clarity. No payor articulated the

---

[2] The Commonwealth used one such remedy already, when MassHealth suspended payment to South Bay well after this litigation was underway, resulting in a settlement of its claims against South Bay and CIS. The Commonwealth nonetheless still seeks to recover from H.I.G. for allegedly "causing" South Bay to submit false claims.

4

requirements that Plaintiffs' expert Reamer advocates. The only thing that was universally understood—including by payors—was that the rules were far from clear. This is evident even in the Plaintiffs' complaint in this case, which alleges that Licensed Mental Health Counselors ("LMHCs") cannot supervise unlicensed counselors. ACC ¶¶ 57 n.6, 135. After realizing in discovery that this is wrong, Plaintiffs recanted this claim (yet it remains in their complaint). *Id.*

The repeated efforts by South Bay to obtain clarity from payors—both before and after the CIS acquisition—also doom Plaintiffs' attempt to establish scienter as a matter of law as to all defendants. South Bay was transparent about its supervision and staffing practices with payors and other regulators, and knew that those practices were being audited and surveyed repeatedly. South Bay was never told by any auditor or surveyor, at any point during the relevant time period (August 1, 2009–December 31, 2017), that its supervision and staffing practices were falling short.

Plaintiffs also cannot establish materiality to payment as a matter of law. The one time prior to this litigation that a regulator found deficiencies in supervision and staffing practices at South Bay was during a 2007 survey, before the time period at issue in this case, by the Department of Public Health ("DPH"). DPH, like MassHealth, is part of the Executive Office of Health & Human Services ("EOHHS") and controls South Bay's license. While MassHealth relied on DPH's surveys, there is no evidence that MassHealth even considered seeking recoupment of payments made on claims submitted during this period, and DPH took no action with respect to South Bay's license. Instead, DPH repeatedly determined in later surveys that South Bay complied with supervision and staffing rules. So too did the payors of South Bay's claims.

Plaintiffs assert a host of additional regulatory violation theories, taking issue with the qualifications of individuals providing supervision, the qualifications of individuals dispensing client care, and the qualifications of South Bay's satellite clinic directors. All of Plaintiffs'

allegations are either inconsistent with the actual language of the regulations, or, at a minimum, those regulations are subject to multiple, reasonable interpretations. Defendants' entitlement to summary judgment on each of these theories, and each of Plaintiffs' claims, is discussed below.

## II.    UNDISPUTED FACTUAL AND REGULATORY BACKGROUND[3]

### A.    South Bay

South Bay is a mental health center that was founded by Dr. Peter Scanlon in 1986, and provides mental health care to thousands of patients at or originating from 18 facilities in Massachusetts. SOF ¶ 1. The Brockton location is the parent facility, and the other locations are satellites to Brockton, operating under Brockton's direct clinical management. SOF ¶ 5. South Bay offers several different programs, but its Mental Health program is at issue here. SOF ¶ 6.

Most of South Bay's clients are beneficiaries of MassHealth (Massachusetts' Medicaid program). SOF ¶ 7. While some clients' care is reimbursed directly by MassHealth, the largest payor of benefits during the relevant period was the Massachusetts Behavioral Health Partnership ("MBHP"), which provides managed care services to certain MassHealth members. *Id*. Other managed care organizations ("MCOs") also reimbursed many of South Bay's claims. *Id*. MassHealth pays MBHP and the MCOs a per client, capitated rate. SOF ¶¶ 8-9. MassHealth has no role in paying claims submitted to MBHP and the MCOs. SOF ¶ 10.

### B.    Relator Christine Martino-Fleming

Relator was hired at South Bay as a Job Coach in June 2008. SOF ¶ 11. In September 2013, she started working for CIS and her job title changed to Coordinator of Staff Development and Training. *Id.* During her time at South Bay and CIS, Relator did not treat clients or provide supervision to those who did, and does not recall ever sitting in on a supervision session. SOF

---

[3] Defendants have filed a separate Statement of Undisputed Facts ("SOF") pursuant to Local Rule 56.1.

¶ 12.

### C.  The Formation of CIS and Its Purchase of South Bay

H.I.G. Capital, LLC is private equity firm.  SOF ¶ 15.  It provides consulting and advisory services to portfolio companies.  *Id.*  H.I.G. Growth Partners, LLC is a subsidiary of H.I.G. Capital. SOF ¶ 16.  It invests in a fund that invests in portfolio companies.  *Id.*  CIS is a portfolio company of H.I.G. Growth.  SOF ¶ 17.  CIS purchased South Bay in April 2012 from Dr. Scanlon, and owned five subsidiaries during the time period at issue, of which South Bay was one.  SOF ¶¶ 17-18.  CIS was formed shortly before the South Bay acquisition.  SOF ¶ 19.

Prior to the transaction, H.I.G. understood that South Bay was viewed within the market as one of the "preeminent providers" of behavioral health services.  SOF ¶ 20.

#### 1.  The Pre-Transaction Due Diligence

H.I.G. conducted substantial due diligence of South Bay before forming CIS to buy it, including clinical and other due diligence by third parties.  SOF ¶ 21.  H.I.G. was not informed of any supposed noncompliance with MassHealth requirements prior to the transaction, or at any time after closing until learning of the investigation relating to this litigation.  SOF ¶ 22.  To the contrary, a third-party clinical due diligence report informed H.I.G. that South Bay was operating in compliance with payor and other requirements.  SOF ¶¶ 23-24.  The review leading to that report, performed by Dr. Raphael Luccasen, was thorough.  SOF ¶ 25.  Dr. Luccasen observed:

> As a result of my analysis of South Bay Mental Health's clinical programs, services, personnel, systems, processes and survey results, my opinion is that the company provides adequate patient care to the patients that it serves. **No serious survey compliance issues, complaints or patient incidents were identified.**
>
> The principle descriptor of the company, to me, is adequate. **This is meant to convey the understanding that South Bay Mental Health provides services that are acceptable to the community, its payors and the agencies that oversee the operation of the company.**

SOF ¶ 23 (emphasis added); *see also* SOF ¶ 26.

2.    Seller Representations in the Stock Purchase Agreement

The experienced clinician who sold South Bay to CIS and continued working for South Bay, Dr. Scanlon, made multiple warranties that South Bay was in compliance with health care and other laws.  SOF ¶¶ 27-28.  Specifically, the Stock Purchase Agreement ("SPA") provided that South Bay was *not* "in material violation of or being investigated for material violation of any Health Care Laws . . . ."  SOF ¶ 29;[4] *see also* SOF ¶ 30 (again representing that South Bay complied with health care rules and regulations).

It is undisputed that H.I.G. relied on the foregoing representations.  SOF ¶ 31.  Dr. Scanlon agreed to indemnify the Buyer up to $5 million for breaches of the foregoing provisions, which provided additional assurance that the representations about compliance were correct.  SOF ¶ 32.

3.    H.I.G.'s Role Post-Closing

After the transaction, the CIS Board of Directors had five seats, three of which were occupied by H.I.G. employees.  SOF ¶ 33.  The CIS Board typically met quarterly.  *Id*.  The H.I.G. employees on the CIS Board were not involved in the day-to-day operations of South Bay, CIS's subsidiary.  SOF ¶¶ 18, 34.  They did not decide which clinicians were qualified to perform what functions, or how supervision should be dispensed.  *Id*.  The Board's role was to provide strategic assistance to CIS, but not to manage its affairs or those of its subsidiaries.  SOF ¶ 35.

Kevin Sheehan, who had substantial experience in behavioral health, became CEO of CIS, with responsibility for managing the company.  SOF ¶ 36.  Clinical operations and initiatives were routinely on the agenda and discussed at Board meetings.  SOF ¶ 38.  The CIS Board, including H.I.G. employees, relied on management to understand applicable regulations, ensure claiming compliance, and bring potential compliance issues to their attention.  SOF ¶ 39.  This is entirely

---

[4] "Health Care Laws" expressly included Medicaid programs, such as MassHealth.  SOF ¶ 29 n.1.

appropriate, and consistent with both the usual practices and the obligations of members of any board of directors.  SOF ¶ 40.  Nobody raised concerns about compliance with MassHealth regulations to H.I.G. Board members during any Board meeting or at any other time.  SOF ¶ 41.

H.I.G. also had a management services agreement ("MSA") with CIS, as is typical in transactions such as this, pursuant to which H.I.G. employees would assist the CIS management team with data analysis and strategic advice "as needed from time to time."  SOF ¶ 42.  The MSA did not contemplate that H.I.G. would provide advice about staffing or supervision at South Bay's clinics, or provide a role for H.I.G. in the daily operations of any CIS subsidiary, much less in the process for a subsidiary's submission of claims to payors.  SOF ¶ 43.  And H.I.G. did none of these things.  SOF ¶ 44.  South Bay (which was two steps removed from H.I.G. in the corporate hierarchy) had its own management, claiming and compliance functions.  SOF ¶ 45.

### D.    Employee Retention at South Bay

Employee retention in behavioral health is a common problem across all providers, and South Bay was no different.  SOF ¶ 47.  Consistent with its advisory role, H.I.G. employees helped CIS examine causes of turnover at South Bay.  SOF ¶ 48.  That work did not arise due to concerns about, and had nothing to do with, compliance with MassHealth regulations.  SOF ¶ 49.  At no time during the course of analyzing the retention issue were purported concerns about regulatory noncompliance raised to H.I.G.  *Id.*  While a desire for more of a certain type of supervision on the part of some clinicians was among the many issues identified as potentially contributing to retention issues, this was uncoupled from compliance with the regulatory requirements of MassHealth or any other regulator.  SOF ¶ 50.  Nobody ever informed H.I.G. that the desire for more supervision was linked to regulatory compliance, because it wasn't: instead, clinicians who were electing to pursue a license wanted more "licensure supervision" in order to meet the supervision hours of their relevant licensure boards.  SOF ¶ 51.  "Licensure supervision" was a

term developed by South Bay to describe the hours needed if a clinician chose to seek a license (again, a license is not required), and was a benefit offered to employees. SOF ¶ 52. Plaintiffs contend that "licensure supervision" is not the supervision required by MassHealth. SOF ¶ 109.

