## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>CHRISTINE MARTINO-FLEMING, Relator<br><br>and<br><br>COMMONWEALTH OF MASSACHUSETTS<br>ex rel. CHRISTINE MARTINO-FLEMING,<br>Relator<br><br>v.<br><br>SOUTH BAY MENTAL HEALTH CENTER,<br>INC.; COMMUNITY INTERVENTION<br>SERVICES, INC.; COMMUNITY<br>INTERVENTION SERVICES HOLDINGS, INC.;<br>H.I.G. GROWTH PARTNERS,<br>LLC; H.I.G. CAPITAL, LLC; PETER J.<br>SCANLON; AND KEVIN P. SHEEHAN | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 15-CV-13065-PBS |

_____

## PLAINTIFFS' CONSOLIDATED OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................1

ARGUMENT ............................................................................................................3

    I.    Summary Judgment Standard ......................................................................3

    II.    Each of the Defendants Not Only Knew About, but Caused the Submission of These False Claims ...........................................................................................4

        A.  H.I.G. Knew Medicaid Required Licensed Supervisors, Knew that South Bay Did Not Have Enough Licensed Supervisors, and Failed to Implement Recommendations to Bring South Bay into Compliance ........................................7

          i.   H.I.G. Oversaw South Bay's Regulatory Compliance and Knew that Medicaid Required Licensed Supervision ......................................................................8

          ii.  H.I.G. Was Repeatedly Informed that South Bay Did Not Provide Licensed Supervision to Its Many Unlicensed Clinicians ...............................................12

          iii.  H.I.G. Failed to Implement Recommendations to Bring South Bay Into Compliance with MassHealth Regulations .....................................................16

        B.  Peter Scanlon Was Repeatedly Informed about South Bay's Noncompliance, Recklessly Disregarded His Obligations to Ensure Compliance, and Controlled South Bay's Billing Process ...........................................................18

          i.   Scanlon knew about the noncompliant supervision practices at South Bay....20

          ii.  Scanlon oversaw South Bay's claims submission process prior to the acquisition .....................................................................................23

          iii.  Scanlon failed to bring South Bay into compliance with licensure and supervision regulations before and after the acquisition..................................24

        C.  Kevin Sheehan Was Repeatedly Informed about South Bay's Noncompliance, Recklessly Disregarded His Obligations to Ensure Compliance, and Failed to Implement Recommendations to Bring South Bay into Compliance ..................26

          i.   Sheehan was unequivocally responsible for South Bay's regulatory compliance, so he cannot abdicate this responsibility in deference to others .....................28

          ii.  Sheehan was informed on numerous occasions, including by the Relator, that South Bay was not in compliance with MassHealth regulations....................29

i

iii.  Sheehan's defense that he did not understand South Bay's noncompliance to have billing implications is the definition of "deliberate ignorance" and "reckless disregard." ...................................................................................30

iv.  Despite this knowledge and clear recommendations to bring South Bay into compliance, Sheehan repeatedly failed to do so ..............................................32

D.  South Bay Is Not Entitled to Summary Judgment on Scienter .............................34

i.  South Bay had actual knowledge that it was submitting claims for services rendered by unqualified clinicians who had not received direct and continuous supervision from independently licensed clinicians ...........................................35

ii.  South Bay's *post-hoc* regulatory interpretations do not negate scienter ..........37

iii.  South Bay never sought clarification about MassHealth's regulations from MassHealth but was repeatedly reminded by MCOs about the fundamental requirement of licensed clinical supervision for unqualified clinicians ..........40

E.  C.I.S. Knew About and Participated in South Bay's Submission of False Claims ......................................................................................................................42

i.  C.I.S. had actual knowledge that South Bay was submitting claims for services rendered by unlicensed staff who had not received direct and continuous supervision from appropriately licensed clinicians ............................................43

ii.  C.I.S. caused South Bay's submission of false claims ....................................44

III.  Plaintiffs Can Clearly Establish the Falsity of Defendants' Claims ...........................45

A.  Unlicensed Social Workers and Counselors and LCSWs Are Prohibited from Supervising Unqualified Clinicians Under MassHealth Regulations....................46

B.  MassHealth Regulations Require that the Independently Licensed Supervision be Clinical in Nature ..................................................................................................49

C.  MassHealth Regulations Apply to MBHP and MCOs .........................................53

D.  MassHealth Requires that Supervision Be as Frequent and Extensive as Required by the Relevant Licensing Boards ........................................................................54

E.  MassHealth and DPH Regulations Require That Clinical Supervision Be Documented ...........................................................................................................57

F.  MassHealth Regulations Explicitly Condition Reimbursement on Satellite Clinics Having Qualified Clinic Directors .......................................................................58

G. South Bay Allowed Unlicensed Clinicians Without Mental Health Counseling Degrees to Treat MassHealth Members ...............................................61

H. There Is No "Reasonable Interpretation Exception" to Falsity ...........................62

IV. The Materiality of these Regulations to Payment Is Obvious .....................................62

A. Plaintiffs Need Not Prove that Defendants Actually Knew These Requirements Were Material, Though They Can Anyway..........................................................63

B. Defendants Cannot Show Actual Knowledge of the Government Prior to the Unsealing of the Complaint ....................................................................................64

C. The MassHealth Regulations Were Material to MBHP and MCOs ....................66

V. The Commonwealth's Unjust Enrichment Cause of Action Stands Against All Defendants ....................................................................................................................67

CONCLUSION...................................................................................................................69

# **TABLE OF AUTHORITIES**

**Cases**                                                                            **Page**

*A.J. Properties, LLC v. Stanley Black & Decker, Inc.,*
   972 F. Supp. 2d 68 (D. Mass. 2013) ....................................................................... 68

*Estrada v. Rhode Island*,
   594 F.3d 56 (1st Cir. 2010)..................................................................................... 3

*Heckler v. Comm'y Health Svcs. of Crawford County, Inc.*,
   467 U.S. 51 (1984)............................................................................................. 5, 13

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
   2007 WL 1051642 (D. Mass. Apr. 2, 2007) ............................................................ 68

*Iverson v. City of Boston*,
   452 F.3d 94 (1st Cir. 2006)...................................................................................... 3

*Lamb Eng'g & Const. Co. v. United States*,
   58 Fed. Cl. 106 (2003) ............................................................................................ 27

*Lowell Housing Authority v. PCS International, Inc.*,
   692 F. Supp. 2d 180 (2010) .................................................................................... 60

*Massachusetts v. Mylan Labs.*,
   357 F. Supp. 2d 317 (D. Mass. 2005) ..................................................................... 68

*Massachusetts v. Mylan Labs.*,
   608 F. Supp. 2d 127 (D. Mass. 2008) ................................... 5, 23, 30, 32, 40, 41, 65

*McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,
   339 F.3d 1087 (9th Cir. 2003) ................................................................................. 68

*Minnesota Assoc. of Nurse Anesthetists v. Allina Health System, Corp.*,
   276 F.3d 1032 (8th Cir. 2002) ................................................................................. 40

*Reed v. Zipcar, Inc.*,
   883 F. Supp. 2d 329 (D. Mass 2012) ...................................................................... 68

*Sentinel Prods. Corp. v. Mobile Chem. Co.*,
   2001 WL 92272 (D. Mass. Jan. 17, 2001)............................................................... 68

*Shaw v. AAA Eng'g & Drafting, Inc.*,
   213 F.3d 519 (10th Cir. 2000) ................................................................................. 23

*Siebert v. Gene Security Network, Inc.*,
　2014 WL 6765835 (N.D. Cal. Dec. 1, 2014) ........................................................ 41

*Siebert v. Gene Security Network, Inc.*,
　75 F. Supp. 3d 1108 (N.D. Cal. 2014) .................................................................. 5

*Securities and Exchange Commission v. Tropikgadget FZE.*,
　146 F. Supp. 3d 270 (2015) ................................................................................. 43

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
　842 F.3d 103 (1st Cir. 2016) ("*Escobar III*")…………………………………63, 64, 65, 66

*United States ex rel. Franklin v. Parke-Davis Div. of Warner-Lambert Co.*,
　2003 WL 22048255 (D. Mass. Aug. 22, 2003) ...................................................... 6

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
　880 F.3d 89 (3d Cir. 2018) ................................................................................. 60

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
　498 F. Supp. 2d 25 (D.D.C. 2007) ........................................................................ 6

*United States ex rel. Lockyer v. Pacific Health Grp. Plan*,
　343 F. App'x 279 (9th Cir. 2009) ....................................................................... 38

*United States ex rel. Oliver v. Parsons Co.*,
　195 F.3d 457 (9th Cir. 1999) ........................................................................ 37, 62

*United States ex rel. Phalp v. Lincare Holdings Inc.*,
　857 F.3d 1148 (11th Cir. 2017) .................................................................... 37, 62

*United States ex rel. Rost v. Pfizer, Inc.*,
　507 F.3d 720 (1st Cir. 2007) ................................................................................ 5

*United States ex rel. Trim v. McKean*,
　31 F. Supp. 2d 1308 (W.D. Okla. 1998) ........................................................ 35, 43

*United States ex rel. Williams v. Renal Care Grp., Inc.*,
　696 F.3d 518 (6th Cir. 2012) .............................................................................. 42

*United States ex rel. Winkelman et al. v. CVS Caremark Corp.*,
　827 F.3d 201 (1st Cir. 2016) ............................................................................... 63

*United States ex. rel. Harman v. Trinity Industries, Inc.*,
　872 F.3d 645 (5th Cir. 2017) .............................................................................. 66

*United States v. Bestfoods*,

524 U.S. 51 (1998) .......................................................................................................... 6

*United States v. Bourseau*,
   531 F.3d 1159 (9th Cir. 2008) ............................................................................... 5, 30

*United States v. Mack*,
   2000 WL 33993336 (S.D. Tex. May 16, 2000) .......................................................... 32

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ....................................................................................... 5

*United States v. Medica-Rents Co.*,
   285 F. Supp. 2d 742 (N.D. Tex. 2003) ...................................................................... 42

*United States v. President and Fellows of Harvard College*,
   323 F. Supp. 2d 151 (D. Mass. 2004) .......................................................................... 6

*United States v. R&F Props. of Lake County, Inc.*,
   433 F.3d 1349 (11th Cir. 2005) ................................................................................. 39

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ("*Escobar II*") .................................................................. 63, 64

*Urquilla-Diaz v. Kaplan*,
   780 F.3d 1039 (11th Cir. 2015) ................................................................................. 29

*Visiting Nurse Assoc of Brooklyn v. Thompson*,
   378 F. Supp. 2d 75 (E.D.N.Y. 2004) ......................................................................... 42

## Statutes and Regulations

105 C.M.R. § 140.530(E) ..................................................................................... 38, 39, 58
105 C.M.R. § 164.006 .................................................................................................... 49
130 C.M.R. § 429.402 ..................................................................................................... 61
130 C.M.R. § 429.404(A) ................................................................................................ 58
130 C.M.R. § 429.422(D) ................................................................................................ 59
130 C.M.R. § 429.423(B) ........................................................................................... 59, 60
130 C.M.R. § 429.424 ........................................................................... 47, 51, 55, 56, 57
130 C.M.R. § 429.424(C)(2) ............................................................... 38, 39, 48, 51, 58
130 C.M.R. § 429.424(F)(1) ............................................................... 38, 46, 48, 51, 58
130 C.M.R. § 429.424(F)(2) ............................................................................................ 61
130 C.M.R. § 429.436 ..................................................................................................... 57
130 C.M.R. § 429.438 ..................................................................................................... 57
130 C.M.R. § 429.438(E) ................................................................................................ 46
130 C.M.R. § 429.438(E)(1) ................................................................. 39, 54, 55, 56, 57
130 C.M.R. § 429.439 .................................................................................................. 59, 60
130 C.M.R. § 429.439(C) ............................................................................................. 46, 59

130 C.M.R. § 429.439(C)(3)................................................................................. 60

130 C.M.R. § 450.205(A) ..................................................................................... 58

258 C.M.R. §§ 8.03, 12.01(2) & (5) ..................................................................... 48

258 C.M.R. § 9.03 ................................................................................................. 55

258 C.M.R. § 12.02 ............................................................................................... 55

258 C.M.R. § 12.02(1) .......................................................................................... 48

262 C.M.R. § 2.07(3)(b)&(c) ................................................................................ 55

262 C.M.R. §§ 2.02, 2.04, and 2.05 ..................................................................... 61

31 U.S.C. § 3729(a)(1)(A) ...................................................................................... 5

Mass. Gen. Laws c. 12, § 5B(a)(1) ......................................................................... 5

S. Rep. No. 99–345, at 21 (1986), as *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286 ..................... 5

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 3

Fed. R. Civ. P. 56(c) ............................................................................................. 42

Fed. R. Civ. P. 56(c)(2) ........................................................................................ 23

Fed. R. Evid. 802 ................................................................................................. 23

## INTRODUCTION

Despite Defendants' attempts to complicate it,[1] this case is actually quite simple:

- MassHealth, much like every other payor of behavioral health services, forbids clinicians who do not have an independent license to practice (hereinafter "unqualified clinicians") from providing services to its members unless those clinicians receive clinical supervision from an independently licensed clinician.
- For at least nine years, Defendant South Bay Mental Health Center, Inc. ("South Bay") allowed unqualified clinicians to supervise other unqualified clinicians in the provision of services to MassHealth members and submitted claims for payment for those services.
- Defendants Community Intervention Services, Inc. and Community Intervention Services Holdings, Inc. (collectively, "C.I.S."), which acquired South Bay in April 2012; Defendants H.I.G. Growth Partners, LLC and H.I.G. Capital, LLC (collectively, "H.I.G."), which was the majority owner of C.I.S., controlled the C.I.S. Board of Directors, and was heavily involved in South Bay's operations; Defendant Peter Scanlon, who founded and served as the CEO of South Bay until April 2012; and Defendant Kevin Sheehan, who served as the CEO of C.I.S. and South Bay from April 2012 until November 2016, all had the ability to bring South Bay into compliance, knew about this practice, and repeatedly rejected recommendations that would have corrected it.
- Upon learning of these violations, MassHealth suspended payment to South Bay.

Defendants cannot rebut any of these facts, which, taken together, establish that **they are not entitled to summary judgment on any element of Plaintiffs' causes of action**.

Instead, they adopt spurious arguments that mischaracterize fact and law. For example, they argue that they cannot be held liable for knowing about South Bay's noncompliance because, when they were told about South Bay's supervision deficiencies, there was no explicit reference to the regulations that those deficiencies violated. *See* Corp. Defs.' Mem. at 2; Scanlon Mem. at 12; Sheehan Mem. at 17. First of all, that is not the law. The False Claims Act ("FCA")

---

[1] For the Court's convenience, Plaintiffs' opposition addresses together all three motions and supporting memoranda Defendants filed, including the Memorandum of Law in Support of Defendant Kevin Sheehan's Motion for Summary Judgment, ECF No. 282 (May 8, 2020) (hereinafter "Sheehan Mem."), Memorandum of Law in Support of Defendant Peter J. Scanlon's Motion for Summary Judgment, ECF No. 286 (May 8, 2020) (hereinafter "Scanlon Mem."), and Memorandum in Support of Motion for Summary Judgment by South Bay Mental Health Center, Inc., Community Intervention Services, Inc., Community Intervention Services Holdings, Inc., H.I.G. Growth Partners, Inc., and H.I.G. Capital, Inc., ECF No. 290 (May 11, 2020) (hereinafter "Corp. Defs.' Mem.").

and Massachusetts False Claims Act ("MFCA") do not require that a relator or anyone else identify for a defendant the specific regulatory provisions that have been violated; in fact, failure to familiarize oneself with those regulatory provisions can itself be sufficient to establish scienter in this context.

Second, that isn't true. Even accepting Defendants' incorrect standard, witnesses have testified that every single one of the Defendants was told that licensed supervision was a matter of compliance with regulations, and several of the Defendants have already admitted that. Indeed, South Bay's Director of Outpatient Mental Health testified that she told H.I.G. that licensed supervision was a matter of compliance with regulations, Plaintiffs' Rule 56.1 Statement of Additional Facts ("SAF"), ¶ 47, and H.I.G. was told on numerous occasions that South Bay's unqualified clinicians were not receiving licensed supervision. Plaintiffs' Rule 56.1 Statement of Facts ("Pls.' SOF"), ¶¶ 84, 127, 133, 156; SAF, ¶¶ 48, 50. Their pleas of ignorance are thus emblematic of much of the Defendants' memoranda—they are based on an incorrect legal standard and applied misleadingly to the facts of this case.

Defendants take this approach in other contexts as well. With respect to falsity, Defendants point to a series of newly identified "ambiguities" in the regulations, none of which confused South Bay's employees during the relevant time period. For example, Defendants claim that the MassHealth regulations do not require that a supervisor be "licensed," so long as they are "trained" in the core behavioral health disciplines, which they posit is an "objectively reasonable interpretation." *See* Corp. Defs.' Mem. at 34. Aside from the fact that this is not what the regulations say, the real problem is that ***none of the Defendants ever conceived of that interpretation during the relevant time period***. South Bay's now-president, then-compliance officer, said in 2014 that she was "confident" that South Bay was not meeting regulatory

2

requirements and created a chart that showed, accurately, that only independently licensed people could supervise unqualified clinicians. Pls.' SOF, ¶¶ 142, 144, 146. Sheehan admitted that he was aware that South Bay was noncompliant because of its use of unlicensed supervisors as of 2014. Pls.' SOF, ¶¶ 135-36. Even H.I.G.'s witnesses testified that they knew that Medicaid required licensed supervision. SAF, ¶ 46. If defendants were able to belatedly parse every regulation and ascribe to themselves an interpretation they never actually considered to defeat falsity, the FCA and MFCA would be gutted. That is why this desperate argument, like all of Defendants' arguments, must be rejected.

Plaintiffs' case rests on a fundamental axiom—a clinician who performs behavioral health services without an independent license must be supervised by someone who is independently licensed. No one can reasonably dispute that. Nor can any of the Defendants dispute that they knew that, that they knew that South Bay did not comply with this requirement, and that they could have fixed it, but chose not to. These facts establish that they are not entitled to summary judgment, and the rest of their various distractions and red herrings are just noise.

