## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                        )
UNITED STATES OF AMERICA ex rel.        )
CHRISTINE MARTINO-FLEMING, Relator      )
                                        )
and                                     )
                                        )
COMMONWEALTH OF MASSACHUSETTS            )        Civil Action
ex rel. CHRISTINE MARTINO-FLEMING,      )        No. 15-cv-13065-PBS
Relator                                 )
                                        )
v.                                      )
                                        )
SOUTH BAY MENTAL HEALTH CENTERS,        )
COMMUNITY INTERVENTION SERVICES,        )
INC., H.I.G. GROWTH PARTNERS, LLC,      )
H.I.G. CAPITAL, LLC, PETER J.           )
SCANLON, and KEVIN P. SHEEHAN,          )
                                        )
                    Defendants.         )
_____ )
```

### MEMORANDUM AND ORDER

May 19, 2021

Saris, D.J.

### INTRODUCTION

This qui tam case involves allegations of false claims for reimbursement for services provided by unlicensed and improperly supervised social workers and counselors at South Bay Mental Health Center, Inc. ("South Bay"). The Commonwealth of Massachusetts and Relator Christine Martino-Fleming bring this action against South Bay; Community Intervention Services; Community Intervention

Services Holdings, Inc.[1] (collectively "C.I.S."); H.I.G. Growth Partners, LLC; H.I.G. Capital, LLC (collectively "H.I.G."); Dr. Peter Scanlon ("Scanlon"); and Kevin P. Sheehan ("Sheehan").  The Plaintiffs specifically allege that the Defendants caused South Bay to submit false claims for reimbursement to the Massachusetts Medicaid agency in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., and the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5 et seq.  The parties have filed cross-motions for summary judgment.

The Plaintiffs seek partial summary judgment with respect to the falsity and materiality elements of their "false-presentment" claims under the federal and state False Claims Acts against all Defendants.  They further seek summary judgment with respect to some of the affirmative defenses.

The Defendants seek summary judgment on all claims on multiple grounds.  The cross-cutting dispute applicable to all Defendants is whether the submitted claims are false under the state regulations and whether any violations are material.  The Defendants also argue that no reasonable juror could find scienter or causation.  Finally, they seek summary judgment on the

---

[1] The Commonwealth settled its claims against South Bay, C.I.S., and C.I.S. Holdings.  However, the Relator has not settled the federal False Claims Act allegations against these parties. South Bay, C.I.S., and C.I.S. Holdings have declared bankruptcy and are subject to an automatic stay.

Plaintiffs' unjust enrichment claims against H.I.G., Scanlon, and Sheehan.[2]

After the hearing and review of the extensive briefing, the Court **ALLOWS** in part and **DENIES** in part the Plaintiffs' partial motion for summary judgment (Dkt. 276) and **ALLOWS** in part and **DENIES** in part the Defendants' cross-motions (Dkt. 281; Dkt. 284; Dkt. 289).

<u>**BACKGROUND**</u>

Except where noted, the following facts are undisputed.

## I.   <u>South Bay</u>

South Bay, a for-profit mental health center, was founded by Scanlon, a licensed psychologist, in 1986.  South Bay operates at least 17 facilities in Massachusetts.[3]  It is composed of one parent facility in Brockton, Massachusetts, as well as several satellite programs.

Most South Bay clients are members of the Massachusetts state Medicaid program, MassHealth.  Payment for services received by MassHealth members comes from a variety of sources.  MassHealth

---

[2] The Complaint also includes claims by the Relator that the Defendants made false statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(B) and Mass. Gen. Laws ch. 12, § 5B(a)(2) (Counts 2 and 4).  In their opposition to the Defendants' motion for summary judgment, the Plaintiffs stated that the Relator does not intend to pursue these claims.  The Defendants' motion for summary judgment on these two counts is therefore allowed without opposition.
[3] The parties dispute whether South Bay operated 17 or 18 facilities.

directly reimburses South Bay for the cost of some MassHealth members' services. Other members receive coverage through the Massachusetts Behavioral Health Partnership (MBHP), which contracts with MassHealth to provide managed care services. The remaining MassHealth members' care is administered by managed care organizations (MCOs) that contract with MassHealth. MassHealth is ultimately responsible for payment for all services that its members receive, whether the coverage is administered by the agency or through MBHP or the MCOs.

## II. **South Bay's Ownership and Leadership**

H.I.G. Capital is a private equity firm, and H.I.G. Growth Partners is a subsidiary of H.I.G. Capital. C.I.S., in turn, was formed and incorporated by H.I.G. Growth Partners, H.I.G. Capital, and Sheehan. H.I.G. Growth Partners was the majority shareholder of C.I.S. Holdings, which indirectly owns C.I.S. During the time in question, most seats of the C.I.S. Board of Directors were held by employees of H.I.G., including Board members Nicholas Scola, Steven Loose, and Eric Tencer. The remaining two seats were held by Sheehan and Scanlon.

Scanlon acted as South Bay's sole officer and director until 2012, when C.I.S. and C.I.S. Holdings purchased South Bay from him. After the sale, Scanlon became the Chief Clinical Officer of C.I.S. and joined the C.I.S. Board of Directors. Sheehan was the Chief Executive Officer of South Bay and C.I.S. from April 2012 to

November 2016, after which time he remained on the Board of Directors of C.I.S.  Mike Pelletier became the president and Chief Operating Officer of South Bay in 2014.

## III. **Due Diligence Surrounding the Acquisition**

At the beginning of 2012, prior to the acquisition of South Bay, a third-party clinical expert conducted a due-diligence report on the mental health center, which was sent to H.I.G. and Sheehan.  The report concluded that "[n]o serious survey compliance issues, complaints or patient incidents were identified."  Dkt. 201-27 at 7.  However, the report also highlighted "[e]xamples of documentation issues" and "poor quality of supervision" in its findings.  Id. at 3.  It also recommended further training in the areas of "clinical documentation of patient assessments and treatment" and "clinical supervision."  Id.  A Stock Purchase Agreement provided by Scanlon as part of the sale of South Bay stated that neither South Bay nor its officers, managers, personnel, or health care providers were in violation of any health care laws.

South Bay's Director of Outpatient Mental Health, Jennifer Gearhart, recalled having discussions with Scanlon about supervision at South Bay during the due-diligence period.  Gearhart testified that, after the acquisition, "the pressure to grow was like astronomical compared to what it had been."  Dkt. 295-28 at 8.  She explained, specifically, that she had observed that South

Bay needed more licensed supervisors, noting that "[i]t was really volume and, you know, as you increase volume, you need to increase the number of supervisors that you're having that are licensed." Id. at 5-6.

## IV.  Concerns about Supervision and Hiring Practices at South Bay

The Relator, Christine Martino-Fleming, was employed by South Bay from June 2008 to September 2013, after which she was transferred to C.I.S.  She was the Coordinator of Staff Training and Development at South Bay and at C.I.S., a position that required her to visit South Bay facilities to train staff.  In doing so, she claimed to have observed that South Bay was providing inadequate supervision to some of its clinicians.

The Relator asserts that she voiced her concerns about supervision and hiring practices at South Bay to Scanlon, Sheehan, and others in early 2012.  She specifically asserts that she raised questions about unlicensed individuals receiving supervision from unlicensed clinicians, a practice which she believed to be in violation of the MassHealth regulations.  For instance, the Relator asserts that she and Scanlon had "at least four or five conversations that were really substantive about" supervision issues at South Bay and that she told Scanlon that South Bay was acting "against regulations."  Dkt. 321-2 at 40.  The Relator described Scanlon's response to her concerns as apathetic, explaining that Scanlon "often did not respond verbally, and he

would just go on to a different topic or just not answer my question or concern." Dkt. 321-2 at 41. She also recalled frequently talking to Sheehan on the phone and in-person about her concerns regarding unlicensed supervision at South Bay. She further claims that she discussed the issue with Sara Hart, South Bay's Compliance Officer.

The Defendants dispute that the Relator ever voiced concerns about South Bay's compliance with the MassHealth regulations to Scanlon, Sheehan, or anyone else.

At the same time, the Relator also claims to have observed that South Bay hired clinicians who did not have what she considered mental health counseling degrees. These clinicians instead had degrees in fields such as school counseling, forensic psychology, and pastoral counseling. The Relator asserts that she raised concerns about these clinicians' qualifications with Scanlon. The Defendants once again, however, dispute that the Relator voiced concerns about regulatory noncompliance with Scanlon.