In connection with helping CIS analyze the retention issue, Relator had a telephone conversation with Nick Scola, an H.I.G. employee and CIS Board member, in 2013. SOF ¶ 53. Relator concedes she did not report concerns to Scola about regulatory violations during this conversation, and that she had no other conversations or communications with H.I.G. employees in which she reported such purported concerns. SOF ¶¶ 53-55. There is no contrary evidence. There is also no evidence that any other person reported concerns to H.I.G. employees about violations of MassHealth regulations (or any other regulations) concerning supervision or staffing at any relevant time. SOF ¶ 57. This lack of evidence is notable since Relator testified that she retained counsel and began building this case approximately a year before she left CIS. *Id.*

Ultimately, CIS decided, among other things, to pay clinicians more in order to help improve retention. SOF ¶ 62. There is no evidence or allegation that South Bay started to provide less supervision after the CIS acquisition.

### E. Supervision and Staffing Rules in Massachusetts

#### 1. The MassHealth Regulations

The regulations on which Plaintiffs rest their claims are those promulgated by MassHealth concerning staffing and supervision. ACC ¶¶ 40-42. Those regulations (the text of which can be found at SOF ¶¶ 65-66) require supervision of unlicensed clinicians, but provide little specificity about what that means. 130 CMR § 429.424(C) (2015) (social workers), § 429.424(F) (formerly, E) (counselors), § 429.438(E) (stating, *inter alia*, that supervision must be "appropriate to the person's skills and level of professional development"), § 429.422(D) (dependent satellite program staffing), § 429.439(C) (same). None contains the standards advanced by Plaintiffs' experts.

10

### 2.    MBHP and MCO Guidance

MBHP and the MCOs publish their own guidance, including requirements concerning supervision. Their requirements, which are not a basis for Plaintiffs' claims, do not contain the same terms as MassHealth's regulations, but are similar both in their lack of specificity and their lack of the standards Plaintiffs advocate. SOF ¶ 67.

### 3.    Department of Public Health Regulations

DPH, which is part of the same agency—EOHHS—as MassHealth, issues its own regulations concerning supervision and staffing. 105 CMR §§ 140.530, 140.310, 140.311 (2014). Plaintiffs say these are "similar" to MassHealth's regulations, ACC ¶ 69, though they are not a basis for their claims. As DPH's corporate designee confirmed, DPH regulations provide no specificity on how supervision must occur, or what subjects it should cover. SOF ¶ 68.

## F.    Successful Audits and Surveys of South Bay

MassHealth's corporate designee testified that MassHealth did not conduct audits or surveys of South Bay, and apparently relied on DPH to do so. SOF ¶ 81. In 2013 and again in 2014, DPH approved relocation of certain South Bay facilities after finding "compliance with applicable clinic licensure requirements." SOF ¶ 86. Other DPH surveys were also conducted, with successful findings concerning supervision. SOF ¶¶ 80, 84-85, 87. In January 2016, DPH conducted a "thorough" survey of South Bay in response to a complaint concerning supervision, and, again, determined that South Bay was compliant with DPH's supervision regulations:

> Q. Do you remember anything else about the details of this -- particular survey?
> A. I recall that Donna said that she was impressed with the documentation and level of policy indications of supervision.

SOF ¶ 88.

MBHP and the MCOs—the largest payors of the claims at issue—also regularly conducted audits and reviews of mental health providers, including South Bay. SOF ¶ 91. For example,

11

MBHP reviewed South Bay's supervision practices and records at network management meetings, and never indicated that South Bay was lacking. SOF ¶¶ 92-93, 96. Beacon also reviewed South Bay's supervision and staffing practices, and never identified any problems. SOF ¶¶ 95, 96.

### G.    Payors Repeatedly Attempt to Clarify Their Requirements

South Bay continuously sought to ensure it complied with regulatory requirements, which differed across payors and agencies. SOF ¶ 97. The record is replete with efforts by South Bay personnel to seek clarification and guidance from payors concerning their expectations, both before and after CIS' acquisition of South Bay. SOF ¶¶ 98-99.

Payors issued numerous communications to providers attempting to clarify the requirements; none of these said that supervision must occur in the manner Plaintiffs and their experts now claim. SOF ¶¶ 101-104. For example, in 2014, at the heart of the time period at issue, MBHP e-mailed all providers with a "clarification" of its "supervision requirements." SOF ¶ 103. That clarification simply said, "DPH regulations and MBHP credentialing criteria require [outpatient] providers to provide supervision by a licensed clinician to unlicensed clinicians." *Id.* Notably, this e-mail referenced DPH regulations, not the MassHealth regulations at issue in this case, and contained no mention of Plaintiffs' newfound standards. *Id.*

MassHealth saw the need to issue a clarifying bulletin to providers regarding *its* regulations (the regulations at issue here) as recently as 2019. SOF ¶ 104. But according to Plaintiffs' expert, even that document did not go far enough to clarify MassHealth's requirements. SOF ¶ 118.

Despite these repeated attempts at clarification, and repeated inquiries to payors by South Bay and other providers, at no time did any payor take any action with respect to payment of South Bay's claims (until, of course, the suspension that occurred in connection with this lawsuit). Instead, South Bay was told repeatedly it was compliant. SOF ¶¶ 80, 84-88, 91-93, 95-96.

**H.**      <u>**South Bay Provided Supervision and Properly Staffed Its Satellite Facilities**</u>

South Bay produced over 100,000 records of supervision totaling over 175,000 pages in this case, spanning the course of the relevant time period.  SOF ¶ 74.  It is undisputed that South Bay provided supervision to clinicians in multiple ways, including individual supervision, group supervision, and licensure supervision for those seeking to become licensed.  SOF ¶¶ 70-72, 74.  Numerous witnesses testified about South Bay's efforts to provide supervision and follow the rules.  SOF ¶¶ 70-72.  South Bay's supervision records detail, among other information, the clinician receiving supervision, the clinician providing it, and the date of the supervision.  SOF ¶ 74.  While these records are voluminous, the Court need not review them to grant summary judgment, where the deficiencies Plaintiffs allege are absent from the regulations.

<u>**ARGUMENT**</u>

**I.**      <u>**THE SUMMARY JUDGMENT STANDARD**</u>

"Summary judgment is appropriate when the evidence of record 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Theriault v. Genesis HealthCare, LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the nonmovant cannot produce evidence to demonstrate a triable issue of fact, summary judgment is appropriate.  *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015); Fed. R. Civ. P. 56.  Importantly, a dispute about the meaning of a regulation is not a dispute of fact warranting consideration by the jury; that is an issue for the Court to decide.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–70 (2007).

## II.    H.I.G. IS ENTITLED TO SUMMARY JUDGMENT UNDER THE FCA & MFCA

### A.    There Is No Evidence That H.I.G. Caused South Bay to Submit False Claims or Create False Records, Requiring Summary Judgment on Counts 1-4

Counts 1 and 3 allege that H.I.G. caused South Bay, a subsidiary of CIS, to submit false claims in violation of 31 U.S.C. § 3729(a)(1)(A) and Mass. Gen. Laws ch. 12 § 5B(a)(1).[5]  "The elements of a false presentment claim are thus that (1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false or fraudulent, and (3) the defendant acted knowingly."  *United States ex rel. Landis v. Tailwind Sports Corp.*, 324 F. Supp. 3d 67, 72 (D.D.C. 2018).  Plaintiffs must also prove that the alleged falsity was material to the government's payment decision.  *Escobar*, 136 S. Ct. at 2002.  Counts 2 and 4, brought by Relator only, allege that H.I.G. caused South Bay to make or use a false statement material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B) and Mass. Gen. Laws c. 12 § 5B(a)(2).  This claim requires proof of a false statement or record *in addition to* the false claim.  *United States ex rel. Reidel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 81 (D.D.C. 2018).

#### 1.    H.I.G. Did Not Cause South Bay to Submit False Claims

Plaintiffs' theory is that South Bay was committing regulatory fraud on MassHealth and other payors before the April 2012 transaction, and H.I.G. (and CIS) then knowingly jumped on board the fraud train and let it chug along unabated after the deal closed.  This, they say, is so even though the clinical due diligence report that H.I.G. received prior to the acquisition explicitly informed H.I.G. that South Bay was performing in compliance with agency and payor requirements.  SOF ¶ 23.  Plaintiffs have relied on this report in support of their claims, but while Dr. Luccasen found practices that could be improved, he concluded that South Bay complied with

---

[5] The MFCA is construed consistently with its federal counterpart.  Memorandum and Order, ECF No. 165, at 11 (Sept. 21, 2018) (citing *Scannell v. Att'y Gen.,* 70 Mass. App. Ct. 46, 49 n.4 (2007)).

payor requirements, which is what matters for purposes of liability under the FCA and MFCA, *statutes which solely concern themselves with fraud on government payors*.  Furthermore, the SPA associated with the sale repeatedly represented that South Bay was compliant with payor rules and regulations.  SOF ¶¶ 29-30.  No concerns about regulatory or payor noncompliance were raised during the due diligence process.