## ARGUMENT

### I.    Summary Judgment Standard.

A party may move for summary judgment, identifying "the part of each claim . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). The Court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. The court views all "facts and draws all reasonable inferences in the light most favorable to the nonmoving party," who may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Estrada v. Rhode Island*, 594 F.3d 56, 62 (1st Cir. 2010); *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

## II.    <u>Each of the Defendants Not Only Knew About, but Caused the Submission of These False Claims.</u>

Each of the Defendants knew what MassHealth required, knew that South Bay was not meeting those requirements, and rejected recommendations to bring South Bay into compliance. To argue instead that they do not have liability on scienter, Defendants all rely on a very similar principal argument. They do not dispute (because they cannot dispute) that they knew about the lack of qualified supervision at South Bay. They instead rely on variations of the assertion that they did not comprehend how those supervision issues connected to regulatory or billing requirements. *See* Corp. Defs.' Mem. at 19 ("Furthermore, there is not a single document that contains a report from Relator (or anyone else) to any H.I.G. personnel about supposed regulatory noncompliance"); Scanlon Mem. at 16 ("there no evidence of Dr. Scanlon's alleged actual knowledge of a regulatory violation"); Sheehan Mem. at 17 ("Not one of those enumerated concerns mentions regulations or billing considerations.").

The first problem for the Defendants is that this simply isn't true. There is considerable evidence that each of the Defendants, who were actively involved in the operations and management of South Bay, was specifically told about supervision practices ***in the context of regulatory and/or billing noncompliance***. For these Defendants to now claim ignorance of the connection between the supervision deficiencies they knew about and regulatory requirements they also knew about is convenient, but unavailing.

The second problem for the Defendants is that, even if they were right about the facts (which they are not), scienter under the FCA and MFCA does not require that someone identify a compliance problem and then quote to them, chapter and verse, from regulations. The "deliberate ignorance" and "reckless disregard" provisions instead are intended to prevent "what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and

4

failed to make simple inquiries which would alert him that false claims are being submitted." *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99–345, at 21 (1986), as *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286) (internal quotation marks omitted). Defendants who fail to "familiarize themselves with the legal requirements, standards and procedures of the Medicaid program," including legal requirements for reimbursement, meet the "reckless disregard" standard. *Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 154 (D. Mass. 2008) (citing *Heckler v. Comm'y Health Svcs. of Crawford County, Inc.*, 467 U.S. 51, 63-65 (1984)); *see also United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001) (defendant's failure to familiarize himself with Medicare requirements amounted to reckless disregard or deliberate ignorance); *Siebert v. Gene Security Network, Inc.,* 75 F. Supp. 3d 1108, 1118-1119 (N.D. Cal. 2014) (collecting FCA cases on defendants' duty to familiarize themselves with requirements for payment). Each of the Defendants easily meets these standards.

The Defendants similarly rely on mischaracterizations of fact and law to negate their liability on the causation element,[2] claiming that they were not responsible for South Bay's billing process and that they did not knowingly ratify the continued submission of false claims. But under the FCA and MFCA, a person need not directly submit claims to the government to be liable; a defendant who does not himself submit false claims is liable if he "causes to be presented" a false or fraudulent claim for payment or approval. *See* Mass. Gen. Laws c. 12, § 5B(a)(1), 31 U.S.C. § 3729(a)(1)(A); *United States ex rel. Rost v. Pfizer, Inc.,* 507 F.3d 720, 732 n.9 (1st Cir. 2007). In assessing causation, courts look at whether the defendant's conduct was a substantial factor in causing the presentation of false claims. *See, e.g., United States ex rel. Franklin v. Parke-Davis Div. of Warner-Lambert Co.,* Civ. A. No. 96-11651-PBS, 2003 WL 22048255, *4-5 (D. Mass.

---

[2] South Bay did not move for summary judgment on causation. Corp. Defs.' Motion for Summary Judgment, ECF No. 289 (May 11, 2020).

Aug. 22, 2003). A defendant may be liable for causing the submission of false claims if "it operates under a policy that causes others to present false claims." *United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004). A defendant's actual role in the claims process matters less than whether it is foreseeable to the defendant that the claims at issue would be submitted to the government. *See id.*

Relying on this precedent, this Court has made clear that "knowingly ratify[ying] [a] prior policy of submitting false claims by rejecting recommendations to bring South Bay into regulatory compliance constitutes sufficient participation in the claims process to trigger FCA liability." Memorandum and Order, ECF No. 164, at 13 (Sept. 21, 2018) (citing *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62-63 (D.D.C. 2007) (holding a parent liable for causation given the "frequency and level of detail" of communication between subsidiary and corporate officials); *United States v. Bestfoods*, 524 U.S. 51, 68 (1998) (parent company may be liable when it participates in the activities of the facility)). In evaluating this causation component in the context of Defendants' motions to dismiss, this Court considered the responsibilities of the various Defendants, their involvement in "South Bay's operations," and their responsibility for ensuring compliance with MassHealth regulations. *Id.* at 13-14.

Each of the Defendants plainly meets this standard. H.I.G. was heavily involved in South Bay's operations, including overseeing compliance, and even represented that it was ensuring compliance to outside lenders. Pls.' SOF, ¶¶ 70-71, 111; SAF, ¶¶ 29-31, 51-60. H.I.G. also learned on several occasions that South Bay was not ensuring that unlicensed clinicians received supervision from licensed clinicians and was presented with recommendations to fix this problem. Pls.' SOF, ¶¶ 84, 127, 133, 156; SAF, ¶¶ 42, 48, 50. Scanlon founded South Bay, set up and oversaw the claims submission process, and was directly responsible for regulatory

compliance prior to the acquisition. Pls.' SOF, ¶¶ 62, 66; SAF, ¶¶ 32-36. And Sheehan oversaw South Bay through his role as CEO at South Bay and C.I.S., was the "last word" on regulatory interpretation, and served as a sponsor of the Tiger Teams, where, by his own admission, he learned of South Bay's noncompliance. Pls.' SOF, ¶¶ 72, 110, 130, 135-36; SAF, ¶¶ 37, 75-76. The fact that these Defendants did not work in South Bay's Billing Department cannot negate causation. The members of South Bay's Billing Department were not the ones who had any role in overhauling South Bay's supervision structure or hiring more independently licensed supervisors to ensure it complied with MassHealth regulations. SAF, ¶¶ 32-37, 54-55, 62. That responsibility fell to H.I.G., Scanlon, and Sheehan, each of whom were involved in South Bay's hiring and retention efforts and each of whom chose not to implement recommendations that would have brought South Bay into compliance. Pls.' SOF, ¶¶ 151-156, 158; SAF, ¶¶ 32-35, 37, 51-55, 59, 62, 65-67, 92-95. These facts plainly meet the standard for causation.

> **a.**  **H.I.G. Knew Medicaid Required Licensed Supervisors, Knew that South Bay Did Not Have Enough Licensed Supervisors, and Failed to Implement Recommendations to Bring South Bay into Compliance.**

H.I.G. is a sophisticated private equity firm that was intimately involved in South Bay's operations. Its repeated claims of ignorance as to the pervasive fraud at South Bay do not pass the smell test, let alone pass muster in light of the evidence in this case. H.I.G. knew that: (1) South Bay made its money from Medicaid; (2) Medicaid had reimbursement requirements; (3) those requirements included supervision of unlicensed clinicians; (4) South Bay employed unlicensed clinicians; and (5) South Bay did not provide licensed supervision to all of its unlicensed clinicians. Pls.' SOF, ¶¶ 84, 127, 133, 156; SAF, ¶¶ 27-28, 31, 41, 43-48, 50, 56-58. H.I.G. relies on the same misguided argument that the other Defendants do, claiming that it did not learn all of this information at once and thus cannot be held liable under the FCA and MFCA. Corp. Defs.' Mem. at 19. That isn't true; witnesses have testified that the discussions

with H.I.G. about supervision occurred in the context of regulatory compliance. SAF, ¶¶ 43, 46-48. Moreover, the H.I.G. witnesses did not testify that conversations about compliance definitely did not occur; they simply could not recall either way. SAF, ¶ 61. Even accepting the facts as H.I.G. now frames them, H.I.G.'s failure to tie its knowledge of the regulations with which South Bay was required to comply to the supervision deficiencies of which they were aware is the very definition of "ostrich-like" behavior.

The same is true with respect to causation. Numerous witnesses have testified that H.I.G. was presented with recommendations to correct the noncompliance at South Bay, whether through the initial Tiger Teams report, a subsequent report commissioned for H.I.G. about the failure to implement the Tiger Teams' recommendations, a clinical training initiative by C.I.S.'s Chief Clinical Officer, and Relator herself. Pls.' SOF, ¶¶ 127, 133, 154, 156; SAF, ¶¶ 48, 50, 94. And those same witnesses have testified that H.I.G. failed to bring South Bay into compliance, despite the fact that H.I.G.'s approval would have been required to do so. Pls.' SOF, ¶¶ 151-56, 158; SAF, ¶¶ 54-55, 93-94. Once again, H.I.G.'s own witnesses do not dispute this; they simply do not recall either way. SAF, ¶¶ 49, 95. Faced with some witnesses who remember H.I.G. meeting the standard for causation, and with its own principals' recollections conveniently erased, H.I.G.'s assertion that there is ***no question of material fact*** here is baseless.

i.    H.I.G. Oversaw South Bay's Regulatory Compliance and Knew that Medicaid Required Licensed Supervision.

As a private equity firm, H.I.G.'s acquisition of South Bay was a business decision. The managing director of H.I.G., Steven Loose, testified that South Bay was "an interesting business. . . I had seldom seen businesses with a supply-demand imbalance like this. . . there is way too much demand for the services and not enough supply, so if . . . we just crack that code, that's a great business with, at the time, good margins." SAF, ¶ 25. Of course, what Loose meant is that

8

low-income people in Massachusetts needed more mental health services than were available, and H.I.G. wanted to make a profit off that imbalance. That motivation is instructive in understanding what H.I.G. knew about South Bay's business, of which it now seeks to absolve itself of all responsibility.

At South Bay, the vast majority of the profits H.I.G. sought would be generated by payments from Medicaid. SAF, ¶¶ 27, 31. H.I.G. knew that from the start. H.I.G. testified, through Loose as its corporate designee, that it knew, at the time of the acquisition, that "the great majority of South Bay's revenue came directly or indirectly from Medicaid." SAF, ¶ 27. Nick Scola, H.I.G.'s principal and the only member of the deal team that acquired South Bay with previous experience with health care companies, knew even more details about Medicaid's reimbursement, stating that the primary source of revenue at the time of the acquisition was from "MBHP and Beacon." SAF, ¶ 27. Even after the acquisitions, H.I.G. continued to correctly articulate the details of how South Bay made money, stating in a presentation to lenders in June 2015 that "[t]he primary source of reimbursement for mental and behavioral health services is Medicaid, which provides funding directly and indirectly through numerous managed care organizations ('MCOs')." SAF, ¶ 31.

H.I.G. also knew that Medicaid had specific reimbursement requirements, compliance with which was a condition of payment. H.I.G.'s corporate designee confirmed that "H.I.G. knew before the transaction and after the transaction that Medicaid had certain conditions of reimbursement or payment." SAF, ¶ 28. The other members of H.I.G.'s deal team, Scola, Eric Tencer, and Mark Waiting, similarly confirmed that they knew that Medicaid had reimbursement requirements. SAF, ¶ 28 ("clearly there's specific requirements in order for payment to be made.").

And ***H.I.G. knew that Medicaid had licensure and supervision requirements***. Loose testified that he was aware at the time of H.I.G.'s oversight of South Bay that "Medicaid had some requirements in terms of licensure and qualification for mental health professionals." SAF, ¶ 43. And Jeff Fritsch, a later member of H.I.G.'s team and a current occupant of a seat on the C.I.S. Board of Directors, confirmed:

> Q. When employees of South Bay were performing supervision and H.I.G. is analyzing all of this data, was H.I.G. considering supervision as revenue generating?
> A. Supervision was considered as a requirement and we looked at all billable hours sent to payers and looked at the average reimbursement rate for each.
> Q. Okay. And **so H.I.G. was aware that supervision was a Medicaid requirement, right?**
> **A. Yes.**

SAF, ¶ 46 (emphasis added). In fact, Fritsch admitted that not only did H.I.G. know that supervision was a Medicaid requirement, but also that he knew how it was paid, stating that "any supervision was part of the reimbursement" for the underlying service, not reimbursed separately by Medicaid. SAF, ¶ 46. Fritsch may have obtained this sophisticated knowledge through the detailed analysis that he, on behalf of H.I.G., conducted for and circulated to H.I.G., C.I.S., and South Bay, providing South Bay with Medicaid reimbursement information broken down by code, type of service, and location. SAF, ¶ 58.

Gearhart, South Bay's Director of Outpatient Mental Health, similarly informed H.I.G. that licensed supervision was a matter of regulatory compliance, stating that:

> Q. Did you communicate at all that the licensed supervision was a matter of compliance with regulation?
> A. Yes.
> Q. At meetings with HIG?
> A. Yes.
> Q. Do you recall specific discussions with HIG about how South Bay was complying with the performance specs for MassHealth?
> A. When it comes to supervision or just in general?
> Q. When it comes to supervision?
> A. Yes. I mean, the model around having every single staff person that has a

10

> Master's degree that's not licensed, has to be supervised by an independently
> licensed clinician or supervisor.

SAF, ¶ 47.

H.I.G. was in this to make a profit, knew that the profits came from Medicaid, knew that Medicaid had certain requirements, and ***knew that those requirements included the licensure and supervision of clinicians***. It is no surprise, then, that H.I.G. put its principals in charge of overseeing compliance with those requirements. Fritsch said it best when he acknowledged that "I believe that was the board's duty to . . . ensure the business is in compliance." SAF, ¶ 29. According to South Bay's policies and procedures manual, the C.I.S. Board of Directors, which H.I.G. controlled, was slated to receive "quarterly compliance reports from the Compliance Officer and an annual report recommending any changes necessary to improve the compliance program." SAF, ¶ 30. The Board also was supposed to review and approve South Bay's "Agency Compliance Plan"—a plan which, ironically, identified billing for services provided by unqualified, unlicensed staff as a risk area for South Bay—on an annual basis. Pls.' SOF, ¶¶ 105, 111.

Even beyond its obligations on the Board, H.I.G. placed itself in a managerial role with respect to C.I.S. and South Bay. H.I.G. entered into a management services agreement with C.I.S.'s holding company, C.I.S.H., wherein it agreed to provide "management, consulting, and financial advisory services" to C.I.S.H.'s subsidiaries, which includes South Bay. SAF, ¶ 26. H.I.G. provided those services, assisting South Bay in operational issues ranging from recruiting and retention analysis to personnel management, compensation, and compliance. SAF, ¶¶ 51-60. In fact, right after H.I.G. purchased the company, Scola told Sheehan that he would provide dedicated assistance in evaluating retention at South Bay, stating "I'm going to make myself available to spend a lot more time in Brockton to help get this thing turned around." SAF, ¶ 51.

11

In this managerial role, H.I.G. represented to outside lenders that it was ensuring compliance with these requirements at C.I.S. and its subsidiaries, including South Bay, even going so far as to state that "[u]nder H.I.G.'s ownership, the Company has not experienced material litigation or significant regulatory issues." SAF, ¶ 31.

> ii.     H.I.G. Was Repeatedly Informed that South Bay Did Not Provide Licensed Supervision to Its Many Unlicensed Clinicians.

But South Bay was experiencing significant regulatory issues, and H.I.G. knew that too. In addition to knowing that South Bay's business model relied on Medicaid reimbursement and that licensed supervision was one of Medicaid's requirements, H.I.G. knew South Bay's workforce primarily consisted of unlicensed clinicians. Waiting, one of the initial deal team members at H.I.G., testified that he recalled discussing "the qualifications – for example, what degrees people – had for SBMH therapists," during the due diligence process to acquire South Bay with Loose and Scola. SAF, ¶ 41. Scola confirmed that, testifying he recalled knowing that "South Bay hired therapists straight out of master's programs[.]" SAF, ¶ 44. So did Loose, who stated that he understood "[t]hat there are some clinicians that are unlicensed, yes." SAF, ¶ 44.

It is no surprise that H.I.G. knew this information, because H.I.G. was intimately involved in South Bay's recruitment and retention efforts with respect to clinicians. Sheehan testified to this involvement, stating that he was having "continuous" conversations with Scola about retention, and with Loose as well. SAF, ¶ 45. As part of those efforts, the Chief Financial Officer of C.I.S., Russell Allen, sent Sheehan and Scola a database reflecting every employee's licensure status, including the type of license obtained and when it expired. SAF, ¶ 56. Moreover, Relator recalled being requested to send detailed retention and recruitment data to Scola, which included "their degree program, whether they were qualified, all of that." SAF, ¶ 48. She was not alone; H.I.G. received, on numerous occasions, detailed spreadsheets from

South Bay and C.I.S. employees identifying the licensure status and degrees of South Bay employees. SAF, ¶¶ 56-57.

Nor can H.I.G. claim that it did not understand that the unlicensed clinicians at South Bay were not receiving required clinical supervision from an independently licensed supervisor, because it was informed about South Bay's deficient supervision practices on numerous occasions. In reading the Corporate Defendants' brief, one could be misled to assume that the only way H.I.G. could have possibly learned about South Bay's noncompliance was from Relator; her conversations with H.I.G. are the only ones they focus on in attempting to demonstrate that there is *no* dispute of material fact in this matter. *See* Corp. Defs.' Mem. at 17-19. It's easy to understand why H.I.G. would want to discredit Relator, since she ***did*** tell Scola that South Bay was losing employees because they were not receiving appropriate licensed supervision. SAF, ¶ 48. Relator acknowledged that while she did not point Scola to specific regulations requiring such supervision, she assumed that this conversation put him on notice of noncompliance because he "was investing in a mental health care company," and "because I think people even outside of mental health know that if you go to see a provider for treatment, that they should be licensed." SAF, ¶ 48. This is consistent with decades-old caselaw holding that participants in government programs have a duty to familiarize themselves with legal requirements for payment. *Heckler v. Comm'y Health Svcs. of Crawford County, Inc.,* 467 U.S. 52, 64 (1984).