Other former employees also testified that they had discussed supervision issues with South Bay leadership. Gearhart, for instance, stated that she had brought up concerns about "how South Bay was going to ensure compliance with supervision requirements" with Kevin Sheehan at least 10 times from 2012 to 2014. Dkt. 295-28 at 9-10. She also recalled communicating these concerns to

Scanlon and Pelletier.  And she remembered having informed Sheehan and Pelletier that MassHealth would not pay for services provided by Master's level counselors who did not receive supervision from independently licensed clinicians.  The Defendants deny that Gearhart ever believed that South Bay was actually in noncompliance with any MassHealth requirement or voiced concerns about actual noncompliance to leadership.

Along similar lines, several South Bay employees attested that South Bay had developed a policy of allowing licensed supervisors to review and sign off on the notes or charts of clinicians whom they were not directly supervising.  Rose Lunney, South Bay's business manager, explained that, beginning in 2011, South Bay began directing licensed clinicians to sign off on the charts of supervisees for the purposes of satisfying payer supervision requirements.  Hart similarly communicated that licensed supervisors were allowed to review and sign off on notes for clinicians with whom they had not met.  The Relator, in an email to several South Bay employees, including Gearhart and Lunney, explained that "[t]he majority of clinicians said they were being told to write in a name of a supervisor other than their actual supervisor" on their session notes.  Dkt. 296-6 at 3.  She elaborated that "[o]ne clinician stated that they were being told they had to do this in case they were ever audited."  Dkt. 296-6 at 3.  The Defendants, however, contend that the notes discussed

by Lunney, Hart, and the Relator were separate from the supervision documentation at issue in this case and were not required by MassHealth.

## V.   __Grabbing the Tiger by the Tail-or Not__

In 2013, Sheehan asked Lucy Andrade, South Bay's Human Resources Director, to chair a retention task force meeting aimed at studying the issue of employee turnover at South Bay.  One of the issues that the Retention Working Group focused on was the need for improved supervision.  Sheehan was a sub-chair of the group.  The Working Group proposed that "[l]icensure should be a required criteria" for supervisors, but it did not specify that this requirement stemmed from the MassHealth regulations.  See Dkt. 295-25 at 8.

The record shows that concern over supervision at South Bay began to grow after the Retention Working Group was convened.  In April 2014, for instance, Andrade informed Pelletier over email that South Bay's Mental Health Division had only 70 licensed staff.  She indicated that South Bay needed to hire more licensed staff, in part so that the licensed staff could "sign off on supervision."  Dkt. 296-10 at 3.  The Defendants deny that South Bay needed to hire more staff in order to comply with the MassHealth regulations.

Also in April 2014, C.I.S.'s Chief Clinical Officer, Ed Neuhaus, developed a report on supervision at South Bay.  He explained in his report that he was "starting to see the underside

of how things work at [South Bay] and it is raising concerns."
Dkt. 296-3 at 4.  According to the report, although Neuhaus had
"no complete set of hard data, one pattern is emerging; namely,
the small number of licensed clinicians in the workforce requires
non-licensed clinicians to do supervision and be accountable."
Id. at 4.  Through a survey, Neuhaus was able to determine that 70
percent of South Bay's supervisors were unlicensed.  He further
concluded that only 67% of Clinic Directors were independently
licensed.  Neuhaus shared this report with H.I.G. members Scola
and Loose in an email in 2016, noting that the report was "still
relevant."  Dkt. 296-11 at 2.  The Defendants dispute the
statements from Neuhaus's report to the extent that they suggest
that Neuhaus's analysis addressed MassHealth regulations, and they
also dispute the underlying cited evidence.

South Bay also decided to convene a series of working groups,
called the "Tiger Teams," in 2014.  The Sponsors of the Tiger Teams
included Sheehan, Pelletier, and Neuhaus.  Among other issues, the
Tiger Teams focused on the problem of employee retention at South
Bay.  The Mental Health Tiger Team presented its findings to the
Sponsors in May 2014.  Gearhart, who attended the meeting, said
that she observed that the MassHealth regulations concerning
supervision requirements were passed around the room during the
meeting.  She testified that "there was a concern that . . . we
could be out of compliance if this recommendation was not taken

10

. . . to add more independently licensed supervisors to South Bay as a whole." Dkt. 296-14 at 15. The Relator similarly observed that a member of the Mental Health Tiger Team "had with her a copy of [the MassHealth mental health center regulations] and she raised that up for everybody to see and said this is not just a training requirement, this is not just . . . something that we would like as a benefit, this is what is needed according to regulations." Dkt. 295-21 at 12. Sheehan explained that, during the Tiger Teams meeting, he heard that South Bay was "out of compliance" with the regulations, although he asserts that no one at the meeting raised the financial or billing ramifications of South Bay's noncompliance. Dkt. 294-44 at 12.

Notably, the Defendants dispute this account of the events. They point out that when Gearhart was questioned about whether South Bay complied with MassHealth's supervision expectations while she was director, Gearhart responded in the affirmative. Globally, they dispute that the Tiger Team recommendations addressed compliance with MassHealth regulations.

After the Tiger Teams presentation in 2014, the Relator emailed Pelletier with information regarding the MassHealth regulations pertaining to mental health centers. In her email, she explained that "only 4 out of 5 regional directors have their independent license." Dkt. 296-20 at 2. She further expressed that "[t]he direct supervisor is responsible for all cases and

11

thus we are failing to provide direct and continuing supervision by an independently licensed clinician in most cases." Dkt. 296-20 at 3. Pelletier explained that this exchange was the first time that he realized that supervision was a regulatory issue. The Defendants dispute that the Relator's email described actual regulatory noncompliance at South Bay.

Concurrently, Hart emailed Pelletier to inform him that she had discovered that 75% of clinicians at South Bay were being supervised by unlicensed supervisors, based on a sample that Hart took at Pelletier's request. Hart explained that she had included supervisors who were Licensed Clinical Social Workers (LCSWs) in the 75% figure due to a policy adopted by the Board of Registration of Social Workers providing that LCSWs may not supervise other mental health practitioners. The Defendants dispute the premise of Hart's email, asserting that MassHealth does not require a specific ratio of unlicensed clinicians to clinicians and that LCSWs are qualified to provide supervision under the MassHealth regulations.

In an email sent by Neuhaus to Sheehan, Neuhaus expressed that Hart had similarly told him that she was "confident [South Bay] is not meeting standards for clinical supervision." Dkt. 296-22 at 2. The Defendants dispute Neuhaus's statement to the extent that it purports to represent Hart's understanding of the regulations and that it conveys that South Bay was in

noncompliance.   In a later email to Neuhaus and Pelletier, Hart directly quoted the MassHealth regulations relevant to clinical supervision, explaining "I pulled out the key regs/statements and got it down to one page—I think this is pretty straight forward." Dkt. 296-23 at 2.

Pelletier subsequently spoke with Gearhart about the supervision policies at South Bay.   He learned that Gearhart believed that so long as a Regional Director of a mental health clinic was licensed, any employees below the Regional Director in the "clinical pyramid" were receiving adequate supervision under the regulations.[4]   Dkt. 294-20 at 17.   Pelletier explained that Scanlon apparently shared Gearhart's view that clinical supervision could be provided through this so-called "waterfall [e]ffect."   Dkt. 294-20 at 37.   The Defendants dispute Pelletier's characterization to the extent that it suggests that South Bay was in noncompliance with the regulations or that Scanlon knew or had

---

[4] Gearhart's testimony seems to be inconsistent on certain points. Gearhart testified that she understood that MassHealth would not pay for services provided by Master's level counselors who did not receive clinical supervision from independently licensed clinicians, and that she conveyed this information to Sheehan, Pelletier, and others.   She recalled telling Sheehan that South Bay would have to pay MassHealth back if South Bay did not meet supervision requirements. But Gearhart testified that she never informed Sheehan or others at South Bay that South Bay was actually out of compliance with the regulations.

reason to believe that South Bay did not comply with the regulations.

In June 2014, Pelletier held a meeting with Neuhaus, Hart, Gearhart, and Scanlon to discuss the issue of supervision at South Bay. He, Hart, and Neuhaus concluded during the meeting that a "more stringent" approach was necessary, while Scanlon and Gearhart believed that South Bay was compliant with the supervision requirements. Dkt. 334-4 at 6. Pelletier, however, did not take any steps to ensure that unlicensed counselors were not providing care to MassHealth patients going forward. He further testified that, in his capacity as South Bay's corporate representative, he understood that "there was a billing component to the MassHealth regulations requiring licensed supervision of . . . unlicensed therapists." Dkt. 294-14 at 22. The Defendants take issue with this account, explaining that several other South Bay personnel testified that they believed that the supervision South Bay provided was consistent with regulatory requirements or that the regulatory requirements were unclear.