The same is true after the deal closed.  There is no evidence that anyone from H.I.G. ever knew that South Bay was out of compliance with payor requirements (with good reason: as detailed below, it was not).  As the Commonwealth admitted in an earlier filing, "the H.I.G. Defendants were not involved in the decision-making of South Bay, particularly with respect to the violations at issue."  ECF No. 117 at 12.  The evidence is consistent with this admission.  Plaintiffs' theory in discovery thus became that H.I.G. should have (1) learned the details of every single regulation applicable to South Bay and engaged in a regulation-by-regulation compliance review, and (2) read Relator's mind about the supposed concerns she now claims she harbored but which she never disclosed to any H.I.G. employee.  In other words, despite no mention to H.I.G.—ever—of concerns about compliance with MassHealth (or any other) regulations, H.I.G. should have surmised that violations were occurring.  This does not meet the causation standard, and it improperly collapses the separate elements of causation and scienter (as to which Plaintiffs also cannot satisfy their burden*, see* § II(B), *infra*.).

As this Court has already held, "[a] parent may be liable for the submission of false claims by a subsidiary where the parent had direct involvement in the claims process."  *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, No. 15-13065-PBS, 2018 WL 4539684, at *5 (D. Mass. Sept. 21, 2018); *see also United States v. President and Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 186–88 (D. Mass. 2004) ("To 'cause' the presentation of false claims under

15

the FCA, some degree of participation in the claims process is required" and granting summary judgment to a defendant who "did not take any actions to have claims submitted to the government"); *United States v. Universal Health Servs., Inc.*, No. 1:07CV00054, 2010 WL 4323082, at *2 (W.D. Va. Oct. 31, 2010) (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 59–60 (D.D.C. 2007) (holding that "some degree of participation by the parent in the claims process" is required).

> This Court denied H.I.G.'s motion to dismiss for the following reason:

> Because it is alleged that H.I.G. members and principals formed a majority of the C.I.S. and South Bay Boards, and were directly involved in the operations of South Bay, the motion to dismiss the H.I.G. entities is also denied. A parent may be liable for the submission of false claims by a subsidiary where the parent had direct involvement in the claims process.

*Martino-Fleming*, 2018 WL 4539684, at *5. But there is no evidence that H.I.G., whether by virtue of occupying Board seats or otherwise, had any involvement whatsoever in South Bay's claims process at any point in time. H.I.G. could not possibly have had any involvement prior to the April 2012 acquisition of South Bay by CIS, and thus could not have caused false claims to be submitted prior to that time. And there is no evidence that H.I.G. had any role, no matter how attenuated, in South Bay's claims process after the acquisition. SOF ¶¶ 44-45.

Causation is an element that is distinct from scienter under the FCA and MFCA. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017) ("A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality."). For this reason, mere knowledge of or reckless disregard for regulatory violations does not satisfy the causation standard. *United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 125 (W.D. Pa. 2006); *Harvard College*, 323 F. Supp. 2d at 186 ("Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish 'causation' under

16

the FCA."). Regardless of what somebody allegedly may or should have known, for FCA liability

to attach, the law requires more to establish causation. In *Harvard College*, the Court underscored

this point, observing that defendant Shleifer "did not take any actions to have claims submitted to

the government" and that:

> [E]ven if Shleifer knew or should have known about the claims process, and even
> if he knew that false claims were going to be submitted, his failure to take steps to
> ensure that Harvard discontinued the submission of the claims does not constitute
> 'causation' under the [FCA].

323 F. Supp. 2d at 188–89.

In any event, there is no evidence that H.I.G. had any knowledge of the alleged regulatory

violations, much less that it knew that false claims were being submitted and allowed this to

continue; as such, under any standard, the claims against H.I.G. fail. It is important to distinguish

what Plaintiffs alleged in their complaint from the evidence. In the ACC, Plaintiffs alleged that

Relator reported concerns about noncompliance with billing regulations to a member of the CIS

Board, Nick Scola. ACC ¶¶ 211, 249. This Court relied on that allegation in denying Relator's

motion to dismiss. *Martino-Fleming*, 2018 WL 4539684, at *2 ("Relator told [Scola] that South

Bay's clinician's lacked the licensure and educational background required by MassHealth

regulations . . . ."), *4 ("Here, the Relator alleges that she and the Tiger Teams expressly informed

. . . Boards of C.I.S. and South Bay that the supervision of clinical workers violated state

regulations . . . ."). At her deposition, however, Relator conceded that she did no such thing:

> Q. And that was a telephone conversation that you had with Mr. Scola, it sounds
> like, about employee retention?
> A. Correct.
> **Q. During the course of that conversation, did you say to Mr. Scola that you
> were concerned that regulations were being violated?**
> A. **I assumed he knew that**, because when I say people are leaving because they're
> unlicensed and they're not supervised by [licensed] people, this was just sort of
> something I blurted out because I finally had somebody else on the phone,
> somebody else I could talk to and tell them about this, who was somebody that I

17

had talked about it with previously. And as a member of the board, I would think that should raise some pretty hefty alarm bells.

SOF ¶ 54.  Further:

> Q. What exactly did you say to Mr. Scola during this conversation? What were your words?
> A. We reviewed the retention data. I let him know -- I walked him through the information that I kept, which included their productivity each week. It included their degree program, whether they were qualified, all of that. And I said I understand that you want this conversation because you're concerned about retaining staff. You want to decrease the turnover. I can tell you that because of that, is the fact that there are unlicensed people working here and they're not getting what they need to be able to perform their job. They need licensed supervision. So it was some -- I don't remember the exact words, but.
> **Q. Okay. Did you tell him that you were concerned that MassHealth or other payor regulations were being violated?**
> **A. I didn't use those words because that was an underlying assumption that he knew since he was investing in a mental health care company.**
> **Q. So you assumed that he would take, from what you just described, that there was some regulatory noncompliance going on?**
> **A. Yes**, because I think people even outside of mental health know that if you go to see a provider for treatment, that they should be licensed.

*Id.*  Of course, as to her last answer, it is undisputed that there is no requirement that therapists be licensed.  *See e.g.*, 130 CMR § 429.424(F).

Consistent with Relator's testimony, Scola testified that he never heard a report about compliance problems at South Bay.  SOF ¶ 53.  Relator's assertion about what she "assumed" based on a single telephone conversation with Scola is insufficient to create a genuine dispute of material fact about what H.I.G. supposedly knew (which, again, fails to meet the standard of causation, in any event).  Indeed, the entire basis for her assumption was simply that Scola "was investing in a mental health care company."  Fed. R. Evid. 701; *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) ("[T]he requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise.").  While Relator made an unfounded assumption about what was in Scola's mind, she never approached anyone else at H.I.G. about her concerns:

18

Q. Okay. Any other conversations with any individuals from H.I.G. where you recall raising concerns about supervision, either in connection with retention or otherwise?

A. Specific conversations with H.I.G. members about this would have just been with Nick Scola that I remember.

Q. Okay. That one conversation was it?

A. It was like an ongoing conversation. Like we talked a couple times during this process, but I am referring to that one.

**Q. Yeah, but was there more than one instance in which you said that you believe supervision issues were a cause of the retention problems at South Bay?**

**A. No**, I thought once was enough.

SOF ¶ 55.  And in case it was not already clear:

Q. Okay. **Other than the conversation that you described with Nick Scola, are there any other conversations we've not discussed where you relayed that concern to somebody at H.I.G.**

**A. No, I believe that's the extent of it.**

*Id.*

Furthermore, there is not a single document that contains a report from Relator (or anyone else) to any H.I.G. personnel about supposed regulatory noncompliance, much less compliance with the MassHealth regulations at issue in this case.  Such a document does not exist.  Plaintiffs' complaint contended that H.I.G. employees on the CIS Board were aware of reports from the Tiger Teams, employee groups that examined employee retention and, according to Plaintiffs, supposedly found that South Bay was not compliant with MassHealth requirements.  ACC ¶ 249.[6]  The Court, again, relied on this allegation in denying the motion to dismiss.  *Martino-Fleming*, 2018 WL 4539684, at *3-4.  But discovery confirmed that none of the conclusions generated by the Tiger Teams—whether shared with H.I.G. or otherwise—addressed the issue of purported noncompliance with payor or any other regulations; Relator herself concedes that this was not part of the Tiger Teams' work.  SOF ¶ 60.  There is no question that clinicians who exercised their

---

[6] Relator also contended in the ACC (¶ 224) that the Board "rejected" the Tiger Teams' recommendations, and the Court relied upon that allegation.  *Martino-Fleming*, 2018 WL 4539684, at *4.  But her testimony revealed she does not know if this topic was discussed at Board meetings, or what happened after she left the company.  SOF ¶ 63.

option to pursue licensure wanted more "licensure supervision" to achieve that end.  But this had nothing to do with whether South Bay was complying with MassHealth's regulations governing payment of claims, a fact which Plaintiffs' experts effectively concede.  SOF ¶ 50.  Thus, while merely informing H.I.G. of concerns about regulatory violations would not be sufficient to establish the element of causation under the FCA, nobody did so, in any event.