But Relator was far from the only one who told H.I.G. that South Bay was noncompliant. Gearhart explained that, starting in 2012, H.I.G. had increased the pressure to grow on South Bay "astronomical[ly]", and that she expressed concern, in part, in an attempt to mitigate against South Bay's inability to hire enough licensed supervisors to keep up with the accompanying

growth. Pls.' SOF, ¶¶ 112-113. From its internal emails, it is clear that H.I.G. knew that South Bay would need to hire enough licensed supervisors to keep up with its intended growth; in a 2017 email on this issue, Scola tells Loose and Fritsch, "Not sure you need many more billers – ***but the additional supervisors are a real cost as they need to scale proportionately to clinician growth (not sure of the exact ratio)***." SAF, ¶ 59 (emphasis added).

And H.I.G. continued to learn about South Bay's compliance as time went on. In 2014, Scola was informed about the findings of the Tiger Teams, which were designed to examine retention, among other issues, in each of South Bay's divisions and make recommendations about improvements. Pls.' SOF, ¶ 133; SAF, ¶ 50. Scola received a document explicitly noting that the mental health division Tiger Team recommended hiring enough licensed supervisors to ensure all unlicensed clinicians received licensed supervision, which was not happening at the time. Pls.' SOF, ¶¶ 132-34. Jeff Quade, a leader of the Tiger Teams and C.I.S.'s Vice President of Human Resources, testified as much:

> Q. Were you at any time made aware by anyone at CIS, executives, anybody at H.I.G. or the CIS board, that licensed supervisors were required? That licensure needed to be a requirement for supervisors?
> A. Yes.
> Q. So you were told at some point that licensure was required for supervisors?
> A. Yeah, that came up in Tiger Teams.

SAF, ¶ 50.

The findings of the Tiger Teams were echoed again to H.I.G. by Ed Neuhaus, C.I.S.'s Chief Clinical Officer, who emailed Scola and Loose in 2016 about a clinical training initiative that he informed them had previously "died on the vine." Pls.' SOF, ¶¶ 127, 156. In the report accompanying his email, Neuhaus informed H.I.G. that 80% of South Bay's clinician pool did not have independent licenses, including only 67% of South Bay's clinic directors and 30% of clinic supervisors. Pls.' SOF, ¶¶ 127-28. Neuhaus reported that "There is a shortage of licensed

and qualified supervisors as only 20% of all MH clinicians are licensed, and 12% of the staff

therapist sub-group. The in-house capacity at SBMH is limited to provide ongoing supervision

and monitoring of clinicians in their daily practice." Pls.' SOF, ¶¶ 127 (Neuhaus Ex. 16 (Silhan

Decl. 58) at CIS003754), 156.

Even though it clearly was told on numerous occasions, H.I.G. did not even need to be

told who the supervisors at South Bay were, because it was conducting its own detailed analyses

of supervision and its impact on South Bay's revenue. In 2015, Fritsch was emailing C.I.S. and

H.I.G. employees and working on "monitor[ing] the impact of supervisor staffing on the direct

labor cost per hour billed" metric. SAF, ¶ 58. When asked about this document, Fritsch testified:

> Q. Okay. H.I.G. is requesting that South Bay monitor the impact of supervisor
> staffing on the direct labor costs per hour billed; correct?
> A. Yes.
> **Q. And H.I.G. understood that the supervisors had to be licensed
> supervisors; right?**
> **A. Yes.**

SAF, ¶ 58 (emphasis added). Similarly, South Bay sent disciplinary action reports to H.I.G.,

which reported on employee-level details of compliance violations, including individual session

notes not matching claims data, "documentation concerns," and employees who were

"[d]ishonest with degree." SAF, ¶ 60.

All of this evidence makes plain that H.I.G. has not come close to meeting its burden of

demonstrating that there is ***no question of material fact*** with respect to H.I.G.'s knowledge.

H.I.G. attempts to rebut this evidence with testimony from its own witnesses, but, in fact, those

witnesses have litigation-induced amnesia and cannot state either way whether they knew about

South Bay's deficient supervision. For example, when asked about his conversations with

Relator, Scola testified that he couldn't deny or agree with her recollection of them, stating "I

don't remember what we talked about." SAF, ¶ 49. The corporate designee for H.I.G., Loose,

similarly struggled with his memory:

> Q. So H.I.G. was aware, prior to this case, of requirements relating to qualification and licensure of mental health professionals in order to bill Medicaid?
> A. So we were aware of that there were, broadly speaking, qualification -- requirements around licensure and supervision -- sorry. Strike that. Licensure and qualifications. But in terms of the "in order to bill Medicaid part", I'm not -- no, not necessarily. No. I don't believe so. Or I'm not sure.

SAF, ¶ 43. Given that the H.I.G. witnesses cannot remember key conversations or issues in this case, but other people definitively recall discussing South Bay's noncompliance with them, including the fact that licensed supervision was a condition of regulatory compliance, H.I.G.'s knowledge is "a factual issue rife with credibility determinations" that is for a jury to decide. *Siebert*, 75 F. Supp. 3d at 1120. Its request for summary judgment must be denied.

### iii.    H.I.G. Failed to Implement Recommendations to Bring South Bay Into Compliance with MassHealth Regulations.

Aside from H.I.G.'s direct involvement in the operations of South Bay, which is described above, there is also considerable evidence that H.I.G. "reject[ed] recommendations to bring South Bay into regulatory compliance," which "constitutes sufficient participation in the claims process to trigger FCA liability." Memorandum and Order, ECF No. 164, at 13 (Sept. 21, 2018). The witnesses in this case who do not work at H.I.G. all have a similar recollection about what H.I.G. did when it was presented with recommendations to correct South Bay's noncompliance (recommendations for which H.I.G.'s approval would be required to proceed)— nothing. H.I.G.'s employees, on the other hand, cannot recall what they did with these recommendations. H.I.G. cannot come close to being entitled to judgment as a matter of law.

As noted above, the recommendations of the Tiger Teams to hire additional licensed supervisors were shared with H.I.G. in 2014. H.I.G. did not do anything to make sure those recommendations were implemented. SAF, ¶¶ 93-95. Neuhaus, who was a sponsor of the Tiger

Teams, testified that H.I.G. did not "take any action . . . of any type, acting on the Tiger Team recommendations." SAF, ¶ 94. But for South Bay to implement those recommendations, H.I.G. would have needed to. The Tiger Teams recommended hiring more licensed supervisors and improving clinician compensation, both of which would have increased South Bay's and C.I.S.'s budgetary expenses. SAF, ¶¶ 52-55.  As Jeff Quade testified, H.I.G. needed to sign off on any such expenditures:

> Q. And was H.I.G.'s approval required to address the compensation issue?
> A. When -- can I give more than a yes/no?
> Q. Sure.
> A. Is that okay? In my experience, any company that is going to put through a systematic change in spending always has to get that approved by whatever higher body there is, whether it's an owner, whether it's a board, whether it's the shareholders, whatever else. And I don't -- I don't remember the total spin that would have been put in place to make these changes to make us more competitive, but it was substantive. And you are going to have to get approval for that to make budgetary changes in a fiscal year, and we set a budget. That's just normal operating procedure for any business.

SAF, ¶ 55.

Not only did H.I.G. not approve those recommendations in 2014, but H.I.G. also received a report documenting how the Tiger Team recommendations were not implemented in July 2016. At that time, H.I.G. commissioned a report by ghSMART to identify certain deficiencies and potential solutions at South Bay, including those related to Sheehan's leadership. Pls.' SOF, ¶ 154. In that report, multiple employees commented that the Tiger Team recommendations were ignored. The report includes the following employee statements:

- "We were unwilling to spend the money after the Tiger Teams to implement the required changes. It was a thorough process, but nothing was implemented."
- "The Tiger Team stuff identified all of these issues and nothing came of it. We would be in a much better position if we had actually done something."
- "The Tiger Teams were something that were great; they came out with some great ideas, but nothing got acted on at the time."
- "We need to feel heard. We did this Tiger Team thing 2-3 years ago and nothing came of it. I'm really worried that nothing will come of this, either."

17

Pls.' SOF, ¶ 155. Unsurprisingly, Scola did not recall if he discussed this report. SAF, ¶ 95.

Loose acknowledged that he knew that the Tiger Team recommendations had not been

implemented from this report, but could not recall whether that included supervision. SAF, ¶ 95.

      A few months later, as discussed in Section II.a.ii, *supra*, Neuhaus contacted Scola and

Loose of H.I.G. to talk about his previous clinical training initiative that had "died on the vine,"

and the fact that a high percentage of supervisors and clinic directors at South Bay were

unlicensed. Neuhaus testified that H.I.G. responded as they had to the Tiger Teams:

> Q. Did the H.I.G. folks, after you sent this email, ever follow up with you and ask
> you about the lack of licensed supervision?
> A. No.

SAF, ¶ 94. In fact, according to Neuhaus, despite his raising of this issue, H.I.G. never discussed

it with him. SAF, ¶ 94.

      As a result, the Court is left with key undisputed facts. H.I.G. knew that: (1) Medicaid

had reimbursement requirements; (2) those requirements included licensed supervision for

unlicensed clinicians; (3) South Bay employed large numbers of unlicensed clinicians; and (4)

South Bay did not provide licensed supervision to all of its unlicensed clinicians. Armed with

that knowledge, H.I.G. was repeatedly presented with recommendations—from the Tiger Teams,

from employees complaining that the Tiger Teams' recommendations were not implemented,

from Ed Neuhaus—to correct this noncompliance. And it failed to implement the

recommendations, ratifying South Bay's continued submission of false claims. H.I.G. cannot

credibly say that there is no question of fact and that it is entitled to judgment as a matter of law,

particularly given how directly involved it was in South Bay's operations. Its motion with

respect to causation should be denied.

      **b.**    **Peter Scanlon Was Repeatedly Informed about South Bay's Noncompliance, Recklessly Disregarded His Obligations to Ensure Compliance, and Controlled South Bay's Billing Process.**

To escape liability for his role in this scheme, Scanlon attempts to portray himself as a passive observer—not having anything to do with South Bay's claims process, not able to connect the dots between unlicensed supervision and regulatory infractions, and wholly reliant on the government to tell him whether the company he created was breaking the rules. Scanlon Mem. at 1-2. Abundant evidence contradicts these assertions.

What is undisputed is that Scanlon founded South Bay and was responsible for virtually all aspects of South Bay's operations for more than two decades, including regulatory compliance. Pls.' SOF, ¶¶ 62, 66; SAF, ¶¶ 32-36, 62. What is also undisputed is that, on multiple occasions, Scanlon was directly told by multiple South Bay employees—not just Relator—that South Bay was not in compliance with regulations requiring supervision of unqualified clinicians, regulations that he admitted he had read and understood. Pls.' SOF, ¶¶ 102-04, 106, 131-133; SAF, ¶¶ 66-71, 86; *see also* SAF, ¶ 92. In fact, when asked by Sheehan about South Bay's compliance with regulations, Scanlon admitted that South Bay was not fully compliant. Pls.' SOF, ¶ 116. Moreover, South Bay employees during his tenure reported that Scanlon referred to fraud as the "f word" at South Bay and that it was Scanlon's attitude that "nothing can be considered 'fraudulent' until proven by a court and proves intent." SAF, ¶ 69. In light of this unambiguous evidence of knowledge, his newfound ignorance as to the impact of supervision issues on regulatory noncompliance, *see* Scanlon Mem. at 14, as well as his reliance on the government to identify his company's noncompliance for him, *see* Scanlon Mem. at 11-12, are particularly unavailing.

Equally unavailing is Scanlon's argument as to why he did not cause the submission of South Bay's false and fraudulent claims. Scanlon claims that he did not have "any actual involvement in the claims preparation or submission process at South Bay." Scanlon Mem. at 18.

But personally submitting the claims is not required, Memorandum and Order, ECF No. 165 at 21-23, (Sept. 21, 2018), and in any case, the discovery has demonstrated that while he was in charge of South Bay, Scanlon oversaw the entirety of the claims submission process and therefore was the person responsible for the submission of all of South Bay's claims, including those for services rendered by unqualified clinicians who did not receive supervision from an independently licensed clinician. Pls.' SOF, ¶¶ 62, 66; SAF, ¶¶ 32-36, 62-64. Scanlon also claims that he actually "took affirmative steps to prevent South Bay from submitting false claims." Scanlon Mem. at 18. This statement, too, is at odds with all relevant facts; both before and even after the acquisition, when Scanlon was no longer overseeing the claims submission process, Scanlon actively prevented South Bay from coming into compliance despite being presented with opportunities to do so. Pls.' SOF, ¶¶ 115, 149; SAF, ¶¶ 65-68, 70, 86, 92. He is in no way entitled to dismissal of the case against him.

       i.    <u>Scanlon knew about the noncompliant supervision practices at South Bay.</u>

Before he sold South Bay for $31 million, Scanlon, as owner, president, and CEO, was responsible for ensuring that South Bay was in compliance with MassHealth regulations and knew that South Bay was required to ensure that unqualified clinicians received supervision from an independently licensed clinician. Numerous individuals who worked at South Bay prior to its acquisition, including the Director of Outpatient Mental Health, the Controller, the Business Manager, and the Assistant Business Manager, all identified Scanlon as the person responsible for interpreting and understanding regulations and payor performance specifications at South Bay. SAF, ¶ 33. Scanlon understood that South Bay's clinics were required to be in compliance with all state and federal statutes, rules, and regulations, including the regulations promulgated by MassHealth and the Massachusetts Department of Public Health ("DPH"). SAF, ¶ 32.

During his testimony in this case, Scanlon made clear that not only was he responsible for

South Bay's compliance with regulations, but that he was aware of the specific requirements promulgated by MassHealth. Scanlon knew that, to bill for services provided by unqualified clinicians, MassHealth required that those clinicians be under the direct and continuous supervision of independently licensed clinicians. Pls.' SOF, ¶ 102. Scanlon stated that he referred to the MassHealth regulations "regularly" and recalled reviewing the regulation requiring direct and continuous supervision of social workers without an independent license and of unlicensed mental health counselors. SAF, ¶¶ 63-64. Scanlon testified that he "repeatedly" discussed these provisions with staff members and administrators. SAF, ¶ 63.

Not only did Scanlon know what MassHealth required, but he also knew that South Bay was not meeting those requirements. Gearhart testified that, in 2011, she spoke with Scanlon about problems related to staffing. In these discussions, Gearhart told Scanlon that South Bay needed to hire additional independently licensed clinicians to supervise unlicensed clinicians or South Bay "had to get everyone licensed." Pls.' SOF, ¶ 106. Similarly, in May 2011, Scanlon spent considerable time reviewing South Bay's compensation structure for supervisors. As part of that review, Scanlon reviewed a list of South Bay supervisors and identified those with and without licenses; Scanlon indicated his intention to provide clinic directors and supervisors with licenses with salary increases, as they were qualified to provide licensed supervision. SAF, ¶ 65.

In early 2012, Relator began voicing her concerns to Scanlon about South Bay's noncompliance. Pls.' SOF, ¶ 115. Relator's concerns began when she initially identified three newly hired unlicensed staff therapists who lacked the requisite educational degrees and clinical training, and another therapist, Donna Scott, who did not have a qualifying educational background to treat MassHealth members. Pls.' SOF, ¶ 115; SAF, ¶ 66. Relator recalled having had such frequent conversations with Scanlon about the issue that "I can't pinpoint the dates

because we all worked so closely together that they were such frequent conversations." SAF, ¶ 72. She recalled Scanlon telling her that "fraud is not fraud until it is proven in court" and that, if South Bay were ever found to be in violation of a regulation, nothing more would come of it than a "slap on the wrist and a fine." SAF, ¶¶ 68-69. After Relator raised these concerns to Sheehan as well, Sheehan recalled asking Scanlon if South Bay had compliant supervision practices. Pls.' SOF, ¶ 116. Sheehan recalls that Scanlon indicated that he knew that South Bay provided inadequate supervision to unlicensed clinicians and responded that "with the turnover we have, with people leaving, people moving on, are we 100 percent, 24/7 compliant? . . . I'm sure there's days when we're not." Pls.' SOF, ¶ 116.

Scanlon continued to be informed about South Bay's noncompliance after South Bay was acquired by C.I.S. Pls.' SOF, ¶¶ 106, 131-133; SAF, ¶¶ 70-72, 86, 92. In 2014, Scanlon was also one of the "sponsors" of the "Tiger Teams," which ultimately recommended the hiring of additional licensed supervisors and specifically discussed how not having those supervisors did not comply with MassHealth regulatory requirements. *See* Section II.c.ii, *infra*.

Scanlon's principal defense—that he did not connect supervision issues raised to him to regulatory noncompliance—is thus unavailing for two reasons. First, there is direct evidence that the regulatory issues were raised to him and that he admitted to his then-boss that South Bay was not fully compliant with those regulations. Second, he has admitted that he knew what the regulatory requirements were. He cannot claim ignorance here.

Scanlon's other defense on scienter—that MBHP, MCO, and DPH audits did not find South Bay to be noncompliant—is equally unpersuasive. This bizarre defense, which South Bay

also relies on,[3] appears to be an attempt at the inverse of the traditional "government knowledge"

theory. Ordinarily, "government knowledge can prevent the defendant from forming the requisite

state of mind (knowing that the claim is false or fraudulent). . . only ***where the government's***

***knowledge as to the true facts is extensive and in some cases where the government has***

***actively approved of the underlying facts***." *Mylan Labs.*, 608 F. Supp. 2d at 149 (emphasis

added); *see also Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) ("there

may . . . be occasions when the government's knowledge of or cooperation with a [defendant's]

actions is so extensive that the [defendant] could not as a matter of law possess the requisite state

of mind to be liable under the FCA."). Scanlon's and South Bay's situation is the opposite of

these cases; the government auditors involved here did not actually know about, or bless, the

extent of South Bay's noncompliance through those audits.[4] Pls.' SOF, ¶¶ 159-60; SAF, ¶ 20.