A leadership advisory firm, ghSmart, was enlisted by C.I.S. and South Bay to provide an assessment to Sheehan, Loose, and Scola. The July 2016 assessment determined that retention remained an issue at South Bay and highlighted several areas of employee dissatisfaction. It went on to provide that

> [u]nderlying all of these challenges is a belief among
> the staff that many of these issues were identified 2-3
> years ago when the Tiger Teams were established and
> little was done to address them at the time despite
> assurances that action would be taken.  For example, we
> heard, <u>"We were unwilling to spend the money after the</u>
> <u>Tiger Teams to implement the required changes.  It was</u>
> <u>a thorough process, but nothing was implemented."</u>

Dkt. 296-24 at 6 (emphasis in original).  The Defendants dispute that the Tiger Team recommendations concerned regulatory compliance, and they dispute that no Tiger Team recommendations were implemented.

## VI.   <u>Procedural History</u>

The Relator brought this action in 2015.  The Commonwealth of Massachusetts intervened after the case was unsealed in November 2017.  In a previous decision, this Court allowed in part and denied in part the Defendants' motions to dismiss the Plaintiffs' complaints.  <u>See</u> <u>Massachusetts ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.</u>, 334 F. Supp. 3d 394 (D. Mass. 2018); <u>United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.</u>, No. CV 15-13065-PBS, 2018 WL 4539684 (D. Mass. Sept. 21, 2018).

The Plaintiffs then filed an amended consolidated complaint in 2019.  Their current complaint alleges that the Defendants knowingly caused false claims to be submitted to MassHealth, in violation of the "false-presentment" provisions of the federal False Claims Act, <u>see</u> 31 U.S.C. § 3729(a)(1)(A), and of the

Massachusetts False Claims Act, see Mass. Gen. Laws Ann. ch. 12, § 5B(a)(1). Specifically, the Plaintiffs allege that false claims were submitted where (1) clinicians providing care were supervised by unlicensed individuals, (2) clinicians were supervised by inadequately licensed individuals, (3) clinicians did not receive "clinical supervision," (4) supervision did not occur with close enough temporal proximity to the date of service, (5) South Bay provided inadequate documentation of supervision, (6) the directors of satellite clinics were unlicensed, and (7) unlicensed clinicians did not have "counseling" degrees.

## LEGAL STANDARDS

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]t summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same." Chadwick v. WellPoint, Inc., 561 F.3d 38, 41 (1st Cir. 2009). "A genuine issue exists when, based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party." Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).

## DISCUSSION

## I.   False Presentment

The False Claims Act creates civil liability where a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" against the United States government. 31 U.S.C. § 3729(a)(1)(A).  The Massachusetts False Claims Act creates similar liability with regard to claims against the Commonwealth of Massachusetts.[5]  See Mass. Gen. Laws ch. 12, § 5B(a)(1).  I address the elements of a false-presentment claim in turn.

A.   **Falsity**

"Evidence of an actual false claim is 'the sine qua non of a False Claims Act violation.'"  Karvelas, 360 F.3d at 225 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir. 2002)).  The Supreme Court has recognized a theory of liability under the False Claims Act known as "implied false certification."  See Universal Health Servs., Inc. v. United States ex rel. Escobar ("Escobar II"), 136 S. Ct. 1989, 1995 (2016) (involving false claims for services performed by unlicensed and unsupervised staff).  Under this theory, "liability can attach when the defendant submits a claim for payment that makes specific

---

[5] The Court will use caselaw interpreting the federal False Claims Act to interpret the Massachusetts False Claims Act.  See United States ex rel. Karvelas v. Tufts Shared Servs., Inc., 433 F. Supp. 3d 174, 181 (D. Mass. 2019) (explaining that "Massachusetts courts look for guidance to cases and treatises interpreting the federal False Claims Act" when interpreting the Massachusetts False Claims Act (cleaned up)).

representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." Id. Where the omission "renders those representations misleading," the falsity element may be satisfied. Id.

The parties' dispute over whether South Bay submitted any "false claims" centers on a disagreement over the meaning of the regulations. Courts have interpreted falsity to "encompass a theory of liability based on non-compliance with regulatory instructions." United States v. Care Alts., 952 F.3d 89, 96 (3d Cir. 2020) (holding that a claim may be "false" where it fails to comply with statutory and regulatory requirements). However, failure to meet "industry standards" does not render a claim false. See Chesbrough v. VFA, P.C., 655 F.3d 461, 468 (6th Cir. 2011) (holding that "Medicare does not require compliance with an industry standard as a prerequisite to payment").

Courts interpreting Massachusetts regulations "ordinarily accord an agency's interpretation of its own regulation considerable deference." Warcewicz v. Dep't of Env't Prot., 574 N.E.2d 364, 366 (Mass. 1991). As such, this Court will "only disturb the agency's interpretation if it is patently wrong, unreasonable, arbitrary, whimsical, or capricious." Goldberg v. Bd. of Health of Granby, 830 N.E.2d 207, 215 (Mass. 2005) (cleaned

up); see also Auer v. Robbins, 519 U.S. 452, 461 (1997); Kisor v. Wilkie, 139 S. Ct. 2400, 2408 (2019).

B.   **Scienter**

With respect to the scienter element, 31 U.S.C. § 3729(b)(1) defines "knowingly" to include situations where the defendant "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." There is no requirement that the defendant have specific intent to defraud.   Id. § 3729(b)(1)(B).   "[I]t is unusual to grant summary judgment on scienter." Massachusetts v. Mylan Labs., 608 F. Supp. 2d 127, 154 (D. Mass. 2008) (quoting S.E.C. v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008)).  Whether a defendant "knowingly" violated a regulation can depend on the reasonableness of the defendant's interpretation of the regulation.  United States ex rel. Herman v. Coloplast Corp., 327 F. Supp. 3d 300, 310 (D. Mass. 2018) ("[T]he reasonableness of defendant's interpretation of the regulation and suggestions of government warnings away from that interpretation present mixed questions of fact and law best resolved by the jury when the material facts are in dispute.").

C.   **Causation**

"If a person knowingly participates in a scheme that, if successful, would ultimately result in the submission of a false claim to the government, he has caused those claims to be

submitted." Martino-Fleming, 334 F. Supp. 3d at 406 (citing United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243-44 (3d Cir. 2004)).  "Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish 'causation' under the FCA."  United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 186 (D. Mass. 2004).  At the same time, however, "a defendant may be liable if it operates under a policy that causes others to present false claims to the government."  Id. at 187.  Furthermore,

> [w]here the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the federal government.

Id. (citation and internal quotation marks omitted).  This Court has previously explained that "[a] parent may be liable for the submission of false claims by a subsidiary where the parent had direct involvement in the claims process."  Martino-Fleming, 2018 WL 4539684, at *5.

D.  **Materiality**

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  Escobar II, 136 S. Ct. at 1996.  "What matters

is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." Id.  The materiality element "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  Id. at 2002 (quoting 26 Williston on Contracts § 69:12 (4th ed. 2003)).  The Supreme Court has described the materiality element as "demanding" and "rigorous."  Id. at 2002-03.

## II.  **The Falsity Element:  What do the Regulations Require?**

All MassHealth mental health centers, including South Bay, must comply with MassHealth regulations.  See 130 Mass. Code Regs. 429.401.  This means that MassHealth mental health centers must meet the requirements detailed under 130 Mass. Code Regs. 429.422-24, the regulations that the Plaintiffs claim were violated in the present case.  The Plaintiffs must prove that the claims submitted by South Bay fail to comply with these regulations to meet the falsity element of a false-presentment claim.

### A.  **Whether South Bay Supervisors Were Properly Credentialed**

The first MassHealth requirement in dispute involves the credentialing requirements for supervisors of unlicensed clinicians.  No party disputes that unlicensed clinicians must be supervised pursuant to the MassHealth regulations.  Indeed, the Commonwealth's regulations generally provide that

> [e]ach staff member must receive supervision appropriate to the person's skills and level of professional development. Supervision must occur within the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor. Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration, as cited in 130 [Mass. Code Regs.] § 429.424.

130 Mass. Code Regs. 429.438(E)(1). This requirement also applies to dependent satellite clinics. 130 Mass. Code Regs. 429.422(D).

The central issue related to credentialling is whether supervisors need to meet certain licensure requirements. The Plaintiffs assert that unlicensed social workers and counselors may not be supervised by Licensed clinical Social Workers ("LCSWs"), Licensed Alcohol and Drug Counselors (LADCs), or unlicensed clinicians. The Defendants do not dispute that supervisors must be licensed, but they argue that no regulation prohibits either LCSWs or LADCs from providing supervision to social workers or counselors. I consider the supervision requirements for social workers and counselors in turn.