Plaintiffs may suggest that H.I.G. was involved in South Bay's operations by virtue of the MSA with its parent, CIS.  As an initial matter, merely having some relationship with a subsidiary is insufficient to establish causation; otherwise, plaintiffs could always establish that a parent caused a subsidiary (or here, the portfolio company's subsidiary) to submit false claims.  More importantly, the MSA did not give H.I.G. a role in the day-to-day operations of CIS' subsidiary, South Bay, or any role relating to claiming.  SOF ¶ 43.  H.I.G. provided strategic guidance and analytical support on an as-needed basis with respect to discrete issues like retention, but, critically, there is no link between the MSA and the claiming process, or to decisions about how supervision should be provided or who should staff South Bay's clinics.  SOF ¶¶ 42-43.  South Bay had its own compliance personnel, and its own claiming department, in which H.I.G. had no role or involvement.  SOF ¶ 45.  There is no evidence that raises a genuine dispute as to whether H.I.G. caused South Bay to submit false claims, requiring summary judgment on Counts 1 and 3.  *See United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 375–76 (5th Cir. 2016).

### 2.    H.I.G. Did Not Cause South Bay to Create False Statements

With respect to Relator's "false statements" claims, she alleges Defendants made false attestations about clinician qualifications in credentialing materials submitted to MassHealth, MBHP and MCOs.  ACC ¶ 265.  As discussed below (*see* § III, *infra*), there is no evidence that *anyone* made false attestations to payors in credentialing materials.  And there is certainly no

evidence linking H.I.G. to the credentialing process or to the alleged attestations; Relator made no

effort to develop this theory.  Summary judgment should be granted on Counts 2 and 4.

      **B.**    **Plaintiffs Cannot Demonstrate Scienter Against H.I.G.**

The minimum mental state to establish "knowledge" under the FCA and MFCA is

"reckless disregard of the truth or falsity" of information.  31 U.S.C. § 3729(b)(1)(A)(iii); Mass.

Gen. Laws ch. 12, § 5A.  Here, for many of the reasons previously discussed, Plaintiffs cannot

establish reckless disregard (much less knowledge) against H.I.G. as a matter of law:

- H.I.G. was informed as a result of an expert's review in due diligence that South Bay was complying with payor requirements;

- The seller of South Bay represented to H.I.G. in the SPA that South Bay was compliant with payor requirements;

- It is undisputed that Relator did not inform anyone at H.I.G. about concerns about regulatory or payor violations after the acquisition;

- It is undisputed that no other person informed H.I.G. about concerns about regulatory or payor violations after the acquisition; and

- It is undisputed that no document transmitted to H.I.G. made any mention of payor or regulatory violations.

*See* pp. 7-9, *supra*; SOF ¶¶ 22-23, 29-30, 53-55, 57.

Moreover, the H.I.G. Board members sitting on the CIS Board met routinely, and properly

relied on management to bring compliance issues to their attention.  SOF ¶¶ 38-40.  Notably, South

Bay was repeatedly informed by regulators through audits and surveys that it complied with the

relevant supervision and staffing rules.  SOF ¶¶ 80, 84-88, 91-93, 95-96; *see* § IV, *infra*.  Plaintiffs'

narrative that H.I.G. could somehow have recklessly disregarded supposed noncompliance in such

circumstances defies logic.  To the extent Plaintiffs nonetheless contend that the H.I.G. Board

members did not "do enough" to learn the regulations, it was not the role of H.I.G. to learn all of

the thousands of regulations applicable to a subsidiary of a portfolio company, and to then assess

compliance. SOF ¶ 40; *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996). Under Plaintiffs' extraordinary reasoning, to avoid FCA liability, H.I.G. employees on the CIS Board would have to learn the many thousands of regulations applicable to all of CIS' subsidiaries in multiple states, and make assessments of compliance with each of them. The notion that not doing so somehow means that H.I.G. committed fraud would routinely render parents liable under the FCA and MFCA for the acts of their subsidiaries, contrary to law, and create a dangerous and impossible precedent for board members of companies across the United States.

## C.    Plaintiffs Cannot Demonstrate H.I.G.'s Knowledge of Materiality to Payment

A plaintiff must prove not only that compliance with a regulation was material to a payor's payment decision, but also that the defendant *knew* it was material to payment. *Escobar*, 136 S. Ct. at 2001–03; *United States v. Salus Rehab., LLC*, 304 F. Supp. 3d 1258, 1262 (M.D. Fla. 2018) (proof of "both" materiality and knowledge of materiality required).

The record is devoid of evidence that H.I.G. had any knowledge that alleged noncompliance with the MassHealth regulations at issue was material to the payment decisions of the payors of South Bay's claims. Indeed, as discussed below, the regulations were not material (*see* § V, *infra*), but even if that were not the case, Plaintiffs can point to nothing that proves or even suggests H.I.G. employees somehow knew they were material. Again, it was not H.I.G.'s role to become an expert or gatekeeper with respect to all state regulations applicable to a subsidiary of a portfolio company, much less to make judgments about whether a particular regulation would have impacted the payment decisions of the payors of claims submitted by that subsidiary. This is an independent basis for summary judgment.

III.    **ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE
        FCA & MFCA BECAUSE PLAINTIFFS CANNOT ESTABLISH FALSITY**

Proving false claims is an essential element of each of Plaintiffs' FCA and MFCA claims.

*See United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) (false

presentment claims); *Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d at 81 (false records claims).

In a case based on regulatory violations, Plaintiffs must demonstrate that the regulations were

violated.  *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999).  Plaintiffs

fall far short of their burden here.

A.    **Plaintiffs Cannot Establish Falsity Based on the MassHealth Regulations**

Plaintiffs seek to establish that, despite the voluminous supervision records and other

evidence of supervision provided to its clinicians, South Bay interpreted the regulations in a

manner that operated as a fraud on MassHealth, such that Defendants should be liable for treble

damages and penalties under the FCA and MFCA.  But Plaintiffs cannot base a fraud claim on

nothing more than their own interpretation of imprecise regulations.  *United States ex rel. Lockyer

v. Haw. Pac. Health Grp. Plan for Emps. of Haw. Pac. Health*, 343 F. App'x 279, 281 (9th Cir.

2009) ("A defendant's good faith interpretation of a regulation does not give rise to liability");

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008).

Unlike cases where the falsity question concerns a dispute about clinical judgment, the question

here is not whether a disputed medical decision can be objectively false.  In this case, the falsity

question asks what the regulations actually require.  *Cf. United States v. Care Alts.*, 952 F.3d 89,

97 (3d Cir. 2020).  Plaintiffs cannot demonstrate falsity because the supposed standards they claim

were violated either do not exist in the regulations or are, at best, ambiguous.

This dispute—a dispute about the meaning of a law or regulation—is not a dispute of fact

warranting consideration by the jury; it is an issue for the Court to decide.  *See Safeco*, 551 U.S.

at 68–70; *see also Stratton v. Nat'l Union Fire Ins. Co.*, No. CIV.A.03-CV-12018-RGS, 2004 WL 1950337, at *4 (D. Mass. Sept. 3, 2004); *United States ex rel. Englund v. Los Angeles Cty.*, No. CIV.S-04-282 LKK/JFM, 2006 WL 3097941, at *10 (E.D. Cal. Oct. 31, 2006) ("Plaintiff and defendant have divergent views as to the meaning and significance of the word 'purpose.' This question of interpretation is purely a legal dispute. . . . [I]mprecise statements or differences in interpretation growing out of a disputed legal question are not false under the FCA." (citing *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477–78 (9th Cir. 1996)).

Here, the Court should find that Plaintiffs cannot make the required falsity showing because the regulations provide no specificity and certainly do not contain the "requirements" against which Plaintiffs' expert made falsity determinations. While Plaintiffs' evolving theories of liability are difficult to pin down, their allegations fall into four broad categories, and concern: (1) the adequacy of the supervision; (2) the qualifications of supervisors; (3) clinic staffing; and (4) the education and credentialing of clinicians. We address each theory in turn.

1.    The Regulatory "Requirements" Advanced by Plaintiffs Concerning What Constitutes Supervision Do Not Exist

It is undisputed that South Bay provided supervision to unlicensed clinicians, and has produced tens of thousands of documents showing just that. SOF ¶ 74. Numerous witnesses testified that South Bay provided regular supervision, and in doing so, South Bay sought to comply with all applicable regulations and payor guidance. SOF ¶¶ 70-72; *see also* §§ IV, V, *infra*. Plaintiffs nonetheless allege that South Bay committed fraud by failing to live up to MassHealth's supervision regulations, but their complaint lacks any detail on *how* supervision should be furnished aside from alleging that supervision should be "direct and continuous" as set forth in 130 CMR § 429.424. *See, e.g.*, ACC ¶ 122. Plaintiffs now claim, based on their experts' recent opinions, that supervision must clear a number of precise hurdles, to wit:

24

a) Every supervision session must include discussion of a specific client to be compliant, *see, e.g.*, SOF ¶ 106 ("Q. Does the client -- let me make it easy. Does a client's name need to be [on] a document reflecting clinical supervision? A. That's my advice. Q. Does it have to be on the document in order to comply with regulatory requirements? A. I think it does.");

b) Group supervision sessions were only compliant for a participating clinician if that clinician's individual client(s) were discussed, *see, e.g.*, SOF ¶ 107;

c) Supervision had to be exclusively "clinical" in nature, SOF ¶ 108;

d) Supervision sessions meeting all of the foregoing, supposed requirements had to occur within 2 weeks before or 2 weeks after the date of service, *see, e.g.*, SOF ¶ 112; and

e) All of these requirements had to be meticulously documented in a written supervision note, *see, e.g.*, SOF ¶ 115.

*MassHealth's regulations contain no such requirements.* The fact that South Bay's thousands of supervision records do not uniformly conform to Plaintiffs' newly articulated, arbitrary, and post hoc "requirements" cannot sustain a claim for fraud under the FCA or MFCA.

        a.    <u>There Is No Regulatory Requirement That Every Supervision Session Must Discuss Particular Clients</u>

MassHealth's regulations state that supervision of unlicensed therapists must be "direct and continuous." *See, e.g.*, 130 CMR § 429.424(F)(1) (supervision requirements for unlicensed counselors). "Direct and continuous" is not defined. MassHealth also provides that:

> Each staff member must receive supervision appropriate to the person's skills and level of professional development. Supervision must occur within the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor. Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration, as cited in 130 CMR 429.424.