That is probably because, as Plaintiffs argued in their Memorandum in Support of Plaintiffs'

Motion for Partial Summary Judgment, ECF No. 277 (May 8, 2020) (hereinafter "Pls.' Mem."),

South Bay concealed the identity of supervisors by instructing licensed supervisors to sign off on

supervision notes for clinicians they had not supervised. Pls.' SOF, ¶¶ 107, 120. Either way,

there is no evidence that the government knew of or approved South Bay's noncompliance.

Scanlon's scienter cannot be negated on this basis.

ii.    Scanlon oversaw South Bay's claims submission process prior to the
acquisition.

Scanlon's argument that he was not responsible for claims submission at South Bay also

strains all credulity. As founder, sole owner, president, and CEO of South Bay from 1986 to

---

[3] The sole evidence South Bay offers to support this claim is the testimony of Gearhart, whom South Bay neglects to
mention was quoting a self-serving, unsupported, and vague assertion about managed care audits in one of South
Bay's own documents. *See* Plaintiffs' Response to Statement of Corporate Defendants' Undisputed Material Fact
No. 96. Because that evidence is inadmissible hearsay that South Bay cannot produce in admissible form, Fed. R.
Evid. 802, Fed. R. Civ. P. 56(c)(2), the Court should not consider it.
[4] *See* Plaintiffs' Response to Statement of Corporate Defendants' Undisputed Material Fact No. 96.

April 2012, Scanlon created and enforced South Bay's policies and procedures, oversaw the

billing department, and registered South Bay as a MassHealth provider. Before April 12, 2012,

Scanlon had signed all MassHealth provider contracts on behalf of South Bay clinics. SAF, ¶ 32.

He had represented in his signatures on those contracts that South Bay would comply with all

applicable laws and regulations. SAF, ¶ 32. And as Plaintiffs have argued in Section II.b.i, *supra*,

before April 12, 2012, Scanlon was ultimately responsible for reviewing MassHealth regulations

and ensuring that South Bay was following those requirements; he was also recognized as having

that responsibility by others at South Bay. Pls.' SOF, ¶¶ 62, 66; SAF, ¶¶ 32-36.

In fact, numerous individuals testified that Scanlon was responsible for ensuring

compliance with requirements from all payors, not just MassHealth, and controlled, supervised,

and delegated responsibility for claims submission to South Bay's billing department and staff.

Gearhart testified that Scanlon was responsible for ensuring that South Bay satisfied the payors'

performance specifications, and even though Rose Lunney, the Business Manager, was

responsible for reviewing regulations, there was no distinction between Scanlon's

responsibilities and Lunney's responsibilities for understanding MassHealth's billing regulations.

SAF, ¶ 35. Gearhart added that the responsibility of ensuring the billing of third-party payors

rested with both Scanlon and the billing department. SAF, ¶ 35. Christine Oldham, South Bay's

Assistant Business Manager, also testified that concerning South Bay's billing process, Scanlon

would "weigh in on" the specific requirements that payors had for billable services, and Scanlon

was responsible for determining whether a payer would cover a particular kind of service related

to South Bay's behavioral health practice. SAF, ¶ 35. Kathy Bangerter, South Bay's Director of

Utilization Management and Compliance Officer until 2012, also indicated that Scanlon oversaw

the billing department and was responsible for making sure that South Bay's billers properly

24

implemented MassHealth directives, like returning overpayments. SAF, ¶ 35.

> iii.    Scanlon failed to bring South Bay into compliance with licensure and supervision regulations before and after the acquisition.

Not only did Scanlon exercise considerable authority over the claims submission process, but he also prevented South Bay from coming into compliance with MassHealth regulations during the time period when he was empowered to do so. The fact that Scanlon failed to bring South Bay into compliance with MassHealth regulations is obvious from evidence presented in Section II.a, *supra*, and II.c, *infra*. Scanlon was in charge of South Bay before H.I.G. and Sheehan; the fact that multiple employees were bringing South Bay's noncompliance to H.I.G.'s and Sheehan's attention (and their failure to correct that noncompliance) shows that South Bay failed to come into compliance on Scanlon's watch.

Moreover, the record is replete with instances of Scanlon turning down or rejecting opportunities to bring South Bay into compliance. Even though Gearhart told Scanlon in 2011 that South Bay needed to hire additional independently licensed supervisors to supervise unlicensed clinicians, and that this problem would be exacerbated with C.I.S.'s plans for growth, Scanlon did not discuss these concerns with C.I.S. Instead, he made representations and warranties in the purchase and sale agreement that South Bay was in material compliance with applicable health care program rules and regulations. SAF, ¶ 36. In 2012, Relator brought concerns to the attention of multiple C.I.S. and South Bay employees, including Scanlon, about South Bay's pervasive practice of employing unlicensed and unqualified supervisors. Pls.' SOF, ¶ 115; SAF, ¶¶ 66-68, 70. She testified that she had four or five in-person substantive conversations with Scanlon concerning the MassHealth supervision regulations when this issue arose, and Scanlon often would not respond to or answer her concerns. SAF, ¶ 67. And after the Tiger Teams, Scanlon wrote to Sheehan, noting that the Mental Health Tiger Team "did raise some concerns about our compliance

with state regulations" and "got into some very specific recommendations about hiring"—
specifically, hiring eight supervisors—that "may or may not be practical." DeVoe Ex. 20. He
suggested they instead focus on "[t]raining the supervisors we have now." *Id.* Around the same
time, when South Bay's own corporate designee claimed that he convened a meeting aimed at
addressing the systemic noncompliance at South Bay, Scanlon told attendees that South Bay was
in compliance with MassHealth regulations, contradicting not only the available evidence but other
members of the C.I.S. and South Bay leadership team who concluded the opposite. Pls.' SOF, ¶
149; SAF, ¶¶ 84-87, 96.

Scanlon went further than just rejecting recommendations to bring South Bay into
compliance; he misrepresented that South Bay was in compliance while ignoring or shooting down
attempts to fix South Bay's practices. That behavior more than meets the standard for causation.

### c.   Kevin Sheehan Was Repeatedly Informed about South Bay's Noncompliance, Recklessly Disregarded His Obligations to Ensure Compliance, and Failed to Implement Recommendations to Bring South Bay into Compliance.

In his Memorandum, Sheehan continues to do what he did for years when running South
Bay and C.I.S.—recklessly disregard the facts. Sheehan claims that Plaintiffs cannot establish his
scienter because: (1) he reasonably relied on the experience of others to manage South Bay's
compliance with regulations, Sheehan Mem. at 14-16; (2) his conversations with the Relator did
not put him on notice of South Bay's noncompliance with specific regulations, Sheehan Mem. at
17-19; and (3) even if he did know about noncompliance with MassHealth regulations, he did not
understand that noncompliance to be related to a billing problem, Sheehan Mem. at 17.

These defenses do not come close to satisfying the demanding summary judgment
standard. First, in his role as CEO of South Bay and C.I.S., Sheehan assumed responsibility for
South Bay's regulatory compliance after he took over for Scanlon. Pls.' SOF, ¶ 72; SAF, ¶ 37.
That responsibility was attested to by many individuals, both subordinates and supervisors of

Sheehan, in the depositions conducted in this case; in fact, some of the testifying individuals stated that they relied on his judgment in ensuring compliance because of his past experience managing healthcare companies. Pls.' SOF, ¶ 108; SAF, ¶ 37. When in such a role, Sheehan cannot simply wash his hands of responsibility. *See Lamb Eng'g & Const. Co. v. United States*, 58 Fed. Cl. 106, 110 (2003) (noting that the inclusion of the "deliberate ignorance" and "reckless disregard" standards were "designed to address the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know.").

Second, his claims that he relied on others who told him that South Bay was in compliance are particularly unpersuasive given that Sheehan ***was personally told*** on numerous occasions, including, but not limited to, his afore-mentioned conversations with the Relator, that South Bay was ***not*** in compliance. Pls.' SOF, ¶¶ 113-116, 119, 124, 128, 130, 132-33; 142; SAF, ¶¶ 70, 72-78, 92. In his deposition, Sheehan admitted as much, stating that, as of the Tiger Teams presentations in 2014, he was specifically told that South Bay's practices violated applicable MassHealth regulations and he became aware that South Bay was not in compliance. Pls.' SOF, ¶¶ 135-36 ("So, from this whole compliance matter, I knew we were out of compliance with the rules.")

Meanwhile, Sheehan's third scienter defense—that even if he did understand there to be regulatory violations, he did not understand those regulations to have billing implications—falls squarely within the "deliberate ignorance" or "reckless disregard" scienter standard. Sheehan was ultimately responsible for South Bay's compliance with billing regulations after the C.I.S. acquisition and had previously settled a case under the False Claims Act that involved inadequate staffing and required his company to pay back government funds; he cannot now claim that he simply did not know that regulatory violations had billing implications. SAF, ¶¶ 37-40. *See, e.g.*,

27

*Mylan Labs.*, 608 F. Supp. 2d at 154.

Sheehan's causation defense basically amounts to an assertion that, when he became aware of regulatory noncompliance (of which he somehow also claims he was unaware), he attempted to bring South Bay into compliance. Sheehan Mem. at 10-12. This argument fails for the same reasons that H.I.G.'s causation argument fails. It is clear from the evidence that Sheehan was not only empowered to bring South Bay into compliance, but that he was presented with recommendations for bringing South Bay into compliance as well. Pls.' SOF, ¶¶ 119, 132-136. In the words of C.I.S. Chief Clinical Officer Ed Neuhaus, those recommendations "died on the vine." Pls.' SOF, ¶ 156. Given this evidence, it is inconceivable that Sheehan could argue that it is ***undisputed*** that he did ***not*** cause the submission of false claims; in fact, it is plainly clear that he did. His motion on scienter and participation grounds should be rejected.

> i.    Sheehan was unequivocally responsible for South Bay's regulatory compliance, so he cannot abdicate this responsibility in deference to others.

Sheehan cannot successfully claim that he delegated responsibility for South Bay's regulatory compliance because, according to numerous individuals, ***it was Sheehan*** who was ultimately responsible for South Bay's regulatory compliance when he was in charge. Both subordinates and supervisors testified to Sheehan's responsibility for regulatory compliance. Gearhart, who served under Sheehan until her departure from South Bay in 2014, testified that Sheehan was "the last word on regulatory interpretation at South Bay." SAF, ¶ 37. Scanlon, who took a subordinate role to Sheehan at C.I.S. after selling South Bay, stated that Sheehan "was responsible for pretty much anything that happened." SAF, ¶ 37. This responsibility was confirmed by the H.I.G. representatives who held a majority of the C.I.S. Board of Directors seats. For example, Scola testified that, in determining compliance with regulations, "we were relying on Kevin Sheehan and his experience." SAF, ¶ 37.

28

Against this backdrop, it is absurd for Sheehan to argue that he was relying on the statements of others that South Bay was in compliance with MassHealth regulations. Sheehan Mem. at 15. In fact, the one case that Sheehan relies on to support this argument, *Urquilla-Diaz v. Kaplan*, 780 F.3d 1039 (11th Cir. 2015), is plainly inapposite—there, the Defendant who successfully argued that he had delegated responsibility to subordinates **was not the person responsible for compliance**. *See id.* at 1062.

> ii.    <u>Sheehan was informed on numerous occasions, including by the Relator, that South Bay was not in compliance with MassHealth regulations.</u>

The defendant in *Kaplan* also testified that he "had no reason to believe that Kaplan's policies violated . . . implementing regulations," *Kaplan*, 780 F.3d at 1061, but he and Sheehan do not have that in common. After he became CEO of C.I.S., Sheehan was informed multiple times about South Bay's noncompliant supervision practices, including the fact that these practices violated material MassHealth regulations.

In 2012, Relator informed Sheehan, in the context of the Donna Scott issue about which she also had conversations with Scanlon, that South Bay had a "systemic issue" of "unlicensed staff therapists who were not supervised by somebody licensed." Pls.' SOF, ¶ 115. Indeed, in emails between Relator and Sheehan in July 2012, she reminded him of this issue and stated that she would "continue[] to bring to [Scanlon's] attention the ethical issues that arise from hiring unqualified people who are not being supervised adequately by a licensed person." Pls.' SOF, ¶ 115. And she was far from the only one. For example, Gearhart "vocalized [her] concerns about how South Bay was going to ensure compliance with supervision requirements" to Sheehan, and she did so starting in 2012. Pls.' SOF, ¶¶ 112-13.

In 2013, Sheehan was informed, yet again, about South Bay's practice of allowing unqualified clinicians to be supervised by unqualified clinicians. Around this time, Sheehan

requested that South Bay develop a retention task force designed to address South Bay's struggles with retaining clinicians. Pls.' SOF, ¶¶ 117-18. That retention task force, whose members included Sheehan and which made recommendations to management, recommended that South Bay hire more licensed supervisors and make licensure a required criterion when hiring supervisors. Pls.' SOF, ¶ 119. This information, taken alone, is sufficient to establish that Sheehan, as the person in charge of regulatory noncompliance who was presented with clear, unambiguous information that South Bay's supervision practices were deficient, at the very least **should have known** that the lack of proper supervision at South Bay had regulatory implications. *Bourseau*, 531 F.3d at 1168; *Mylan Labs.*, 608 F. Supp. 2d at 154.

But there can be no doubt that Sheehan was put on notice that South Bay was not complying with MassHealth regulations requiring licensed, clinical supervision by the 2014 Tiger Teams, as described above in Section II.a.ii, *supra*. At one meeting, members of the Tiger Team passed around copies of the MassHealth regulations to the sponsors and identified how South Bay's practice of not requiring licensed supervision for all unqualified clinicians violated MassHealth regulations. Pls.' SOF, ¶ 134; *see also* DeVoe Ex. 20 at CIS018691. That is when Sheehan turned to Scanlon and Gearhart and remarked, "I don't want to be in pinstripes." SAF, ¶ 75. Even if he does not recall that specific remark, Sheehan himself has acknowledged in his own testimony that he understood "by this point that South Bay was, by not providing licensed supervision to unlicensed clinicians, **was non compliant**." Pls.' SOF, ¶ 136 (emphasis added). He cannot now claim otherwise.

iii.     Sheehan's defense that he did not understand South Bay's noncompliance to have billing implications is the definition of "deliberate ignorance" and "reckless disregard."

Despite understanding at least by the Tiger Teams that "we were out of compliance," Sheehan's testimony was that:

> [i]t never dawned on me that we had a billing issue. It just – it just didn't. And I –
> when we got this, you know, I talked to some people at South Bay and it was like
> it went right over our head. So, from this whole compliance matter, I knew we were
> out of compliance with rules. But, I didn't realize there was a financial impact. I
> just didn't.

SAF, ¶ 76. Despite its obvious inconsistency with his newfound claims of total ignorance, Sheehan repeats this argument in his Motion and in his accompanying Declaration, stating that "[i]t was not until the investigation conducted by the Office of Inspector General that I understood there was any contention that the regulations at issue may impact South Bay's ability to render billable services." Declaration of Kevin P. Sheehan, ECF No. 285, ¶ 5 (May 8, 2020). In light of Sheehan's role at C.I.S., his failure to attempt to understand the billing requirements for the company he oversaw, and his prior settlement under the False Claims Act, his own explanation plainly meets the "deliberate ignorance" or "reckless disregard" standard.

As noted above in Section II.c.i, *supra*, there is no question that Sheehan was responsible and relied upon for regulatory compliance at South Bay once he took the reins as CEO of South Bay and C.I.S. Pls.' SOF, ¶¶ 72, 108; SAF, ¶ 37. And it is not surprising that the employees at South Bay, C.I.S., and H.I.G. testified that they had relied on Sheehan's expertise in ensuring compliance with regulatory requirements, as he had previously run multiple healthcare companies, including his last one, which had settled a prior case involving fraudulent billing of the Medicaid program. SAF, ¶¶ 37-40. In 2009, Youth and Family Centered Services, Inc. ("YFCS"), of which Sheehan was Chief Executive Office, entered into a settlement agreement for $150,000.00 with the U.S. Department of Justice to address allegations of "inadequate or worthless" services delivered by a YFCS subsidiary, Southwood Psychiatric Hospital, Inc. ("Southwood"). SAF, ¶¶ 39-40. Among the allegations were that Southwood had "insufficient levels and methods of staffing" and "inadequate staff training." SAF, ¶ 39. In his testimony in this case, Sheehan

confirmed that not only had he signed this agreement, which H.I.G. also knew about, but that he was aware that the settlement involved both the False Claims Act and billing to the Medicaid program. SAF, ¶¶ 39-40.

Sheehan not only was responsible for regulatory oversight and knew that South Bay was "out of compliance with rules," but had previously settled similar actions in which his company paid back money under the False Claims Act. Even accepting his convenient defense, the FCA and MFCA do not protect providers who fail to "familiarize themselves with the legal requirements, standards and procedures of the Medicaid program," including reimbursement. *Mylan Labs.*, 608 F. Supp. 2d at 154. Nor do they excuse "defendants who claim the defense of confusion over billing practices or records." *United States v. Mack*, No. CIV.H-98-1488, 2000 WL 33993336, at *5 (S.D. Tex. May 16, 2000). Sheehan is no exception.

    iv.    <u>Despite this knowledge and clear recommendations to bring South Bay into compliance, Sheehan repeatedly failed to do so.</u>

There is no question that Sheehan, as the CEO of both South Bay and C.I.S. and the person in charge of regulatory compliance, armed with actual knowledge that South Bay was not in compliance with those regulations, was in a position to adopt recommendations that would have brought South Bay into compliance. It is also clear from the record that Sheehan did exactly what the Court found would constitute "sufficient participation in the claims process to trigger FCA liability," Memorandum and Order, ECF No. 164, at 13 (Sept. 21, 2018)—he rejected those recommendations.