a. **Supervision of Social Workers**

The regulations unambiguously support the Plaintiffs' argument with regard to the supervision of social workers by LCSWs or LADCs. The MassHealth regulation delineating the "Qualifications of Professional Staff Members" requires that mental health centers employ "[a]t least one staff social worker" who must "be licensed or have applied for and have a license

22

pending as an independent clinical social worker by the Massachusetts Board of Registration of Social Workers." 130 Mass. Code Regs. 429.424(C)(1). The regulation then addresses the supervision requirements for "any additional social workers on the staff." 130 Mass. Code Regs. 429.424(C)(2). Specifically, the regulation states that these "additional social workers on the staff" must provide services under the direct and continuous supervision of "an independent clinical social worker." 130 Mass. Code Regs. 429.424(C)(2) (emphasis added). To the extent that social workers were not supervised by licensed independent clinical social workers ("LICSWs"), South Bay failed to meet the requirements of 130 Mass. Code Regs. 429.424(C)(2). While the parties did not focus on this point, the regulation does not require supervision of a licensed social worker with a license pending as an independent clinical social worker.

This conclusion is supported by the fact that, under the Massachusetts Board of Registration of Social Workers regulations, LICSWs, but not LCSWs, are "licensed by the Board to engage in the independent practice of clinical social work." 258 Mass. Code Regs. 8.03; see also 258 Mass. Code. Regs. 12.01(5) (providing that LICSWs may "[p]rovide clinical . . . supervision to individual social workers or groups of social workers").

b.  **Supervision of Counselor**

Similarly, LCSWs or LADCs may not supervise counselors.  The "Scope of Professional Practice" regulation for LCSWs issued by the Board of Registration of Social Workers provides that "[a] LCSW may not provide clinical supervision to any other mental health practitioner," a category that includes counselors. 258 Mass. Code. Regs. 12.02(7).  The MassHealth regulations do not expressly incorporate this requirement, but 130 Mass. Code Regs. 429.424(F)(1) states that supervision of counselors must be provided by "a fully qualified professional staff member trained in one of the core disciplines described in 130 [Mass. Code Regs.] 429.424(A) through (D)."  Because LCSWs are not permitted to provide clinical supervision to other mental health practitioners, they cannot be considered "fully qualified" supervisors under the relevant MassHealth regulations.

Similarly, because LADCs are licensed only to treat substance use disorders, see 105 Mass. Code Regs. 164.006, they are not "fully qualified" to supervise counselors providing a full range of services.  Indeed, under the regulations governing the licensure of LADCs, the highest level of LADC (Licensed Alcohol and Drug Abuse Counselor I) is permitted to provide "supervision to other alcohol and drug counselors," but the regulations do not provide that LADCs may supervise other non-LADC counselors or LCSWs.  See 105 Mass. Code Regs. 168.004.

c.    **Supervision of Social Workers and Counselors by
Unlicensed Clinicians**

To the extent that South Bay's unlicensed clinicians were
supervised by other unlicensed clinicians, any relevant claims
submitted are false.  The regulations are clear that supervision
must be provided by "a fully qualified professional staff member
trained in one of the core disciplines described in 130 [Mass.
Code Regs.] 429.424(A) through (D)" for counselors, 130 Mass. Code
Regs. 429.424(F)(1), and by an "independent clinical social
worker" for social workers, 130 Mass. Code Regs. 429.424(C)(2).
Unlicensed clinicians meet neither of these requirements.

B.    **Whether the Regulations Require "Clinical" Supervision
which Involves a Discussion of Individual Cases**

The parties dispute whether unlicensed clinicians must
receive "clinical supervision," and whether clinical supervision
requires a discussion of individual client cases between the
supervised clinician and the supervisor.  The Defendants argue
that no regulation requires that "clinical supervision" be
provided.  Instead, they contend that administrative supervision
or licensure supervision will also suffice.[6]  They further argue
that, even if clinical supervision were required, there is no
regulation requiring that a discussion of individual client cases

---

[6] Licensure supervision is a form of supervision offered by South
Bay to help unlicensed clinicians obtain their licenses.

occur during every individual supervision session or during group supervision sessions.

The regulations require that "social workers on the staff . . . provide services under the direct and continuous supervision of an independent clinical social worker." 130 Mass. Code Regs. 429.424(C)(2). Similarly, the regulation requiring supervision for counselors provides that "[a]ll unlicensed counselors included in the center must be under the direct and continuous supervision of a fully qualified professional staff member trained in one of the core disciplines described in 130 CMR 429.424(A) through (D)." 130 Mass. Code Regs. 429.424(F)(1).

The Plaintiffs convincingly argue that the Court should interpret these regulations to require "clinical supervision" of the services provided by clinicians. Indeed, the supervision requirements of the MassHealth regulations are focused on the "services" rendered by social workers and counselors, not on administration or licensure. The Defendants' interpretation makes no sense. Why would MassHealth permit mental health services to be provided by unlicensed clinicians with only administrative or licensing oversight?

Furthermore, the Defendants' argument that the supervision need not be "clinical" is disingenuous given past admissions. South Bay's corporate officers and internal policies corroborate the Plaintiffs' interpretation that the supervision must be

"clinical" in nature.   Pelletier, South Bay's Rule 30(b)(6) corporate designee, testified that "[a]n unlicensed clinician must receive licensed <u>clinical</u> supervision from an independently licensed supervisor."   Dkt. 294-14 at 21 (emphasis added). Similarly, South Bay's 2015-2016 Policy and Procedures Manual defined supervision as "clinical supervision," explaining that "[a]ll full-time, unlicensed, master's level therapists must receive at least 1 hour of clinical supervision a week from an independent, licensed clinician." Dkt. 295-9 at 97.  Based on the text of the regulations and the evidence of South Bay's policy and practice, I conclude that the only reasonable interpretation of the regulation is that supervision provided to clinicians under the MassHealth regulations must be "clinical" in nature.

Defendants' stronger argument is that "clinical supervision" does not necessarily require discussion of individual clients. There is some evidence that, under the best practices of the profession, "clinical supervision" should include a discussion of individual clients.   Stephanie Jordan Brown, MassHealth's designee, testified that clinical supervision definitionally includes "discussion of care that is being delivered to the client." Dkt. 294-7 at 28.  Pelletier further testified that unlicensed clinicians at South Bay received "clinical supervision," meaning "discussing their case work, discussing any issues they may have with any of their consumers or clients." Dkt.

294-20 at 18.   And Hart testified that clinical supervision requires a discussion of individual cases.   While the practice of the profession suggests that discussing individual cases is typical, the regulation itself is silent on whether individual and group "clinical supervision" must always include a discussion of individual cases.   I hold that the MassHealth regulations do not unambiguously require the discussion of individual clients at every clinical supervision session even though that is one reasonable interpretation.

Moreover, the regulations do not require that a discussion of individual cases be documented as part of each supervision session. As discussed below, the regulations do include a documentation requirement, but there is no clear requirement that individual clients' names be listed in each instance of documentation. Indeed, when asked whether the MassHealth regulations require "that documentation actually list out an individual client or patient's name," Dr. Frederic Reamer (the Plaintiffs' expert) testified that such documentation was not required "in every instance, in every discussion, but typically as a pattern in the clinical supervision documentation, yes, absolutely." Dkt. 298-1 at 30.   When asked what such a "pattern" of documentation would look like, Dr. Reamer explained that he did not "think there is an explicit standard." Dkt. 298-1 at 31.

In the absence of a requirement that a discussion of individual client cases be documented during each supervision session, the Court holds that a failure to document clinical supervision by listing an individual client's name does not make a claim false.  However, the fact of supervision must be documented and truthful.  At the hearing, the Plaintiffs explained that some supervision documentation consisted of nothing more than a blank form.  In such obvious instances, South Bay did not provide an adequate record of clinical supervision.

C.   **Whether the Regulations Require Supervision to Occur within Two Weeks of a Service**

The Plaintiffs argue that supervision must occur within two weeks before or after a patient's date of service.  The Defendants contend that the regulations contain no such requirement.  They assert that the only relevant stipulation in the MassHealth regulations is that supervision be "frequent."  See 130 Mass. Code Regs. 429.438(E)(1).  But the Defendants overlook the remainder of the language in 130 Mass. Code Regs. 429.438(E)(1).  The subsection reads in full:

> [e]ach staff member must receive supervision appropriate to the person's skills and level of professional development. Supervision must occur within the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor.  Frequency and extent of supervision must conform to the licensing standards of each discipline's Board of Registration, as cited in 130 [Mass. Code Regs.] 429.424.