*Id.* at § 429.438(E)(1). MassHealth's corporate designee testified that this constitutes MassHealth's definition of supervision. SOF ¶ 65. That is it. MassHealth does not require that supervision include a discussion of individual client cases, or otherwise impose the myriad supervision and documentation rules now articulated by Plaintiffs.

25

Nor do the requirements issued by MBHP or the MCOs provide support for Plaintiffs' newly articulated requirements. While not a basis for Plaintiffs' claims, MBHP and the MCOs do not impose any of the supposed rules Plaintiffs now claim exist, including the "requirement" that particular client cases must be discussed. SOF ¶ 67. If the rules were as clear as Plaintiffs suggest, one would expect them to appear in *some* payor guidance. But they do not.

DPH, which is not a payor but instead governs the licensure of South Bay, likewise imposes none of the requirements Plaintiffs advocate. The relevant DPH regulation provides that unlicensed clinicians should be "clinically supervised on a regular basis . . . ." 105 CMR § 140.530(E). DPH does not define what "regular basis" means; there is certainly no requirement mandating discussion of particular clients during a supervision session. *See also* SOF ¶ 68.

None of this is in dispute. Plaintiffs' experts concede that there is no regulatory basis for Plaintiffs' contention that supervision must include discussion of clients. SOF ¶ 106 (testifying that he is not aware of a single regulation stating that clinical supervision must include a discussion of client cases). Moreover, while this Court need not engage in a competing analysis of expert opinions to grant summary judgment on falsity, Defendants' clinical expert's opinions underscore the fact that the regulations are, at best, ambiguous, subject to multiple interpretations, and do not contain the standards Plaintiffs' advocate.[7] SOF ¶ 73. Plaintiffs cannot just make it up as they go along.

        b.      <u>There Is No Regulatory Requirement That Group Supervision Include Particular Client Discussions</u>

Plaintiffs take it one step further, arguing that group supervision sessions are only compliant "supervision" if a participating clinician's *own* client is discussed. SOF ¶ 107. So

---

[7] *See, e.g.*, *United States ex rel. Lockyer v. Hawaii Pac. Health*, 490 F. Supp. 2d 1062, 1075 (D. Haw. 2007) (dispute between experts is not fraud), *aff'd in part sub nom. United States ex rel. Lockyer v. Hawaii Pac. Health Grp. Plan for Employees of Hawaii Pac. Health*, 343 F. App'x 279 (9th Cir. 2009).

according to Plaintiffs, group discussion of another clinician's cases during a supervision session with a licensed supervisor would not be recognized as "supervision" by MassHealth. This odd argument fails for the same reasons detailed above. It is not contained in the regulations. Besides, it is undisputed that the MassHealth regulations do not even mention, let alone distinguish between, the contours of individual versus group supervision:

> Q. Is your view about the sufficiency of group supervision in terms of whose clients need to be discussed articulated anywhere in MassHealth's regulations?
> . . .
> **A. I'm sorry. I do not recall seeing that in regulation.**

*Id.* This theory, too, cannot support falsity under the FCA and MFCA.

c.    There Is No Regulatory Requirement That Supervision Be Exclusively "Clinical"

Plaintiffs' newly articulated client-discussion "requirement" apparently flows from their claim that despite the existence of multiple types of supervision, the only supervision that complies with MassHealth regulations is "clinical supervision" (as opposed to supervision with an administrative or licensure focus), and that supervision is not "clinical" unless there is discussion of client cases. SOF ¶¶ 108-110. But MassHealth's regulations do not even use the term "clinical supervision":

> Q. Does [MassHealth] distinguish between administrative, clinical, and licensure supervision?
> A. Not to my knowledge.

SOF ¶ 108. If anything, MassHealth contemplates that supervision is an administrative function, listing supervision as one of the "administrative operations" included in its payments of claims. 130 CMR § 429.408(C)(3).

Plaintiffs' own experts are inconsistent regarding their convoluted supervision hierarchy. Reamer, Plaintiffs' falsity expert, testified that "there are three kinds of supervision that behavioral health professionals typically provide"—clinical supervision, administrative supervision, and

27

licensure supervision.  SOF ¶ 109.  According to Reamer, everyone knows that administrative and licensure supervision do not always require discussion of client cases, but  "clinical supervision"— the type of supervision he says is required by MassHealth—does require discussion of client cases. SOF ¶ 110.  Except, of course, when it doesn't:

> Q. So your view is that the MassHealth regulations applicable to mental health centers that require supervision also require documentation and further require that that documentation actually list out an individual client or patient's name?
> A. Not in every instance, in every discussion, but typically as a pattern in the clinical supervision documentation, yes, absolutely.
> Q. . . . . well, describe how that pattern should look. . . .
> A. **I don't think there is an explicit standard.**

*Id.*

Plaintiffs nevertheless claim that South Bay violated the MassHealth regulations even where they concede that supervision was regularly provided by multiple licensed supervisors simply because South Bay's supervision notes do not contain what Plaintiffs deem to be sufficient "clinical" detail (i.e., a client's name).   For instance, at his deposition, Reamer offered the following bewildering explanation for his finding that a particular clinician's supervision was insufficient (changing his mind for the second time during the course of the deposition):

> Q. Okay. So we've got a note from an -- several notes from an LICSW that say, "Clinical case review"; correct?
> A. Correct.
> Q. And then we've got notes from an LMHC that discuss what you've already testified were clinical issues; correct?
> A. Correct.
> Q. Yet, despite all of those factors, you view this to be a noncompliant record sufficient to support a claim for fraud brought by the Commonwealth and the relator?
> A. . . . . As I said before -- I'm repeating myself -- the vague, cryptic, in my opinion, reference to "clinical case review" doesn't meet the [documentation] standard.
> Q. And as you testified earlier, I believe, you have no reason to doubt that that was a truthful note. In other words, that clinical case review, in fact, occurred. You just don't have any details about it in that document?
> A. Correct.

SOF ¶ 111.  Whatever standard this is, it is not articulated in the MassHealth regulations.

When pressed on the absence of any regulation to support their detailed supervision and documentation requirements, Plaintiffs' experts fell back on widely understood (so they say) "industry standards" to support their claimed, particular requirements.  SOF ¶ 105.  However, the suggestion that everyone just understands that MassHealth requires these nuanced and highly specific "clinical" supervision and documentation requirements is at odds with the evidence.

Williams testified that, as recently as 2018, she was working with MassHealth to clarify what the supervision and recordkeeping standards "should be for MassHealth providers."  SOF ¶ 118.  The culmination of this work was a 2019 MassHealth All-Provider Bulletin designed to "clarify ambiguities."  *Id.*; SOF ¶ 104.  Regrettably, this 2019 attempt at clarification simply referred providers to the regulations.  SOF ¶ 118. ("**Q. So a clarifying bulletin from MassHealth sent in response to a need to clarify regulations tells providers to go read the regulations?  A. Among other -- yes.**").  As a result, this attempt to give MassHealth providers clarity remains "unfinished business" to this day.  *Id.*

Moreover, there is no evidence that any of the relevant payors require compliance with Plaintiffs' claimed "industry standards" or "best practices."  And, in any event, compliance with some hypothetical industry standard is insufficient to establish liability under the FCA.  *See, e.g., Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) ("[R]equesting payment for tests that allegedly did not comply with a particular standard of care does not amount to a 'fraudulent scheme' actionable under the FCA"); *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d 272, 287 (D.D.C. 2004) ("At most, this would demonstrate that defendant failed to conform to an industry standard . . ., which is not actionable under the FCA."), *aff'd*, 393 F.3d 1321 (D.C. Cir. 2005). "The FCA is a fraud prevention statute," *United States ex rel. Patton*

*v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 369 (5th Cir. 2011); it is not intended to enforce industry standards or best practices. *See Chesbrough*, 655 F.3d at 468. Newly articulated "industry standards" untethered to the regulations cannot establish fraud liability under the FCA and MFCA.

d.     There Is No Regulatory Requirement That Supervision Occur Within Two Weeks of a Service

With respect to Plaintiffs' contention that supervision had to occur within two weeks before or after the date of service, nowhere in the MassHealth regulations is supervision tethered to dates of service. This is undisputed. SOF ¶ 112 (Reamer testifying that Plaintiffs' counsel told him to apply the two week window). MassHealth merely says supervision must be "frequent" and that supervision will vary with the clinician's "skills and level of professional development." 130 CMR § 429.438(E)(1).

To the extent Plaintiffs seek to rely on the relevant licensure boards' regulations to import some specific supervision schedule, it is notable that, throughout the course of this case, Plaintiffs have alternatively suggested on the one hand that "licensure supervision" (supervision required for clinicians seeking to obtain a license) is *not sufficient* to satisfy MassHealth's supervision requirements, and on the other hand that the licensing board regulations are *fully incorporated* into the MassHealth regulations. *Compare* ACC ¶ 218 (alleging that "licensure supervision" . . . is insufficient), *with* SOF ¶ 113 ("Q. Is it your position that the MassHealth regulations incorporate by reference all of the requirements of the licensing boards applicable to counselors and social workers? . . . A. I believe so. I believe so." (Reamer deposition)).