After being told of South Bay's noncompliance, it is clear that Sheehan was presented with recommendations for correcting that. During the 2012 discussions with Relator about the Donna Scott issue, Relator requested "an immediate and thorough review of our policies regarding hiring qualified clinical therapists and our ethical and legal responsibilities to provide unlicensed

therapists with licensed supervision." SAF, ¶ 73. Similarly, the retention task force not only told Sheehan about South Bay's noncompliance, it also made specific recommendations that South Bay hire more licensed supervisors and make licensure a required criterion when hiring supervisors. Pls.' SOF, ¶ 119. The recommendations Relator presented to Sheehan in 2012, and the retention task force made to him in 2013, clearly went nowhere, because the same recommendations came up again through the Tiger Teams in 2014. Pls.' SOF, ¶¶ 132-33.

And as described in Section II.a.iii, *supra*, the record is replete with evidence that the recommendations made by the Tiger Teams, for which Sheehan was a sponsor, were not adopted. Indeed, the issue persisted in November 2016, when Neuhaus emailed H.I.G. about a clinical training initiative that he informed them had previously "died on the vine." Pls.' SOF, ¶ 156. In the report accompanying his email, Neuhaus informed H.I.G. that only 67% of South Bay's clinic directors and 30% of clinic supervisors were independently licensed. Pls.' SOF, ¶¶ 128, 156. The previous, unadopted iteration of this initiative Neuhaus was referring to was **with Sheehan**, to whom Neuhaus had sent this report more than two years earlier. Pls.' SOF, ¶¶ 127-28. Neuhaus also confirmed during his deposition that he had previously discussed the issue of supervisor licensure with Sheehan. SAF, ¶ 77-78.

Sheehan's argument that he was "direct[ing]" compliance at South Bay—despite also claiming that he relied on others to ensure compliance—after learning of the regulatory violations is misleading and inaccurate. South Bay's Compliance Officer Sara Hart put together a "corrective action plan," but it was clearly ineffective, as Hart relied on the same person whom she, Sheehan, and Michael Pelletier, South Bay's President and Chief Operating Officer, had concluded was wrong about South Bay's regulatory compliance—Jennifer Gearhart—to implement it. Pls.' SOF, ¶ 149; SAF, ¶¶ 87-88, 96. Hart did nothing to ensure that it was being

followed. SAF, ¶ 97. Had she done so, she would have found that it was not, as Sheehan learned himself. SAF, ¶¶ 76-78, 92, 98. As Neuhaus reported to Sheehan and Jeff Quade in 2015 after having "in-depth" interviews with a regional director and manager at South Bay, his "take home message about clinical supervision is that we are not providing high quality clinical supervision with any consistency." SAF, ¶ 78. He further noted that South Bay was still not requiring that its supervisors be licensed, and that its supervisors' biggest complaint was that "'supervision is just about numbers' rather than how to treat this particular consumer." SAF, ¶ 78.

And, as usual, Sheehan did nothing. According to C.I.S.'s corporate designee, Andrew Calkins, South Bay was not in compliance when he took over for Sheehan. Calkins stated that South Bay did not begin requiring that supervisors have an independent license until 2017, well after Sheehan had been presented with these recommendations from multiple sources and the Tiger Teams. Pls' SOF, ¶ 158. In fact, South Bay's September 2017 job description for the "Clinical Supervisor" position still did not require licensure as a qualification for the job. Pls' SOF, ¶ 158. Calkins also refused to confirm, even as C.I.S.'s corporate designee, that South Bay was compliant with MassHealth regulations until *2019*, well after the filing of this lawsuit and South Bay's settlement with the Commonwealth. Pls' SOF, ¶ 158. Sheehan cannot escape his role in causing the submission of continued false claims at South Bay.

### d.    South Bay Is Not Entitled to Summary Judgment on Scienter.[5]

An abundance of evidence shows that South Bay knew that it was submitting materially false claims for services rendered by unqualified clinicians who had not received direct and

---

[5] After filing its Complaint in Intervention, the Commonwealth settled its allegations against South Bay and C.I.S. *See* Commonwealth's Notice of Voluntary Dismissal of Defendants South Bay Mental Health Center, Inc.; Community Intervention Services, Inc.; and Community Intervention Services Holdings, Inc., ECF No. 96 (Feb. 15, 2018). The Relator has not settled the federal False Claims Act allegations against South Bay and C.I.S., so this Opposition responds to South Bay's and C.I.S.'s motion for summary judgment with respect to the Relator's case.

continuous supervision from independently licensed clinicians. Virtually every corporate officer with the power to bind South Bay, including Scanlon and Sheehan, had actual knowledge that South Bay was not in compliance with MassHealth regulations on licensure and supervision of clinicians. And even if they did not, South Bay, as a MassHealth provider, was required to understand the requirements associated with claims it submitted, and failed to follow up on the numerous concerns raised about its compliance with those requirements.

South Bay's proffered defenses to its scienter are a series of *post-hoc* regulatory interpretations that are counter to the plain text of the regulations at issue and the testimony of numerous witnesses from South Bay, C.I.S., and H.I.G., including Scanlon and Sheehan. Far from supporting the arguments advanced in support of its motion for summary judgment, the evidence in this case clearly shows that, throughout the relevant time period and beyond, South Bay knew exactly what the MassHealth regulations require. The Court should reject its attempt to dispute its knowledge of all these requirements now.

      i.    <u>South Bay had actual knowledge that it was submitting claims for services rendered by unqualified clinicians who had not received direct and continuous supervision from independently licensed clinicians.</u>

As described in Sections II.b and II.c, *supra*, both Scanlon and Sheehan had actual knowledge of South Bay's noncompliance with regulations requiring that unqualified clinicians receive direct and continuous supervision from independently licensed supervisors. Because Scanlon was the President and CEO of South Bay, and Sheehan served as the CEO of both South Bay and C.I.S. from April 2012 until April 2016 and served on the C.I.S. Board of Directors, which oversaw South Bay, that knowledge is imputed to South Bay. *See, e.g.*, *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998) ("Further, where a corporate officer has knowledge of the falsity of a claim, that knowledge is imputed to his employer—the corporation itself.").

Other evidence further establishes South Bay's knowledge of MassHealth requirements. For instance, Gearhart testified that she knew that MassHealth would not reimburse for services performed by unlicensed, master's level clinicians unless the unlicensed clinician received clinical supervision from an independently licensed clinician. Pls.' SOF, ¶ 114. Pelletier stated that he knew that unlicensed clinicians must receive "direct and continuous supervision," meaning "[c]linical supervision" involving an ongoing relationship, "discussing any issues they may have with any of their consumers or clients." Pls.' SOF, ¶¶ 20, 88.

There were numerous instances where South Bay employees in a position to bind the company became aware of noncompliance with these requirements. Andrade told Pelletier that South Bay needed more independently licensed social workers and mental health counselors— the latter "for sign off on supervision"—because "[n]ot having licensed directors and/or supervisors [has] always been an issue." Pls.' SOF, ¶ 125. Moreover, following the Tiger Teams report, on June 5, 2014, Relator provided Pelletier with copies of the regulations and a list of the few staff at South Bay who were independently licensed. Pls.' SOF, ¶ 138. She informed Pelletier that South Bay was "failing to provide direct and continuing supervision by an independently licensed clinician in most cases." Pls.' SOF, ¶ 138. That same day, Hart further notified Pelletier that seventy-five percent of the unlicensed mental health clinicians she had sampled were being supervised by unlicensed supervisors. Pls.' SOF, ¶ 141.

Pelletier also learned from Gearhart that, because of the small number of licensed supervisors, South Bay had been relying on what he called a "waterfall effect," meaning that South Bay just tried to make sure that there was someone somewhere in the chain of supervisors or directors who was licensed, even if the licensed person never actually provided direct or continuous supervision to the unqualified clinicians. Pls.' SOF, ¶ 147. Hart confirmed this

36

practice to Pelletier and said that she could "confidently" say that South Bay was not providing proper clinical supervision to all unqualified clinicians. Pls.' SOF, ¶¶ 142, 144. And Gearhart specifically warned Pelletier that if South Bay were audited, it would have to pay back the money it had gotten from MassHealth for the services performed by unqualified clinicians who had not received proper supervision. Pls.' SOF, ¶ 114.

Pelletier, who served as South Bay's corporate representative, and Hart, who is currently South Bay's president, admitted that, at least as of June 2014, they knew that South Bay was not in full compliance with the MassHealth regulations:

> Q. Have you, and Ed [] Neuhaus and Hart concluded that Gearhart and Scanlon were actually wrong looking backwards? That their past practices were in fact wrong? Was that your conclusion?
> A. Yes.

Pls.' SOF, ¶ 149.

> Q. And you and Mike and Ed took the position that South Bay was not in compliance with the regulations; correct?
> A. Yes.

Pls.' SOF, ¶ 149.

ii.   South Bay's *post-hoc* regulatory interpretations do not negate scienter.

Against this clear evidence of knowledge at the time, South Bay's new interpretations of the MassHealth regulations cannot negate scienter. Reasonable interpretation of a regulation only precludes a finding of scienter where the defendant ***actually held*** and acted upon it in good faith ***at the time of submitting the claim***; coming up with it after the fact is not sufficient. *United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 464 (9th Cir. 1999); *see also Lincare Holdings,* 857 F.3d at 1155 (rejecting district court's conclusion that scienter can be negated by mere identification of a reasonable interpretation of an ambiguous regulation, noting that it would allow a defendant to "avoid liability by relying on a 'reasonable' interpretation

manufactured *post hoc*, despite having actual knowledge of a different authoritative interpretation."); *accord United States ex rel. Lockyer v. Pacific Health Grp. Plan,* 343 F. App'x 279, 281 (9th Cir. 2009) (good-faith interpretation may negate scienter when defendant acts upon it in submitting claims).

The evidence here shows that, at the time it was submitting claims for payment, South Bay did not hold the newfound "reasonable interpretations" it now advances.[6] Instead, it knew all along—or at least until mid-way through litigating this case—what MassHealth required, and the record is replete with evidence that, whenever anyone compared South Bay's supervision practices to MassHealth's requirements, they concluded South Bay was noncompliant. By way of example only, the record establishes the following:

- **2009:** South Bay's supervision policy required mandatory supervision of one hour per week provided by a supervisor with a Licensed Independent Clinical Social Worker ("LICSW") license or a Licensed Mental Health Counselor ("LMHC") license. SAF, ¶ 79.
- **2011-2012:** Jennifer Gearhart told Scanlon and C.I.S. that South Bay needed to make sure that its supervisors were licensed. Pls.' SOF, ¶ 106.
- **2013:** Scanlon wrote that it is "central to the supervision process" that the supervisor review the treatment provided to the client. Scanlon CID Ex. 14 (Silhan Decl. Ex. 21), at SB00015621. South Bay's supervision policy requires weekly supervision for full-time staff and bi-weekly supervision for part-time staff, contains detailed documentation requirements, and requires that supervisors review clinical details of client cases. SAF, ¶ 80.
- **2014:** The Tiger Team meetings displayed MassHealth regulations regarding licensed clinical supervision and reported that South Bay's practices violated them. Pls.' SOF, ¶ 134. Hart reviewed regulations regarding clinical supervision and determined they were "pretty straight forward." SAF, ¶ 84. She distributed highlighted copies of DPH and MassHealth regulations identifying ones that South Bay violated, including 105 C.M.R. § 140.530(E), 130 C.M.R. §§ 429.424(C)(2) & (F)(1), & 429.438(E)(1) SAF, ¶ 84. Pelletier, Hart, and Neuhaus reviewed the regulations and South Bay's supervision practices, Pls.' SOF, ¶ 149, and they agreed that South Bay's practices violated the regulations. SOF, ¶ 149. Hart prepared a "corrective action plan" that required clinical supervision by an independently-licensed supervisor weekly for full-time staff, bi-weekly for part-time staff, and that the clinical supervision be documented. SAF, ¶¶ 87-88.

[6] The fact that these interpretations are not, in any way, reasonable is discussed in Section III, *infra*.

- **2015-2016:** South Bay's supervision policy quotes 130 C.M.R. § 429.438(E)(1) in its entirety. SAF, ¶ 81. It continues to set out detailed documentation requirements, specifically describes the supervision as "clinical supervision," and requires it include discussion of clinical details of client cases. SAF, ¶ 81. It details that clinical supervision is required weekly for full-time unlicensed therapists and bi-weekly for part-time, and that it must be provided by an independently licensed supervisor. SAF, ¶ 81. It lists independently licensed supervisors and refers to their licensing boards, including for LMHCs "the Board of Registration of Allied Mental Health and Human Services Professions." SAF, ¶ 81. It also explicitly cites DPH regulations at 105 C.M.R. § 140.530(E). SAF, ¶ 81.

- **2017:** Pelletier, who was running the company at the time (and reporting to C.I.S.), testified pursuant to a civil investigative demand that MassHealth regulations required "[c]linical supervision. So, discussing their case work, discussing any issues they may have with any of their consumers or clients[,]" that LICSWs supervise "Social Workers that are not independently-licensed" for one hour for full-time staff every week, or biweekly for part-time staff; and that clinic directors have independent licenses. SAF, ¶ 89. Scanlon testified pursuant to a civil investigative demand that he understood that MassHealth conditioned reimbursement on unqualified clinicians being supervised by licensed supervisors, Pls.' SOF, ¶ 102, and that he understood 429.424(C)(2) to require that LCSWs be supervised by LICSWs. Pls.' SOF, ¶ 104.

- **2019:** Pelletier, as South Bay's corporate designee, repeatedly testified that under MassHealth regulations, unlicensed clinicians must receive clinical supervision from independently licensed supervisors. SAF, ¶ 89. He further testified that South Bay began hiring independently-licensed clinic directors to "meet expectations" set forth in its "regulations and contracts." SAF, ¶ 89.

This timeline makes clear that South Bay never acted upon its newly-claimed regulatory interpretations in submitting the claims at issue in this case, because when it bothered to consult the regulations, none of its employees involved in ensuring compliance with them had any doubt what they meant.

Plaintiffs' evidence of industry standard further supports a finding of scienter. That evidence clearly establishes that, in the mental health field, it is axiomatic that non-independently licensed clinicians can only provide mental health services under the clinical supervision of an independently licensed supervisor. *See, e.g.,* Pls.' SOF, ¶¶ 23, 25, 42-49; *see also* Plaintiffs' Response to Statement of Corporate Defendants' Undisputed Material Fact No. 105. This further undercuts South Bay's claims of ignorance or good-faith regulatory

interpretation. *See United States v. R&F Props. of Lake County, Inc.*, 433 F.3d 1349, 1357 (11th Cir. 2005) (where plaintiffs "must establish the defendant's knowledge of the falsity of the statement, which it can do by introducing evidence of how the statement would have been understood in context.") (quoting *Minnesota Assoc. of Nurse Anesthetists v. Allina Health System, Corp.,* 276 F.3d 1032, 1053 (8th Cir. 2002) (internal quotation omitted)); *accord Mylan Labs,* 608 F. Supp. 2d at 154 (evidence of industry meaning of term could support a finding that defendant had knowledge of falsity). Because South Bay's desperate attempt to negate scienter with after-the-fact regulatory interpretations is at odds with both the facts and the law, the Court should reject it.

iii.     South Bay never sought clarification about MassHealth's regulations from MassHealth but was repeatedly reminded by MCOs about the fundamental requirement of licensed clinical supervision for unqualified clinicians.

South Bay contends not only that it sought clarity from payors to confirm its supposed interpretation of supervision requirements, but also that it was told it was compliant with these requirements during surveys. Corp. Defs.' Mem. at 40. But that isn't true. South Bay sought clarification from the *MCOs* about the MCOs' specific contract requirements (e.g., which provider identifiers should go on claims)—and it did so without disclosing its actual practice of having unqualified clinicians supervise other unqualified clinicians. *See* Plaintiffs' Response to Statement of Corporate Defendants' Undisputed Material Fact Nos. 96, 98.

As the Corporate Defendants assert in their memorandum, though, the MCO contract requirements don't determine liability here; the regulations do, and there is no evidence that South Bay ever sought clarification from MassHealth about its regulations. Moreover, when South Bay did communicate with the MCOs, it was repeatedly told, and it understood, the same thing—that unlicensed clinicians may provide services only under the supervision of a licensed

supervisor:[7]

- ▪ "This means a lic[ensed] supervisor must have regular one on one supervision with the nonlic[ensed] staff person about the case and we need to have written documentation that this happens." Beckley Ex. 78 at SB00012933 (regarding UBH).
- ▪ "We currently hope that all nonlic[ensed] staff who see Beacon consumers are being directly supervised by a lic[ensed] person but this information has not been included on the claims." Beckley Ex. 81 at SB00388683 (regarding Beacon).
- ▪ "Jennifer spoke with Patrick Shaunessy…he said nonlic[ensed] ok as long as supervised by lic[ensed] person. Same as we have been told in the past." Beckley Ex. 84 at SB00388009 (Regarding Tufts).

This doesn't, as South Bay suggests, preclude a finding of scienter; it underscores the fact that South Bay had actual knowledge of the uniform requirement that unqualified clinicians must be supervised by independently licensed supervisors, that this supervision must be clinical, and that it must be documented.