130 Mass. Code Regs. 429.438(E)(1) (emphasis added).

The MassHealth regulations therefore speak directly to the frequency of supervision, which must comply with the standards of each discipline's Board of Registration.  The Board of Registration of Social Workers, in turn, provides that the frequency of supervision for social workers is "one hour per week, or equivalent pro rata amount for part time employees, of face-to-face individual clinical supervision."  258 Mass. Code Regs. 12.02.  The Board of Allied Mental Health and Human Services Professions requires that mental health counselors receive "a minimum of one Supervisory Contact Hour of supervision for every 16 Contact hours of Direct Client Contact Experience," 262 Mass. Code Regs. 2.07(3)(b), or "if working Part Time, supervision that is pro-rated no less than one Supervisory Contact Hour bi-weekly," 258 Mass. Code Regs. 2.07(3)(c).  For part-time counselors, the minimum amount of supervision is therefore one hour every two weeks.

The Defendants assert a strained interpretation that the supervision requirements from the Boards of Registration for social workers and counselors speak only to a ratio of supervisory hours to service hours, rather than the two-week window of supervision.  This interpretation of the regulations is unreasonable because it would permit unlicensed clinicians to spend months without receiving regular supervision only to get a marathon session occasionally.  Considering the fact that the

MassHealth regulations specify that supervision must be "frequent and regularly scheduled," the Plaintiffs' interpretation is the only reasonable one.  See 130 Mass. Code Regs. 429.438(E)(1).  On this basis, I conclude that the supervision requirements speak to the frequency, and not merely the ratio, of supervisory hours.

The Defendants also point out that the relevant provision of the MassHealth regulations refers to the "licensing standards of each discipline's Board of Registration, as cited in 130 [Mass. Code Regs.] 429.424."  See 130 Mass. Code Regs. 429.438(E)(1) (emphasis added).  They argue that, because the provision cites to no specific Board of Registration for counselors (as it does for other core disciplines, including social workers), counselors need not be supervised on a biweekly basis.  While there is no direct citation to the licensing standards for the Board of Allied Mental Health and Services Professions, the context of the regulation, along with the requirement that supervision be "frequent and regularly scheduled personal contact with the supervisor," 130 Mass. Code Regs. 429.438(E)(1), is reasonably interpreted to mean that this standard is incorporated.

As a final argument, the Defendants point out that the licensing standards put forth by the Boards of Registration apply only to those clinicians seeking to become licensed.  See 258 Mass Code Regs. 9.01 et seq. (licensing standards for social workers); 262 Mass. Code Regs. 2.01 et seq. (licensing standards for

counselors).  They contend that the requirement under 130 Mass.
Code Regs. 429.438(E)(1) that the "frequency and extent of
supervision must conform to the licensing standards of each
discipline's Board of Registration" must apply exclusively to
those social workers and counselors seeking licensure.  But 130
Mass. Code Regs. 429.438(E)(1) makes no such distinction.  And, as
the Plaintiffs point out, such an interpretation of the regulations
would defeat the further requirement in 130 Mass. Code Regs.
429.438(E)(1) that "[e]ach staff member . . . receive supervision
appropriate to the person's skills and level of professional
development."  The Defendants' proposed interpretation is
unreasonable.  The least skilled social workers and counselors who
are not aspiring for licensure would receive the least supervision.
I therefore conclude that supervision must occur within two weeks
of a service for all supervised clinicians.

> D.  **Whether Documentation of Supervision Is Required under the Regulations**

The Defendants argue that the regulations do not require
documentation of the supervision of unlicensed clinicians.  The
Plaintiffs, in contrast, contend that the MassHealth regulations
require that supervision be documented.

Consistent with the Defendants' argument, the "Recordkeeping
Requirements" provision of the MassHealth "Mental Health Center
Services" regulations refers only to a requirement that providers

keep medical records. See 130 Mass. Code Regs. 429.436. But the general MassHealth "Administrative & Billing" regulations expressly state that:

> [t]he MassHealth agency will not pay a provider for services if the provider does not have adequate documentation to substantiate the provision of services payable under MassHealth. All providers must keep such records, including medical records, as are necessary to disclose fully the extent and medical necessity of services provided to, or prescribed for, members.

130 Mass. Code Regs. 450.205(A). The Plaintiffs argue that because supervision is required for the payment for services rendered by unlicensed clinicians, documentation of supervision is required to "substantiate the provision of services payable under MassHealth." See 130 Mass. Code Regs. 450.205(A). This interpretation of 130 Mass. Code Regs. 450.205(A) is reasonable.

The MassHealth regulatory scheme supports the Plaintiffs' conclusion. MassHealth requires participating mental health centers to be licensed by the Massachusetts Department of Public Health, unless the agency has waived the requirement. 130 Mass. Code Regs. 429.404(A). The Department of Public Health, in turn, requires that unlicensed clinicians "be clinically supervised on a regular basis" and that "documentation of supervision must be available for review." 105 Mass. Code Regs. 140.530(E). Because the Department of Public Health expressly requires supervision to be recorded—and because MassHealth requires mental health centers to be licensed by the Department of Public Health—the MassHealth

regulations are reasonably construed to incorporate this recordkeeping requirement.

E.   **Whether Satellite Programs Must Have Their Own Licensed Clinic Director**

The Defendants argue that, because all South Bay's satellite programs were dependent on the South Bay parent clinic, the programs were not required to have their own licensed clinic directors.  The Plaintiffs contend that MassHealth regulations require all satellite clinics to have licensed clinic directors.

The Defendants' interpretation is contradicted by the plain language of the regulations.  130 Mass. Code Regs. 429.439 describes the conditions under which services provided by satellite programs are reimbursable.  The regulation governing satellite programs expressly states that "[t]he director of clinical services of the parent center must designate one professional staff member at the satellite program as the satellite's clinical director.  The clinical director must be employed on a full-time basis and meet all of the requirements in 130 [Mass. Code Regs.] 429.423(B)."  130 Mass. Code Regs. 429.439(C).  Turning to 130 Mass. Code Regs. 429.423(B), the regulation provides that "[t]he clinical director must be licensed, certified, or registered to practice in one of the core disciplines listed in 130 [Mass. Code Regs.] 429.424, and must have had at least five years of full-time, supervised clinical

experience subsequent to obtaining a master's degree, two years of which must have been in an administrative capacity."

The relevant regulations thus require that clinical directors of dependent satellite programs be "licensed, certified, or registered" and have "at least five years of full-time, supervised clinical experience."  To the extent that the dependent satellites at South Bay did not have clinical directors or the clinical directors did not meet these requirements, South Bay has not complied with the regulations.

The Defendants' main argument relies on a sub-provision of 130 Mass. Code Regs. 429.439, which explains that "[i]n a dependent satellite program, the supervisor must meet the basic qualifications required for his or her discipline, as set forth in 130 [Mass. Code Regs.] 429.424."  130 Mass. Code Regs. 429.439(C)(3).  The Defendants assert that "supervisor" in this context means "clinical director" of a dependent satellite program.  Because the "basic qualifications" under 130 Mass. Code Regs. 429.424 do not include licensure, the Defendants argue that clinical directors need not be licensed.  They point out that the Plaintiffs' expert also interpreted the regulation that way.  <u>See</u> Dkt. 336-3 at 3.  However, their interpretation does not square with the requirements set forth for clinical directors in 130 Mass. Code Regs. 429.423(B).  Based on a reasonable interpretation of the plain language of the regulations, I conclude that they

unambiguously require that clinical directors of dependent satellite programs must be licensed.

### F. **Whether Clinicians Are Required to Have Counseling Degrees**

The Plaintiffs argue that some South Bay counselors failed to meet the degree requirements of the regulation describing the "Qualifications of Professional Staff Members," which provides that "[a]ll counselors must hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling." 130 Mass. Code Regs. 429.424(F)(1). More specifically, the Plaintiffs assert that some South Bay clinicians had degrees in subjects like "art therapy, early childhood education, rehabilitation education, sociology, and pastoral counseling," which they contend do not qualify as "counseling degrees" under the regulations. Dkt. 306 at 61–62. The Defendants contend that South Bay's counselors were properly credentialled to provide clinical services.

In support, the Defendants point to a separate Board of Allied Mental Health and Human Services Professions regulation providing that, in order to be eligible for licensure as a Licensed Mental Health Counselor, a candidate must have a degree in "[c]ounseling, counselor education, expressive therapies, adjustment counseling, rehabilitation counseling, counseling psychology, clinical psychology, or another Mental Health Counseling field determined

by the Board to be a Related Field." 262 Mass. Code Regs. 2.02. The Defendants argue that this regulation gives the Board flexibility in determining what fields are "related" to counseling.