First, it is undisputed that licensure regulations for counselors are *not even mentioned* in the MassHealth regulations, as Plaintiffs' experts concede. *Id.*; 262 CMR §§ 2.01, *et seq.* (2015). Consequently, the suggestion they are fully incorporated defies logic and all notions of regulatory interpretation. Second, the licensing board regulations are only applicable to those seeking to

30

become licensed—which is not a requirement; they do not govern mental health centers or individuals not seeking to become licensed and, anyway, they do not impose the level of specificity Plaintiffs contend.  *See* 262 CMR §§ 2.01, *et seq.*; 258 CMR §§ 9.01 *et seq.* (2017); SOF ¶ 114. Nothing in the licensure regulations states that client cases must be discussed, or tethers the frequency of supervision to billable services.  According to Williams, these regulations are "pesky, complicated, hard-to-read."  SOF ¶ 114.  She explained:

> And I do think [the regulations are] hard to read, not just because of the language, but I think it's because of everything we've been doing, which is you go flip back and forth between -- it's the structure of the -- of ways that regulations are written in Massachusetts, that the definitions are separate from the areas of practice that they refer to. That is my primary complaint.

*Id.*

  e. <u>MassHealth Imposes No Supervision Documentation Requirement</u>

   Finally, Plaintiffs' contention that all of the above requirements must be exhaustively detailed in a corresponding supervision note is baseless, where it is undisputed that MassHealth's mental health regulations contain no requirement of supervision documentation of any kind.  SOF ¶ 115 (Reamer conceding these regulations contain no documentation requirement); *see also* SOF ¶ 116.  In fact, the "Recordkeeping Requirements" provision of the mental health center regulations, which Plaintiffs studiously avoid, *contains no mention of supervision records at all*, much less of Plaintiffs' specific requirements.  *See* 130 CMR § 429.436.

   Plaintiffs recently suggested that their documentation standards[8] somehow flow from (1) the DPH regulations (which are not a basis for their claims) and (2) MassHealth's general administrative and billing regulations (which are not identified in Plaintiffs' complaint).  SOF

---

[8] Paradoxically, one of Plaintiffs' experts testified that the high rates of attrition in the industry would be alleviated with fewer administrative burdens, including a reduction in required paperwork.  SOF ¶ 117.  It is ironic that the Commonwealth now seeks billions of dollars because South Bay's records were allegedly not good enough.

¶ 116.  But while DPH requires documentation, it provides no specificity on the form it should take.  105 CMR § 140.530(E).  MassHealth's general administrative and billing regulations—which apply to all health care providers, not just mental health—do not mention supervision documentation at all, and require "adequate documentation to substantiate the provision of services payable under MassHealth . . . including medical records, as are necessary to disclose fully the extent and medical necessity of services provided . . . ."  130 CMR § 450.205(A) (emphasis added).  The plain language of this provision clearly concerns documentation of the service *provided to the client*, which is the billable event; Plaintiffs' recently conjured theory that it imposes their detailed mental health supervision documentation rules in the mental health setting is baseless, where it not only contains no reference to supervision documentation, but offers no guidance on how that documentation should look.

>    f.    South Bay Reasonably Interpreted Regulatory Guidance and Provided Regular Supervision in Accordance With the Regulations

Even if the Court were to find, contrary to a plain reading of the regulations, that Plaintiffs' (current) interpretation was somehow a "preferable" reading of the regulations, that is insufficient to establish falsity where South Bay's interpretation of the regulations was reasonable.  *See Lockyer*, 343 F. App'x at 281 (good faith nature of defendant's regulatory interpretation defeats liability); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) ("[E]rrors based simply on . . . flawed reasoning are not false under the FCA.").

Supervision is designed to assist clinicians in their professional development and to ensure that they have the tools to deliver quality care.  SOF ¶ 69.  Again, there is no evidence in this case that care suffered as a result of the alleged regulatory deficiencies, as Relator concedes.  *Id.* Confronted with the vague and convoluted regulatory scheme, South Bay reasonably interpreted its obligations, and provided regular supervision to its unlicensed clinicians.  This supervision was

tailored to each clinician's particular skills and needs as contemplated by 130 CMR § 429.438(E)(1). SOF ¶ 72. South Bay has produced over 175,000 pages of supervision records showing that this supervision was provided and occurred regularly. SOF ¶ 74. These records typically detail the clinician receiving supervision, the clinician providing the supervision, the date of the supervision session, and often further information. *Id.* Even where gaps may exist, that is not sufficient to establish liability where MassHealth did not require *any* documentation of supervision as a prerequisite for payment. *See United States ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11–cv–1392, 2014 WL 2960344, at *7 (C.D. Ill. July 1, 2014) ("While the regulations above indicate Medicare expected documentation to be maintained, there is no indication that service providers . . . had to present documentation as a prerequisite to submitting claims for payment or receiving money."). In any case, this Court need not undertake an evaluation of individual records, where the standards on which Plaintiffs seek to establish falsity do not exist.

### 2. South Bay Supervisors Were Properly Credentialed

While Plaintiffs now concede, contrary to the allegations in the ACC, that LMHCs and Licensed Marriage and Family Therapists are qualified supervisors, they still contend that South Bay employed certain ineligible supervisors. Plaintiffs' falsity expert determined for instance that certain supervision records were noncompliant with the MassHealth regulations if the supervision was provided by a Licensed Alcohol Drug Abuse Counselor ("LADC 1") or a Licensed Certified Social Worker ("LCSW") (he claims only Licensed Independent Clinical Social Workers ("LICSWs"), but not LCSWs, can supervise). *See, e.g.*, SOF ¶ 120. This does not comport with the plain language of the MassHealth regulations or the expectations of the licensing boards.

With respect to supervision of unlicensed counselors, who are the majority of the supervisees in question, all the MassHealth regulations require is that they be supervised by "a **fully qualified professional staff member trained**" in various disciplines, including "social

33

work" and "clinical or counseling psychology." 130 CMR §§ 429.424(A)–(D), (F) (emphasis added). "Fully qualified" and "trained" are not defined. There can be no dispute that LCSWs are trained and certified in the field of social work. *See, e.g.*, 258 CMR § 9.04 (detailing training required to become an LCSW). Likewise, there can be no dispute that LADC 1 clinicians are trained in counseling.[9] Even if the regulations did say "licensed" (they do not), an LCSW is a "Licensed" Certified Social Worker, and a LADC 1 is a "Licensed" Counselor.

In fact, both the MassHealth regulations and the social work licensure regulations recognize that LCSWs who are *eligible for or have applied* for licensure as an LICSW are appropriate supervisors in any circumstance. 130 CMR § 429.424(C); 258 CMR § 12.02 (2017) (noting that LCSWs can practice under the supervision of social worker "who is licensed or eligible for licensure" as an LICSW). This too is not in dispute. ACC ¶ 58. Reamer conceded that the social work regulations are inconsistent with his conclusions that LCSWs cannot provide clinical supervision. SOF ¶ 120 ("I do think it's not consistent."). But he nevertheless failed to assess license eligibility, and simply disqualified all LCSWs as supervisors. *Id.*

South Bay provided its unlicensed clinicians with regular supervision, often from multiple supervisors. SOF ¶¶ 70-71. Some supervisors were independently licensed, and others were not but provided additional supervision, mentorship and training. *See, e.g.*, SOF ¶ 70. Even when not "independently" licensed, South Bay' supervising staff members were "fully qualified" and "trained" in appropriate disciplines, and South Bay believed that its therapists received supervision appropriate for their "skills and level of professional development." SOF ¶ 72. This is all the regulations require. At a minimum, it is an objectively reasonable interpretation, which is all that is necessary to dispose of Plaintiffs' allegations. *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp.

---

[9] *See Apply for an Alcohol and Drug Counselor License*, Mass.Gov, https://www.mass.gov/how-to/apply-for-an-alcohol-and-drug-counselor-license (last visited May 5, 2020) (training required to obtain a LADC 1).

2d 1034, 1049 (N.D. Ill. 1998) ("[A]mbiguous statutory requirements, where no regulations further define those requirements, cannot hold a defendant to the government's strict interpretation, so long as defendant's interpretation was reasonable"), *aff'd*, 183 F.3d 730 (7th Cir. 1999).

        3.    <u>Plaintiffs' Claims Regarding MassHealth's Clinic Staffing Requirements Are Inconsistent With the Regulations</u>

Next, Plaintiffs allege that each of South Bay's 17 satellite programs had to have its own licensed clinic director, and that South Bay failed to comply with this requirement. *See* ACC ¶ 106. But, yet again, the MassHealth regulations contain no such requirement.[10]

MassHealth's regulations differentiate between parent "centers" and "satellite programs." 130 CMR § 429.402. The parent center is "the central location of the mental health center, at which most of the administrative, organizational, and clinical services are performed." *Id*. A satellite is "a mental health center program at a different location from the parent center that operates under the license of and falls under the fiscal, administrative, and personnel management of the parent center . . . ." *Id*. Brockton is the parent center to South Bay's outpatient satellite programs, which operate under its clinic license. ACC, Ex. 1, ECF No. 201-1.

MassHealth also distinguishes between "autonomous" and "dependent" satellites. 130 CMR § 429.402. Dependent satellites operate "under the direct clinical management of the parent center," while "autonomous" satellites assume their "own clinical management independent of the parent center." *Id*. At all times, South Bay's satellite programs were under the direct clinical management of its parent center, Brockton. SOF ¶ 5. Plaintiffs concede that at least one South Bay satellite is dependent, ACC ¶ 165, and they have offered no evidence to dispute that the rest are dependent. Nor can they. SOF ¶ 5. As dependent satellites, they were not required to have their own licensed clinic directors. The only staffing constraint placed on dependent satellites is

---

[10] DPH does not even impose a clinic director requirement, much less a licensed one. SOF ¶ 68.

that they must "employ at least two full-time equivalent professional staff members from separate nonphysician core disciplines." 130 CMR § 429.422(D). The provision does not mention a clinic director and makes no reference to licensure at all. *See id.* at § 429.424; *see also* SOF ¶ 123.