With this background, the idea that the "internal debate" among its billing staff could negate scienter, Corp. Defs.' Mem. at 41, is simply wrong. There is plenty of evidence that there was no internal debate about the requirement of licensed clinical supervision, but even accepting South Bay's word for it (which is not the summary judgment standard), this behavior establishes its repeated failure to familiarize itself with billing requirements, which meets the reckless disregard standard. *Mylan Labs.*, 608 F. Supp. 2d at 154; *see also* Section II.c.iii, *supra*. Further, if South Bay actually believed at the time that the MassHealth regulations were confusing—as opposed to the MCO requirements it supposedly sought to clarify—it had a duty to seek clarification of the perceived ambiguity ***from MassHealth***. The failure to do so also meets the reckless disregard standard. *Siebert v. Gene Security Network, Inc.,* 2014 WL 6765835, at *7-8 (N.D. Cal. Dec. 1, 2014) ("those who submit claims to the government for reimbursement may

---

[7] *See also* Plaintiffs' Response to Statement of Corporate Defendants' Undisputed Material Fact No. 98.

be acting in reckless disregard as to the truth or falsity of their submissions if they fail to take steps to confirm the accuracy of those submissions." (internal quotation omitted)).[8]

The Court should also reject South Bay's implication that, because MassHealth and MBHP issued allegedly "clarifying communications," there was confusion in the industry that is relevant to the question of South Bay's own state of mind. Corp. Defs.' Mem. at 12, 29, 38. A defendant cannot hide behind general "confusion and misdirection" surrounding a regulation (or, in the case of much of the evidence cited by South Bay, surrounding payor contracts), where the defendant itself showed no such confusion. *Visiting Nurse Assoc of Brooklyn v. Thompson,* 378 F. Supp. 2d 75, 95 (E.D.N.Y. 2004). South Bay's motion for summary judgment on scienter should be denied.

> **e.    C.I.S. Knew About and Participated in South Bay's Submission of False Claims.**

Despite their heading claiming that "Plaintiffs Cannot Establish Scienter as to Any Defendant," the Corporate Defendants' Memorandum only argues scienter with respect to H.I.G., Corp. Defs.' Mem. at 21-22, and South Bay, *id.* at 39-41. C.I.S. fails to support its motion on scienter with any argument or evidence, and for that reason alone it should be denied. Fed. R. Civ. P. 56(c).

If the Court decides to reach the issue of C.I.S.'s scienter, it should find that the evidence shows it had actual knowledge of the regulatory violations at issue here. C.I.S. is bound by the knowledge of its corporate officers and directors, including Scanlon and Sheehan, who were informed on numerous occasions about South Bay's practice of hiring unqualified clinicians and

---

[8] The cases cited by the Corporate Defendants do not support their argument, since in each instance the defendants sought clarification from the government, which did not happen here. *See United States ex rel. Williams v. Renal Care Grp., Inc.* 696 F.3d 518, 531 (6th Cir. 2012) (detailing attempts to obtain clarification from federal officials, including by defendant's counsel); *United States v. Medica-Rents Co.,* 285 F. Supp. 2d 742, 772-75 (N.D. Tex. 2003) (detailing guidance defendant sought and received from "representatives of the United States government" supporting its use of a particular billing code)

then not providing them with appropriate, independently licensed supervision. In fact, some of the people who told Sheehan about South Bay's noncompliance were also corporate officers with the power to bind C.I.S., including Chief Clinical Officer Ed Neuhaus, whose research revealed the staggering scope of unlicensed supervision at South Bay.

Finally, C.I.S. devotes only one paragraph to its argument on causation, deferring to Sheehan's brief on the issue of its independent liability for causing South Bay to submit false claims. Corp. Defs.' Mem. 44. For the same reason there are genuine disputes of material fact as to Sheehan causation of false claims, *supra* at II.c.iv, and because, as set out further below, C.I.S. was clearly involved in South Bay's clinical operations, C.I.S.'s motion for summary judgment should be denied.

> i.   C.I.S. had actual knowledge that South Bay was submitting claims for services rendered by unlicensed staff who had not received direct and continuous supervision from appropriately licensed clinicians.

C.I.S. is liable for the knowledge held by its corporate officers and directors, including both Scanlon and Sheehan, who had actual knowledge of South Bay's noncompliance with regulations requiring that unlicensed staff receive direct and continuous supervision from independently licensed clinicians. *See, e.g.*, *McKean*, 31 F. Supp. at 1315; *see also Tropikgadget FZE*, 146 F. Supp. 3d at 280.

Beyond Scanlon and Sheehan's knowledge, C.I.S. obtained actual knowledge of South Bay's noncompliance from other employees and its own research. Gearhart told C.I.S. that MassHealth does not reimburse for master's level clinicians who have not received clinical supervision from independently licensed clinicians. Pls.' SOF, ¶ 114. Gearhart warned C.I.S.'s executives that any money received from MassHealth for noncompliant services would have to be paid back. Pls.' SOF, ¶ 114. Additionally, beyond her reports to Defendants Scanlon and Sheehan, Relator, herself a C.I.S. employee after September 2013, reported to Neuhaus and

C.I.S. Vice President of Human Resources Jeff Quade that unlicensed clinicians were being told to write in the name of a licensed supervisor even though they had never met that supervisor. Pls.' SOF, ¶ 121.

C.I.S. also knew from Neuhaus's own research in 2014 that there was a serious lack of licensed supervision for South Bay's unqualified clinicians. Pls.' SOF, ¶¶ 124, 127-28, 143. And Hart, South Bay's Compliance Officer, told Neuhaus that she was "confident SB is not meeting standards for clinical supervision[,]" which Neuhaus in turn reported to Sheehan. Pls.' SOF, ¶ 142. When Neuhaus met with Hart and Pelletier in June 2014, they collectively concluded that South Bay was, in fact, not in compliance with MassHealth regulations. Pls.' SOF, ¶ 149. There is no question that C.I.S. is liable for its knowledge of South Bay's noncompliance.

      ii.    <u>C.I.S. caused South Bay's submission of false claims.</u>

The evidence also establishes that, after this meeting, C.I.S. rejected the Tiger Team recommendation to hire licensed supervisors to ensure that unqualified clinicians were not providing care to MassHealth patients unless they had required supervision. Pls.' SOF, ¶¶ 152, 154-155; SAF, ¶¶ 50, 92-95. That alone is sufficient to trigger C.I.S.'s liability for causation.

And contrary to its claim that it stayed out of South Bay's operations, Neuhaus repeatedly took it upon himself, as C.I.S.'s Chief Clinical Officer, to scrutinize South Bay's supervision policies and practices, noting in 2014 that while Gearhart put together documents that appeared to be "in line with compliance criteria," he knew that "clinicians on the ground are reporting a very different situation." Pls.' SOF, ¶¶ 124, 127-28. He requested to review documentation of South Bay's compliance, and told Pelletier and Hart that the three of them "need to connect the dots among policy for supervision, actual practice of what we are doing, documentation of supervision, clinical staffs' ongoing concerns that they do not get adequate supervision, and leadership's response to these concerns." Pls.' SOF, ¶ 127 (Hart CID Ex. 20 (Silhan Decl. Ex.

44

61) at SB00004256). He continued scrutinizing South Bay's clinical operations even later, when in 2015 he interviewed South Bay staff and told Sheehan and Quade that South Bay was still not requiring that supervisors be licensed, SAF ¶ 78, and again in 2016, when he reminded H.I.G. of South Bay's shortage of licensed supervisors and clinic directors. Pls.' SOF, ¶ 156.

Beyond Neuhaus's involvement in South Bay's clinical operations and compliance, the evidence shows that C.I.S. and its Board were also involved in operations of South Bay and knowingly ratified South Bay's policy of submitting false claims. Pls.' SOF, ¶¶ 71, 111; *see* Section II.c.iv, *supra*. For example, when Andrew Calkins joined C.I.S. in 2016, he directed South Bay to initiate weekly audits of compliance in various risk areas, including licensed supervision. Pls.' SOF, ¶ 157; SAF, ¶¶ 90-91. C.I.S. also had control over who was in charge of overseeing South Bay. Pls.' SOF, ¶¶ 71, 109. In fact, it was C.I.S. that installed Pelletier as South Bay's President and Chief Operating Officer in 2014. Pls.' SOF, ¶ 109. Pelletier reported directly to C.I.S. Pls.' SOF, ¶ 123.

This evidence, coupled with Scanlon and Sheehan's knowledge, shows C.I.S. knew that South Bay was submitting claims for services from unqualified clinicians who had not received direct and continuous supervision from independently licensed clinicians. Moreover, it establishes that, far from leaving South Bay's regulatory compliance and clinical operations alone, C.I.S. was actively involved in both. Viewed in the light most favorable to Relator, this evidence easily creates triable issues on C.I.S.'s scienter and causation.

### III.   <u>Plaintiffs Can Clearly Establish the Falsity of Defendants' Claims.</u>

Defendants attempt to avoid liability for the falsity of South Bay's claims for payment by arguing that the regulations either don't mean what they say, or if they do, Defendants should nevertheless be excused from violating them because they have now, in 2020, devised new ways to interpret them. For instance, they now claim that, contrary to the plain language of 130 C.M.R.

§ 429.424(F)(1) requiring that supervisors of unlicensed counselors be "fully qualified" in a core discipline (and contrary to their previous filings in this case), supervisors who were merely "trained" in social work were qualified to supervise services provided to MassHealth members. Similarly, despite South Bay's corporate designee repeatedly testifying that it understood that MassHealth regulations require "licensed clinical supervision," and despite evidence that this necessarily entails a discussion of client cases, Defendants now claim that supervision that had nothing to do with the clinical care provided to MassHealth members satisfies this requirement. And even though 130 C.M.R. § 429.438(E) clearly states that the "[f]requency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration," Defendants now argue (contrary to their earlier filings in the case) that there is no specific frequency requirement at all. Finally, despite the fact that 130 C.M.R. § 429.439(C) expressly conditions reimbursement on all satellite clinics having qualified clinic directors (and despite previously conceding this), Defendants now claim that dependent satellites didn't need to have a qualified clinic director at all.

Taken together, Defendants' argument is that the MassHealth regulations permit unlicensed clinicians to treat MassHealth members without any oversight whatsoever of the clinical care they're providing, and without the involvement of anyone with an independent license, so long as they receive something called "supervision" at some point before becoming licensed. Aside from being contrary to the language and intent of the MassHealth regulations and the evidence of Defendants' understanding of them, their argument would have MassHealth regulations supersede the Commonwealth's scope of practice regulations, an absurd result that the Court should reject. Defendants' motion for summary judgment on falsity should be denied.[9]

---

[9] The Commonwealth did not intervene in Relator's False Statements counts (Counts 2 and 4), and Relator does not intend to pursue them.

**a.**   **Unlicensed Social Workers and Counselors and LCSWs Are Prohibited from Supervising Unqualified Clinicians Under MassHealth Regulations.**

As Plaintiffs argued in their motion for partial summary judgment, the most fundamental requirement governing behavioral health services provided by unlicensed clinicians is that ***their supervisors must have an independent license***. Importantly, the Defendants only dispute part of that. They do not dispute that claims for services provided by unlicensed master's level clinicians who were supervised by other unlicensed master's level clinicians are false. *See* Corp. Defs.' Mem at 33-35. Because South Bay submitted numerous claims of that nature, Defendants cannot achieve total dismissal of this case on falsity grounds.

But Defendants also advance a new argument, contradicted even by their previous court filings, that non-independently licensed social workers—individuals with the introductory Licensed Certified Social Worker ("LCSW") license—can provide supervision to mental health counselors because they are "trained" in the discipline of social work. Defendants once knew that this argument was wrong. In its memorandum in support of its Motion to Dismiss Relator's complaint, South Bay correctly stated the regulatory requirements governing who may provide the supervision required by MassHealth regulations:

> Prior to 2015, MassHealth regulations provided that only . . . unlicensed counselors under the "direct and continuous" supervision of a licensed psychiatrist, licensed psychologist, ***LICSW***, or psychiatric nurse could deliver mental health care to MassHealth members. *See* 130 C.M.R. § 429.424. MassHealth amended these regulations in 2015 to permit licensed mental health counselors ("LMHCs") to deliver services to MassHealth members without supervision.

South Bay Motion to Dismiss, ECF No. 102 at 4 (Feb. 16, 2018) (emphasis added).

There is good reason for that. The only social workers permitted to practice clinical social work ***independently*** in the Commonwealth are LICSWs. 258 C.M.R. §§ 8.03, 12.01(2) & (5); Pls.' SOF, ¶¶ 36-38. Accordingly, MassHealth prohibits LCSWs from supervising other social

47

workers. 130 C.M.R. § 429.424(C)(2) (requiring supervision to be provided by "independent clinical social worker[s]"); SAF, ¶ 4.[10] Defendants do not dispute this; as such, any claims South Bay submitted for services rendered by master's level social workers or LCSWs, who themselves were supervised by LCSWs, are unambiguously false.

Defendants' argument that all LCSWs, despite not being able to supervise other social workers, can supervise mental health counselors, is belied by a plain reading of the regulations. 130 C.M.R. § 429.424(F)(1), which governs the supervision of counselors, specifies that only "*fully qualified* professional staff member[s] trained in one of the core disciplines described in 130 CMR 429.424(A) through (D)" may provide supervision to unlicensed counselors. 130 C.M.R. § 429.424(F)(1). LCSWs have not achieved the highest level of licensure in their discipline and therefore are not "fully qualified" as social workers. SAF, ¶¶ 1, 3-4. They are explicitly prohibited from practicing independently or providing clinical supervision by scope of practice regulations. 258 C.M.R. § 12.02(1); Pls.' SOF, ¶ 37; SAF, ¶ 4. It is absurd to assert that MassHealth overruled the Commonwealth's scope of practice regulations with its own requirements. Probably for that reason, Defendants don't even argue that these clinicians are "*fully* qualified" as required by § 429.424(F)(1); they just contend that "LCSWs are trained and certified in the field of social work." Corp. Defs.' Mem. at 34. But mere training isn't enough; under Defendants' reading, even unlicensed master's level clinicians with the same level of training—or with even less training—could supervise each other, defeating the purpose of supervision entirely.

Despite their newfound claims of having a "reasonable interpretation" of the MassHealth

---

[10] MassHealth prohibits LCSWs from supervising mental health counselors unless they have been approved by the Massachusetts Board of Registration of Social Workers to be licensed as LICSWs and are awaiting final licensure paperwork to be returned. *See* SAF, ¶ 4.

regulations, the evidence shows that South Bay has actually known since at least 2009 that only independently licensed clinicians could provide clinical supervision, and that for social workers, this means an LICSW. SAF, ¶¶ 79-83, 85, 88-89. Scanlon also testified that he understood this, Pls.' SOF, ¶¶ 25, 102, 104, as did Sara Hart. Pls.' SOF, ¶¶ 25, 141. Likewise in 2014, when its "corrective action plan" drafted after review of the MassHealth regulations noted that employees must receive "clinical supervision . . . from an independent, licensed clinician (LICSW, LMHC, LMFT)." SAF, ¶ 87-88. Its 2015-2016 Policy and Procedures Manual echoed the same requirement and added a citation to the licensing board and DPH regulations SAF, ¶ 81, as did its 2018-2019 manual, which specifically notes that LCSWs are not independently licensed. SAF, ¶ 82. Moreover, South Bay's corporate designee testified repeatedly that the MassHealth regulations require that "independently licensed supervisors" be the ones providing clinical supervision to unqualified clinicians. SAF, ¶ 89. The Court should reject Defendants' attempts to rewrite history and the regulations, and deny their motion for summary judgment on the falsity of claims for services by unlicensed counselors supervised by LCSWs.

Defendants' argument concerning another newfound category of supervisors for counselors—licensed alcohol and drug abuse counselors ("LADCs")—is equally unavailing. There can be no dispute that LADCs are not "fully qualified" to provide supervision of mental health counselors; in fact, as their name suggests, they are only permitted within licensure regulations to provide treatment for individuals with a substance use disorder. 105 C.M.R. § 164.006; SAF, ¶¶ 1-2, 5-6. Their inability to provide supervision covering the full range of services a counselor would offer is why MassHealth does not allow them to serve as supervisors. SAF, ¶ 5. Defendants' assertions to the contrary should be rejected.

> **b.**  **MassHealth Regulations Require that the Independently Licensed Supervision be Clinical in Nature.**

Incredibly, after suggesting a new interpretation of who can supervise unlicensed clinicians that would both violate scope of practice regulations and contradict their own understanding during the relevant time period, Defendants accuse Plaintiffs of inventing regulatory requirements about the type of supervision that is required by the regulations. But the evidence shows that the ***Defendants understood the same regulations to require the same thing that Plaintiffs, their experts, and the payors say they do:*** clinical supervision. As South Bay's own Rule 30(b)(6) corporate designee, Michael Pelletier, testified when asked about MassHealth's regulations, there was "no question" that "[a]n unlicensed clinician must receive licensed ***clinical*** supervision from an independently licensed supervisor." Pls.' SOF, ¶ 39 (emphasis added). Further, when asked specifically whether South Bay understood "that the supervision required by regulations and provider contracts and whatnot, is clinical supervision provided by an independently licensed clinician[,]" he answered "[i]n my corporate capacity it's the understanding that licensed, licensed ***clinical*** supervision is provided by an independently licensed supervisor." Pls.' SOF, ¶¶ 24, 29. (emphasis added); *see also* Pls.' SOF, ¶¶ 88-89.

That is why South Bay's own supervision policies dating back to 2009 required "clinical supervision." SAF, ¶¶ 79-82. That is also why after Pelletier, Hart, and Neuhaus reviewed the MassHealth regulations and determined that South Bay's supervision practices violated them, Hart prepared a "corrective action plan" (which wasn't implemented), and it specifically required "***clinical supervision***." Pls.' SOF, ¶¶ 142-146, SAF, ¶¶ 86-88, 96-98; *accord* Corp. Defs.' SOF, ¶ 100. And as set out in support of Plaintiffs' summary judgment motion, there is considerable evidence in the record establishing that "clinical supervision" by definition requires supervision of the care being provided to the client—that is, a discussion of client cases with the supervisee. Pls.' SOF, ¶¶ 29, 56, 88, 89, 93. That is why South Bay's policies explicitly required that clinical

supervision include a review of new and ongoing client cases, along with their medication and treatment updates and questions, SAF, ¶¶ 80-82, and why Scanlon wrote that "[c]entral to the supervision process [at South Bay] is the review of the therapist's treatment of the client by the supervisor." Pls.' SOF, ¶ 89.