The Plaintiffs seem to concede that the Board has the discretion to determine eligibility for licensure as a Licensed Mental Health Counselor on a case-by-case basis. I agree with the Defendants that the regulation gives discretion as to whether degrees in adjacent subjects like art therapy, early childhood education, and pastoral counseling can count as an eligible mental health counseling degree. Accordingly, I allow the Defendants' motion for summary judgment with respect to alleged false claims based on the degrees of counselors in related fields. See Hagood v. Sonoma Cty. Water Agency, 81 F.3d 1465, 1477 (9th Cir. 1996) (holding that falsity could not be established where the relevant statute left key determinations to the discretion of government officials).

G. **Whether the MassHealth Regulations Are Applicable to the MBHP and MCO Claims**

Finally, the Defendants argue that a claim submitted to MBHP or the MCOs cannot be false based on the MassHealth regulations. Specifically, the Defendants contend that MassHealth delegates authority to MBHP to makes its own payment rules. In support of their argument, they cite 130 Mass. Code Regs. 450.124(A), which

provides that "[p]ayment for [behavioral health] services is subject to the terms of the Contractor's provider contracts including, but not limited to, provisions governing service authorization and billing requirements." Because MBHP is a contractor with MassHealth, the Defendants contend that claims submitted to MBHP are subject to MBHP's requirements, not MassHealth regulations.

The Defendants make the same argument with regard to the MCOs, pointing to 130 Mass. Code Regs. 450.200, which provides, "[i]f the MassHealth regulations about payment methods and conditions of provider participation conflict with a provider or managed care contract, such contract supersedes the regulation, unless the contract expressly states otherwise." On this basis, they assert that the MCOs have their own payment terms, which supersede any payment terms put in place by MassHealth.

But the Defendants have not shown how the billing, payment, and contractual terms of MBHP and the MCOs conflict with the clinical supervision requirements of MassHealth. Moreover, their argument that MBHP and the MCOs can circumvent MassHealth regulations by setting lower licensure and supervision requirements makes little sense given the overarching requirement that all MassHealth mental health centers comply with MassHealth regulations. See 130 Mass. Code Regs. 429.401. The Plaintiffs' argument that the requirements set forth in the MassHealth

regulations apply as a payment condition to MBHP and the MCOs is therefore reasonable.

### III.  <u>Whether a "Reasonable Interpretation" of a Regulation Precludes Falsity</u>

The Defendants argue that, even if they misinterpreted any applicable MassHealth regulations in submitting claims to the agency, these claims were not "false" because their interpretation of the regulations was reasonable.  This argument conflates the knowledge and falsity elements of the False Claims Act.  Because it is sometimes difficult to discuss falsity without implicating the knowledge requirement, some courts discuss it in conjunction with the knowledge element.  <u>See, e.g.</u>, <u>United States ex rel. Lamers v. City of Green Bay</u>, 168 F.3d 1013, 1018 (7th Cir. 1999).

The reasonableness of a defendant's interpretation of regulations may be relevant to whether it knowingly submitted a false claim, but "the question of 'falsity' itself is determined by whether [the defendant's] representations were accurate in light of applicable law."  <u>United States ex rel. Oliver v. Parsons Co.</u>, 195 F.3d 457, 463 (9th Cir. 1999); <u>cf.</u> <u>United States v. Harra</u>, 985 F.3d 196, 204 (3d Cir. 2021) (holding in the criminal fraud context that, "[w]hen a defendant is charged with false reporting based on an ambiguous reporting requirement," "the Government must prove either that its interpretation of the reporting requirement is the only objectively reasonable interpretation or that the

defendant's statement was also false under the alternative, objectively reasonable interpretation")   The meaning of the regulations, though, "is ultimately the subject of judicial interpretation." See Oliver, 195 F.3d at 463.

Thus, in the above discussion, the Court interpreted the agency regulations to determine whether the Government has proven the falsity element.  It also determined the reasonableness (or not) of the Defendants' interpretation of the regulation.  Whether defendants had an alternative objectively reasonable interpretation bears on the "scienter" element of the false-presentment claims

## IV. <u>Whether the Plaintiffs Have Presented Sufficient Evidence of Violations</u>

In support of their Motion for Summary Judgment, the Plaintiffs cite three illustrative examples of false claims submitted by South Bay to payers for reimbursement.  The Defendants argue that in order to prevail on the falsity element, the Plaintiffs must "produce competent evidence of an actual false claim made to the government." See <u>United States ex rel. Booker v. Pfizer, Inc.</u>, 847 F.3d 52, 58 (1st Cir. 2017).  They contend that the three examples of false claims supplied by the Plaintiffs do not suffice to show falsity.

The Defendants concede that all three of the example claims involve the provision of services by unlicensed clinicians.  In

the three examples, the unlicensed clinicians received supervision from unlicensed clinicians at the time of the service.  These claims are false under the only reasonable interpretation of the regulations because any supervision by a licensed clinician occurred months from the time of service.[7]  However, I note that this holding is limited to the three false claims submitted by the Plaintiffs at this juncture, and it does not apply broadly to the other claims identified by the Plaintiffs as false but not submitted to this Court for review.

## V.   **Materiality**

### A.   **Whether Compliance with the Regulations Was Material to Payment**

The Defendants argue that the regulations at issue in this case were not material to MassHealth's decision to issue payment. The First Circuit's decision in United States ex rel. Escobar v. Universal Health Servs., Inc., 842 F.3d 103 (1st Cir. 2016) ("Escobar III"), however, complicates their argument regarding at

---

[7] With respect to claim one, a master's level counselor who provided therapy on August 3, 2009 received supervision by an unlicensed mental health counselor, who did not get her license until two years after the date of service.  Defendants point out that she was supervised by a LMHC in March, April, and May 2009, but these supervision sessions occurred three months prior to the claim at issue.  With respect to claim two, a clinician with a master's degree in counseling psychology who provided therapy on April 17, 2013 was supervised by an unlicensed clinician.  Finally, with respect to claim three, an unlicensed social worker with a master's degree received supervision from an unlicensed social worker and was later supervised by a LCSW, who was not yet a LICSW.

least some of the regulations.  There, the court concluded that
the licensing and supervision requirements at issue in the present
case are material as a matter of law.  In its analysis, the court
considered three main factors: (1) whether compliance with the
regulations was a condition of payment, (2) whether the information
at issue under the regulations goes to the "essence of the
bargain," and (3) whether the Government paid a particular claim
despite its actual knowledge that certain requirements were
violated.  Id. at 110.

> Regarding the first factor, the court explained that:
>
> regulatory compliance is not merely a condition of
> payment; rather, MassHealth's decision to have a series
> of regulations in place to ensure that clinical mental
> health counselors, psychiatrists and psychologists are
> of sufficient professional caliber to treat patients
> strongly counsels in favor of a finding that compliance
> with these regulations is central to the state's
> Medicaid program and thus material to the government's
> payment decision.

Id. at 110.  Compliance with licensing and supervision requirements
designed to ensure that professionals like social workers and
mental health counselors possess the necessary qualifications for
the job is therefore central to MassHealth's regulatory program.
See Escobar II, 136 S. Ct at 2000-01.

As to the question of whether the regulations go to the "very
essence of the bargain," the First Circuit's decision in Escobar
III again provides guidance.  Specifically, the court explained

the centrality of the licensing and supervision
requirements in the MassHealth regulatory program, which
go to the very essence of the bargain of MassHealth's
contractual relationships with various healthcare
providers under the Medicaid program, is strong evidence
that a failure to comply with the regulations would be
sufficiently important to influence the behavior of the
government in deciding whether to pay the claims.

842 F.3d at 110 (cleaned up).  The First Circuit has thus made
clear that the supervision and licensure requirements imposed by
MassHealth go to the "essence of the bargain" between the agency
and healthcare providers.

Despite this strong language from the First Circuit on the
exact regulations at issue here, the Defendants argue that, even
if they did not comply with the above regulations, their compliance
with the regulations was not material to MassHealth's payment
decision because MassHealth continued to pay claims despite having
knowledge of the Defendants' regulatory noncompliance.  The
Defendants point to evidence that MassHealth never audited South
Bay for compliance with the regulations above.  See United States
ex rel. Coffman v. City of Leavenworth, 303 F. Supp. 3d 1101, 1121
(D. Kan. 2018) (finding that a failure to audit "suggest[ed] that
regulatory compliance was not material to payment").  And they
highlight the fact that MassHealth continued paying South Bay's
claims for two years after the Relator disclosed her allegations
to the Commonwealth of Massachusetts.  Finally, the Defendants
contend that MassHealth has not sanctioned similarly situated

mental health centers.  The Department of Public Health identified one mental health center, for instance, as having provided deficient clinical supervision, but the Defendants claim that there is no evidence that MassHealth took any action against it.