Disregarding these provisions entirely, Plaintiffs point to Section 429.439 of the MassHealth regulations to support their contention that each dependent satellite facility was required to have a licensed clinic director. ACC ¶ 59. That provision requires that the clinic director of the parent center—here, Brockton—"designate one professional staff member at the satellite program as the satellite's clinical director." 130 CMR § 429.439(C). It then states that the "clinic director must be employed on a full-time basis and meet all of the requirements in 130 CMR 429.423(B)," before adding that **at a dependent satellite** the designated clinic director need only "meet **the basic qualifications required for his or her discipline"** and can **"receive regular supervision and consultation from qualified core staff at the parent center**." *Id.* at § 429.439(C)(3) (emphasis added). While poorly written perhaps, it is certainly reasonable to conclude that this provision does not require dependent satellite clinic directors to be licensed. The very purpose of the parent-satellite structure, particularly as to dependent satellites, is to allow providers to leverage the resources of the parent center such that each satellite need not have its own, duplicative set of personnel.

In any event, Plaintiffs cannot assert that "all" claims were false when submitted by a satellite facility that lacked a licensed clinic director, as they attempt to do here. Courts reject assertions that "every claim is false" simply because claims were submitted at the same time a defendant was in violation of some regulatory or statutory provision. *See, e.g., United States ex rel. Greenfield v. Medco Health Sols, Inc*., 880 F.3d 89, 100 (3d Cir. 2018) (". . . [W]e must have some record evidence that shows a link between the alleged kickbacks and the medical care

36

received . . . .").  Here, there is no evidence of a link between a violation of the purported licensed clinic director requirement and the services provided and claims submitted by South Bay.

4.    South Bay Clinicians Were Properly Credentialed

Finally, Plaintiffs' allege that South Bay employed counselors who were not properly credentialed to provide services because they lacked a qualifying degree from a fully accredited program.  ACC ¶ 115.  MassHealth mental health center regulations provide that counselors "must hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling," 130 CMR § 429.424(F)(2), but, as Plaintiffs' experts testified, these three categories are illustrative and are not intended to limit counselors to degrees with those exact titles.  SOF ¶ 121.  Rather, as the licensing boards make clear, there is discretion in determining whether a particular degree is sufficiently "related" to mental health counseling.  262 CMR §§ 2.01 *et seq.* The counseling board defines "Related Field[s]" to include "[c]ounseling, counselor education, expressive therapies, adjustment counseling, rehabilitation counseling, counseling psychology, clinical psychology, **or** another Mental Health Counseling field determined by the Board to be a Related Field."  262 CMR § 2.02 (emphasis added).  There is similar discretion in determining whether a program is appropriately accredited.  *See e.g.*, SOF ¶ 121.

Despite this, Reamer admits he did not assess what types of degrees the licensing board would deem appropriate.  SOF ¶ 122.  Which is why he inappropriately disqualified clinicians with degrees that the counseling board has recognized as compliant.  *Id.* (declaring he had "never, ever in my entire career -- and this is not hyperbole -- ever met someone with a degree in forensic psychology who was hired to provide mental health counseling services in a mental health agency" but later admitting that *the licensing board had granted a license* to a clinician with a forensic psychology degree).

37

South Bay reviewed clinician resumes and applications to assess qualifications and coursework on an individual basis. SOF ¶ 75. Plaintiffs may disagree with South Bay's determinations of what qualified under the relevant regulations—they apparently disagree in some cases with the licensing board as well—but such disagreement is insufficient to establish falsity.

### B.    The MassHealth Regulations Are Inapplicable to the MBHP/MCO Claims

A claim submitted to MBHP and the MCOs cannot be false based on the MassHealth regulations—the only regulations at issue in this case for purposes of liability.[11]  MassHealth expressly delegates authority to these entities to make their own payment rules. As to MBHP, MassHealth's regulations provide:

> . . . all behavioral health services covered by the MassHealth agency's contract with the behavioral health contractor (the Contractor) are authorized, provided, and paid solely by the Contractor. Payment for such services is subject to the terms of the Contractor's provider contracts including, but not limited to, provisions governing service authorization and billing requirements.

130 CMR § 450.124(A). MassHealth thus mandates that claims submitted to MBHP are subject to MBHP's rules, not MassHealth's regulations. This is perhaps why, in clarifying communications to providers, MBHP did not mention MassHealth's regulations. SOF ¶ 102. Plaintiffs have not alleged violations of MBHP's provider contracts. ACC ¶¶ 41–42. Where MassHealth's regulations are inapplicable to the claims, summary judgment must be granted. *See, e.g.*, *United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 828, 832 (W.D. Mich. 2000) (granting summary judgment where regulations inapplicable; analysis "must be of applicable regulations to the submission of claims"), *aff'd*, 24 F. App'x 491 (6th Cir. 2001).

---

[11] Defendants do not dispute that a claim submitted to MBHP or an MCO is a "claim" for purposes of the FCA and MFCA, as this Court previously held. *Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 394, 409 (D. Mass. 2018). However, the question here is whether such a claim can be false, where the regulations Plaintiffs claim South Bay violated do not apply to the claim. It cannot.

Similarly, as to the MCOs, their requirements are controlling. 130 CMR § 450.200 ("If the MassHealth regulations about payment methods and conditions of provider participation conflict with a provider or managed care contract, such contract supersedes the regulation, unless the contract expressly states otherwise."). Here, again, the MCOs promulgate their own payment rules, but none of those rules are a basis for liability in this case. Thus, as with MBHP, Plaintiffs cannot establish falsity based on the MassHealth regulations for claims submitted to MCOs.

### C.    Relator's False Statements Claims Fail

Relator's claim that South Bay made false statements in credentialing applications is wholly unsupported by any evidence. To the contrary, as discussed in further detail below (p. 43 *infra*.), South Bay's credentialing applications correctly identified who South Bay's clinicians were, including who would supervise unlicensed clinicians and serve as clinical directors. SOF ¶ 77. Summary judgement should be granted on Counts 2 and 4.

* * * *

South Bay thoughtfully worked to interpret a complex and ambiguous web of regulations. Its interpretations were correct, but even if Plaintiffs take issue with those interpretations, such disagreements cannot establish falsity, where South Bay's interpretations were reasonable. Defendants are entitled to summary judgment on the FCA and MFCA claims.

## IV.    PLAINTIFFS CANNOT ESTABLISH SCIENTER AS TO ANY DEFENDANT

At their very best, the regulations at issue were ambiguous and confusing and any "innocent mistakes" or "negligence" in interpreting them is not actionable under the FCA. *Purcell*, 807 F.3d at 287–88; *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 340 n.12 (5th Cir. 2008) (holding that because "the regulations were thoroughly unclear, as a matter of law, the FCA's knowledge and falsity requirements have not been met"). Given the regulations' lack of clarity, South Bay's attempts to interpret them correctly, SOF ¶¶ 97-104, and repeated reports from

39

regulators that it was compliant, SOF ¶¶ 80, 84-88, 91-93, 95-96, Plaintiffs cannot prove knowledge or recklessness.

The issue of knowledge under the FCA must be judged as of the time the claims were submitted; knowledge is not determined with the benefit of 20/20 hindsight. *United States ex rel. Phalp v. Lincare Holdings, Inc*., 857 F.3d 1148, 1155–56 (11th Cir. 2017). There is no record evidence to suggest that South Bay knew or recklessly disregarded violations of regulatory requirements when it submitted the claims at issue in this case. To the contrary, South Bay reasonably interpreted the MassHealth regulations to allow for supervision that was variable in substance and frequency based on the needs and skills of each individual, and it believed it was complying with the relevant requirements. SOF ¶ 72. It made numerous attempts to seek clarity from payors in order to confirm its interpretation, and was told it was compliant during surveys and audits. SOF ¶¶ 96, 98*; see United States ex rel. Williams v. Renal Care Grp., Inc*., 696 F.3d 518, 531 (6th Cir. 2012) (holding that efforts to seek clarification from the government defeat a finding of reckless disregard); *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 775 (N.D. Tex. 2003) (granting summary judgment where there was evidence of "considerable confusion over what products could be billed" and defendants "repeatedly sought advice on how to code . . . ."). South Bay also reasonably believed it did not need a licensed clinic director at each satellite facility; this was a patently reasonable reading of the regulations (SOF ¶ 76; *see* § III(A)(3), *supra*), and is consistent with contemporaneous communications within South Bay. SOF ¶ 76.

To the extent there were any disagreements between employees at South Bay and CIS over the interpretation of the requirements, this merely underscores the ambiguous nature of the regulations and South Bay's internal efforts to comply. SOF ¶ 100. More importantly, there is no evidence that anybody ever surmised that supervision had to satisfy all the various requirements

Plaintiffs now claim are required, such as discussion of a particular client in every session.  In any case, internal debate about regulatory requirements highlights the point: no defendant can be liable for good faith attempts to understand the supervision and staffing obligations, as South Bay did here.  Even if South Bay's ultimate interpretation was flawed (it was not), being wrong about the law is not a violation of the FCA or MFCA.  *See Purcell*, 807 F.3d at 287–88; *United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Grp*., 298 F. Supp. 2d 91, 101 (D.D.C. 2004).