Skipping past all of the evidence in the record that throughout the relevant time period MassHealth required clinical supervision and Defendants knew it (and knew what that entailed), Defendants now claim that, because the MassHealth regulations use the phrase "direct and continuous" to describe the type of supervision it requires for unqualified social workers and counselors providing services to MassHealth members, and because the regulations at one point list supervision under a provision covering "administrative operations," there is no regulatory requirement that supervision be clinical. Corp. Defs.' Mem. at 27-30. Aside from being counterfactual, this argument is nonsensical, and the Court should reject it.

130 C.M.R. § 429.424 requires that "social workers on the staff must ***provide services under*** the direct and continuous supervision of an independent clinical social worker[,]" and that "[a]ll unlicensed counselors . . . be under the direct and continuous supervision of a fully qualified professional staff member[.]" 130 C.M.R. § 429.424(C)(2) & (F)(1) (emphasis added). The services being provided to MassHealth members by unqualified clinicians are the subject of the supervision required by 130 C.M.R. § 429.424, and as MassHealth's designee testified, this supervision is required to ensure the quality of the mental health services MassHealth pays for. Pls.' SOF, ¶ 42, SAF, ¶¶ 7, 10; *see also* Pls.' SOF, ¶ 43. Supervision pertaining to administrative matters like approving clinicians' time off requests and discussing their work calendars—called "administrative supervision" at South Bay, Pls.' SOF, ¶ 86; SAF, ¶ 9—obviously has nothing to do with MassHealth clients at all, let alone with ensuring the quality of the services provided by

unqualified clinicians to MassHealth members. This is plainly not the kind of supervision described by MassHealth.

Similarly, supervision focused on an unqualified clinician's progress towards licensure—called "licensure supervision" at South Bay, Pls.' SOF, ¶¶ 91-92; Corp. Defs.' SOF, ¶ 52—would not satisfy MassHealth's requirement for direct and continuous supervision *of the services provided* by unlicensed clinicians to MassHealth members (clinical supervision) unless it actually pertained to those services and those MassHealth members. MassHealth pays mental health providers like South Bay for providing mental health care; it does not pay them to provide their unlicensed clinicians with "professional growth [or to] prepare for the licensing exam[.]" Pls.' SOF, ¶¶ 42, 95-96. Despite the Defendants' convenient new arguments to the contrary, *South Bay did not dispute this*. Its own corporate representative noted the difference between licensure supervision as provided by South Bay and the licensed clinical supervision required by MassHealth regulations, as did its current President and former Compliance Officer, Sara Hart. Pls.' SOF, ¶¶ 87, 93-94; *see also* Pls.' SOF, ¶¶ 139-140; *accord* Corp Defs.' SOF ¶ 70 (quoting Pelletier testimony distinguishing between licensure, administrative, and licensed clinical supervision).

Moreover, the evidence shows that the licensure supervision provided by South Bay often did not include any discussion of any client cases at all, let alone services provided to MassHealth members specifically. Pls.' SOF, ¶¶ 95-96. Indeed, licensure supervisors were instructed not to discuss clinical cases with their supervisees, instead focusing on professional growth and preparing for the licensure exam. Pls.' SOF, ¶¶ 95-96. In any event, throughout most of the relevant time period, it was a "fringe benefit" provided only to a subset of unlicensed clinicians, and only if they worked full time and had been with South Bay longer than ninety

days. Pls.' SOF, ¶¶ 97-101; *accord* Corp. Defs.' SOF, ¶ 52 (quoting Andrade describing

licensure supervision as a "fringe benefit"). So even if a licensure supervision session did happen

to include a discussion of the care provided to MassHealth members—which South Bay's

designee testified would not necessarily be the case, Pls.' SOF, ¶ 95—there can be no genuine

dispute that this would only matter for the subset of the unlicensed clinicians who actually

received licensure supervision.

Plaintiffs don't even dispute that if "licensure supervision" (or "administrative

supervision") includes a discussion of the care provided to the supervisee's clients and was

provided by an independently-licensed supervisor, it would satisfy MassHealth's requirements,

regardless of the label South Bay assigned to the supervision session. Accordingly, in his review

of South Bay's records, Plaintiffs' expert, Dr. Reamer, credited all documentation of supervision

that included any evidence of a discussion of mental health services provided by the supervisee

(assuming that the supervisor was properly licensed) to particular clients, regardless of the note it

was written on, or whether it was provided in individual or group format. SAF, ¶¶ 9, 12. There is

no credible dispute that this is the supervision that MassHealth requires, Pls.' SOF, ¶¶ 29-31,

SAF, ¶¶ 7-8, but Plaintiffs' evidence establishes that South Bay routinely and systematically

failed to provide it.

### c.    MassHealth Regulations Apply to MBHP and MCOs.

Defendants also wrongly claim that the MassHealth requirement of clinical supervision,

and thus a discussion of client cases, does not apply to claims administered by MBHP and the

MCOs. Corp. Defs.' Mem. at 26. As set out below at Section IV.c, *infra*, MBHP, the MCOs, and

the providers in their networks are required to comply with all applicable regulations, including

MassHealth, DPH, and licensure regulations, thereby incorporating the requirement of clinical

supervision of unqualified clinicians. *See also* SAF, ¶¶ 7, 21-22. Consistent with that

requirement, MBHP's designee testified that based on applicable regulations, MBHP expects unlicensed clinicians to "have weekly clinical supervision[,]" which required "[m]eeting regularly *to discuss cases.*" Pls.' SOF, ¶ 56; SAF, ¶ 23. Likewise, Beacon's designee testified that its providers are required to comply with federal and state regulations, including MassHealth and DPH regulations, as well as professional licensure requirements, including those pertaining to supervision. Pls.' SOF, ¶ 57. And both MBHP and Beacon submitted declarations in support of Plaintiffs' motion stating that neither would knowingly pay a claim for mental health services provided by an unqualified clinician who did not receive clinical supervision from an independently licensed supervisor. Declaration of Carol Kress on Behalf of Massachusetts Behavioral Health Partnership, ECF No. 279 (May 8, 2020), ¶ 7; Declaration of Alexandra Forster on Behalf of Beacon Health Options, ECF No. 280 (May 8, 2020), ¶ 7. Because the same regulations that establish the falsity of claims submitted directly to MassHealth apply to claims submitted to MBHP and the MCOs for services provided to MassHealth members, Defendants' motion for summary judgment as to these claims should be denied.

> **d.    MassHealth Requires that Supervision Be as Frequent and Extensive as Required by the Relevant Licensing Boards.**

Defendants' about-face does not end at who can supervise or what kind of supervision is required. Defendants also incorrectly fault Plaintiffs for relying on the licensing boards' requirements for the frequency of supervision, Corp. Defs.' Mem. at 30, despite the fact that the MassHealth regulations plainly state that the "[f]requency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration," 130 C.M.R. § 429.438(E)(1) (emphasis added), and despite the fact that *South Bay relied on the same plain reading of the regulations* in support of its Motion to Dismiss Relator's Complaint. ECF No. 102 at 5-6 (Feb. 16, 2018) (specifically noting that "MassHealth regulations incorporate board of

licensure regulations by reference in proscribing 'the frequency and extent' of supervision. 130 C.M.R. § 429.438(E)(1).").

As set out in support of Plaintiffs' motion, for social workers, this frequency is "one hour per week, or equivalent pro rata amount for part time employees, of face-to-face individual clinical supervision." 258 C.M.R. § 12.02; Pls.' Mem. at 9; *see also* 258 C.M.R. § 9.03. For mental health counselors, this is a minimum of one hour per sixteen hours of direct client contact experience, or if working part time, supervision that is pro-rated no less than one supervisory contact hour bi-weekly. 262 C.M.R. § 2.07(3)(b)&(c); Pls.' Mem. at 9. In other words, under the licensing standards clearly incorporated into the MassHealth regulations at 130 C.M.R. § 429.438(E)(1), unlicensed social workers and mental health counselors must receive a minimum of one hour of clinical supervision every two weeks.

This is precisely what Plaintiffs' expert Dr. Reamer looked for in his review of South Bay's records, and because his review concerned the falsity of ***claims for services billed by South Bay***, he necessarily looked at whether the required supervision was provided to the clinician within two weeks of the date of service on the claim at issue. SAF, ¶ 12. As such, if a clinician received licensed clinical supervision at some point within the month surrounding the claim, Dr. Reamer credited South Bay's supervision as compliant. That is plainly consistent with the regulations. Defendants' framing, by contrast, would allow an unlicensed clinician to provide mental health services to a MassHealth member so long as she received clinical supervision at any point before becoming licensed, even in the months or years before or after the services at issue were provided to the MassHealth member. This absurd result plainly contravenes the MassHealth regulations' explicit requirement of "direct and continuous supervision" of the services provided to MassHealth members that is both "frequent and regularly scheduled." 130

C.M.R. §§ 429.424, 429.438(E)(1).

Similarly absurd is the Defendants' new argument that the licensing standards explicitly incorporated by 130 C.M.R. § 429.438(E)(1) only apply to unlicensed clinicians seeking licensure, and therefore there is no requirement as to the frequency and extent of supervision for unlicensed clinicians who do not seek to become licensed. Corp. Defs.' Mem. at 30-31. First, the regulations say no such thing; if MassHealth intended to exempt unlicensed clinicians who are not pursuing licensure from its licensed supervision requirement, it would do so explicitly. MassHealth instead has confirmed that *all* unlicensed clinicians must receive supervision as frequently as and to the extent specified in the licensing standards that apply to their profession. SAF, ¶ 10. Second, if credited, this argument would have the perverse effect of exempting the least qualified clinicians—those who lack the required training to even sit for a licensure exam— from the requirements associated with licensed supervision, and would also mean that any clinician who opted out of licensure could treat MassHealth members independently, in clear contravention of the Commonwealth's scope of practice rules.

Even if Defendants were right, and 130 C.M.R. § 429.438(E)(1) could be read to only apply to unqualified clinicians pursuing licensure, the MassHealth regulations still plainly require that unqualified clinicians receive "direct and continuous supervision" that is "frequent and regularly scheduled." 130 C.M.R. §§ 429.424, 429.438(E)(1). As Plaintiffs' experts testified, in the behavioral health profession the standard frequency for supervision is weekly for full-time staff, and bi-weekly for part-time staff. SAF, ¶ 11. This is what South Bay's own supervision policies required during the relevant time period. SAF, ¶¶ 79-81. Defendants' newfound suggestion that supervision could occur years prior to a claim and that there is literally no standard for clinicians not seeking licensure are entirely unpersuasive.

Defendants further argue that, because the "licensing regulations for mental health counselors are not even mentioned" in 130 C.M.R. § 429.424, their requirements for the frequency and extent of supervision do not apply to unlicensed counselors treating MassHealth members. Corp. Defs.' Mem. at 30. This argument is apparently based on the language in 130 C.M.R. § 429.438(E)(1) requiring frequency and extent of supervision to "conform to the licensing standards of each discipline's Board of Registration, as cited in 130 CMR 429.424." But *none* of the licensing regulations for any discipline are actually "cited" in § 429.424, and the relevant licensing boards are not identified for a few of the disciplines, not just counselors. It is not a reasonable reading of the regulation that the Board of Registration of Social Workers is to be followed, but the Board of Allied Mental Health and Human Services Professions (governing counselors) is to be ignored. The correct reading of 130 C.M.R. § 429.438, then, and what has been confirmed by MassHealth, is that it incorporates board requirements for *each discipline* cited in 130 C.M.R. § 429.424, of which counselors are indisputably one. *Accord* SAF, ¶ 10.

e.   **MassHealth and DPH Regulations Require That Clinical Supervision Be Documented.**

Defendants' next claim on falsity is that, even though the MassHealth regulations explicitly require supervision, South Bay was not required to document it. Corp. Defs.' Mem. at 31-32. Defendants attempt to base this interpretation on the fact that 130 C.M.R. § 429.436 does not include supervision in its list of required recordkeeping, but this provision pertains exclusively to the contents of medical records of MassHealth members, not the documentation evidencing the facility's compliance with MassHealth's requirements for payment. The requirements to document supervision are contained elsewhere.

First, in 130 C.M.R. § 450.205(A), MassHealth explicitly states that it will not pay for services unless the provider has "adequate documentation to substantiate" them. "All providers

must keep such records . . . as are necessary to disclose fully the extent and medical necessity of services provided to . . . members." 130 C.M.R. § 450.205(A). Because MassHealth will only pay for mental health services performed by unqualified clinicians if they are provided under the direct and continuous clinical supervision of an appropriately licensed supervisor, 130 C.M.R. § 429.424(C)(2)&(F)(1), the required supervision is an essential part of the "billable event" Defendants describe, Corp. Defs.' Mem. at 32, and South Bay was required to keep documentation substantiating the supervision upon which payment for its mental health services was conditioned. SAF, ¶¶ 13-14.

Second, as Defendants concede, DPH explicitly requires that unlicensed clinicians be "clinically supervised on a regular basis" and that "[t]he documentation of supervision must be available for review." 105 C.M.R. § 140.530(E); Corp. Defs.' Mem. at 26;[11] Pls.' SOF, ¶¶ 40-41, 63. South Bay, like all mental health clinics, was required to comply with these requirements to provide services to MassHealth members, 130 C.M.R. § 429.404(A); Pls.' SOF, ¶¶ 39-41. Defendants don't dispute this; they just unconvincingly argue, in essence, that because the regulation "provides no specificity on the form [the documentation] should take," South Bay was entitled to pretend the documentation requirement didn't exist. Corp. Defs.' Mem. at 31-32. That is far from an "objectively reasonable" interpretation, and the Court should reject it.[12]

### f.    MassHealth Regulations Explicitly Condition Reimbursement on Satellite Clinics Having Qualified Clinic Directors.

To continue with the theme, despite having previously conceded that all mental health

---

[11] Contrary to Defendants' claim, Plaintiffs' complaint specifically incorporates these requirements. Amended Consolidated Complaint, ECF No. 201 (Jan. 4, 2019), ¶ 69.

[12] In any event, Plaintiffs do not assert that any claims were false because South Bay's supervision documentation did not meet some unspecified form, or because it was not "nuanced," "highly specific," or "meticulous." Corp. Defs.' Mem. at 25, 29, 32. Instead, any supervision record supporting an inference that the required discussion of the care provided by the supervisee to clients took place—even mere patient initials on an otherwise blank supervision form—was credited by Plaintiffs' expert. SAF, ¶ 9.

clinics, regardless of whether they are the main clinic or a satellite clinic, must have clinic

directors, and that these clinic directors "must 'meet all of the requirements in 130 CMR

429.423(B)'"—precisely as Plaintiffs, MassHealth, and Plaintiffs' experts claim—Defendants

advance a new interpretation of MassHealth's regulations on clinic directors. Defendants now

assert that dependent satellite clinics were not required to have clinic directors at all. *Compare*

South Bay's Memorandum in Support of Motion to Dismiss, ECF No. 102 at 12 ("A satellite

clinic must have a clinic director. 130 CMR § 429.439(C). The satellite clinic director must

'meet all of the requirements in 130 CMR 429.423(B).'") *with* Corp. Defs.' Mem. at 35-36 ("As

dependent satellites, they were not required to have their own licensed clinic directors.").

Instead, the new argument goes, all of South Bay's facilities outside of the Brockton parent

center were dependent satellites, and the only "staffing constraint" that applies to them is found

at 130 C.M.R. § 429.422(D), which requires that they employ two full-time staff from separate

non-physician core disciplines. Corp. Defs.' Mem. at 35-36.

But § 429.422(D) is not the only provision in the MassHealth regulations that applies to

satellite clinics. Another section, 130 C.M.R. § 429.439, titled "Satellite Programs," explicitly

conditions reimbursement on satellite clinics having a clinic director who meets specific

requirements enumerated in 130 C.M.R. § 429.423(B), irrespective of whether they are

dependent or autonomous:

> Services provided by a satellite program are ***reimbursable only if*** the program
> meets the standards below.
> . . .
> (C) The director of clinical services of the parent center must designate one
> professional staff member at the satellite program as the satellite's clinical
> director. The clinical director must be employed on a full-time basis and meet all
> of the requirements in 130 CMR 429.423(B).

130 C.M.R. § 429.439 (emphasis added). Section 429.423(B), in turn, requires that clinic

directors be "licensed, certified, or registered to practice" in the disciplines set out in 130 C.M.R. § 429.424 and have at least five years' full-time, supervised clinical experience. As such, the many instances in which South Bay's clinics were overseen by a clinic director with no independent license who had less than five years' experience were clearly noncompliant. Pls.' SOF, ¶¶ 128, 156.

Defendants misleadingly argue that this provision is modified by a subsection that adds "that at a dependent satellite the designated *clinic director* need only 'meet the basic qualifications required for his or her discipline' and can receive regular supervision and consultation from qualified core staff at the parent center.' *Id.* at 429.439(C)(3)." Corp. Defs.' Mem at 36 (emphasis added). But this is *not* what 429.439(C)(3) says. If it were, it would cancel out MassHealth's clear requirement that all satellite clinic directors satisfy the requirements of 130 C.M.R. § 429.423(B), in violation of the basic rule of construction that the two provisions be read in harmony. SAF, ¶ 17; *Lowell Housing Authority v. PCS International, Inc.*, 692 F. Supp. 2d. 180, 188 (2010). Instead, 130 C.M.R. § 429.439(C)(3) describes another position—a *supervisor* over a dependent satellite: "[i]n a dependent satellite program, the *supervisor* must meet the basic qualifications required for his or her discipline." Supervisors are not the same as clinic directors, though in South Bay's case, neither were licensed as required.

And finally, contrary to Defendants' claim, Plaintiffs have established the requisite "link" between South Bay's violation of 130 C.M.R. § 429.439 and its submission of false claims to MassHealth. Corp. Defs.' Mem. at 36-37. The sole case they rely on, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89 (3d Cir. 2018), is a kickback case where the Third Circuit held that it was not enough to prove that federal claims were submitted on the one hand, with kickbacks paid on the other, without a connection between the two. *Id.* at 880 F.3d at

99-100. This case is completely inapposite to the violations alleged here. Here, Plaintiffs' expert used data specifically identifying each clinic director at South Bay, the periods in which they served in that role, whether they were licensed during those periods, and calculated the number of false claims submitted by South Bay for services provided at the particular clinics that lacked qualified clinic directors. SAF, ¶ 18. That analysis is precisely the "link" that is required.