The Plaintiffs, in response, argue that the materiality element is concerned with what MassHealth actually knew of South Bay's regulatory noncompliance and not whether MassHealth could have learned of South Bay's noncompliance through audits.  They contend that the Department of Public Health's findings regarding the other mental health center referenced by the Defendants were immaterial and there is no evidence that MassHealth knew of these findings.  See Escobar III, 842 F.3d at 112 (finding that evidence that state regulators had some knowledge of complaints of regulatory violations was not enough to show that MassHealth had actual knowledge of violations).  They also point out that when MassHealth did become aware of the scope of the allegations once the complaint in the present case was unsealed, it stopped payment.

Based on the undisputed evidence in the record, the Court concludes as a matter of law that no reasonable juror could find that misrepresentations of compliance with the licensure and supervision requirements are not material.  However, there may be minor violations of these regulations that were not material to payment.  Take, for example, the case of unlicensed clinic directors.  The Defendants point out that they disclosed the

qualifications of the clinical director in one of the dependent satellites, but MassHealth never objected to the credentials. Based on this evidence, a reasonable juror could find that services by a properly credentialed and supervised clinician will be reimbursed even if the clinical directors were improperly credentialed.  As another example, clinical supervision may be frequent and regularly scheduled even if on occasion there is a longer interval than required by the regulations (say, three weeks instead of two weeks).  Further, there may be documentation errors which are not material. Because materiality "cannot be found where noncompliance is minor or insubstantial," Escobar II, 136 S. Ct. at 2003, I conclude that minor deviations from the licensing, supervision and documentation requirements are not material to payment.

## VI.  **Scienter**

The Defendants move for summary judgment on the scienter element on the ground that the Plaintiffs cannot establish scienter as to any Defendant because the regulations at issue were ambiguous.[89]  They contend that they reasonably interpreted all the regulations at issue, made attempts to clarify the regulations, and were told that South Bay was compliant during audits.  But the

---

[8] Plaintiffs did not move for summary judgment on scienter.
[9] The parties have not briefed the effect of the bankruptcy on the pending motions by the other defendants.

Defendants have provided no evidence that they sought clarity from or were audited by MassHealth. Even assuming they did, the Plaintiffs have presented sufficient evidence that a reasonable jury could find that the officers, directors, and other employees at South Bay and the other corporate entities recklessly disregarded the regulations that the court determined were not ambiguous.

As another matter, the parties disagree as to whether the "materiality" element requires an additional showing of scienter. The Defendants contend that, because they did not know that their violations of the regulations were material to payment, the materiality element is not satisfied. To repeat, the Supreme Court explained in Escobar II: "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." 136 S. Ct. at 1996 (emphasis added).

## VII. H.I.G's Arguments Regarding Scienter and Causation

### A. Scienter

The Defendants contend that H.I.G. members and principals were never aware of South Bay's noncompliance with MassHealth requirements. The Plaintiffs allege that H.I.G. members knew that South Bay received Medicaid reimbursement that was conditioned on its compliance with MassHealth regulations; they further contend

that H.I.G. members knew that South Bay had submitted false claims. I conclude that the Plaintiffs have pointed to sufficient evidence to raise a genuine dispute of material fact about H.I.G.'s knowledge of noncompliance.  First, through the testimony of H.I.G. designee and Board member Loose, they show that H.I.G.'s leadership understood that South Bay's revenues were tied to Medicaid.  They also showed that H.I.G. understood that Medicaid had terms and conditions of payment. Second, they point to evidence that H.I.G.'s members were aware that MassHealth regulations required certain forms of supervision.  Loose testified, for instance, that he understood that Medicaid had requirements in terms of licensure and qualification.  Gearhart testified, likewise, that she communicated at a meeting with H.I.G. that individuals with master's degrees who are not licensed must be supervised by an independently licensed clinician or supervisor.  Although the Defendants take issue with the characterization of Gearhart's testimony, at the summary judgment stage it suffices to create a disputed fact issue as to scienter and knowledge of materiality.

Third, the Plaintiffs point to evidence that H.I.G. members were informed that clinicians at South Bay were provided with inadequate supervision.  For instance, they point out that Neuhaus shared his findings regarding supervision at South Bay directly with H.I.G in 2016, several years after concerns about supervision first surfaced.  Similarly, they point to evidence that the Relator

had informed Nick Scola, an H.I.G. employee and C.I.S. Board member, that "many people at South Bay were leaving because they didn't have the licensed supervision that they needed." Dkt. 321-2 at 46. And they cite to evidence showing that Scola was informed of the Tiger Team's recommendation to hire more supervisors. Because the scienter element can be satisfied with a showing of "reckless disregard for the truth," see 31 U.S.C. § 3729(b)(1); Mass. Gen. Laws ch. 12, § 5A, a reasonable jury could conclude that the scienter element is satisfied with respect to H.I.G.

The Defendants further argue that the Plaintiffs have not shown that H.I.G. knew that compliance with the regulations was material to payment. With respect to scienter, the Supreme Court indicated that actual knowledge of materiality can be established by showing that a defendant knew the government typically did not pay where the condition was not satisfied; additionally, deliberate ignorance or reckless disregard can be shown if a reasonable person would understand the materiality of the condition. Id. at 2001-02.

The undisputed facts in the record support the Plaintiffs' argument that H.I.G. should have known that misrepresentations concerning compliance with the supervision and licensing requirements were material to payment, given the above-cited testimony by the corporate deponents. See Baena v. KPMG LLP, 389 F. Supp. 2d 112, 119 (D. Mass. 2005), aff'd, 453 F.3d 1 (1st Cir.

2006) (explaining that "knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation" under Massachusetts law (quoting Demoulas v. Demoulas, 703 N.E.2d 1149, 1170 (Mass. 1998))).   Accordingly, H.I.G.'s motion for summary judgment is denied on the scienter element.

**B.   Causation**

The corporate Defendants assert that H.I.G. members were not involved in the decision-making process with respect to claims submission and could not have caused their submission.  Obviously, H.I.G. could not have caused any false claims to be submitted until after its acquisition of South Bay in 2012.  With respect to later claims, though H.I.G. is liable for any false claims submitted by South Bay if H.I.G. "had direct involvement in the claims process." Martino-Fleming, 2018 WL 4539684, at *5.   Further, knowing ratification of "the prior policy of submitting false claims by rejecting recommendations to bring South Bay into regulatory compliance constitutes sufficient participation in the claims process to trigger [False Claims Act] liability." Id. at *4.

In this context, the Plaintiffs have met their burden of providing sufficient evidence of causation at the summary judgment stage.  As stated above, they point to the evidence that, two years after the Tiger Teams recommendations were presented, Scola and Loose received a report from Neuhaus showing that the relevant

recommendations were not implemented.    There is sufficient evidence in the record that by virtue of its members' participation in the C.I.S. Board, H.I.G. had the power to fix the regulatory violations which caused the presentation of false claims but failed to do so.   I therefore deny the Defendants' motion for summary judgment with respect to H.I.G.'s role in causing the submission of false claims.

## VIII.    Scanlon's Motion for Summary Judgment

### A.   Scienter

Scanlon argues that the Plaintiffs have provided no evidence to satisfy the "scienter" element.   Dkt. 286 at 11.   However, whether Scanlon recklessly disregarded evidence of regulatory noncompliance is a disputed fact.   Indeed, the exhibits are replete with evidence that Scanlon was aware of and familiar with the regulatory requirements imposed by MassHealth.   Scanlon himself admitted that he "referred to [the regulations] regularly" while in charge of South Bay.   Dkt. 320-16 at 20.   Christine Oldham, South Bay's Assistant Business Manager, testified that Scanlon would weigh in on regulatory requirements that payers had for billable services.   And Gearhart testified that Scanlon "was the person who was in charge of the regulations when it came to a regulation."   Dkt. 320-17 at 8.

Not only have the Plaintiffs provided sufficient record evidence showing that Scanlon was aware of the regulatory

requirements, but they have also demonstrated a genuine dispute of material fact as to whether Scanlon knew or should have known that South Bay was in noncompliance with the regulations.  To begin, Scanlon testified that he, as executive director of South Bay, would be responsible for ensuring compliance with certain provisions of the MassHealth regulations. And the Relator has testified that she had conversations with Scanlon in which she explained that South Bay was acting "against regulations."  Dkt. 321-2 at 40. Indeed, the Relator explained that she had "at least four or five conversations that were really substantive about" her concerns about South Bay with Scanlon.

Similarly, Pelletier testified that, after the Relator sent an email raising her concerns, Scanlon and several South Bay employees met to discuss the issue of compliance.  Although Scanlon expressed that he felt that South Bay was compliant with the regulations during the meeting, several others believed that South Bay should take a more stringent approach to the supervision of its employees.