## V.    PLAINTIFFS CANNOT ESTABLISH MATERIALITY AS TO ANY DEFENDANT

To satisfy their burden, Plaintiffs must establish (A) that noncompliance with a regulation was material to the payor's payment decision, and (B) that Defendants knew that the violation was material.  *See Escobar*, 136 S. Ct. at 2001–02.  Plaintiffs can do neither.

### A.    The Regulations at Issue Were Not Material to Payment

The FCA is neither "'an all-purpose antifraud statute'" nor a "vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003.  Materiality to payment is a "rigorous" and "demanding" standard.  *Id.* at 2002–03.  If payors took no payment action despite knowledge of the violations, a plaintiff cannot satisfy the materiality requirement. *See, e.g.*, *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 542 (10th Cir. 2020) (affirming summary judgment and holding inaccurate statements were not material to the government's payment decision because it paid claims after learning of the noncompliance); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017) (affirming summary judgment based on "the demanding standard required for materiality under the FCA, the government's acceptance of [defendant's] reports despite their non-compliance with [the relevant guidelines], and the government's payment of [defendant's] public vouchers for its work. . . ."); *United States v. Sanford-Brown Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (affirming summary judgment on materiality grounds).

Here, the staffing and supervision regulations were not material to MassHealth's decision to pay South Bay's claims. MassHealth never audited South Bay for compliance with the regulations at issue, despite having the ability to do so. SOF ¶ 81. This, alone, suggests that the requirements were immaterial to MassHealth's payment decisions. *See United States ex rel. Coffman v. City of Leavenworth*, 303 F. Supp. 3d 1101, 1121 (D. Kan. 2018) (holding that failure of government to audit to ensure compliance "suggests that regulatory compliance was not material to payment."). Instead, MassHealth apparently relied on DPH. SOF ¶ 81. DPH found staffing and supervision deficiencies in 2007, prior to the time period at issue in this case, but there is no evidence that MassHealth even considered whether to seek recoupment of payments made on claims associated with the alleged noncompliance. *See United States ex rel. Winkelman et al. v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016) (materiality asks "whether a piece of information is sufficiently important to influence the behavior of the recipient"). MassHealth continued paying South Bay's claims, suspending payments only to buttress its litigation position in late 2017, over two years after Relator disclosed her allegations to the Commonwealth and after the Supreme Court in *Escobar* outlined what Plaintiffs must prove to establish materiality.

What's more, when each of its mental health clinics opened, South Bay submitted a credentialing application to MassHealth that identified who would supervise unlicensed clinicians and serve as clinical directors. SOF ¶ 77. For example, the application for South Bay's Leominster clinic described the qualifications for a "clinical supervisor" and "clinic director" and stated that "staff therapists" may also provide supervision—yet none of these staff members were required to be independently licensed. SOF ¶ 78. MassHealth's corporate designee testified that it was "unfortunate" that MassHealth supposedly "did not catch" the issue. *Id.* But South Bay submitted similar materials with other applications (which is also further evidence that South Bay lacked the

requisite scienter). *Id.* MassHealth's failure to raise a single concern about South Bay's supervision and staffing disclosures, much less take any timely action with respect to payment of South Bay's claims, precludes a finding of materiality.

MassHealth not only showed longstanding indifference to South Bay's compliance with these regulations, it similarly failed to take action against other providers who had been identified as violating supervision requirements. For example, DPH, which is the entity on which MassHealth says it relied, identified numerous deficiencies with respect to supervision at Staffier Associates, Inc. in a series of surveys it conducted at the facility starting in January 2018. SOF ¶ 89. There is no evidence that MassHealth ever even requested these results, or that DPH ever believed the results were significant enough to bring to MassHealth's attention. SOF ¶ 90.

Plaintiffs also cannot establish that MBHP or the MCOs considered MassHealth's requirements to be material to their own payment decisions. Where, as discussed above, MassHealth regulations delegate authority over payment decisions to these entities which, in turn, require providers like South Bay to comply with their own sets of requirements, the MassHealth regulations cannot be material to these claims as a matter of law. *See* § III(B), *supra*. But even putting this fundamental issue aside, it is undisputed that MBHP and the MCOs were well aware that there was ongoing and pervasive confusion about the regulations among mental health providers, including but not limited to South Bay. *See* § IV, *supra*. These payors were on notice that different providers were likely interpreting the guidance regarding supervision differently, but at no relevant time did they explore whether reimbursement to such providers should be halted, recouped, or suspended. In fact, MBHP often disregarded the requirements entirely: for example, it routinely waived the credentialing requirements for certain clinicians, including some at South Bay. SOF ¶ 94. Where a payor waives requirements for clinicians and pays claims for services

43

delivered by those clinicians, the waived requirements cannot be material.

### B.    There is No Evidence That Defendants Knew the Regulations Were Material

Even if Plaintiffs could meet the first prong of the materiality test, they cannot meet the second.  As discussed above, Plaintiffs cannot, as a matter of law, establish that H.I.G. knew that compliance with the regulations at issue in this case was material to any payor's payment decision.  *See* § II(C), *supra*.  The same is true for CIS and South Bay.  South Bay was entirely forthcoming with payors regarding its staffing and supervision practices, and, nonetheless, MassHealth never asked South Bay any follow-up questions or requested to audit their supervision records, and the managed care payors never stopped paying South Bay's claims.  *See* §§ IV, V(A), *supra*.

Moreover, while eventually reversed and remanded for factual development, during the same time period, Judge Woodlock concluded that *these very regulations* were not material to payment *as a matter of law*.  *United States ex rel. Escobar v. Universal Health Servs., Inc.*, No. 11-11170-DPW, 2014 WL 1271757, at *7 (D. Mass. Mar. 26, 2014).  In these circumstances, no reasonable healthcare provider should have known the regulations were material to payment.

## VI.    CIS DID NOT CAUSE SOUTH BAY TO SUBMIT FALSE CLAIMS

Plaintiffs cannot establish that CIS caused South Bay to submit false claims.  First, CIS did not exist before February 29, 2012, so it cannot be liable for "causing" anything prior to that time.  SOF ¶ 19.  Second, Plaintiffs' claims fail for the reasons articulated in Kevin Sheehan's opening brief.[12]  It is undisputed that South Bay continued to employ billing and compliance departments, and it was South Bay—not CIS—that submitted claims to MassHealth.  SOF ¶ 45.  CIS was not directly involved in the billing process and instead properly relied on South Bay to adhere to all necessary regulations.  SOF ¶ 46.  The claims against CIS fail as a matter of law.

---

[12] Mem. of Law in Supp. of Sheehan's Mot. for Summ. J., at § I, ECF No. 282.

## VII.    SUMMARY JUDGMENT SHOULD BE GRANTED TO H.I.G. ON THE COMMONWEALTH'S UNJUST ENRICHMENT CLAIM (COUNT 5)

The Commonwealth's unjust enrichment claim against H.I.G. requires proof of "'(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.'" *Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 179 (D. Mass. 2010).  While this Court held that the Commonwealth may *plead* the unjust enrichment claim in the alternative, *Martino-Fleming*, 334 F. Supp. 3d at 409, the claim is no longer viable because the Commonwealth did nothing to establish that its remedy at law under the MFCA is inadequate.  An adequate remedy at law includes statutory remedies, *see Reed v. Zipcar, Inc.*, 883 F. Supp. 2d 329, 334 (D. Mass 2012), and the fact that the MFCA claims fail is irrelevant.  *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017).

The unjust enrichment claim also fails because H.I.G. was not "enriched."  H.I.G. did not submit claims to or receive reimbursement from any payor; South Bay received all such payments.  SOF ¶¶ 44-45.  There is no evidence that H.I.G. received any money paid to South Bay as a result of the allegedly false claims.

Finally, the Commonwealth cannot assert an unjust enrichment claim based on claims submitted to MBHP and the MCOs.  MassHealth does not pay those claims.  Instead, MassHealth pays MBHP and the MCOs a capitated rate, irrespective of how many claims are submitted to those entities.  SOF ¶¶ 8-9; ACC ¶¶ 76, 78.  The Commonwealth thus cannot establish that it has been "impoverished" based on claims submitted to MBHP and the MCOs.

## VIII.    CONCLUSION

For all of the reasons set forth above, the Court should grant summary judgment to Defendants on all of Plaintiffs' claims.

45

Respectfully submitted,

Dated: May 11, 2020                    SOUTH BAY MENTAL HEALTH CENTER,
                                       INC.; COMMUNITY INTERVENTION
                                       SERVICES, INC.; COMMUNITY
                                       INTERVENTION SERVICES HOLDINGS, INC.;
                                       H.I.G. GROWTH PARTNERS, LLC; AND H.I.G.
                                       CAPITAL, LLC.

                                       *By their attorneys*,

                                       */s/ Shamis N. Beckley*
                                       Mark W. Pearlstein (BBO # 542064)
                                       Laura McLane (BBO # 644573)
                                       Shamis N. Beckley (BBO # 697425)
                                       Mara Theophila (BBO # 704763)
                                       MCDERMOTT WILL & EMERY LLP
                                       28 State Street
                                       Boston, MA  02109-1775
                                       Email:  mpearlstein@mwe.com
                                       Email:  lmclane@mwe.com
                                       Email: sbeckley@mwe.com
                                       Telephone: (617) 535-4000
                                       Facsimile: (617) 535-3800

## CERTIFICATE OF SERVICE

I, Shamis N. Beckley, hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on May 11, 2020.

Dated:  May 11, 2020                   */s/ Shamis N. Beckley*
                                       Shamis N. Beckley (BBO # 697425)

46