> **g.    South Bay Allowed Unlicensed Clinicians Without Mental Health Counseling Degrees to Treat MassHealth Members.**

The MassHealth regulations require that all unlicensed counselors hold master's degrees in "counseling education, counseling psychology, or rehabilitation counseling[.]" 130 C.M.R. § 429.424(F)(2); *see also id.* at § 429.402 (defining "Professional Staff Member Authorized to Render Billable Mental Health Center Services" as, relevant here, someone trained in "counseling" as described in 429.424). Separately, the Board of Allied Mental Health and Human Services Professions regulations state that, to be eligible for licensure as an LMHC, candidates must have a degree in mental health counseling, specified mental-health counseling-related disciplines, "or another Mental Health Counseling field determined by the Board to be a Related Field." 262 C.M.R. §§ 2.02 (defining "Related Field"), 2.04 (pre-July 1, 2017 education and degree requirements), 2.05 (post-July 1, 2017 education and degree requirements). While the licensing board may have the discretion to award licenses on a case-by-case basis if it determines that an applicant's particular mental health counseling-related degree program is sufficient, there can be no dispute that based on the plain text of the regulation, the degree must be ***related to mental health counseling***.

Plaintiffs' expert reviewed South Bay's degree titles for unlicensed clinicians, and determined that degrees in subjects like art therapy, early childhood education, rehabilitation education, sociology, and pastoral counseling did not qualify, since they are not degrees in

mental health counseling. SAF, ¶ 19. South Bay's motion for summary judgment as to its

unlicensed counselors who did not hold mental health counseling degrees should be denied.

###### h.    There Is No "Reasonable Interpretation Exception" to Falsity.

Finally, the Court should not consider Defendants' supposed "reasonable interpretations"

in assessing falsity. Reading such an exception into the falsity element would allow a defendant

to submit claims, knowing all the while that they were false or with reckless disregard as to their

falsity—therefore satisfying the scienter element—but nevertheless avoid liability on falsity by

arguing that the claims reflected a so-called "reasonable interpretation" of the regulations

manufactured after the fact. *United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 463 n.3

(9th Cir. 1999); *see also United States ex rel. Phalp v. Lincare Holdings Inc.*, 857 F.3d 1148,

(11th Cir. 2017). In *Parsons*, the Ninth Circuit reversed the district court's holding that the

plaintiff failed to establish falsity where the defendant offered a reasonable interpretation of

ambiguous regulations, holding instead that the reasonableness of the interpretation "may be

relevant to whether it knowingly submitted a false claim, [but] the question of 'falsity' itself is

determined by whether Parsons' representations were accurate in light of applicable law." *Id.* at

463. The Court should reach the same conclusion here.

### IV.    <u>The Materiality of these Regulations to Payment Is Obvious.</u>

The Defendants cannot win this case on materiality. There is no question that South

Bay's regulatory violations were material to payment because ***the payor stopped paying South***

***Bay when it learned of those violations***. Pls.' SOF, ¶¶ 160-61. That is because, as MassHealth's

corporate designee testified, "if supervision is absent, then the Commonwealth has very little

assurance that professional standards are being upheld and very little confidence in the quality of

those services. . . we would not pay for them." Pls.' SOF, ¶ 42. Not only did MassHealth

unambiguously represent the importance it places on these regulations, but every other payor that

testified did so as well; MBHP's and Beacon's designees both stated that they, too, were planning to suspend payment to South Bay before the settlement with the Commonwealth was reached. Pls.' SOF, ¶ 162. Plaintiffs, not Defendants, are entitled to summary judgment on this element. *See* Pls.' Mem. at 20-25. Against these odds, Defendants turn to a desperate mischaracterization of the law, one the Court has already corrected, and a couple of factual red herrings to try to marshal a materiality argument. The Court should reject those arguments, much like it has before.

> a.   **Plaintiffs Need Not Prove that Defendants Actually Knew These Requirements Were Material, Though They Can Anyway.**

Defendants' first materiality argument relies on a blatant mischaracterization of the law, which the Court already corrected at the motion to dismiss stage. As the Supreme Court held in *Escobar II*, the focus of the materiality inquiry is on "the recipient of the alleged misrepresentation." *Escobar II* at 2002. The First Circuit, in finding these same regulations to be material, affirmed that view, noting that "the fundamental inquiry is 'whether a piece of information is sufficiently important to influence ***the behavior of the recipient***.'" *Escobar III* at 110 (quoting *United States ex rel. Winkelman et al. v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016)). The evidence on that point could not be clearer—the recipients of these misrepresentations viewed them as reason to stop payments to the provider. Pls.' SOF, ¶¶ 160-62.

Incapable of building a materiality defense based on the behavior of the recipient, Defendants attempt to argue that Plaintiffs must also prove that each of them "knew a regulation was material to payment." Corp. Defs.' Mem. at 22. As the Court spelled out in its ruling on motions to dismiss, that is not the standard. The Supreme Court clearly held that where a reasonable person realizes the importance of a condition, "a defendant's failure to appreciate the

materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of this information' even if the Government did not spell this out," and therefore would support a finding of materiality. *Escobar II*, 2001–02. Plaintiffs need not prove that Defendants had actual knowledge of the materiality of these requirements; if a reasonable person would have recognized their importance, that is enough.

Even so, in this case, Plaintiffs can prove both. As Plaintiffs argued in their motion for partial summary judgment, the requirement of licensed clinical supervision for unlicensed clinicians is a bedrock principle in the behavioral health professions, one acknowledged by Plaintiffs' and Defendants' experts alike. *See* Pls.' Mem. at 25-28. Any reasonable person that owned or oversaw a behavioral health clinic would know about the importance of such a fundamental requirement. And as demonstrated in Section II, *supra*, every single one of these Defendants did know about this requirement. Under either the correct standard, as the Court has previously articulated it, or the Defendants' new, misconstrued one, they cannot defeat materiality on this basis.

### b. Defendants Cannot Show Actual Knowledge of the Government Prior to the Unsealing of the Complaint.

Faced with the fact that MassHealth suspended payments upon the unsealing of the complaint in this case, the Defendants attempt to throw a few factual red herrings at the Court about MassHealth's knowledge prior to the payment suspension. For one, Defendants argue that the fact that MassHealth did not conduct an audit of South Bay during the relevant period "alone, suggests that the requirements were immaterial to MassHealth's payment decisions." Corp. Defs.' Mem. at 42. The problem for the Defendants is that the materiality inquiry is not an inquiry into the frequency of government audits. Materiality is based on what MassHealth ***actually*** knew of South Bay's regulatory noncompliance, not what it hypothetically had the

64

opportunity to learn. *Escobar II*, at 2003-04; *Escobar III*, at 110, 112 ("mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance."). Here, because no audit occurred, there is no suggestion that MassHealth had actual knowledge of Defendants' fraud. Likewise, any supervision deficiencies identified by DPH, absent ***any*** evidence that the payor, MassHealth, ***ever*** knew about the deficiencies, are irrelevant to the materiality inquiry. *See Escobar III*, 842 F.3d at 112 (distinguishing knowledge of various state regulators from MassHealth knowledge, the relevant government entity); *Mylan Labs.*, 608 F. Supp. 2d. at 149–50 (warning that knowledge of certain agencies of the Commonwealth cannot be attributed to others).

It is also clear that MassHealth did not have actual knowledge of South Bay's noncompliance based on the credentialing application Defendants cite. Defendants argue that job descriptions, submitted among myriad other documents by South Bay in an application associated with a single clinic, put MassHealth on notice that South Bay, in fact, was systematically using unlicensed clinicians to supervise unlicensed clinicians at all seventeen of its clinics. *See* Corp. Defs.' Mem. at 42-43. The job descriptions at issue identify supervision as one of the functions for individuals applying to be a "clinical supervisor" or "clinical director", but do not indicate a license is required for that position under "[q]ualifications." But this job description alone does not demonstrate that MassHealth had actual knowledge of actual regulatory violations, in part because it does not establish that any occurred. Even the Defendants themselves will not directly assert that this job description puts MassHealth on notice of noncompliance, as they refuse to admit that any noncompliance existed, stating "[s]ome supervisors were independently licensed, and others were not but provided additional supervision, mentorship and training." Corp. Defs.' Mem. at 34. Nor is it obvious from the face

65

of the document that South Bay was, in fact, noncompliant, as South Bay may have hired individuals who, despite not requiring it, were actually licensed. In her deposition, MassHealth's corporate designee acknowledged that MassHealth "did not catch" that the job descriptions left room for the possibility of noncompliance, but added "that doesn't change the fact that supervision is provided by licensed professionals." SAF, ¶ 20.

That is exactly right—in light of precedent establishing that continued payment after actual knowledge is not sufficient to defeat materiality, MassHealth's failure to catch something that might, with considerable further investigation, have put them on notice that one of South Bay's seventeen clinics might have had some level of noncompliance is nowhere near sufficient to defeat materiality in this case alleging widespread fraud at all seventeen clinics. *See Escobar III* at 110; *United States ex. rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645, 661-63 (5th Cir. 2017) (collecting circuit cases relating to government knowledge of allegations and noting "continued payment by the federal government after it *learns* of the alleged fraud" does not defeat materiality). What is important is what MassHealth did when it learned the scope of this case because this complaint was unsealed—it stopped payment. Pls.' SOF, ¶¶ 159-62.

### c. The MassHealth Regulations Were Material to MBHP and MCOs.

Finally, Defendants incorrectly argue that MassHealth's requirements cannot be found to be material with regard to claims submitted to MBHP or the MCOs. Corp. Defs.' Mem. at 43. As Plaintiffs have argued in Section III.c, *supra*, this argument, too, is directly contradicted by the documents and deposition testimony in this case. Beacon designee's, Alexandra Forster, testified that providers in Beacon's network were required to comply with "MassHealth regulations associated with staff composition, supervision, [and] licensure." Pls.' SOF, ¶ 57. MBHP's designee, Carol Kress, similarly testified that MBHP lacked the authority "to implement its own and perhaps less rigid standards than what MassHealth requires," indicating that providers, thus,

would have to follow MassHealth regulations. SAF, ¶ 22. MassHealth has confirmed that, clearly stating that MBHP and MCOs, and their network providers, must comply with MassHealth regulations. Pls.' SOF, ¶¶ 50-51; SAF, ¶ 21. In fact, MassHealth exercises such control over MBHP and MCOs that it has authority to require them to suspend payments to providers in their networks, and, after learning that South Bay was not compliant *with MassHealth regulations*, MassHealth did just that. Pls.' SOF, ¶¶ 160-62. MBHP and the MCOs were fully prepared to do so, proving the primacy and materiality of the MassHealth regulations. Pls.' SOF, ¶ 162.

Defendants also claim that MBHP's waivers undermine materiality because "waived requirements cannot be material." Corp. Defs.' Mem. at 43-44. This explanation is egregiously misleading. MBHP never, at any time, waived the requirement for unqualified clinicians to receive licensed, clinical supervision. Instead, MBHP allowed clinicians who did not obtain their license within two years to seek a waiver of the MBHP-specific credentialing criteria to continue billing as a master's level clinician after that two-year period. SAF, ¶ 23. Even when such clinicians were granted a waiver, they were explicitly subject to the same supervision provisions as all other unlicensed clinicians. SAF, ¶ 23. MBHP did not waive any requirements that are at issue, SAF, ¶ 24, and, as such, the waivers have no bearing on materiality.

## V.     The Commonwealth's Unjust Enrichment Cause of Action Stands Against All Defendants.

Defendants also cannot establish that they are entitled to judgment as a matter of law on the Commonwealth's unjust enrichment claim. Defendants' first argument—that they were not financially enriched by monies paid by the Commonwealth—is clearly belied by the facts. As H.I.G. told potential investors, South Bay's primary revenue source was Medicaid funds. SAF, ¶ 31. And each of the Defendants was enriched when South Bay was enriched. Scanlon was the founder, sole owner, president, CEO, and holder of all outstanding capital stock in South Bay for

more than 16 years. Pls.' SOF, ¶¶ 62, 66. Sheehan was a co-owner of C.I.S. and CEO of both

C.I.S. and South Bay for four years thereafter. Pls.' SOF, ¶¶ 67, 72. And H.I.G. was the majority

shareholder of C.I.S. and was entitled to a "consulting and management fee" of at least $300,000

from C.I.S.H. for its assistance in managing the operations of subsidiaries of C.I.S., which

included South Bay. SAF, ¶ 26. The fortunes of these Defendants rose and fell with South Bay's

fortunes; in fact, the opportunity to make a profit off South Bay's Medicaid reimbursement is

what motivated H.I.G.'s initial investment in the business. SAF, ¶¶ 25, 27. And contrary to

Defendants' argument, whether Defendants submitted the claims at issue in the litigation has no

bearing on whether they were enriched. Unjust enrichment does not require any contractual or

fiduciary relationship among the parties, nor does it "require that a defendant receive direct

payments from a plaintiff." *In re Pharmaceutical Industry Average Wholesale Price Litigation*,

No. 01–12257–PBS, 2007 WL 1051642, at *9 (D. Mass. Apr. 2, 2007) (quoting *Massachusetts v.

Mylan Labs.*, 357 F. Supp. 2d 317, 324 (D. Mass. 2005)).

Defendants' second argument—that this remedy is duplicative—should also be rejected

because courts routinely allow unjust enrichment claims to proceed alongside other claims

beyond the summary judgment stage. *See Sentinel Prods. Corp. v. Mobile Chem. Co.,* No. Civ.A.

98–11782–PBS, 2001 WL 92272, at *22 (D. Mass. Jan. 17, 2001) (allowing plaintiff to choose

avenue of recovery at trial stage); *A.J. Properties, LLC v. Stanley Black & Decker, Inc.,* 972 F.

Supp. 2d 68, 79-80 (D. Mass. 2013). Typically, including in the cases cited by Defendants, when

courts do dismiss an unjust enrichment claim at summary judgment on this basis, the plaintiff has

a breach of contract claim that provides an adequate remedy. *See McKesson HBOC, Inc. v. New

York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003); *Reed v. Zipcar,

Inc.,* 883 F. Supp. 2d 329, 334 (D. Mass 2012). There is no breach of contract claim in this case,

making the remedy non-duplicative.

Defendants' only remaining argument is that the Commonwealth was not financially damaged by South Bay's MBHP and MCO claims; that argument is wrong on the facts as Defendants themselves articulate them. The Defendants acknowledge that the claims for MassHealth beneficiaries, even when on an MBHP or MCO plan, are paid by MassHealth funds, adding that, "MassHealth pays MBHP and MCOs a per patient, capitated rate," which is then used to administer benefits on behalf of MassHealth beneficiaries. Corp. Defs.' SOF, ¶ 8. Regardless of whether the funds are paid by MassHealth directly or through an MCO intermediary, the Commonwealth's funds were used to pay South Bay. Many of those payments were based on false and fraudulent claims, and South Bay's unjust enrichment led to the unjust enrichment of other Defendants. There is no basis for dismissal of this count.

## CONCLUSION

MassHealth, like every payor of behavioral health services, unambiguously requires unqualified clinicians to receive licensed clinical supervision, and has made clear that it would not pay a provider that fails to meet that requirement. Each of the Defendants knew about this requirement and that South Bay was not meeting it; and each of the Defendants had an opportunity to, and failed to, correct the noncompliance at South Bay. None of the Defendants' mischaracterizations of law, *post-hoc* regulatory interpretations, or distracting red herrings can change these facts, which viewed in the light most favorable to Plaintiffs, show there are genuine issues for trial. The Court should deny Defendants' motions for summary judgment in their entirety.

Dated: June 19, 2020                                  Respectfully submitted,

                                                      For the Commonwealth

**MAURA HEALEY**
**ATTORNEY GENERAL**

By: /s/ *Kevin Lownds*
Gregory H. Matthews (BBO # 653316)
Kevin Lownds (BBO # 685274)
Nita Klunder (BBO # 689304)
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts 02108
Tel: (617) 727-2000
Fax: (617) 727-2008


For the Relator

**WATERS & KRAUS, LLP**

By: /s/ *Caitlyn E. Silhan (w/ consent)*
Charles Siegel, Esq. (*pro hac vice*)
Texas State Bar No. 18341875
Pennsylvania State Bar No. 310882
Caitlyn E. Silhan, Esq. (*pro hac vice*)
Texas State Bar No. 24072879
California State Bar No. 303177
Taryn Ourso, Esq. (*pro hac vice*)
Texas State Bar No. 24107315
3141 Hood Street, Suite 700
Dallas, Texas 75219
214-357-6244 (Telephone)
214-357-7252 (Facsimile)
siegel@waterskraus.com
csilhan@waterskraus.com
tourso@waterskraus.com

**HAMILTON WINGO, LLP**
Christopher S. Hamilton (*pro hac vice*)
Texas State Bar No. 24046013
Ray T. Khirallah, Jr. (*pro hac vice*)
Texas State Bar No. 24081982
Andrea L. Fitzgerald (*pro hac vice*)
Texas State Bar No. 24081982
325 North St. Paul Street, Suite 3300
Dallas, Texas 75201
214-234-7900 (Telephone)

214-234-7300 (Facsimile)
chamilton@hamiltonwingo.com
rkhirallah@hamiltonwingo.com
afitzgerald@hamiltonwingo.com

**JEFFREY NEWMAN LAW**
Jeffrey A. Newman
Massachusetts BBO # 370450
One Story Terrace
Marblehead, MA 01945
(617) 823-3217 (Telephone)
(781) 639-8688 (Facsimile)
jeffrey.newman1@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I, Kevin Lownds, hereby certify that pursuant to this Court's Electronic Order, ECF No.

275 (May 7, 2020), this document will be sent electronically to all registered participants as

identified on the Notice of Electronic Filing (NEF) on June 19, 2020.

By: /s/ *Kevin Lownds*
Kevin Lownds (BBO # 685274)
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
Tel: (617) 727-2000
Fax: (617) 727-2008