In a note to Sheehan, furthermore, Scanlon explained that the so-called "Tiger Teams" convened to address retention issues at South Bay "did raise some concerns about our compliance with state regulations."  Dkt. 293-20 at 10.  Although Scanlon expressed that he was "pretty confident" that South Bay complied with the regulations, he also conveyed that he believed that some of the

recommendations made by the Tiger Teams regarding increased supervision might be impractical.  Id.

Scanlon argues that various audits conducted by payers undermine any inference of scienter, and he disputes the content of his conversations with the Relator.  But ultimately, whether Scanlon acted with reckless disregard towards South Bay's noncompliance with the regulations and whether he knew compliance was material are disputed facts, and weighing the evidence provided by both sides is a task for the jury.

B.  **Causation**

Scanlon's arguments regarding the causation element are similarly unavailing with respect to claims submitted during his tenure at South Bay and C.I.S.  He argues that causation under the False Claims Act requires evidence of an affirmative act on the part of the defendant.  The causation element may be satisfied where a defendant with the "power, authority, and duty to stop the submission of false claims" does not intervene after learning about the existence of false claims.  See Martino-Fleming, 334 F. Supp. 3d at 410.  The Plaintiffs have provided sufficient evidence to show that Scanlon had the "power, authority, and duty to stop the submission of false claims" up until the time when he left his positions at C.I.S. in December 2014.  The fact that false claims continued to be submitted during his tenure at South Bay and C.I.S. supports the Plaintiffs' argument that Scanlon did not use his

authority to stop the submission of false claims.  The Plaintiffs have therefore raised a factual dispute as to the causation element up until Scanlon's departure from C.I.S. in 2014, and Scanlon's motion for summary judgment is therefore allowed in part and denied in part.

## IX.   Sheehan's Motion for Summary Judgment

### A.   Scienter

Sheehan attests that he did not learn of potential compliance issues until mid-2014, when the issue of South Bay's compliance with MassHealth's supervision regulations was brought to his attention after the Relator sent an email expressing her concerns to Pelletier.  He asserts that, from the start of his leadership role at South Bay in 2012 up until the email was received in 2014, he did not have any knowledge of regulatory noncompliance.

But the record complicates this assertion.  Although Sheehan claims he relied on subordinates for information about regulatory compliance, Pelletier and Gearhart testified that Sheehan oversaw regulatory interpretation and compliance at South Bay.  And the Relator alleged that she began informing leadership, including Sheehan, that South Bay had issues with supervision as early as 2012.  Based on these asserted facts, there is sufficient evidence for a jury to determine that Sheehan at least recklessly disregarded evidence of noncompliance prior to 2014.

Moreover, Sheehan appears to have been aware of South Bay's regulatory noncompliance during his time at South Bay.  Sheehan himself admitted that he "heard we were out of compliance" with the regulations at the Tiger Teams meetings, although he asserted that he did not understand that South Bay's noncompliance was a "billing issue" material to payment.  Dkt. 294-44 at 12.  Although Sheehan's testimony might raise questions as to whether he knew South Bay's violations were material, a reasonable jury could nevertheless find that Sheehan recklessly disregarded evidence of materiality.  In sum, the Plaintiffs have provided sufficient evidence to create a genuine dispute of material fact as to scienter.

B.   **Causation**

The Plaintiffs have also provided sufficient evidence as to the causation element to survive summary judgment with regard to their claims against Sheehan.  Although Sheehan claims to have instructed his subordinates to implement stringent policies to address the supervision problems at South Bay after being notified about the Relator's concerns in 2014, the record shows that Sheehan was provided with recommendations to bring supervision into compliance as early as 2012, when the Relator sent Sheehan an email requesting "[a]n immediate and thorough review of . . . our ethical and legal responsibilities to provide unlicensed therapists with licensed supervision."  Dkt. 321-25 at 6.  The Plaintiffs have

provided support for their claim that Sheehan did not adopt any functional measures to address the supervision problem, even after the Tiger Teams raised it in 2014. He is therefore not entitled to summary judgment on the causation element for claims submitted after he joined South Bay in 2012.

## X.   Unjust Enrichment

The Defendants seek judgment as a matter of law on the Plaintiffs' unjust enrichment claim. Unjust enrichment "provides an equitable stopgap for occasional inadequacies in contractual remedies at law." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 (1st Cir. 2005). The Defendants argue that they did not financially benefit from any money paid to them by MassHealth, and they contend that the claim should be dismissed because the Plaintiffs have an alternate remedy in their False Claims Act causes of action. As to the Defendants' first argument, each of the Defendants benefited financially from their relationship to South Bay, and South Bay's main source of revenue was payments from MassHealth. Their argument on this point is therefore unavailing. Regarding the second point, courts do dismiss unjust enrichment claims where an adequate remedy at law is available. See, e.g., A.J. Props., LLC v. Stanley Black & Decker, Inc., 972 F. Supp. 2d 68, 79-80 (D. Mass. 2013) (citing Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. 2005)). Because an adequate remedy at law exists in the Plaintiffs' False Claims Act

claims, I conclude that their claims for unjust enrichment should be dismissed.

## XI.  __Affirmative Defenses__

The Plaintiffs move for partial summary judgment on a range of the 19 affirmative defenses put forth by the Defendants.  I allow summary judgment as to the defenses already rejected in this Court's earlier order on the Motions to Dismiss (failure to state a claim upon which relief may be granted and failure to plead fraud with particularity).  The Defendants have not opposed the Plaintiffs' arguments regarding their affirmative defenses of waiver, estoppel, and laches, and I allow the Plaintiffs' motion as to these defenses.

The Defendants do oppose the Plaintiffs' motion as to the defenses of public disclosure, prior civil suit, or administrative proceeding standing.  They also oppose the Plaintiffs' motion regarding their 19th affirmative defense, which seeks to reserve their right to rely upon any affirmative or additional defenses that may become known to the Defendants during the action.  Because the Defendants do not point to evidence in the record supporting the affirmative defenses of public disclosure and the existence of a prior civil suit or administrative proceeding, I allow the Plaintiffs' motion as to these issues.

I further allow the Plaintiffs' motion as to the Relator's standing to sue.  Courts have held that relators seeking solely

civil penalties have standing to sue, see United States ex rel. Bunk v. Gosselin World Wide Moving, N.V., 741 F.3d 390, 404 (4th Cir. 2013), and although the Supreme Court has reserved judgment on the question of whether qui tam suits are constitutional under Article II of the constitution, this issue does not raise jurisdictional questions of standing, see Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 778 n.8 (2000). Finally, I allow the Plaintiffs' motion as to the Defendants' right to rely upon any affirmative or additional defenses to the extent that any such defenses should have been previously raised and have been waived.

## XII. __IN SUMMARY__

A.   With regard to the Plaintiffs' and the Defendants' motions on the falsity element, I hold:

1.   Any claims for reimbursement for services provided by LCSWs who were not supervised by a LICSW, as defined by 130 Mass. Code Regs. 429.424(c)(1), are false.

2.   Any claims for reimbursement for the services of counselors who were supervised by a LCSW, LADC or an unlicensed clinician are false.

3.   Any claims for reimbursement for the services of unlicensed clinicians supervised by other unlicensed clinicians are false.

4.   Any claims for reimbursement for the services of clinicians requiring supervision who did not receive clinical supervision are false.

5.   Any claims for reimbursement for services by clinicians requiring supervision who were not supervised in a "frequent and regularly scheduled" manner as defined in this decision are false.

6.   Any claims for reimbursement for services by clinicians requiring supervision without supporting documentation of the supervision are false.

7.   Any claims for reimbursement for services in satellite programs without a licensed clinic director are false.

8.   Claims submitted by South Bay to MBHP and the MCOs are false if they violate the above regulations.

9.   Claims for reimbursement for services by mental health counselors with degrees in fields related to counseling are not false.

10.  Claims for reimbursement for claims by unlicensed clinicians that do not reflect clinical supervision of individual cases are not false.

B.   With regard to the materiality element, the Court holds that misrepresentations regarding compliance with the licensing and supervision regulations are material to payment, unless the violations are de minimis.

C.     I deny the motions by H.I.G. and the individual Defendants with regard to the scienter and the causation elements. Scienter includes the much-disputed issue of whether the Defendants knew about materiality and falsity.

D.     I allow the Defendants' motion for judgment on the unjust enrichment claim.

E.     I allow the Plaintiffs' motion on the affirmative defenses.

### ORDER

For the reasons set forth above, the Court **ALLOWS** in part and **DENIES** in part the Plaintiffs' motion for summary judgment (Dkt. 276) and **ALLOWS** in part and **DENIES** in part the Defendants' motions (Dkt. 281; Dkt. 284; Dkt. 289).

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge